# EXHIBIT 1

# Temu | Terms of Use

Last updated: December 19, 2023

English|Filipino

Thank you for using Temu! These Terms of Use ("Terms") contain the rules and restrictions that govern your use of our applications, products, services and websites ("Services"). These Terms form a binding agreement between you and us. By completing the registration process and/or browsing the Services, you represent that (1) you have read, understand and agree to be bound by the Terms; (2) you are of legal age to form a binding contract with us; (3) you have the authority to enter into the Terms personally; and (4) if you are using the Services on behalf of a company or other entity, (a) you agree that "you" includes you and that entity, (b) you are an authorized representative of the entity with the authority to bind the entity to these Terms, and (c) you agree to these Terms on the entity's behalf. You should not access or use the Services unless you agree to be bound by all of these Terms.

# 1. Overview

**1.1** Your residence determines the party with which you enter these Terms:

- If you reside in the United States, these Terms are between you and Whaleco Inc., a Delaware company.
- If you reside in the United Kingdom, these terms are between you and Whaleco UK Limited, a UK company.
- If you reside in Canada, you contract with Whaleco Canada Inc. and the applicable terms are here.
- If you reside anywhere other than the United States, Canada, or the United Kingdom, these Terms are between you and Whaleco Technology Limited, an Ireland company.

**1.2** Whaleco Inc., Whaleco UK Limited, and Whaleco Technology Limited, as applicable, are referred to in these Terms and Policies (as defined below) as "we" or "us,". For purposes of these Terms and Policies, we also refer to:

- Our website and mobile apps, which may offer features, products, services or content, including exchanges of information, as "Temu" or "our app";
- End users, including visitors to Temu and those who use Temu to purchase products as "you."

**1.3** We and our affiliates provide technical and operational support for our app. You may pay for multiple orders in one transaction on Temu. Multiple orders may be delivered together in one package.

**1.4** Your use of, and participation in, certain Services may be subject to additional policies we may publish from time to time ("Policies"), including our

Privacy Policy. If the Terms are inconsistent with the Policies, the Policies shall control with respect to the relevant subject matter.

**1.5** PLEASE BE AWARE THAT SECTION 19 BELOW CONTAINS PROVISIONS GOVERNING HOW DISPUTES BETWEEN YOU AND US WILL BE RESOLVED, INCLUDING WITHOUT LIMITATION, ANY DISPUTES THAT AROSE OR WERE ASSERTED PRIOR TO THE EFFECTIVE DATE OF THE TERMS. SECTION 19 CONTAINS, AMONG OTHER THINGS, AN AGREEMENT TO ARBITRATE WHICH REQUIRES, WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU AND US BE RESOLVED BY BINDING AND FINAL ARBITRATION. UNLESS YOU OPT OUT OF THE AGREEMENT TO ARBITRATE WITHIN 30 DAYS OF THE EFFECTIVE DATE OF THE AGREEMENT: (1) YOU AND WE WILL ONLY BE PERMITTED TO PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF AGAINST THE OTHER PARTY ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION OR PROCEEDING AND EACH OF US WAIVES OUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION; AND (2) EACH OF US IS WAIVING OUR RIGHT TO PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF IN A COURT OF LAW AND TO HAVE A JURY TRIAL. IN SOME COUNTRIES YOU MAY HAVE ADDITIONAL RIGHTS AND/OR ELEMENTS OF THE ARBITRATION AGREEMENT MAY NOT APPLY TO YOU AS REQUIRED BY LAW.

**1.6** PLEASE NOTE THAT THESE TERMS ARE SUBJECT TO CHANGE BY US IN OUR SOLE DISCRETION AT ANY TIME. When changes are made, we will make a new copy of the Terms and any updated Policies available on Temu. We will also update the "Last Updated" date at the top of the Terms. Any changes to the Terms will be effective immediately for all users of the Services, provided that any material changes shall be effective for existing users thirty (30) days after posting. We may require you to provide consent to the updated Terms in a specified manner before further use of the Services is permitted. If you do not agree to any change(s) after receiving a notice of such change(s), you shall stop using the Services. Otherwise, your continued use of the Services constitutes your acceptance of such change(s). PLEASE REGULARLY CHECK THE WEBSITE OR APPLICATION TO VIEW THE THEN-CURRENT TERMS.

# 2. User Requirements and Registration

**2.1** To use the Services, you represent that you are at least eighteen (18) years old and of legal age to form a binding contract. Products for children's use may be sold on Temu. However, these products are intended for sale to adults. Certain products may be intended for individuals of certain ages or "mature audiences" only. By ordering such products, you certify that you are old enough to view, use, own, or receive them. We are not responsible for third-party content that you may find offensive, indecent, or objectionable.

**2.2** You may not use the Services if: (a) you cannot enter into a binding contract with us; (b) you are located in a country embargoed by your country of residence or other relevant country; (c) you are on any agency list of prohibited persons or entities, such as the U.S. Treasury Department's list of Specially Designated Nationals; or (d) you are banned from using the Services by us, in our sole discretion.

**2.3** You may be required to create an account, and select a password and user name. When creating your account on Temu ("Account"), you agree to provide true, accurate, complete, and updated information about yourself, including contact details. You are responsible for keeping your registration information with us up to date. You are responsible for all activities that occur under your Account. You agree that you shall monitor your Account to restrict use by minors, and you will accept full responsibility for any unauthorized use of the Services by minors. You may not select as your user name a name that you don't have the right to use, or another person's name with the intent to impersonate that person. You may not transfer your account to anyone else without our prior written permission. You agree not to create an Account or use the Services if you have been permanently banned from any of the Services. You may not share your Account or password with anyone, and you agree to notify us immediately of any unauthorized use of your password or any other breach of security and to exit from your Account at the end of each session.

**2.4** You may also register an Account by connecting through a social network service account and its credentials (an "SNS Account"). If you access the Services through a SNS as part of the functionality of the Services, you may link your Account with SNS Accounts by allowing us to access your SNS Account, as is permitted under the applicable terms and conditions that govern your SNS Account. You represent that you are entitled to grant us access to your SNS Account (including, but not limited to, for use for the purposes described herein) without breach by you of any of the terms and conditions that govern your SNS Account and without obligating us to pay any fees or making us subject to any usage limitations imposed by such SNS. By granting us access to any SNS Accounts, you understand that we may access, make available and store (if applicable) any Content (as defined below) that you have provided to and stored in your SNS Account **("SNS Content")** so that it is available on and through the Services via your Account. Unless otherwise specified in the Agreement, all SNS Content shall be considered to be User Submissions for all purposes of the Terms. Depending on the SNS Accounts you choose and subject to the privacy settings that you have set in such SNS Accounts, personal information that you post to your SNS Accounts may be available on and through your Account on the Services. Please note that if a SNS Account or associated service becomes unavailable, or our access to such SNS Account is terminated by the SNS, then SNS Content will no longer be available on and through the Services. You have the ability to disable the connection between your Account and your SNS Accounts at any time by accessing the "Settings" section of the Services. PLEASE NOTE THAT YOUR RELATIONSHIP WITH THE SNS PROVIDERS ASSOCIATED WITH YOUR SNS ACCOUNTS IS GOVERNED SOLELY BY YOUR AGREEMENT(S) WITH SUCH SNS PROVIDERS, AND WE DISCLAIM ANY LIABILITY FOR PERSONAL INFORMATION THAT MAY BE PROVIDED TO US BY SUCH SNS PROVIDERS IN VIOLATION OF THE PRIVACY SETTINGS THAT YOU HAVE SET IN SUCH SNS ACCOUNTS. We make no effort to review any SNS Content for any purpose, including but not limited to, for accuracy, legality or noninfringement, and we are not responsible for any SNS Content.

# 3. Rules and Restrictions

**3.1** You agree to use the Services for your own use, and not on behalf of or for the benefit of any third party, and only in a manner that complies with these Terms, the Policies, and all laws and regulations applicable to you. If your use of the Services is prohibited by any applicable laws, then you are not authorized to use the Services. We are not responsible if you use the Services in a way that breaks the law.

**3.2** You are responsible for all activity associated with your account. Therefore, you must protect the security of your account and password and not share them with any third party. You must notify us immediately of any unauthorized use or security breach of your account.

**3.3** You must not create multiple accounts.

**3.4** Any sweepstakes, contests, raffles, surveys, games, or similar promotions (collectively, "Promotions") made available through the Services may be governed by separate rules. If the rules for a Promotion conflict with these Terms, the Promotion rules will govern.

**3.5** When using the Services, you agree and undertake not to take any action or make available any User Submissions through the Services that may:

> (1) infringe or violate another person's rights, including intellectual property rights;
> (2) violate any of these Terms, the Policies, or applicable laws and regulations;
> (3) engage in any unlawful, harmful, abusive, misleading, false, fraudulent, deceptive, threatening, harassing, defamatory, libelous, pornographic, obscene, profane or otherwise objectionable or discriminatory conduct;
> (4) circumvent or attempt to circumvent any of these Terms, the Policies or other rules relating to the Services including the Promotions;
> (5) constitute unauthorized or unsolicited advertising, or junk or bulk e-mail;
> (6) collect personal data from other users or use any such information collected from the Services;
> (7) engage in any conduct that is likely to cause a security breach of your account;
> (8) obtain another user's password, account, or other security information;
> (9) use a third party's credentials, conceal your true IP address, or otherwise impersonate or misrepresent your identity or your affiliation with any person or entity;
> (10) violate or interfere with the proper functioning or security of any computer network;
> (11) run any form of auto-responder or "spam" on the Services, any process that runs or is activated while you are not logged into the Services, or any process that otherwise interferes with the proper functioning of the Services (including by placing an unreasonable load on the Services' infrastructure through overloading, "flooding," "mail bombing" or crashing the Services);
> (12) potentially harm the Services, including but not limited to the violation of any security features of the Services, use of manual or automated software or other means to access, "crawl," "scrape," or "spider" any page, data, or portion of or relating to the Services or the introduction of viruses, worms or similar harmful code into the Services;
> (13) copy or store any significant portion of the content on the Services without written consent from us;
> (14) decompile, reverse engineer, or otherwise obtain the source code or underlying ideas or information of or relating to the Services;
> (15) buy any products which you are not legally allowed to purchase or use;
> (16) abuse any promotions, discounts, or other benefits offered by us, or manipulate the price of any listed products or interfere with listings; or
> (17) attempt to do anything, or permit, encourage, assist, or allow any third party to do anything, prohibited in this list.

> In addition to any other remedies available to us, a violation of any of the foregoing is grounds for:

> (1) removal or refusal to post any User Submission for any or no reason in our sole discretion;
> (2) cancellation of your purchases of products;
> (3) cancellation of Rewards or payments due from us; and/or
> (4) suspension or termination of your access or use the Services.

If we become aware of any possible violations by you of the Terms, we reserve the right to investigate such violations. If, as a result of the investigation, we believe that criminal activity has occurred, we reserve the right to refer the matter to, and to cooperate with, any and all applicable legal authorities. We are entitled, except to the extent prohibited by applicable law, to disclose any information or materials on or in the Services, including User Submissions, in our possession in connection with your use of the Services, to (i) comply with applicable laws, legal process or governmental request; (ii) enforce the Terms and Policies, (iii) respond to any claims that a User Submission violates the rights of third parties, (iv) respond to your requests for customer service, or (v) protect the rights, property or personal safety of us, our users or the public, and all enforcement or other government officials, as we in our sole discretion believe to be necessary or appropriate.

# 4. Privacy

**4.1** Our Privacy Policy provides information about how we collect, use, and disclose your personal information when you access, visit or use the Services. In connection with your use of the Services, you acknowledge and agree that we may collect, access, use, preserve and disclose your personal information (including your account and user information) as described in our Privacy Policy. The Privacy Policy is part of and is governed by these Terms and by agreeing to these Terms, you agree to be bound by the terms of the Privacy Policy.

# 5. Communications

**5.1** You consent to receive communications from us electronically, such as emails, texts, mobile push notices, and notices and messages on or through the Services ("Push Messages"), and where required by law, we will obtain your opt-in consent to deliver such Push Messages. You acknowledge that, when you use the App, your wireless service provider may charge you fees for data, text messaging and/or other wireless access, including in connection with Push Messages. Please check with your wireless service provider to determine what fees apply to your access to and use of the Services, including your receipt of Push Messages from us. You are solely responsible for any fee, cost or expense that you incur to download, install and/or use the Services on your mobile device, including for your receipt of Push Messages. You also acknowledge and agree that all terms and conditions, agreements, notices, disclosures, and other communications and documents that we provide to you electronically constitute and shall have the same legal effect as "in writing."

**5.2** You agree that we may communicate with you at any email address or telephone number that you provide us, to: (i) notify you regarding your account; (ii) troubleshoot problems with your account; (iii) resolve a dispute; (iv) collect a debt; (v) poll your opinions through surveys or questionnaires; (vi) notify you regarding order, payment and delivery updates; (vii) send you authentication texts; or (viii) as otherwise necessary to service your Account or enforce these Terms, the Policies, applicable laws and regulations, or any other agreement we may have with you. Standard text messaging charges applied by your cell phone carrier will apply to text messages that we send.

**5.3** If you would like to receive our marketing materials via mobile texts and alerts, you may sign up to do so. By signing up, you provide your consent to receive promotional messages or other mobile messages from or on behalf of us, including one-time passcodes, notifications regarding your orders, our promotional messages, and abandoned cart reminders (enabled by using cookies we collect as described in these Terms) at the mobile number you provide us. Opting in for a program does not entail automatic opt-in for another. Message frequency varies and carriers are not liable for any delays or undelivered messages. Message and Data Rates may apply. You acknowledge that you are not required to consent to receive marketing texts as a condition of using the Services. If you wish to opt out of SMS texts from us, you can reply STOP to the corresponding number from your mobile device receiving the messages. However, you acknowledge that opting out of receiving texts may impact your use of the Services. If you would like to resume the subscription, reply UNSTOP to the corresponding number. We will not share your consent, opt-in and opt-out records with any third parties other than text messaging service providers and aggregators. You may also reply "HELP" for assistance. For further assistance, please contact us 1) if you are using a Temu website, at the appropriate email address on the "Contact us" page linked in the website footer, and (2) if you are using a Temu application, through the "Customer support" section in the "You" menu at the bottom of the home page.

**5.4** If you wish to opt out of marketing emails, you can unsubscribe from our marketing email list by following the unsubscribe options in the marketing email itself.

**5.5** Our communications with you may be through a third-party service provider. You acknowledge and consent that, subject to our Privacy Policy, your communications with us, our agents may be recorded, monitored and stored for quality control and training purposes, or to protect your, and our interests.

# 6. User Submissions

**6.1** "User Submission" means anything posted, uploaded, shared, submitted, stored, or otherwise provided by you through the Services, including suggestions, comments, reviews, ratings, photos, videos, or other feedback or materials, and may be viewable by other users. Any User Submission posted by you in your Account may not contain nudity, violence, sexually explicit, or offensive subject matter as determined by us in our sole discretion.

**6.2** For all User Submissions, you grant us a fully-paid, royalty-free, perpetual, irrevocable, non-exclusive, transferable, sublicensable, worldwide right (including any moral rights) and license to use, license, store, display, reproduce, save, modify (e.g. to make sure the User Submission is viewable on different systems and devices), create derivative works, publicly perform, publicly display, distribute, translate, or otherwise act with respect to such User Submissions as we determine is necessary to operate, market, and advertise the Services, including to present, display, or perform such User Submissions in accordance with your preferences.

**6.3** You acknowledge and agree that all User Submissions (including the user name under which you made them) are non-confidential and non-proprietary. We may freely display, disclose, reproduce, modify, license, transfer, distribute and otherwise use the User Submissions in any manner, without any restriction or compensation to you.

**6.4** You warrant that you own or otherwise control all rights to the User Submissions and that our use of any User Submission will not infringe upon or violate the rights of any third party or violate any of the rules and restrictions contained in these Terms (including those included in Section 3 herein).

**6.5** We do not endorse User Submissions and they do not represent our views. We expressly disclaim any liability for User Submissions or damages resulting from them. We expect users to maintain a high level of integrity when submitting User Submissions that are viewable by other users, especially with respect to ratings and reviews of products. You undertake that the User Submissions that are viewable by other users are made truthfully in good faith and based only on your first-hand experience. You further undertake that you will prominently indicate if a User Submission was sponsored or paid for in any way. You acknowledge that we have no obligation to pre-screen User Submissions, although we reserve the right to pre-screen, refuse, exclude or remove any User Submission for any reason or no reason, at our discretion and without notice to you. By entering into these Terms, you hereby provide your irrevocable consent to such monitoring. You acknowledge and agree that you have no expectation of privacy concerning the transmission of your User Submissions. In the event that we pre-screen, refuse, exclude or remove any User Submissions, you acknowledge that we will do so for our benefit, not yours. Without limiting the foregoing, we shall have the right to remove any User Submissions that violate the Terms or are otherwise objectionable.

# 7. Ownership

**7.1** You acknowledge and agree that all materials displayed, performed, or available on or through the Services, including, but not limited to, text, graphics, data, articles, photos, images, illustrations and User Submissions (collectively, "Content") are protected by copyright and/or other intellectual property laws throughout the world. You undertake to comply with all copyright notices, trademark rules, information, and restrictions contained in the Content, and not to copy, reproduce, modify, translate, publish, broadcast, transmit, distribute, perform, upload, display, license, sell, or otherwise use for any purpose any Content not owned by you without the prior consent of the owner of that Content.

**7.2** We respect others' intellectual property rights, and we reserve the right to delete or disable Content alleged to be infringing upon another person's intellectual property rights and to terminate the accounts of the alleged infringers. See our Intellectual Property Policy to learn how to report potentially infringing content.

**7.3** You acknowledge and agree that we own or license the Services. You undertake not to modify, publish, transmit, participate in the transfer or sale of, reproduce, create derivative works based on, or otherwise exploit any of the Services, except as expressly provided in this Section 7.

**7.4** Subject to your compliance with these Terms and all applicable policies, rules, and guidelines, and your payment of any applicable fees, we or our content providers grant you a limited, non-exclusive, non-transferable, non-sublicensable license to access and make personal and non-commercial use of the Services for the sole purpose of using Temu. All rights not expressly granted to you in these Terms or any policies or guidelines are reserved and retained by us or our licensors, suppliers, publishers, rightsholders, or other content providers. The licenses granted by us terminate if you do not comply with these Terms or any applicable policies, rules, or guidelines.

**7.5** You may not make any commercial use of any of the information provided on the Services or make any use of the Services for the benefit of another business unless explicitly permitted by us in advance. You may not solicit, advertise for, or contact in any form users for employment, contracting or any other purpose not related to the Services facilitated through Temu. If you violate this provision, we reserve the right to refuse service, terminate accounts, and/or cancel purchase transactions in our discretion.

# 8. Responsibilities; Third Party Risks

**8.1** You acknowledge and agree that any Content publicly posted or privately transmitted through the Services is the sole responsibility of the person that posted or transmitted such Content. You access and use the Content, and interact with other users, at your own risk. We are not responsible for any errors, mistakes, omissions, inaccuracies in the Content. We do not control the Content and have no duty to take any action regarding how you may interpret, use or react to the Content. We have no obligation to review or monitor, and do not approve, endorse, or make any representations or warranties with respect to, Content. You also understand that we cannot guarantee the identities of the users with whom you interact while using the Services and are not responsible for which users gain access to the Services.

**8.2** You are responsible for all Content you contribute, in any manner, to the Services, and you represent and warrant you have all rights to contribute such Content to the Services in such manner.

**8.3** The Services may contain links or connections to third-party websites or services that are not owned or controlled by us. We have no control over, and assume no responsibility for, the content, accuracy, privacy policies, or practices of or opinions expressed in any third-party websites or services. In addition, we will not and cannot monitor, verify, censor, or edit the content of any third-party website or service. You acknowledge and agree that we are not responsible for any risks resulting from your access or use of any third party websites or services. We encourage you to be aware when you leave the Services and to read the terms of use and privacy policy of each third-party website or service that you visit or use.

**8.4** Your interactions with other users, other entities or individuals as a result of your use of the Services, including communications, payments, performances and deliveries, are solely between you and such third parties; provided, however, that we reserve the right, but has no obligation, to intercede in such interactions. You should make whatever investigation and/or seek whatever professional advice as you feel necessary or appropriate before proceeding with any interaction with any of these third parties. You acknowledge and agree that we are not responsible for any loss or damage incurred as the result of such interactions. You agree that we will not be responsible for any liability incurred as the result of such interactions.

**8.5** It is a material breach of these Terms to arrange for the sale of listed items from, or the payment of fees to, third parties outside the context of the Temu for the purposes of circumventing the obligation to pay the fee for products purchased through the Services.

# 9. Release

**9.1** We expressly disclaim any liability that may arise between users of Temu. If there is a dispute between you and another user, or any third party on Temu, we are under no obligation to become involved. To the fullest extent permitted under applicable law, you release us, our parents, subsidiaries, affiliates, directors, officers, employees, agents and successors from all claims, demands, and damages of every kind or nature, known or unknown, suspected or unsuspected, disclosed or undisclosed, arising out of or in any way related to such disputes.

IN ENTERING INTO THIS RELEASE, YOU EXPRESSLY WAIVE ANY PROTECTIONS (WHETHER STATUTORY OR OTHERWISE) THAT WOULD LIMIT THE COVERAGE OF THIS RELEASE TO INCLUDE ONLY THOSE

CLAIMS WHICH YOU MAY KNOW OR SUSPECT TO EXIST IN YOUR FAVOR AT THE TIME OF AGREEING TO THIS RELEASE.

# 10. Purchases

**10.1** All product prices ("Prices") listed on Temu are exclusive of shipping charges and applicable taxes and fees, including without limitation goods and sales tax, provincial sales tax and harmonized sales tax, which will be charged to you separately at the applicable rate. Prices may change at any time, but any change shall not apply to any order for which we have sent an order confirmation. All amounts are in American dollars unless otherwise noted on Temu. The acceptance of such offers is in our sole discretion and will be communicated to you in our order confirmation. For the avoidance of doubt, we reserve the rights, in our sole discretion, not to accept your offer to purchase any products and to cancel your order or parts of your order in certain events, including, without limitation, supply difficulties or if the products are no longer in stock. Furthermore, you agree that, where applicable, you will act as the importer of the products purchased and you hereby authorize us to appoint a freight forwarding agent to act as your direct representative and pay any sales tax, VAT and customs duties on your behalf. Please note that sales tax, VAT, customs duties, and similar charges collected at the time of purchase are estimated values and may be subject to change depending on applicable laws. If additional amounts are assessed, you are responsible for them.

**10.2** While we strive to provide accurate information on Temu, typographical errors, inaccuracies, or omissions that relate to pricing, product descriptions, availability, and offers may occur. Subject to applicable law, we reserve the right to correct any errors, inaccuracies, or omissions and to change or modify information or cancel orders or parts of orders if any information on Temu is inaccurate at any time without prior notice, including after your order has been submitted or your receipt of an order confirmation or shipping notice. You should not rely on the strike-through price in your purchase decision. If comparing prices is important to your purchase decision, you should do your own comparison before making a purchase.

**10.3** Please check all descriptions and restrictions regarding the product you are interested in thoroughly before you place your order. If you have any special circumstance (e.g., a medical or health condition and/or special need) that may affect or be affected by the product you wish to purchase, it is solely your responsibility to inform us before you place your order.

**10.4** You agree to pay all amounts specified in your order confirmation, including all shipping charges, local sales taxes and other applicable taxes.

**10.5** We make reasonable efforts to ensure the color display of the products on Temu is as accurate as possible. However, we cannot guarantee that your monitor's display of any color will be an accurate depiction of the color of the product you selected to purchase.

**10.6** You acknowledge that the products are in conformity with the transaction or intended purchase if they: (i) comply with the description provided on Temu and possess the qualities presented on Temu; (ii) are fit for the purposes for which goods of such kind are normally used; and (iii) are of the quality and performance which are normal in goods of the same type and which can reasonably be expected.

**10.7** In order to make purchases, you must provide accurate and complete information for a valid payment method, such as a credit card, that you are authorized to use. You must promptly update your account with any changes related to your payment method. BY PROVIDING INFORMATION FOR A PAYMENT METHOD, YOU AUTHORIZE US OR OUR AGENTS OR PAYMENT SERVICE PROCESSORS TO CHARGE THE PAYMENT METHOD FOR: (A) AMOUNTS DUE FOR PURCHASED PRODUCTS; (B) ANY AND ALL APPLICABLE CUSTOMS, TAXES AND SHIPPING COSTS; AND (C) ANY OTHER CHARGES INCURRED IN CONNECTION WITH YOUR USE OF THE SERVICES. YOUR PAYMENTS ARE NON-REFUNDABLE EXCEPT AS EXPRESSLY PROVIDED IN APPLICABLE POLICIES. We may decline, freeze or hold your transaction for any reason, including for suspected fraud, anti-money laundering and sanctions compliance, or if we believe your transaction poses a risk to us or any third party.

**10.8** Payment Processors may charge you fees for your purchases made through Temu. Such processing fees will be disclosed to you via Temu. Your use of the Services and the payment processing provided by the Payment Processor is subject to your agreement with the Payment Processor, as may be modified from time to time. As a condition of using the payment services, you must provide accurate and complete information, and you authorize us to share this information with the Payment Processor.

**10.9**Your payment obligations are fully fulfilled once your payment of the agreed price is received.

# 11. Refunds, Exchanges and Related

**11.1** We assist you with customer services support involving payment, return, refund and other areas in connection with your purchase of products.

**11.2** We want you to be satisfied with your purchases through the Services. For all the products purchased on Temu, you may be entitled to a return and refund. For details of return and refund, please visit our Return and Refund Policy. Please follow the instructions in the policy If you want to request a refund. You acknowledge and agree that we may issue a refund to you in accordance with the Return and Refund Policy.

Unless otherwise described in the Return and Refund Policy, the refund will not cover customs, taxes, or any return shipping costs you may incur in the refund process.

# 12. Rewards

**12.1** You may receive credits, coupons, cash, gifts or other kinds of reward by use of the Services (collectively, "Rewards"). Some rewards may only be used for discounts on or payment for eligible purchases on or through the Services (but note that not all products may be eligible) and cannot be redeemed for cash, except in jurisdictions where required by law. You should read carefully the information and applicable rules regarding different kinds of rewards.

# 13. Ending Our Relationship

**13.1** You are free to stop using the Services at any time. We are also free to terminate or suspend your use of the Services or your account, for any reason in our discretion, including your breach of these Terms. You acknowledge and agree that we have the sole right to decide whether you are in violation of any of the restrictions set forth in these Terms. Even after your use of the Services is terminated or suspended, these Terms will remain enforceable against you and any unpaid amount you owe to us will remain due.

**13.2** If your account is terminated for any reason, all Content and Rewards associated with your account will be destroyed and cancelled. You should try to use any remaining Rewards before the date on which such termination becomes effective.

**13.3** All provisions of the Terms which by their nature should survive, shall survive termination of these Terms, including without limitation, ownership provisions, warranty disclaimers, and limitations of liability.

# 14. WARRANTY DISCLAIMER

**14.1** TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW WE EXPRESSLY DISCLAIM ALL REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, RELATING TO THE SERVICES, ANY CONTENT OR ANY PRODUCT OFFERED OR PURCHASED ON OR THROUGH THE SERVICES, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF PRODUCTS' CONDITION, QUALITY, DURABILITY, PERFORMANCE, ACCURACY, RELIABILITY, MERCHANTABILITY. FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, OR ANY WARRANTIES OF THE CONTENT'S ACCURACY, CORRECTNESS, COMPLETENESS, OR LEGALITY. ALL SUCH WARRANTIES, REPRESENTATIONS, CONDITIONS, AND UNDERTAKINGS ARE HEREBY EXPRESSLY EXCLUDED. NO COMMUNICATION OR INFORMATION, WHETHER ORAL OR WRITTEN, OBTAINED FROM OR THROUGH THE SERVICES SHALL CREATE ANY WARRANTY NOT EXPRESSLY STATED HEREIN. IN ADDITION, WE MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING SUGGESTIONS OR RECOMMENDATIONS OF PRODUCTS OFFERED OR PURCHASED ON OR THROUGH THE SERVICES. THIS SECTION 14 DOES NOT AFFECT IN ANY WAY OUR RETURN AND REFUND POLICY FOR PRODUCTS PURCHASED ON THE SERVICES.

**14.2** YOUR USE OF THE SERVICES AND YOUR USE OF ANY PRODUCT OFFERED AND PURCHASED ON OR THROUGH THE SERVICES ARE AT YOUR OWN RISK. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, UNLESS EXPRESSLY PROVIDED OTHERWISE, THE SERVICES, PRODUCTS OFFERED AND PURCHASED ON OR THROUGH THE SERVICES, AND THE CONTENT ARE MADE AVAILABLE TO YOU ON AN "AS-IS" AND "AS-AVAILABLE" BASIS, WITH ALL FAULTS AND WITHOUT WARRANTIES OF ANY KIND.

**14.3** YOU ACKNOWLEDGE AND AGREE THAT THE TEMU PARTIES (AS DEFINED IN SECTION16.1) ARE NOT LIABLE, AND YOU AGREE NOT TO SEEK TO HOLD THE TEMU PARTIES LIABLE, FOR THE CONDUCT OF THIRD PARTIES, INCLUDING OPERATORS OF EXTERNAL SITES, AND THAT THE RISK OF INJURY FROM SUCH THIRD PARTIES RESTS ENTIRELY WITH YOU. WE MAKE NO PROMISES WITH RESPECT TO, AND EXPRESSLY DISCLAIM ALL LIABILITY FOR: (1) PRODUCTS, SERVICES, INFORMATION, PROGRAMMING, AND/OR ANYTHING ELSE PROVIDED BY A THIRD PARTY THAT IS ACCESSIBLE TO YOU ON OR THROUGH THE SERVICES; OR (2) THE QUALITY OR CONDUCT OF ANY THIRD PARTY YOU ENCOUNTER IN CONNECTION WITH YOUR USE OF THE SERVICES.

**14.4** YOU ACKNOWLEDGE AND AGREE THAT, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, YOU ASSUME FULL RESPONSIBILITY FOR YOUR USE OF THE SERVICES, INCLUDING YOUR INTERACTIONS WITH OTHER USERS OF THE SERVICES, AND THAT ANY INFORMATION YOU SEND OR RECEIVE DURING YOUR USE OF THE SERVICES MAY NOT BE SECURE AND MAY BE INTERCEPTED OR OTHERWISE ACCESSED BY UNAUTHORIZED PARTIES. YOU AGREE THAT, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, WE ARE NOT RESPONSIBLE FOR ANY LOSS OR DAMAGE TO YOUR PROPERTY OR DATA THAT RESULTS FROM ANY MATERIALS YOU ACCESS OR DOWNLOAD FROM THE SERVICES.

**14.5** IF YOU RELY ON ANY DATA OR INFORMATION OBTAINED ON OR THROUGH THE SERVICES, YOU DO SO AT YOUR OWN RISK. YOU ARE SOLELY RESPONSIBLE FOR ANY DAMAGE OR LOSS THAT RESULTS FROM YOUR USE OF SUCH DATA OR INFORMATION.

# 15. LIMITATION OF LIABILITY

**15.1** TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, UNDER NO CIRCUMSTANCES AND UNDER NO LEGAL THEORY (INCLUDING, WITHOUT LIMITATION, TORT, CONTRACT, STRICT LIABILITY, OR OTHERWISE) SHALL TEMU PARTIES BE LIABLE TO YOU OR TO ANY OTHER PERSON FOR (A) ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES OF ANY KIND, INCLUDING DAMAGES FOR LOSS OF DATA, PROFITS, REVENUE OR GOODWILL, REPUTATIONAL HARM, BUSINESS INTERRUPTION, ACCURACY OF RESULTS, OR COMPUTER FAILURE OR MALFUNCTION ARISING OUT OF OR IN CONNECTION WITH THE SERVICES OR (B) YOUR USE OF THE SERVICES, INCLUDING, WITHOUT LIMITATION, ANY INABILITY TO ACCESS OR USE THE SERVICES OR THE PURCHASE AND USE OF PRODUCTS OFFERED ON OR THROUGH THE SERVICES, EVEN IF WE OR ANY OTHER PERSON HAS FORESEEN OR BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE FOREGOING LIMITATION OF LIABILITY SHALL NOT APPLY TO LIABILITY OF A TEMU PARTY FOR (I) DEATH OR PERSONAL INJURY CAUSED BY OUR GROSS NEGLIGENCE; OR FOR (II) ANY INJURY CAUSED BY OUR FRAUD OR FRAUDULENT MISREPRESENTATION.

**15.2** THIS DISCLAIMER APPLIES, WITHOUT LIMITATION, TO THE MAXIMUM EXTENT PERMITTED UNDER LAW, TO ANY DAMAGES OR PERSONAL INJURY ARISING FROM ANY FAILURE OF PERFORMANCE, ERROR, OMISSION, INTERRUPTION, DELETION, DEFECTS, DELAY IN OPERATION OR TRANSMISSION, COMPUTER VIRUS, FILE CORRUPTION, COMMUNICATION-LINE FAILURE, NETWORK OR SYSTEM OUTAGE, ANY THEFT, DESTRUCTION, UNAUTHORIZED ACCESS TO, ALTERATION OF, LOSS OR USE OF, ANY RECORD OR DATA, AND ANY OTHER TANGIBLE OR INTANGIBLE LOSS.

**15.3** YOU SPECIFICALLY ACKNOWLEDGE AND AGREE THAT WE SHALL NOT BE LIABLE FOR ANY DEFAMATORY, OFFENSIVE, OR ILLEGAL CONDUCT BY ANY USER OF THE SERVICES.

**15.4** TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, UNDER NO CIRCUMSTANCES WILL THE TOTAL AGGREGATE AMOUNT FOR WHICH THE TEMU PARTIES ARE LIABLE TO YOU EXCEED THE GREATER OF: (A) THE TOTAL AMOUNT PAID TO US BY YOU DURING THE ONE-MONTH PERIOD PRIOR TO THE ACT, OMISSION OR OCCURRENCE GIVING RISE TO SUCH LIABIITY; (B) $100.00; OR (C) THE REMEDY

OR PENALTY IMPOSED BY THE STATUTE UNDER WHICH SUCH CLAIM ARISES. THE FOREGOING CAP ON LIABILTY SHALL NOT APPLY TO LIABLITY OF A TEMU PARTY FOR (I) DEATH OR PERSONAL INJURY CAUSED BY OUR GROSS NEGLIGENCE; OR FOR (II) ANY INJURY CAUSED BY OUR FRAUD OR FRAUDULENT MISREPRESENTATION. THE PRECEDING SENTENCE SHALL NOT PRECLUDE THE REQUIREMENT FOR YOU TO PROVE ACTUAL DAMAGES.

**15.5** CERTAIN JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF CERTAIN DAMAGES OR IMPLIED WARRANTIES. IF THESE LAWS APPLY TO YOU, SOME OR ALL OF THE ABOVE EXCLUSIONS OR LIMITATIONS MAY NOT APPLY TO YOU, AND YOU MIGHT HAVE ADDITIONAL RIGHTS.

**15.6** THE LIMITATIONS OF DAMAGES SET FORTH ABOVE ARE ESSENTIAL TO THE AGREEMENT BETWEEN YOU AND US.

# 16. Indemnity

**16.1** To the fullest extent permitted by applicable law, you agree to indemnify and hold us, our parents, subsidiaries, affiliates, directors, officers, agents, employees, suppliers, licensors and partners (each, a "Temu Party" and collectively, the "Temu Parties") harmless from and against any and all claims, liabilities, damages, losses, and expenses (including reasonable attorneys' fees ) arising from or in connection with any third-party claims relating to: (a) your use of the Services, including without limitation, User Submissions or any actions taken by a third party using your account; (b) your violation of these Terms; (c) your violation of any rights of another party, including without limitation any copyright, property, or privacy right or any third-party agreement; or (d) your violation of any applicable laws, rules, or regulations. In the event of such a claim, suit, or action ("Claim"), we will attempt to provide notice of the Claim to the contact information we have for your account (provided that failure to deliver such notice shall not eliminate or reduce your indemnification obligations under these Terms).

**16.2** We reserve the right, at our own cost, to assume the exclusive defense and control of any matter otherwise subject to indemnification by you, in which case you will fully cooperate with us in asserting any available defenses.

**16.3** You agree that the provisions in this section will survive any termination of your Account, the Terms and/or your access to the Services.

# 17. App Stores

**17.1 Application License.** Subject to your compliance with the Terms, we grant you a limited non-exclusive, non-transferable, non-sublicensable, revocable license to download, install and use a copy of the Temu mobile application ("Application") on a single mobile device or computer that you own or control and to run such copy of the Application solely for your own personal or internal business purposes. Furthermore, with respect to any Application accessed through or downloaded from the Apple App Store (an "App Store Sourced Application"), you will only use the App Store Sourced Application (a) on an Apple-branded product that runs the iOS (Apple's proprietary operating system) and (b) as permitted by the "Usage Rules" set forth in the Apple App Store Terms of Service. Notwithstanding the first sentence in this section, with respect to any Application accessed through or downloaded from the Google Play store (a "Google Play Sourced Application"), you may have additional license rights with respect to use of the Application on a shared basis within your designated family group.

**17.2 App Stores.** You acknowledge and agree that the availability of the Application and the Services is dependent on the third party from whom you received the Application license, e.g., the Apple App Store or Google Play (each, an "App Store"). You acknowledge that the Terms are between you and us and not with the App Store. We, not the App Store, are solely responsible for The Services, including the Application, the content thereof, maintenance, support services, and warranty therefor, and addressing any claims relating thereto (e.g., product liability, legal compliance or intellectual property infringement). In order to use the Application, you must have access to a wireless network, and you agree to pay all fees associated with such access. You also agree to pay all fees (if any) charged by the App Store in connection with The Services, including the Application. You agree to comply with, and your license to use the Application is conditioned upon your compliance with all terms of agreement imposed by the applicable App Store when using any Service, including the Application. You acknowledge that the App Store (and its subsidiaries) are third-party beneficiaries of the Terms and will have the right to enforce it.

**17.3 Accessing and Downloading the Application from iTunes.** The following applies to any App Store Sourced Application accessed through or downloaded from the Apple App Store:

> **17.3.1** You acknowledge and agree that (i) the Terms are concluded between you and us only, and not Apple, and (ii) we, not Apple, are solely responsible for the App Store Sourced Application and content thereof. Your use of the App Store Sourced Application must comply with the App Store Terms of Service.

> **17.3.2** You acknowledge that Apple has no obligation whatsoever to furnish any maintenance and support services with respect to the App Store Sourced Application.

> **17.3.3** In the event of any failure of the App Store Sourced Application to conform to any applicable warranty, you may notify Apple, and Apple will refund the purchase price for the App Store Sourced Application to you and to the maximum extent permitted by applicable law, Apple will have no other warranty obligation whatsoever with respect to the App Store Sourced Application. As between Apple and us, any other claims, losses, liabilities, damages, costs or expenses attributable to any failure to conform to any warranty will be our sole responsibility.

> **17.3.4** You and we acknowledge that, as between Apple and us, Apple is not responsible for addressing any claims you have or any claims of any third party relating to the App Store Sourced Application or your possession and use of the App Store Sourced Application, including, but not limited to: (i) product liability claims; (ii) any claim that the App Store Sourced Application fails to conform to any applicable legal or regulatory requirement; and (iii) claims arising under consumer protection or similar legislation.

> **17.3.5** You and we acknowledge that, in the event of any third-party claim that the App Store Sourced Application or your possession and use of that App Store Sourced Application infringes that third party's intellectual property rights, as between Apple and us, we, not Apple, will be solely responsible for the investigation, defense, settlement and discharge of any such intellectual property infringement claim to the extent required by the Terms.

> **17.3.6** You and we acknowledge and agree that Apple, and Apple's subsidiaries, are third-party beneficiaries of the Terms as related to your license of the App Store Sourced Application, and that, upon your acceptance of the terms and conditions of the Terms, Apple will have the right (and will be deemed to have accepted the right) to enforce the Terms as related to your license of the App Store Sourced Application against you as a third-party beneficiary thereof.

> **17.3.7** Without limiting any other terms of the Terms, you must comply with all applicable third-party terms of agreement when using the App Store Sourced Application.

# 18. General

**18.1 Assignment.** You may not assign, delegate, or transfer these Terms, or your rights and obligations hereunder, to any other person in any way (by operation of law or otherwise) without our prior written consent, and any attempted assignment, subcontract, delegation, or transfer in violation of the foregoing will be null and void. We may transfer, assign, or delegate these Terms and its rights and obligations hereunder to any other person without your consent.

**18.2 Unforeseen Events.** We shall not be liable for any delay or failure to perform resulting from causes outside our reasonable control, including, but not limited to, acts of God, war, terrorism, riots, embargos, acts of civil or military authorities, fire, floods, accidents, pandemics, strikes, or shortages of transportation facilities, fuel, energy, labor, or materials.

**18.3 Choice of Law.** These Terms and any dispute of any sort that might arise between you and us hereunder will be governed by the laws of the State of New York and applicable federal laws of the United States of America, consistent with the Federal Arbitration Act, without regard to any principle of conflict-of-laws. The United Nations Convention on Contracts for the International Sale of Goods does not apply to these Terms. If you live outside the United States, you may be entitled to the protection of the mandatory consumer protection provisions of your local consumer protection law.

**18.4 Exclusive Venue.** Any dispute of any sort between you and us that arises out of or in connection with the Services and is not subject to arbitration or eligible for small claims action, shall be decided exclusively by (a) if you enter into these Terms with Whaleco Inc., a court of competent jurisdiction located in New York, New York; (b) if you enter into these Terms with Whaleco Technology Limited, a court of competent jurisdiction located in Ireland; and (c) if you enter these Terms with Whaleco UK Limited, a court of competent jurisdiction located in England. You hereby consent to, and waive all defense of lack of personal jurisdiction and forum non conveniens with respect to, venue and jurisdiction in such courts.

**18.5 Statute of Limitations.** You and Temu agree that regardless of any statute or law to the contrary, any claim arising out of or related to the Services must commence within one (1) year after the cause of action accrues. Otherwise, such cause of action is permanently barred.

**18.6 Notice.** You acknowledge and agree that we may give notice to you through email using the latest email address you provided to us, which constitutes effective notice. Therefore, you are responsible for keeping your email address information with us up to date. You may give notice to us at the following addresses:

If to Whaleco Inc.:

Whaleco Inc.

Suite 355, 31 St. James Avenue
Boston, Massachusetts 02116
USA

If to Whaleco Technology Limited or Whaleco UK Limited:

Whaleco Technology Limited

First Floor, 25 St
Stephens Green
Dublin 2, Ireland

Such notice shall be deemed given when received by us by letter delivered by nationally recognized overnight delivery service or first-class postage prepaid mail at the above address.

**18.7 Export Control.** You undertake to use the Services and products purchased on or through the Services in compliance with all applicable US or other export and re-export restrictions of relevant jurisdictions. In particular, you acknowledge and agree that the Services, including any products purchased on or through the Services, may not be exported or re-exported (a) into any embargoed countries by your country of residence or other relevant countries, or (b) to anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Department of Commerce's Denied Person's List or Entity List. You represent and warrant that (i) you are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a "terrorist supporting" country and (ii) you are not listed on any U.S. Government list of prohibited or restricted parties. You also will not use the Services nor the products purchased on the Services for any purpose prohibited by any applicable law.

**18.8 Consumer Complaints.** In accordance with California Civil Code §1789.3, you may report complaints to the Complaint Assistance Unit of the Division of Consumer Services of the California Department of Consumer Affairs by contacting them in writing at 400 R Street, Sacramento, CA 95814, or by telephone at (800) 952-5210.

**18.9 Waiver.** Our failure to respond to a breach by you or others does not waive our right to act with respect to subsequent or similar breaches.

**18.10 Severability.** If any provision of these Terms is found to be unenforceable or invalid, that provision will be limited or eliminated, to the minimum extent necessary, so that these Terms shall otherwise remain in full force and effect and enforceable.

**18.11 Third-Party Beneficiaries.** Except as expressly provided herein, there are no third-party beneficiaries intended under these Terms.

**18.12 Entire Agreement.** These Terms are the final, complete and exclusive agreement of the parties with respect to the subject matter hereof and supersede and merge all prior discussions between the parties with respect to such subject matter.

**18.13 Translation.** The translated versions of these Terms of Use, Privacy & Cookie Policy, Intellectual Property Policy or any other terms or policies, are provided for your reference only. If there are any discrepancies between the English version and versions in other languages, the English version shall always prevail.

# 19. ARBITRATION AGREEMENT

PLEASE READ THIS SECTION 19 ("ARBITRATION AGREEMENT") CAREFULLY. **PLEASE BE AWARE THAT THIS SECTION CONTAINS PROVISIONS GOVERNING HOW DISPUTES BETWEEN YOU AND US WILL BE RESOLVED. AMONG OTHER THINGS, THIS SECTION 19 INCLUDES AN AGREEMENT TO ARBITRATE, WHICH REQUIRES, WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU AND US BE RESOLVED BY BINDING AND FINAL ARBITRATION. THIS SECTION 19 ALSO CONTAINS A CLASS ACTION AND JURY TRIAL WAIVER. IN SOME COUNTRIES YOU MAY HAVE ADDITIONAL RIGHTS AND/OR ELEMENTS OF THIS ARBITRATION AGREEMENT MAY NOT APPLY TO YOU AS REQUIRED BY LAW.**

**19.1. Applicability of Arbitration Agreement.** Subject to the terms of this Arbitration Agreement, you and we agree that any dispute, claim, or disagreement arising out of or relating in any way to your access to or use of the Services, any communications you receive, any products sold or distributed through the Services, or the Terms, including claims and disputes that arose between us before the effective date of the Terms (each, a "Dispute") will be resolved by binding arbitration, using the English language, rather than in court, except that: (1) you and we may assert claims or seek relief in small claims court if such claims qualify and remain in small claims court; and (2) you or we may seek equitable relief in court for infringement or other misuse of intellectual property rights (such as trademarks, trade dress, domain names, trade secrets, copyrights, and patents). For purposes of this Arbitration Agreement, "Dispute" will also include disputes that arose or involve facts occurring before the existence of this or any prior versions of the Terms as well as claims that may arise after the termination of the Terms.

**19.2. Informal Dispute Resolution.** There may be instances when a Dispute arises between you and us. If that occurs, we are committed to working with you to reach a reasonable resolution. You and we agree that good faith informal efforts to resolve Disputes can result in a prompt, low-cost and mutually beneficial outcome. You and we therefore agree that before either party commences arbitration against the other (or initiates an action in small claims court if a party so elects), we will personally meet and confer telephonically or via videoconference, in a good faith effort to resolve informally any Dispute covered by this Arbitration Agreement ("Informal Dispute Resolution Conference"). If you are represented by counsel, your counsel may participate in the conference, but you also agree to participate in the conference. The party initiating a Dispute must give notice to the other party in writing of its intent to initiate an Informal Dispute Resolution Conference ("Notice"), which shall occur within forty-five (45) days after the other party receives such Notice, unless an extension is mutually agreed upon by the parties in writing. Notice to us that you intend to initiate an Informal Dispute Resolution Conference should be sent by email to dispute@temu.com for the U.S., dispute@eur.temu.com for the EU, or dispute@uk.temu.com for the UK, or by regular mail to the applicable address set forth in Section 18.6. The Notice must include: (1) your name, telephone number, mailing address, e-mail address associated with your account (if you have one); (2) the name, telephone number, mailing address and e-mail address of your counsel, if any; and (3) a description of your Dispute.

The Informal Dispute Resolution Conference shall be individualized such that a separate conference must be held each time either party initiates a Dispute, even if the same law firm or group of law firms represents multiple users in similar cases, unless all parties agree; multiple individuals initiating a Dispute cannot participate in the same Informal Dispute Resolution Conference unless all parties agree. In the time between a party receiving the Notice and the Informal Dispute Resolution Conference, nothing in this Arbitration Agreement shall prohibit the parties from engaging in informal communications to resolve the initiating party's Dispute. Engaging in the Informal Dispute Resolution Conference is a condition precedent and requirement that must be fulfilled before commencing arbitration. The statute of limitations and any filing fee deadlines shall be tolled while the parties engage in the Informal Dispute Resolution Conference process required by this section.

**19.3. Waiver of Jury Trial. YOU AND WE HEREBY WAIVE ANY CONSTITUTIONAL AND STATUTORY RIGHTS TO SUE IN COURT AND HAVE A TRIAL IN FRONT OF A JUDGE OR A JURY.** You and we are instead electing that all Disputes shall be resolved by arbitration under this Arbitration Agreement, except as specified in Section 19.1 above. There is no judge or jury in arbitration, and court review of an arbitration award is subject to very limited review.

**19.4. Waiver of Class and Other Non-Individualized Relief. YOU AND WE AGREE THAT, EXCEPT AS SPECIFIED IN SECTION 19.9, EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS, REPRESENTATIVE, OR COLLECTIVE BASIS, AND THE PARTIES HEREBY WAIVE ALL RIGHTS TO HAVE ANY DISPUTE BE BROUGHT, HEARD, ADMINISTERED, RESOLVED, OR ARBITRATED ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MASS ACTION BASIS. ONLY INDIVIDUAL RELIEF IS AVAILABLE, AND DISPUTES OF MORE THAN ONE CUSTOMER OR USER CANNOT BE ARBITRATED OR CONSOLIDATED WITH THOSE OF ANY OTHER CUSTOMER OR USER.** Subject to this Arbitration Agreement, the arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by the party's individual claim. Nothing in this paragraph is intended to, nor shall it, affect the terms and conditions under Section 19.9. Notwithstanding anything to the contrary in this Arbitration Agreement, if a court decides by means of a final decision, not subject to any further appeal or recourse, that the limitations of this Section are invalid or unenforceable as to a particular claim or request for relief (such as a request for public injunctive relief), you and we agree that that particular claim or request for relief (and only that particular claim or request for relief) shall be severed from the arbitration and may be litigated only in the courts provided for under Section 18.4. All other Disputes shall be arbitrated or litigated in small claims court. This subsection does not prevent you or us from participating in a class-wide settlement of claims.

**19.5. Rules and Forum.**The Terms evidence a transaction involving interstate commerce; and notwithstanding any other provision herein with respect to the applicable substantive law, the Federal Arbitration Act, 9 U.S.C. § 1 et seq., will govern the interpretation and enforcement of this Arbitration Agreement and any arbitration proceedings. If the Informal Dispute Resolution Process described above does not resolve satisfactorily within sixty (60) days after receipt of Notice, you and we agree that either party shall have the right to finally resolve the Dispute through binding arbitration. The arbitration will be conducted by American Arbitration Association (the "AAA"), an established alternative dispute resolution provider, under its rules, including Consumer Arbitration Rules (the "AAA Rules"), then effect, unless otherwise required by law. AAA's rules are also available at https://adr.org/consumer, or by calling 1-800-778-7879. For all actions under the AAA Rules, the proceedings may be filed where your residence is, or in New York, New York, and any in-person hearings will be conducted at a location which is reasonably convenient to both parties taking into account their ability to travel and other pertinent circumstances. If AAA is not available to arbitrate, the parties will select an alternative arbitral forum. Your responsibility to pay any AAA fees and costs will be solely as set forth in the applicable AAA rules.

A party who wishes to initiate arbitration must provide the other party with a request for arbitration (the "Request"). The Request must include: (1) the name, telephone number, mailing address, e-mail address of the party seeking arbitration and the account username (if applicable) as well as the email address associated with any applicable account; (2) a statement of the legal claims being asserted and the factual bases of those claims; (3) a description of the remedy sought and an accurate, good-faith calculation of the amount in controversy in United States Dollars; (4) a statement certifying completion of the Informal Dispute Resolution process as described above; and (5) evidence that the requesting party has paid any necessary filing fees in connection with such arbitration. If the party requesting arbitration is represented by counsel, the Request shall also include counsel's name, telephone number, mailing address, and email address. Such counsel must also sign the Request. By signing the Request, counsel certifies to the best of counsel's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, that: (1) the Request is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of dispute resolution; (2) the claims, defenses and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; and (3) the factual and damages contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. Unless you and we otherwise agree, or the Batch Arbitration process discussed in Section 19.9 is triggered, the arbitration will be conducted in the county where you reside. Subject to the applicable AAA rules, the arbitrator may direct a limited and reasonable exchange of information between the parties, consistent with the expedited nature of the arbitration. You and we agree that all materials and documents exchanged during the arbitration proceedings shall be kept confidential and shall not be shared with anyone except the parties' attorneys, accountants, or business advisors, and then subject to the condition that they agree to keep all materials and documents exchanged during the arbitration proceedings confidential.

**19.6. Arbitrator.** The arbitrator will be either a retired judge or an attorney licensed to practice law in the State of New York, and will be selected by the parties from the AAA roster of consumer dispute arbitrators. If the parties are unable to agree upon an arbitrator within thirty-five (35) days of delivery of the Request, then AAA will appoint the arbitrator in accordance with the applicable AAA rules, provided that if the Batch Arbitration process under Section 19.9 is triggered, AAA will appoint the arbitrator for each batch.

**19.7. Authority of Arbitrator.** The arbitrator shall have exclusive authority to resolve any Dispute, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement, except for the following: (1) all Disputes arising out of or relating to Section 19.4, including any claim that all or part of Section 19.4 is unenforceable, illegal, void or voidable, or that Section 19.4 has been breached, shall be decided by a court of competent jurisdiction and not by an arbitrator; (2) except as expressly contemplated in Section 19.9, all Disputes about the payment of arbitration fees shall be decided only by a court of competent jurisdiction and not by an arbitrator; (3) all Disputes about whether either party has satisfied any condition precedent to arbitration shall be decided only by a court of competent jurisdiction and not by an arbitrator; and (4) all Disputes about which version of the Arbitration Agreement applies shall be decided only by a court of competent jurisdiction and not by an arbitrator. The arbitration proceeding will not be consolidated with any other matters or joined with any other cases or parties, except as expressly provided in Section 19.9. The arbitrator shall have the authority to grant motions dispositive of all or part of any Dispute. The arbitrator shall issue a written award and statement of decision describing the essential findings and conclusions on which the award is based, including the calculation of any damages awarded. The award of the arbitrator is final and binding upon you and us. Judgment on the arbitration award may be entered in any court having jurisdiction.

**19.8. Attorneys' Fees and Costs.** The parties shall bear their own attorneys' fees and costs in arbitration unless the arbitrator finds that either the substance of the Dispute or the relief sought in the Request was frivolous or was brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)). If you or we need to invoke the authority of a court of competent jurisdiction to compel arbitration, then the party that obtains an order compelling arbitration in such action shall have the right to collect from the other party its reasonable costs, necessary disbursements, and reasonable attorneys' fees incurred in securing an order compelling arbitration. The prevailing party in any court action relating to whether either party has satisfied any condition precedent to arbitration, including the Informal Dispute Resolution Process, is entitled to recover their reasonable costs, necessary disbursements, and reasonable attorneys' fees and costs.

**19.9. Batch Arbitration.** To increase the efficiency of administration and resolution of arbitrations, you and we agree that in the event that there are one hundred (100) or more individual Requests of a substantially similar nature filed against us by or with the assistance of the same law firm, group of law firms, or organizations, within a thirty (30) day period, AAA shall (1) administer the arbitration demands in batches of 100 Requests per batch (plus, to the extent there are less than 100 Requests left over after the batching described above, a final batch consisting of the remaining Requests); (2) appoint one arbitrator for each batch; and (3) provide for the resolution of each batch as a single consolidated arbitration with one set of filing and administrative fees due per side per batch, one procedural calendar, one hearing (if any) in a place to be determined by the arbitrator, and one final award ("Batch Arbitration").

All parties agree that Requests are of a "substantially similar nature" if they arise out of or relate to the same event or factual scenario and raise the same or similar legal issues and seek the same or similar relief. To the extent the parties disagree on the application of the Batch Arbitration process, the disagreeing party shall advise AAA, and AAA shall appoint a sole standing arbitrator to determine the applicability of the Batch Arbitration process ("Administrative Arbitrator"). In an effort to expedite resolution of any such dispute by the Administrative Arbitrator, the parties agree the Administrative Arbitrator may set forth such procedures as are necessary to resolve any disputes promptly. The Administrative Arbitrator's fees shall be paid by us.You and we agree to cooperate in good faith with AAA to implement the Batch Arbitration process including the payment of single filing and administrative fees for batches of Requests, as well as any steps to minimize the time and costs of arbitration, which may include: (1) the appointment of a discovery special master to assist the arbitrator in the resolution of discovery disputes; and (2) the adoption of an expedited calendar of the arbitration proceedings. This Batch Arbitration provision shall in no way be interpreted as authorizing a class, collective and/or mass arbitration or action of any kind, or arbitration involving joint or consolidated claims under any circumstances, except as expressly set forth in this provision.

**19.10. 30-Day Right to Opt Out.** You have the right to opt out of the provisions of this Arbitration Agreement by sending written notice of your decision to opt out to the applicable address set forth in Section 18.6, within thirty (30) days after first becoming subject to this Arbitration Agreement. Your notice must include your name and address, the email address you used to set up your Account (if you have one), and an unequivocal statement that you want to opt

out of this Arbitration Agreement. If you opt out of this Arbitration Agreement, all other parts of these Terms will continue to apply to you. Opting out of this Arbitration Agreement has no effect on any other arbitration agreements that you may currently have, or may enter in the future, with us.

**19.11. Invalidity, Expiration.** Except as provided in Section 19.9, if any part or parts of this Arbitration Agreement are found under the law to be invalid or unenforceable, then such specific part or parts shall be of no force and effect and shall be severed and the remainder of the Arbitration Agreement shall continue in full force and effect. You further agree that any Dispute that you have with us as detailed in this Arbitration Agreement must be initiated via arbitration within the applicable statute of limitation for that claim or controversy, or it will be forever time barred. Likewise, you agree that all applicable statutes of limitation will apply to such arbitration in the same manner as those statutes of limitation would apply in the applicable court of competent jurisdiction.

**19.12. Modification.** Notwithstanding any provision in the Terms to the contrary, we agree that if we make any future material change to this Arbitration Agreement, it will notify you. Unless you reject the change within thirty (30) days of such change becoming effective by writing to us at the applicable address set forth in Section 18.6, your continued use of the Services, including the acceptance of products and services offered on or through the Services, following the posting of changes to this Arbitration Agreement constitutes your acceptance of any such changes. Changes to this Arbitration Agreement do not provide you with a new opportunity to opt out of the Arbitration Agreement if you have previously agreed to a version of the Terms and did not validly opt out of arbitration. If you reject any change or update to this Arbitration Agreement, and you were bound by an existing agreement to arbitrate Disputes arising out of or relating in any way to your access to or use of the Services, any communications you receive, any products sold or distributed through the Services or the Terms, the provisions of this Arbitration Agreement as of the date you first accepted the Terms (or accepted any subsequent changes to the Terms) remain in full force and effect. We will continue to honor any valid opt outs of the Arbitration Agreement that you made to a prior version of the Terms.

# Contact Us

1. If you are using a Temu website, at the appropriate email address on the "Contact us" page linked in the website footer2. If you are using a Temu application, through the "Customer support" section in the "You" menu at the bottom of the home page.

# EXHIBIT 2

**Sent by email**                                                                January 22, 2024

Whaleco Inc. *dba* Temu
dispute@temu.com
Attn: Legal Department

### *NOTICE OF DISPUTE*

To Whom It May Concern:

I am writing to provide notice to Whaleco Inc. *dba* Temu ("Temu") that I intend on pursuing a dispute in private arbitration for: (1) violations of New York General Business Law §349 and §350; (2) violations of the Electronic Communications Privacy Act ("ECPA"); (3) violations of state wiretapping statutes; (4) violations of the Video Privacy Protection Act ("VPPA"); (5) common law breach of expressed and/ or implied contract; and (6) breach of the implied covenant of good faith and fair dealing.

The violations outlined above arise out of Temu's unlawful interception, collection, use, and dissemination of consumers' personal and private information.  Specifically, Temu utilized tracking pixels and other surveillance tools to intercept and gather information and data from visitors to its website, users of its mobile applications, and subscribers to Temu's marketing communications. Temu then disseminated the data to third parties.

Temu also engaged in false advertising and deceptive trade practices by advertising deals that are false and deceptive with no intention of actually honoring them. In addition to violating New York's statutes, these deceptive trade practices similarly violate consumer protection statutes across the country.

I, through counsel, am seeking all available remedies for these violations, including but not limited to: (i) liquidated damages of not less than $2,500 for each violation of VPPA; (ii) statutory damages of the greater of $100 per day per violation or $10,000 for each violation of the ECPA; (iii) statutory damages of $50 and treble damages of up to $1,000 for each violation of New York General Business Law §349; (iv) statutory damages of $500 and treble damages of up to $10,000 for each violation of New York General Business Law §350; (v) attorneys' fees and costs; and (vi) any and all other relief that may be available at law or equity.

This notice is intended to initiate an informal dispute resolution conference to take place within 60 days of receipt of this notice, which my counsel will attend, in an effort to resolve this dispute informally and prior to formally commencing arbitration.

My complete contact information is:

Name: Aalany McMahan

Address: ███████████████████████, CA 91343

Phone Number: ████████████

Email Address: ██████████████

Please ensure that any communications regarding this dispute are sent to my counsel:

| | |
|---|---|
| Michael Kind, Esq.<br>mk@kindlaw.com<br>Haim Benoliel, Esq.<br>hb@kindlaw.com<br><br>**Kind Law**<br>8860 S. Maryland Pkwy, Ste. 106<br>Las Vegas, Nevada 89123<br>(702) 337-2322 | Adam Pollock, Esq.<br>adam@pollockcohen.com<br>Raphael Janove, Esq.<br>rafi@pollockcohen.com<br><br>**Pollock Cohen LLP**<br>111 Broadway, Ste. 1804<br>New York, NY 10006<br>(212) 337-5361 |

Sincerely,

Aalany McMahan

# EXHIBIT 3

**Serrin Turner**
(212) 906-1330
Serrin.Turner@lw.com

1271 Avenue of the Americas
New York, New York  10020-1401
Tel: +1.212.906.1200  Fax: +1.212.751.4864
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Silicon Valley |
| Hong Kong | Singapore |
| Houston | Tel Aviv |
| London | Tokyo |
| Los Angeles | Washington, D.C. |
| Madrid | |

# LATHAM & WATKINS LLP

February 6, 2024

**<u>VIA EMAIL</u>**

Michael Kind
Kind Law
8860 S. Maryland Parkway, Suite 106
Las Vegas, Nevada 89123
mk@kindlaw.com

Mr. Kind,

We represent Temu in connection with your clients' notices of dispute.  We write in response to your February 2 email regarding the scheduling of informal dispute resolution conferences ("Conferences") with Temu.

Temu agrees to your proposal to hold the first 20 Conferences on February 19, 2024, but suggests that the first Conference start earlier in the day—at 9am ET (rather than 9am PT).  Please confirm what specific time slot you are proposing for each individual Conference on that date.  It is not clear whether you propose scheduling any of the Conferences to run concurrently, or whether you propose they each run consecutively.  As you know, Section 19.2 of the Terms requires individualized Conferences.  Any deviation from that format requires mutual agreement.  Please also confirm whether you intend to participate in some or all of the Conferences.

The same goes for the remainder of the Conferences.  We understand you wish to reserve your clients' rights to object to participating in them, but that does not obviate the need to agree in advance on a schedule for them.  Accordingly, we reiterate our request that you propose dates and times for each Conference, including the ones you propose taking place after February 19.

With respect to planning the Conferences, we thank you for offering a dial-in number.  We believe it will be easier for everyone and more efficient to conduct the Conferences by Zoom—at least so that each participant can see who else is present at each Conference.  The Zoom meetings can proceed by audio only, such that no one would be required to participate on video.  Please confirm this is acceptable, and Temu will organize sending a Zoom link.

To ensure that each Conference is productive, please ensure that your clients are prepared to participate in good faith in the discussion, as required under Temu's Terms of Use.  Temu looks forward to meeting with your clients in an effort to resolve their disputes in an efficient manner.

Please make sure to include me in all further correspondence with Temu regarding this matter.

**February 6, 2024**
**Page 2**

**LATHAM & WATKINS** LLP

Respectfully,

*/s/ Serrin Turner*
of LATHAM & WATKINS LLP

# EXHIBIT 4



8860 South Maryland Parkway, Suite 106
Las Vegas, Nevada 89123
P: (702) 337-2322 | T: (844) 399-KIND (5463)
https://kindlaw.com

**Sent by email**
Serrin Turner, Esq.
LATHAM & WATKINS LLP
1271 Avenue of the Americas,
New York, New York 10020-1401
Serrin.Turner@lw.com
(212) 906-1330

February 14, 2024

**RE: Temu Informal Dispute Resolution Conferences**

Dear Serrin,

In your letter dated February 6, 2024 addressing the scheduling of the informal dispute resolution conferences ("Conferences"), you referred to several items: (1) the date and time of the conferences; (2) conference time slots; (3) whether the conferences will run concurrently or consecutively; (4) whether the conference will be conducted via zoom or via dial-in; and (5) whether claimants are prepared to participate in good faith. We respond to the above in the order you raised them.

A. <u>Date and Time of Conferences; Conference Time Slots; Conferences to Run Concurrently or Consecutively</u>

    i.    *February 19, 2024*

As mentioned within our February 2, 2024, email, on February 19, 2024, we will set aside twenty time slots of 20 minutes each for the first twenty of our clients. In our email, we suggested a start time of 9 a.m. Pacific Time. In your February 6, 2024, letter, you suggested a start time of 9 a.m. Eastern Time. We understand that 9 a.m. Pacific Time is not convenient for you or your client, as such we propose a start time of 10:30 a.m. Eastern Time / 7:30 a.m. Pacific Time.

As to time slots, attached please find a link to a worksheet detailing the names of the Claimants and corresponding time slots for the February 19, 2024, conferences. Claimants reserve the right to change the order in which they appear, which will be provided to Temu in advance.

    ii.    *Conferences after February 19, 2024*

As to the remainder of the conferences, we intend to schedule 20 conferences a day on Day 2 through Day 5 of the informal process; and 180 conferences a day beginning Day 6 until Day 58

Temu
February 14, 2024
Page 2 of 2

of the informal process. Please refer to the worksheet which includes dates and times for the future conferences. As outlined within the worksheet, 180 conferences per day will be conducted beginning Day 6 through Day 58, concurrently via 9 separate tracks.[1]

### B. Method of Conducting Conferences

Within our February 2, 2024, email, we suggested conferences to be conducted via telephone. In your February 6, 2024, letter, you suggested conferences be conducted via Zoom. You further indicated that the zoom meetings "can proceed by audio only, such that no one would be required to participate on video." We are amenable to your suggestion. Please send us a single Zoom invite to be utilized for all conferences.

### C. Good Faith Participation

Counsel for Claimants will of course be present for each conference, alongside our client. Through these conferences, Claimants will engage in a good faith effort to resolve their claims and expect that Temu will do the same. We look forward to discussing these claims with you in an effort to resolve the disputes in a timely and cost-efficient manner.

Thank you,

*Angel P. Getsov*
Angel P. Getsov, Esq.

---

[1] Claimants reserve the right to change and update the attached list.

# EXHIBIT 5

Serrin Turner
(212) 906-1330
Serrin.Turner@lw.com

**LATHAM & WATKINS** LLP

1271 Avenue of the Americas
New York, New York  10020-1401
Tel: +1.212.906.1200  Fax: +1.212.751.4864
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Silicon Valley |
| Hong Kong | Singapore |
| Houston | Tel Aviv |
| London | Tokyo |
| Los Angeles | Washington, D.C. |
| Madrid | |

February 21, 2024

<u>**VIA EMAIL**</u>

Michael Kind
Haim Benoliel
Angel P. Getsov
Kind Law
8860 S. Maryland Parkway, Suite 106
Las Vegas, Nevada 89123
mk@kindlaw.com
hb@kindlaw.com
angel.getsov@kindlaw.com

Counsel,

We write regarding the informal dispute resolution conferences ("Conferences") that you scheduled with Temu and that each of your clients must complete in good faith as a precondition to initiating arbitration proceedings against Temu.  *See* Terms of Use § 19.2.  Kind Law scheduled over 9,600 individual Conferences with Temu.  After completing just five of them, on February 19, 2024, you elected to prematurely cancel all remaining ones.  Neither your clients nor Kind Law (on their behalf) participated in the Conferences in good faith and therefore have not satisfied the informal dispute resolution precondition under the Terms of Use.

As you know, Kind Law sent Temu a proposed schedule for the Conferences, which were to last around twenty minutes each and take place over 58 days, starting with an initial twenty Conferences on February 19, 2024.  Temu spent considerable time and effort preparing for the Conferences.  The Conferences began as scheduled, around 10:30am ET on February 19, with claimant Isaac Dwek.  Under the schedule Kind Law proposed, the next four scheduled Conferences were to be with claimants Jennifer Wilkinson (10:50am ET), Petrea Vanburen (11:10am ET), Luke Seagraves (11:30am ET), and Tatiana Betady (11:50 am ET).  None of those claimants attended their scheduled Conference.  Instead, after each Conference, Mr. Kind requested a break—which, each time, substantially ate into the 20 minutes allotted for the next scheduled Conference—and then rejoined the Zoom call several minutes later with claimants (Aalany McMahan, Luke Seagraves, Avrohom Shor, and Ariella Shor) who were scheduled for a different time slot or an entirely different day.

Temu was fully prepared to engage in a good faith dialogue with each claimant to obtain more information about their concerns and attempt to resolve them, but was precluded from doing so by Kind Law.  From the very beginning of the Conferences, it was clear that Kind Law sought (a) to avoid providing any substantive information about your clients' use of, or concerns about,

LATHAM&WATKINS LLP

Temu, and (b) to manufacture an excuse to cancel the Conferences as early as possible in the process. For example, Temu's very first question was to ask Mr. Dwek if he recalled around when he began using Temu—a basic and unobjectionable request, given that the purpose of the Conference was to discuss concerns arising from *his use of Temu*. Mr. Kind immediately interjected and demanded to know the relevance of that information, stating that it was somehow contrary to the purpose of the Conferences and not in good faith. When Temu responded that the question was unobjectionable, but that Temu was happy to skip the question in the interest of time and having a productive dialogue, Mr. Kind continued to needlessly filibuster for several more minutes and complain that the question was inappropriate. There were only around eight minutes left in Mr. Dwek's Conference by the time Mr. Kind allowed the conversation to move forward.

Likewise, at the beginning of the second Conference, each participant introduced themselves *except* for the claimant (Aalany McMahan). Temu asked that Ms. McMahan announce herself on the call, as everyone else had already done. Mr. Kind interjected, demanding to know why that was necessary. Temu explained that, aside from basic courtesy, the Terms of Use require that each claimant participate in their Conference, and Temu therefore needed a record of who was present. Mr. Kind objected and, again, wasted considerable time demanding an explanation for Temu's asking Ms. McMahan to announce herself and complaining it was inappropriate for Temu to do so.

This obstructive conduct persisted throughout each Conference and prevented Temu from engaging in any meaningful dialogue necessary to understand and attempt to resolve the claimants' disputes. Not one of the five claimants said a single word about the nature of their claims or concerns with Temu, or about any purported harm they suffered. Indeed, no claimant said anything beyond stating their name. And while Kind Law purported to speak for each claimant, Kind Law likewise refused to provide any substantive information on their behalf.

Early in each Conference, Temu asked if the claimant could generally state what concerns led them to initiate a dispute with Temu. Kind Law refused to provide any information in response to this question as to any claimant—and simply referred Temu back to (and/or read verbatim from) the form notice of dispute Kind Law submitted on behalf of each claimant, which is identical for each of Kind Law's thousands of clients. At one point, Mr. Kind stated it was "ridiculous" to ask the claimant what led them to submit their dispute with Temu.[1] Similarly, Temu attempted to gather information about any harm the claimants believe they suffered—*e.g.*, if they have reason to believe some specific personal data of theirs was stolen, or if they incurred fraudulent charges

---

[1] It also became clear that Kind Law cannot speak to the factual basis for any of their clients' claims. When Mr. Kind read the portion of his form notice of dispute that refers to false advertising, Temu asked if the claimant recalled any specific advertisement they found concerning or unfair—information Temu needs if they are to attempt to resolve that claim. Mr. Kind could not identify any Temu advertisement or promotion with any specificity—vaguely referring to "the wheel thing" and the "95% one," and refusing to answer whether any particular claimant ever saw or engaged with the advertisements to which he was referring. When Temu tried to gather more information as to why the claimant believed any advertisement was misleading, Kind Law responded, without elaborating, that Temu should look at its own records for that information.

**LATHAM & WATKINS** LLP

on their credit card.  Kind Law objected to these questions as well, and refused to provide any answer other than referring to the statutory damages associated with claims in their form notice of dispute, and stating that other types of damages "are difficult to quantify."

After the fifth Conference ended, Mr. Kind took a break, as he had after each preceding Conference.  Mr. Kind rejoined the Zoom call and stated that he was terminating all future Conferences purportedly on the grounds that Temu was not participating in good faith.  Temu stated, as it had throughout the Conferences, that it was simply asking for basic information necessary to understand each claimant's concerns so that it could attempt to informally resolve their dispute, but Kind Law was precluding Temu from doing so.  Indeed, Temu was prepared to make settlement offers at these conferences depending on the good faith participation of each claimant and how the dialogue unfolded, but Kind Law never let the discussions get far enough for Temu to even explore this possibility.

In short, none of Kind Law's clients have met their obligation to engage in good faith informal dispute resolution as a precondition to filing an arbitration demand against Temu.  *See* Terms of Use § 19.2.  Accordingly, were Kind Law to initiate any arbitration proceedings, it would do so in violation of the Terms of Use and the arbitrations would be subject to dismissal on that procedural basis alone—putting aside all the reasons why the claims would fail on the merits.  *See Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1015 (9th Cir. 2023) (holding that pre-arbitration informal dispute resolution requirement was enforceable); *White v. Four Seasons Hotels & Resorts*, 999 F. Supp. 2d 250, 260 (D.D.C. 2013) (same); *Khanna v. Banks*, 2022 WL 1028712, at *2 (N.D. Ill. Apr. 6, 2022) (enforcing alternative dispute resolution mechanism required under parties' agreement).  In addition, we remind Kind Law and each of its clients that Section 19.8 of the Terms of Use entitles Temu to recover its attorneys' fees and costs in arbitration if the arbitrator finds that the relief sought by a claimant is frivolous or brought for an improper purpose.  Temu fully intends to seek such fees and costs were Kind Law to proceed with arbitration in disregard of the informal dispute resolution requirements included in the arbitration agreement.

Temu reserves all rights.

Sincerely,

/s/ Serrin Turner
of LATHAM & WATKINS LLP

# EXHIBIT 6



8860 South Maryland Parkway, Suite 106
Las Vegas, Nevada 89123
P: (702) 337-2322 | T: (844) 399-KIND (5463)
https://kindlaw.com

March 26, 2024

**Sent by email**
Serrin Turner, Esq.
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020-1401
Serrin.Turner@lw.com

**RE: Temu Informal Dispute Resolution Conferences**

Dear Serrin,

We write in response to your February 21, 2024, letter in which you detail Whaleco Inc.'s ("Temu") position regarding claimants' participation in the informal dispute resolution conferences ("IDR conferences" or "conferences").

With all due respect, you were not present at the conferences. I was. Your letter contains numerous misrepresentations about what happened during the February 19, 2024, conferences.

It is the claimants' position that Temu did not participate in the IDR conferences in good faith. The purpose of the informal dispute resolution conferences, under the Terms, is to engage in good faith in informal efforts to resolve the disputes. Temu was not prepared to in good faith try to resolve the disputes. Temu was not willing to engage in discussions with any claimant. Instead, Temu incorrectly believed that the IDR conferences was an opportunity to "gather information," read a boilerplate script, and inappropriately try to chill the claimants with threats of sanctions.

**Temu's boilerplate questions do not amount to good faith informal efforts to resolve the disputes**

Throughout several conferences, the same pattern was witnessed. The Temu customer service representative, Michael, would read out boilerplate questions. But no matter what the claimant responded, the Temu representative would move on to the next question and refuse to have any "discussion" at all. At the end of reading his questions, the Temu customer service representative would read claimant a script, threatening that any action against Temu would be countered with sanctions against the consumer.

Any questions raised by the claimants were simply ignored, and the Temu customer service representative would merely move on to the next scripted question. For example, when asked whether the Temu customer service representative had read the claimants' notices of dispute, the question was flatly ignored. Another example was the claimants' questions regarding Temu's use

Temu
March 26, 2024
Page 2 of 3

of tracking pixels, which was similarly again ignored. In fact, the Temu customer service representative refused to answer a single question raised by the claimants during the conferences.

Temu's boilerplate questions were not designed to lead to any discussions. The first question was, to the effect of, "what is the date you signed up for Temu?" As an initial matter, Temu, of course, has this information in its system. No answer by any claimant would change the result of the conference, since this information was already in Temu's possession. Claimants' counsel even asked the representative whether he already had the answer, as one would expect. The Temu customer service representative refused to answer. Nevertheless, the claimants' answer to this question (for example, in the first conference) did not change the result: Temu would move on to the next question and refuse to engage in any discussions about possible resolution.

Temu's second boilerplate question also made no difference. Temu's second question was essentially, "Describe your claim." First, the question was boilerplate, not in good faith and disingenuous, because each claimant had already provided a detailed "notice of dispute" that detailed the claims at issue. In any case, the claimants spent hours (jointly) adding more information regarding the claimants' claims for (1) privacy violations, including Temu's use of tracking tools and surveillance pixels, and (2) false advertising, including Temu's use of false heavily discounted or "free" offers, and Temu's use of deceptive "wheels." After answering Temu's question in detail, the Temu customer service representative would simply say "ok" and move on to the next question. Thus, Temu's second question was merely a sham and not intended in good faith to lead to any meaningful discussions.

Temu's third boilerplate question—"What damages are you seeking?"—was similarly made in pretense. As discussed above, the details of the claimants' claims, including the breakdown of damages, was already included in the notices of dispute. As discussed, when questioned about whether the Temu customer service representative had, or read, the notices of dispute, the Temu customer service representative refused to even provide a response and instead re-read his scripted questions. In any case, the claimants who detailed the exact damages they were seeking, were simply responded to by the Temu customer service representative continuing to read his script. For example, in the fourth conference of the day, the claimant answered that he only sought statutory damages, as detailed in his notice of dispute. The Temu customer service representative, however, did not deviate from his script. The Temu customer service representative ignored the claimant's response and ended the conference without any further discussions.

As outlined above, Temu's intention for the conference was to gather more information from each claimant. The Temu customer service representative confirmed that he intended to use the same script for all the claimants. The Temu customer service representative refused to answer any of claimants' questions or have any discussions. Temu's boilerplate questions did not amount to good faith informal efforts to resolve the disputes. No matter what the claimants responded, the Temu customer service representative would simply continue reading his script and end the conference with a threat to try to chill the agreived consumer.

Temu
March 26, 2024
Page 3 of 3

**The Temu customer service representative had no authority to discuss the claims**

The Temu customer service representative was not willing, and had no authority, to receive or make any settlement offers. For example, during the conference for Avrohom Shor, the claimant asked the Temu customer service representative, through counsel, whether the claimant could make a settlement offer. The Temu customer service representative responded, "Let us ask the questions." During the next conferences, time and again, when the claimant asked whether the Temu customer service representative can receive or make any settlement offers, the Temu customer service representative responded in the negative.

When pressed about what the point of the conference was since the Temu customer service representative could not accept or make any offers, the Temu customer service representative responded (mistakenly) that the purpose of the conference was for the Temu customer service representative to ask questions and gather information.

**Mr. Valenti frustrated the purposes of the conferences**

Mr. Valenti repeatedly frustrated the purposes of the conferences. For example, throughout the conferences Mr. Valenti encouraged the Temu customer service representative's incorrect position that the purpose of the conferences was for Temu to gather more information from claimants. When reminded that the purpose of the conferences was to engage in meaningful discussions to resolve the claims, Mr. Valenti would ignore counsel and would either instruct the Temu customer service representative to move on to the next question or would end the conference.

As an example, when one of the claimants answered Temu's second boilerplate question ("describe your claim"), at length, detailing the claimant's privacy claims (relating to pixels) and false advertising claims (relating to the deceptive wheel and free offers), Mr. Valenti said, "They're refusing to answer" and directed the Temu customer service representative to "move to the next question."

**Temu's reneged on its commitment to mediate**

Notably, Temu's disinterest in engaging in informal discussions is highlighted from Temu's refusal to honor its commitment to mediate the claims before mediator Robert A. Meyer. During a call between counsel on December 28, 2023, counsel for the parties agreed to mediate the claims. However, Temu then refused to honor the commitment, showing its disinterest in engage in good faith informal efforts to resolve the disputes.

In conclusion, the claimants complied in good faith with the informal dispute resolution process as outlined within Temu's Terms and Conditions, but Temu frustrated all of the claimants' efforts. Temu failed to act in good faith under the very Terms that Temu itself drafted. Should Temu have a change of heart regarding its commitment to mediate the parties' disputes, please let me know.

Thank you,

*Michael Kind*

Michael Kind, Esq.

# EXHIBIT 7

**American Arbitration Association**®

**DEMAND FOR ARBITRATION
CONSUMER ARBITRATION RULES**

Complete this form to start arbitration under an arbitration agreement in a contract.

| 1. Which party is sending in the filing documents? *(check one)* ☒ Consumer ☐ Business |
|---|
| 2. Briefly explain the dispute:<br>        *See attached complaint* |
| 3. Specify the amount of money in dispute, if any: *See attached complaint* |
| 4. State any other relief you are seeking:<br>☒ Attorney Fees ☒ Interest ☒ Arbitration Costs ☒ Other; explain: *See attached complaint* |
| 5. Identify the requested city and state for the hearing if an in-person hearing is held:<br>City: New York        State: New York |
| 6. Please provide contact information for both the Consumer and the Business. Attach additional sheets or forms as needed. |

**Consumer:**

| Name: Aalany McMahan | | |
|---|---|---|
| Address: ███████████ | | |
| City: ███████ | State: CA | Zip Code: 91343 |
| Telephone: ████████ | Fax: | |
| Email Address: █████████ | | |

**Consumer's Representative (if known):**

| Name: Michael Kind | | |
|---|---|---|
| Firm: Kind Law | | |
| Address: 8860 South Maryland Parkway, Suite 106 | | |
| City: Las Vegas | State: NV | Zip Code: 89123 |
| Telephone: (702) 337-2322 | Fax: (702) 329-5881 | |
| Email Address: mk@kindlaw.com | | |

**Business:**

| Name: Whaleco Inc. | | |
|---|---|---|
| Address: Suite 355, 31 St. James Avenue | | |
| City: Boston | State: MA | Zip Code: 02116 |
| Telephone: | Fax: | |
| Email Address: | | |

**AMERICAN ARBITRATION ASSOCIATION**®

**DEMAND FOR ARBITRATION
CONSUMER ARBITRATION RULES**

| Business' Representative (if known): | | |
|---|---|---|
| Name: Matthew P. Valenti / Serrin Turner | | |
| Firm: LATHAM & WATKINS LLP | | |
| Address: 1271 Avenue of the Americas | | |
| City: New York | State: NY | Zip Code: 10020 |
| Telephone: +1.212.906.4798 | Fax: | |
| Email Address: matthew.valenti@lw.com / serrin.turner@lw.com | | |
| Date: March 27, 2024 | | |

**7. Send a copy of this completed form to the AAA together with:**

- A clear, legible copy of the contract containing the parties' agreement to arbitrate disputes;
- The proper filing fee (filing fee information can be found in the Costs of Arbitration section of the Consumer Arbitration Rules); and
- A copy of the court order, if arbitration is court-ordered.

**8. Send a copy of the completed form and any attachments to all parties and retain a copy of the form for your records.**

To file by mail, send the initial filing documents and the filing fee to: AAA Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043.

To file online, visit **www.adr.org** and click on **File or Access Your Case** and follow directions. To avoid the creation of duplicate filings, the AAA requests that the filing documents and payment be submitted together. When filing electronically, no hard copies are required.

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website.

Pursuant to New Jersey Statutes § 2A:23B-1 et seq, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the New Jersey Arbitration Act, and to all consumer arbitrations conducted in New Jersey. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website.

## IN ARBITRATION BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| Aalany McMahan, | Ref. No.: |
| Claimant, | |
| v. | **Complaint for damages** |
| Whaleco Inc., *dba* Temu, | |
| Respondent. | |

## <u>INTRODUCTION</u>

1.      This is a complaint against Respondent Whaleco Inc. ("Temu" or "Respondent") as the owner and operator of the website, temu.com, and the related web and mobile applications (collectively, the "Website").

1.      Claimant brings this action for: (1) violations of the federal Video Privacy Protection Act, 18 U.S.C. §2710 ("VPPA"), (2) violations of the federal Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §2510, (3) violations of applicable state wiretapping statutes, (4) violations of New York General Business Law §349, (5) violations of applicable state Unfair or Deceptive Acts or Practices ("UDAP") statutes, (6) violations of New York General Business Law §350, (7) common law breach of expressed and/or implied contract, and (8) breach of the implied covenant of good faith and fair dealing against Respondent and makes the allegations herein based upon personal information as to allegations regarding Claimant and the investigation of their counsel, and on information and belief as to all other allegations.

2.      Temu, the Western-branded branch of the Chinese online retail giant Pingduoduo, promises shoppers the chance to purchase low-cost goods from Chinese manufacturers. What Temu fails to disclose is its rampant use of deceptive advertising schemes and serious and hidden privacy violations. Despite its recent extensive use in the United States, Temu has been widely scrutinized by consumer advocates for its false advertising and illicit wiretapping. According to Grizzly Research, the "TEMU app is purposefully and intentionally loaded with tools to execute virulent and dangerous malware and spyware activities on user devices which have downloaded and installed the TEMU app."[1]

3.      Experts found that the "widely downloaded shopping app TEMU is the most dangerous malware/spyware package currently in widespread circulation."[2] Temu has "a complete arsenal of tools to exfiltrate virtually all the private data on a user's device and perform nearly any malign action upon

---

[1] https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shopping-app-temu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

[2] https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shoppingapp-temu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

command trigger from a remote server."[3] "Temu gains full access to . . . literally everything on your phone."[4]

4.    What adds to the concern is that Temu conducts all of these activities covertly, using deceptive tactics to hide its actions. "Temu misled people about how it uses their data."[5] According to experts, Temu "'bypasses' phone security systems to read a user's private messages, make changes to the phone's settings and track notifications."[6]

5.    Thus, Apple recently reportedly banned Temu because it "violated the company's mandatory privacy rules."[7] And, the Pinduoduo online shopping app, the predecessor to Temu, was recently suspended from the Google Play Store "due to the presence of malware on the Pinduoduo app that exploited vulnerabilities in Android operating systems."[8] The same team built both the Pinduoduo app and Temu.[9]

6.    These breaches of privacy are especially alarming due to Temu being based in China. According to Chinese law, user data within the possession, control, or access of entities in China can be accessed by the government at any point. The extent of user data accessibility to Chinese entities and, ultimately, the Chinese government is not disclosed to Temu app users. The apprehensions surrounding data privacy linked to Temu and other Chinese-owned applications have prompted government entities to either prohibit, as was the case in Montana, or limit their usage.[10]

## **JURISDICTION**

7.    Jurisdiction in AAA arises from the FAA and the Website's arbitration clause.

8.    AAA has original jurisdictional authority to hear Claimant's claims against Respondent.

9.    Respondent regularly conducts business in the State of New York.

---

[3] https://grizzlyreports.com/we-believe-pdd-is-a-dying-fraudulent-company-and-its-shopping-apptemu-is-cleverly-hidden-spyware-that-poses-an-urgent-security-threat-to-u-s-national-interests/.

[4] https://www.komando.com/kims-column/temu-security-concerns/883861/.

[5] https://www.politico.eu/article/booming-chinese-shopping-app-temu-faces-western-scrutiny-over-data-security-2/.

[6] https://www.ibtimes.com/after-tiktok-montana-bans-wechat-temu-telegram-governmentdevices-3694060.

[7] https://www.politico.eu/article/booming-chinese-shopping-app-temu-faces-western-scrutinyover-data-security-2/.

[8] *See* https://www.compassitc.com/blog/temu-app-poses-potential-data-risk-for-consumers#:~:text=The%20U.S%20has%20accused%20Temu,vulnerabilities%20in%20Android%20operating%20systems.

[9] https://nypost.com/2023/08/05/why-the-chinese-shopping-app-is-a-scam/.

[10] *See* https://inc.com/jason-aten/the-department-of-defense-is-warning-people-not-to-use-tiktokover-national-security-concerns.html; see also https://www.ibtimes.com/after-tiktok-montana-bans-wechat-temu-telegram-governmentdevices-3694060.

## THE PARTIES

10.     Claimant is an individual and a subscriber of Respondent's services.

11.     Respondent is a corporation that does business across the United States, including in the State of New York.

## FACTUAL ALLEGATIONS

**A.  Respondent unlawfully wiretapped consumers**

12.     Unbeknownst to Claimant and members of the public, when someone visits the Website, Respondent tracks the consumer's actions taken on the Website as detailed herein.

### An Overview of Tracking Pixels

13.     Tracking technology that some website owners, including Respondent, put in place to track visitors is the tracking pixel, also known as a web beacon. A tracking pixel is put in place by tracking pixel code.

14.     Tracking pixels give third parties the ability to request and receive information about a website visitor's private interactions and communications with that website.

15.     Website owners can build in tracking pixels by using tracking pixel code, which is provided by the third party that purveys the given tracking pixel. These third parties are often advertising agencies that would seek to learn about consumer preferences for the purpose of targeted advertising.

16.     Tracking pixel code creates a tiny, imperceptible image on a given web page. When a website visitor loads that page, the tracking pixel code tells the website to communicate with the third-party server that contains the so-called image. Once this initial communication is complete, the third-party server is able to request data about visitor behavior from the host website.

17.     In a recent article, the FTC raised the following concerns about tracking pixels in support of why it is unlawful to utilize such spyware without informed consent:[11]

a)  **Invisibility with no way for consumers to avoid**.  The FTC noted that "[t]raditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information" and that, "many consumers may not realize that tracking pixels exists because they're invisibly embedded within web pages that users might interact with."

---

[11] Federal Trade Commission, *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking* (March 16, 2023), available at https://www.ftc.gove/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking#ftn1 (last visited September 26, 2023).

b) **Lack of clarity**.  The FTC further highlighted that "[w]ith pixels, any type of personal and identifying information can be collected and shared" and that, "information collected from a pixel can be used to identify social media profiles through matching information such as a user's email address that automatically connect a user to their social media account on the platform if they have one."  Even worse, "[t]hese interactions may be further complicated by dark patterns and related practices, which may result in consumer confusion or unwanted sharing."

c) **Steps to remove personal information may be ineffective**.  The FTC also noted that attempts to anonymize personal information are ineffective, because studies have shown that "hashing" or another anonymization techniques can be reversed with relative ease.

18.    Because of these concerns, the FTC warned businesses that "using tracking pixels that impermissibly disclose an individual's personal information . . .  to third parties may be violating the FTC Act . . . other state or federal statutes involving the disclosure of personal information, and your privacy promises to consumers."[12]

**Respondent's Use of Tracking Pixels**

19.    Respondent operates an online e-commerce marketplace through the Website, including web and mobile applications through which it offers goods and services.

20.    Respondent intentionally procured and embedded numerous third-party data collection tools on the Website to surveil a visitor's interactions.

21.    Respondent embedded various pieces of third-party tracking pixel code. This code created tracking pixels that allowed data collection through third-party wiretapping.

22.    For example, using Facebook's Meta Pixel, Respondent sent to Facebook certain information about the Website's users, including, but not limited to, their identity and the media content the user watched. Specifically, the Website sent to Facebook the video content name, its URL, and, most notably, the user's FID.

23.    The FID is a unique and persistent identifier that Facebook assigns to each user. As Facebook itself explains, any ordinary person can look up the user's Facebook profile and name using the FID:

---

[12] *Id.*

## User ID

Your User ID is a string of numbers that doesn't personally identify you but does connect to your Facebook profile. You have a User ID automatically, whether or not you choose to create a username. Learn how to find your user ID.

User IDs can:

- Allow someone with the ID to see your profile, including any public information. Learn how to adjust what people can see in your profile.

- Help other applications personalize your experience by connecting with your Facebook account. When you allow apps to connect with your Facebook account, they can use your user ID to see public information, like your public profile and your friend list.

- When you run into issues with an app or game, your User ID can help the developer better investigate the problem to understand and address your specific concerns.

24.    Respondent's procurement and implementation of tracking pixels through numerous third-party providers are wiretaps in violation of ECPA and state wiretapping statutes.

25.    Further, Respondent's interception and sharing of consumer's Personal Viewing Information of the Website with third parties, including Facebook, in violation of the VPPA.

26.    Claimant visited the Website within the applicable statute of limitations.

27.    When Claimant visited the Website, Claimant's interactions on the Website were intercepted by Respondent's use of tracking pixel code and, as applicable, Claimant's Personal Viewing Information was shared with third parties, including Facebook.

28.    Claimant was never informed of Respondent's interception of Claimant's interactions on the Website, or that, as applicable, Claimant's Personal Viewing Information would be shared with others.

29.    Claimant did not consent to Respondent's use of tracking pixels, nor did Claimant consent to Respondent's sharing of its Personal Viewing Information, as applicable.

30.    Claimant did not consent to this unlawful monitoring. Had Claimant known that the Website would allow third parties to monitor the communications, Claimant would not have visited the Website.

**Respondent engaged in unlawful wiretapping**

31.    By using tracking pixel software, including Facebook's Meta Pixel, on the Website, Respondent intercepted the electronic communications of visitors of the Website.  Respondent also disclosed to Facebook, and others, the contents of these electronic communications in the form of the user's (i) personally identifiable Facebook ID and other related pixel IDs ("FID") and (ii) the computer file containing the watched video and its corresponding URL (the "uniform resource locator" or web

address) ("Video Media"). Together, the FID and Video Media constitute a user's "Personal Viewing Information."

32.    Consumers care about keeping their data private. Americans do not want to be unknowingly followed around a retail store, and Americans do not want to be followed around a website, especially without being told that they're being tracked.

33.    Indeed, by way of parallel example, when Apple began asking for affirmative consent before tracking iPhone users' activity through third-party apps and websites (allowing users to turn off "Allow Apps to Request to Track"), 94% of users said no. "[W]hen given the choice, people would rather not be tracked."

34.    Respondent does not give users a choice. Instead, Respondent uses tracking pixels to covertly track visitors of the Website.

35.    The Website included multiple tracking pixels, which record a website visitor's actions and submit those recordings to third parties. For example, the Meta Pixel (f/k/a Facebook Pixel) is one of the tracking pixels that Respondent installed on the Website allowing Respondent to track "conversions"—that is, when users take certain actions on the Website, such as clicking an ad or viewing content—and to collect users' data. More specifically, the Meta Pixel allowed the Website to track when a user visits the Website and views Video Media, as well as the user's FID.

36.    Importantly, without user consent, Respondent discloses the user's Personal Viewing Information—i.e., the user's unique ID and video content viewed—together as one data point to Facebook, Google, and others. For Facebook, because the user's ID uniquely identifies an individual's Facebook user account, Facebook—or any other ordinary person—can use it to quickly and easily locate, access, and view a user's corresponding Facebook profile. Put simply, the Meta Pixel allows Facebook to know what Video Media a user viewed on the Website.

37.    Claimant visited the Website on one or more occasions. Claimant's actions on the Website and viewing history were transmitted to third parties using tracking pixels.

38.    Respondent never informed Claimant that it was using tracking pixels to intercept, record, and share with others Claimant's interactions with the Website. Nor did it ask for or obtain Claimant's consent.

39.    Had Claimant known that Respondent would share their Personal Viewing Information with Facebook, Google, and others, or allow third parties to monitor their communications, Claimant would not have visited the Website

**B. Respondent's False Advertising Practices**

40.    This is also a complaint against Respondent for its false advertising and deceptive pricing scheme whereby Respondent falsely advertises its products at lower prices than it actually

charges.  Respondent further falsely advertises that consumers will receive "free" products, whereby Respondent does not honor the advertisements.

41.    Respondent uses a variety of mechanisms such as pop-ups with wheels to spin for discounts, tokens to collect, and countdown clocks.  Such mechanisms are used to induce users to sign up on its platform.  However, Respondent's advertisements are not honored and are merely a tool for Respondent to deceptively induce users to sign up on its website or mobile application.

42.    Further, Respondent induces users to sign up with the promise of low-cost, high-quality goods.  However, Respondent's representations regarding the products sold are false – the Better Business Bureau has received hundreds of complaints in the past year, earning Respondent a rating of 2.1 out of 5 stars.  Users experience undelivered packages, poor customer service, and receive goods that are often of low quality, contrary to Respondent's marketing and representations, which serve only to induce the number of users who sign up to its platform

43.    For example, Respondent offers "90% OFF deals," and engages in classic social engineering techniques to create urgency via time-limited offers.  However, Respondent does not honor its advertisement and charges more than the products' advertised price.

44.    Respondent further offers "free" gifts to its subscribers.  However, such gifts are often conditioned on spending thresholds, specific product purchases, or mandatory subscriptions to costly services.

## C. Respondent's breach of data security obligations

45.    This is also a complaint against Respondent for failure to secure and safeguard its consumers' personal data, including, but not limited to, name, address, email address, phone number, credit card information, and biometric data such as fingerprint information.

46.    Consumers, such as Claimant, were required to disclose personal identifying information to Respondent to do business with it.  Consumers, and Claimant, entered into implied contracts for Respondent to implement data security adequate to safeguard and protect the privacy of the consumers', including Claimant's, information.

47.    Respondent's failure to abide by best practices and industry standards to safeguard its customers' personal information, including Claimant's, has compromised the consumers' personal information, or has placed upon the private information an in increased risk of future identity theft, fraud, and/or misuse of the private information, which may take years to manifest, discover, and detect.

48.    Respondent requires customers to disclose personal identifying information and process customer credit and debit card payments.

49.    Respondent's mobile application requests permissions including access to Bluetooth and Wi-Fi network information.

50.     Respondent's mobile application draws on customer data and search history with the assistance of artificial intelligence algorithms to discern emerging fashion preferences and patterns.

51.     The Better Business Burau has amassed more than 900 complaints from customers, including the unauthorized withdrawals from bank accounts and credit card purchases soon after a consumer began purchasing on Respondent's online platform.

52.     China's Cybersecurity Law, introduced in 2016 and enforced from 2017, obligates Critical Information Infrastructure (CII) operators to provide unobstructed access to their data to the government and mandates that such data be stored exclusively within mainland China.

53.     Respondent's failure to comply with reasonable security standards, and instead adhere to Chinese laws, placed consumers', including Claimants', private information at serious and ongoing risk.

54.     Respondent allowed widespread and systematic theft of its customers' personal information, including Claimant's information.  Respondent's actions did not come close to meeting the standards of commercially reasonable steps that should be taken to protect customers' personal information.

## FIRST CAUSE OF ACTION

### Violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710

55.     Claimant incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

56.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

57.     As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

58.     Respondent is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

59.     As defined in 18 U.S.C. § 2710(a)(3), "personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

60.     Respondent knowingly causes Personal Viewing Information of the consumers of the Website, including personally identifiable IDs, to be disclosed to Facebook, Google, and others. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identifies the applicable consumer as an individual who viewed Video Media, including the specific video materials requested from the Website.

61.     As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged in the preceding paragraphs, consumers of Respondent's platform services subscribe to Respondent's services on Respondent's Website, including monthly membership.

62.     As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner." Respondent failed to obtain informed, written consent under this definition.

63.     In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Respondent failed to provide an opportunity to opt out as required by the VPPA.

64.     Respondent knew that these disclosures identified the applicable consumers to Facebook. Respondent also knew that the Personal Viewing Information of its consumers was disclosed to Facebook, Google, and others, because, *inter alia*, Respondent chose, programmed, and intended for third parties to receive the video details and the consumer's ID.

65.     By disclosing the Personal Viewing Information of its consumers, Respondent violated the statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

66.     As a result of the above violations, Respondent is liable to Claimant for actual damages related to Claimant's loss of privacy or alternatively for "liquidated damages not less than $2,500" for each time that Claimant's Personal Viewing Information was disclosed to Facebook or other third parties, as applicable. Under the statute, Respondent is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages.

## SECOND CAUSE OF ACTION

**Violation of the Electronic Communications Privacy Act, 18 U.S.C. §2510 and applicable state Wiretapping Statutes**

67.    Claimant incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

68.    In addition to violating VPPA, Respondent's unlawful wiretapping violates the federal Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §2510, and state wiretapping statutes throughout the country, including, as applicable, Nevada's Interception and Disclosure of Wire and Radio Communications or Private Conversations statute, NRS 200.610, *et seq.*, the California Invasion of Privacy Act ("CIPA"), Cal. Pen. Code §631, and Pennsylvania's Wiretapping and Electronic Surveillance Control Act ("WESCA").

69.    As a result of the above violations, Respondent is liable to Claimant for actual damages, liquidated damages, punitive damages, and reasonable attorneys' fees and other litigation costs.

## THIRD CAUSE OF ACTION

**Violation of the Federal Trade Commission Act, 15 U.S.C. §45, and applicable state Unfair or Deceptive Acts or Practices ("UDAP") statutes**

70.    Claimant incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

71.    Respondent's use of tracking pixel spyware violates Section 5 of the Federal Trade Commission Act, 15 U.S.C. §45, which prohibits businesses from engaging in unfair or deceptive acts or practices in or affecting commerce, as interpreted and enforced by the Federal Trade Commission ("FTC").

72.    Because of these concerns, the FTC warned businesses that "using tracking pixels that impermissibly disclose an individual's personal information . . . to third parties may be violating the FTC Act . . . other state or federal statutes involving the disclosure of personal information, and your privacy promises to consumers."[13]

73.    In this case, Respondent failed to secure Claimant's informed consent before surveilling Claimant with a multitude of third-party tracking pixels and, in so doing, Respondent violated Section 5 of the FTC Act as interpreted by the FTC.

---

[13] *Id.*

74.     By violating Section 5 of the FTC Act and wiretapping statutes in Pennsylvania, Nevada, and California, Respondent also violated state Unfair or Deceptive Acts or Practices ("UDAP") statutes across the country, as applicable.

75.     California's Unfair Competition Law prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]" Cal. Bus. & Prof. Code § 17200.

76.     Similarly, Nevada's Deceptive Trade Practices Act, NRS 598.0901, *et seq.*, prohibits "deceptive trade practices," which is defined to include a knowing violation of "a federal statute or regulation relating to the sale or lease of goods or services." NRS 598.0923(1)(c).

77.     Likewise, the courts have interpreted and enforced Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.*, which prohibit "unfair or deceptive acts or practices," by reference to FTC actions and interpretations as to what constitutes an unfair or deceptive act or practice under Section 5 of the FTC Act.[14]

78.     As a result of these violations, Claimant seeks: (1) actual, nominal, and punitive damages; (2) reasonable attorneys' fees and costs; and (3) any and all other relief that may be available at law or equity.

## FORTH CAUSE OF ACTION

### Violations of New York General Business Law §349

79.     Claimant incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

80.     New York General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

81.     In its sale of goods and or services to customers in New York and throughout the United States, Respondent conducted business and trade within the meaning and intent of New York General Business Law § 349.

82.     Claimant is a consumer who purchased goods or services from Respondent for their personal use.

83.     By the acts alleged herein, Respondent has engaged in deceptive and misleading acts and practices designed to induce users, including Claimant, to sign up to its platform.

---

[14] *See, e.g., Commonwealth v. Hush-Tone Indus., Inc.*, 4 Pa. Commw. 1, 21 (1972) (noting that the UTPCPL "is modeled on the Federal Trade Commission and Lanham Trademark Acts and [courts] may look to the decisions under those Acts for guidance and interpretation").

84.    Respondent induces users to sign up with the promise of low-cost, high-quality goods. However, Respondent's representations regarding the products sold are false. Consumers experience undelivered packages, poor customer services, and receive goods that are often of low quality.

85.    Respondent has profited from consumers signing up to its platform and using its services. Respondent has further profited by surveilling consumers via third-party tracking pixels, including Claimant, and by disseminating and sharing the consumers' data to third parties.

86.    By reason of this conduct, Respondent has engaged and continues to engage in deceptive acts and practices in violation of the New York General Business Law § 349.

87.    Respondent's deceptive acts, misrepresentations, and omissions have a tendency to deceive, and in fact deceived Claimant.

88.    Respondent's deceptive acts, misrepresentations, and omissions were and are material, in that they were likely to, and did in fact, mislead reasonable consumers acting reasonably under the circumstances.

89.    Respondent knowingly and willingly committed these deceptive acts and practices for its own profit and for the profit of its shareholders.

90.    As a direct and proximate result of Respondent's deceptive actions, Claimant has been harmed and has lost money or property.

91.    Respondent's actions were the direct, foreseeable, and proximate cause of the damages that Claimant sustained from having paid for and consumed Respondent's services.

92.    As a result of Respondent's deceptive actions and practices, Claimant has suffered damages and is entitled to recover those damages or $50, whichever is greater. Claimant is also entitled to treble damages up to $1,000 because Respondent willfully and knowingly committed deceptive acts and practices in violation of New York General Business Law § 349. Claimant is also entitled to reasonable attorneys' fees from Respondent.

## <u>FIFTH CAUSE OF ACTION</u>

### **Violations of New York General Business Law §350**

93.    Claimant incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

94.    New York General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

95.    Respondent engaged in false advertising and deceptive pricing schemes whereby Respondent falsely advertised its products at lower prices than it actually charges, and falsely advertises that consumers will receive "free" products, whereby Respondent does not honor its advertisements.

96.    Respondent offers "90% OFF deals," and engages in classic social engineering techniques to create urgency via time-limited offers.  However, Respondent does not honor its advertisement and charges more than the products' advertised price.

97.    Respondent falsely advertised the prices of its products, and falsely advertised "free" awards, which were conditioned upon spending thresholds, specific product purchases, or mandatory subscription s to costly services.

98.    Respondent's material misrepresentations, omissions, and failures to disclose as described herein constitute false advertising in violation of New York General Business Law § 350,

99.    Respondent's false advertising has a tendency to deceive, and in fact deceived, Claimant.

100.    Respondent's false advertising is and was material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

101.    Respondent knowingly and willingly made these false advertisements and misrepresentations for its own profit and for the profit of its shareholders.

102.    As a direct and proximate result of Respondent's false advertising, Claimant has been harmed and has lost money or property.

103.    Respondent's actions were the direct, foreseeable, and proximate cause of the damages that Claimant sustained from having paid for and consumed Respondent's services.

104.    Section 350-e allows any person who has been injured by any violation of section 350 or section 350-a to bring an action to recover actual damages or $500, whichever is greater.

105.    As a result of Respondent's false advertising, Claimant has suffered damages and is therefore entitled to recover those damages or $500 per person (whichever is greater). Claimant is also entitled to treble damages up to $10,000 because Respondent willfully and knowingly conducted false advertising in violation of New York General Business Law § 350. Claimant is also entitled to reasonable attorney's fees from Respondent.

## SIXTH CAUSE OF ACTION

### Breach of Expressed and/or Implied Contract

106.    Claimant incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

107.    Claimant entered into a valid and enforceable express contracts with Respondent under which Claimant agreed to provide their private information to Respondent, and Respondent impliedly, if not explicitly, agreed to protect Claimant's private information.

108.    To the extent Respondent's obligation to protect Claimant's private information was not explicit in those express contracts, the express contracts included implied terms requiring Respondent to implement data security adequate to safeguard and protect the confidentiality of Claimant's private information, including in accordance with FCC regulations; federal, state and local laws; and industry standards.    Claimant would not have entered into these contracts with Respondent without the understanding that Claimant's Private Information would be safeguarded and protected; stated otherwise, data security was an essential implied term of the parties' express contracts.

109.    A meeting of the minds occurred, as Claimant agreed, among other things, to provide their private information in exchange for Respondent's agreement to protect the confidentiality of Claimant's private information.

110.    The protection of Claimant's private information was a material aspect of Claimant's contracts with Respondent.

111.    Respondent's promises and representations described above relating to FCC regulations and industry practices, and Respondent's purported concern about its clients' privacy rights became terms of Claimant's contracts with Respondent.    Respondent breached these promises by failing to comply with FCC regulations and reasonable industry practices.

112.    Claimant read, reviewed, and/or relied on statements made by or provided by Respondent and/or otherwise understood that Respondent would protect their private information if that information was provided to Respondent.

113.    Claimant fully performed their obligations under the implied contract with Respondent, however, Respondent did not.

114.    As a result of Respondent's breach of these terms, Claimant has suffered a variety of damages including but not limited to: the lost value of their privacy; not getting the benefit of their bargain with Respondent; the lost difference in the value between the secure services Respondent promised and the insecure services received; the value of the lost time and effort required to mitigate the actual and potential impact of a data breach on their lives, including, *inter alia*, the requirement to place "freezes" and "alerts" with credit reporting agencies, to contact financial institutions, to close or modify accounts, to closely review and monitor credit reports and carious accounts for unauthorized activity, and to file police reports.    Additionally, Claimant has been put an in increased risk of future identity theft, fraud, and/or misuse of their private information, which may take years to manifest, discover, and detect.

115.    Claimant is therefore entitled to damages, including restitution and unjust enrichment, disgorgement, declaratory and injunctive relief, and fees and costs of litigation.

## SEVENTH CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

116.    Claimant incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

117.    Claimant was required to disclose personal identifying information to Respondent to do business with it. An implied contract was formed for Respondent to implement data security adequate to safeguard and protect the privacy of Claimant's private information.

118.    When Claimant provided their private information to Respondent in exchange for Respondent's goods and/or services, they entered into an implied contract with Respondent pursuant to which Respondent agreed to reasonably protect such information.

119.    In entering such implied contract, Claimant reasonably believed and expected that Respondent's data security practices complied with relevant laws and regulations and were consistent with industry standards.

120.    Under the implied contract, Respondent and/or its affiliated providers promised and was obligated to protect Claimant's private information.  In exchange, Claimant agreed to turn over their private information.

121.    Respondent's express representations, including, but not limited to the express representations found in its notices of privacy practices, memorialize and embody the implied contractual obligations requiring Respondent to implement data security adequate to safeguard and protect the privacy of Claimant's private information.

122.    Claimant performed the obligations under the contract when Claimant provided their private information in consideration for Respondent's goods and/or services.

123.    Where the terms of a contract are literally complied with but one party to the contract deliberately contravenes the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing.

124.    Respondent materially breached its contractual obligations to protect the private information Respondent gathered when Respondent failed to maintain privacy safety measures in compliance with industry standards, or standards of conduct embodied in statutes like Section 5 of the FTCA.

125.    As a result of Respondent's failure to fulfill the data security protections promised, Claimant did not receive the full benefit of the bargain they entered into, and instead received services that were of a diminished value to that described in the contracts.  Claimant, therefore, was damaged

in an amount at least equal to the difference in the value between the secure services Respondent promised and the insecure services received.

126.    Had Respondent disclosed that its security was inadequate or that it did not adhere to industry-standard security measures, Claimant would not have entered into the aforementioned contracts with Respondent.

127.    As a direct and proximate result of Respondent's failure, Claimant has been put in an imminent risk of harm, and is at risk of the release and disclosure of their private information, the loss of control of their private information, the imminent risk of suffering additional damages in the future, out of pocket expenses, and the loss of the benefit of the bargain they had struck with Respondent.

128.    As a result of these violations, Claimant seeks: (1) actual, nominal, consequential, and statutory damages in an amount in excess of the jurisdictional limit of small claims courts applicable to this claim; (2) reasonable attorneys' fee and costs; (3) injunctive relief as to this claim; and (4) any and all other relief that may be available at law or equity.

## REQUEST FOR RELIEF

WHEREFORE, Claimant, requests that judgment be entered against Respondent as follows:

A.    finding in favor of Claimant on all counts asserted herein;

B.    awarding Claimant appropriate relief, including actual, nominal and statutory damages;

C.    awarding Claimant punitive damages;

D.    awarding Claimant civil penalties;

E.    awarding Claimant the costs of prosecuting this action, including expert witness fees,

F.    awarding Claimant reasonable attorneys' fees and costs, and

G.    awarding other relief that the Arbitrator deems appropriate.

## Hearing Requested

Claimant requests that a hearing be held in this matter in accordance with the rules of the American Arbitration Association in a location within New York, New York.

Dated: March 27, 2024

/s/ Michael Kind
Michael Kind, Esq.
8860 South Maryland Parkway, Suite 106
Las Vegas, Nevada 89123
Attorney for Claimant

## DOCUMENT PRESERVATION DEMAND

Claimant hereby demands that Respondent take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Claimant, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Claimant, and any account or number or symbol relating to them. These materials are likely very relevant to this claim. If Respondent is aware of any third party that has possession, custody, or control of any such materials, Claimant demands that Respondent request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties to the Respondent.

/s/ Michael Kind
Michael Kind, Esq.
8860 South Maryland Parkway, Suite 106
Las Vegas, Nevada 89123
Attorney for Claimant

**CERTIFICATE OF SERVICE**

I hereby certify that on or about the day that this Certificate was executed, I caused to be served by email copies of the attached documents:

- Arbitration Complaint

- Demand for Arbitration Form

on the following parties:

Whaleco Inc.
Suite 355, 31 St. James Avenue,
Boston, Massachusetts 02116
Attention: Legal Department

Serrin Turner, Esq.
LATHAM & WATKINS LLP
1271 Avenue of the Americas,
New York, New York 10020-1401
Serrin.Turner@lw.com

Dated: March 27, 2024

**KIND LAW**

 _/s/_ Michael Kind
Michael Kind, Esq.
8860 South Maryland Parkway, Suite 106
Las Vegas, Nevada 89123
Attorney for Claimant

## Certificate of Compliance with the Informal Dispute Resolution Process

I,  Aalany McMahan
hereby certify that I have taken all reasonable measures to comply with the informal dispute resolution process provided in Section 20.2 of the applicable terms and conditions. The attached complaint details the legal claims being asserted and the factual bases of those claims, along with a description of the remedy sought and the amount in controversy. You can confirm directly with the American Arbitration Association any questions about filing fees.

In addition, below is contact information that should suffice to identify my account:

Name:  Aalany McMahan

Telephone: ███████████

Mailing address:
███████████████████████ California 91343

Email address:
███████████████

PERSONALLY SIGNED BY CLAIMANT

Aalany McMahan

# EXHIBIT 8

**Serrin Turner**
Direct Dial: (212) 906-1330
Serrin.Turner@lw.com

1271 Avenue of the Americas
New York, New York  10020-1401
Tel: +1.212.906.1200  Fax: +1.212.751.4864
www.lw.com

**LATHAM&WATKINS** LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Silicon Valley |
| Hong Kong | Singapore |
| Houston | Tel Aviv |
| London | Tokyo |
| Los Angeles | Washington, D.C. |
| Madrid | |

April 12, 2024

**VIA EMAIL**

American Arbitration Association
Mass Arbitration Intake
Rachel Jacobsen
Victoria Chandler
massarbintake@adr.org
VictoriaChandler@adr.org

     Re:     Case Number: 01-24-0003-3726

Ms. Jacobsen:

     We represent the Respondent, Whaleco Inc. d/b/a Temu ("Temu"), in the above-captioned case, comprising arbitration demands submitted on behalf of 15,648 claimants ("Claimants").  We write to inform AAA that Claimants have not satisfied certain mandatory preconditions to arbitrating their claims. Accordingly, AAA should decline to accept this case, unless and until the dispute over this preliminary issue is resolved in court, as the applicable arbitration agreement requires.

     **A. Claimants Have Not Completed Informal Dispute Resolution, as the Terms Require**

     Each Claimant purports to be a subscriber of Temu's services and seeks to bring a demand under the arbitration clause in Temu's Terms of Use ("Terms"). *See, e.g.*, Attachment 7 (Sample Demand – #2991 (Clarence Williams)) at ¶¶ 7, 10.  However, the arbitration clause in the Terms requires any party seeking to file an arbitration demand to first participate in an informal dispute resolution ("IDR") process.  Specifically, the Terms provide:

     **19.2 Informal Dispute Resolution.** There may be instances when a Dispute arises between you and us. If that occurs, we are committed to working with you to reach a reasonable resolution. You and we agree that good faith informal efforts to resolve Disputes can result in a prompt, low-cost and mutually beneficial outcome. You and we therefore agree that before either party commences arbitration against the other (or initiates an action in small claims court if a party so elects), we will personally meet and confer telephonically or via videoconference, in a good faith effort to resolve informally any Dispute covered by this Arbitration Agreement ("Informal Dispute Resolution Conference"). If you are represented by counsel, your counsel may participate in the conference, but you also agree to participate in the conference. The party initiating a Dispute must give notice to the other party in writing of its intent to initiate an Informal Dispute Resolution Conference

LATHAM&WATKINS LLP

("Notice"), which shall occur within forty-five (45) days after the other party receives such Notice, unless an extension is mutually agreed upon by the parties in writing. Notice to us that you intend to initiate an Informal Dispute Resolution Conference should be sent by email to dispute@temu.com, or by regular mail to the applicable address set forth in Section 18.5. The Notice must include: (1) your name, telephone number, mailing address, email address associated with your Account (if you have one); (2) the name, telephone number, mailing address and e-mail address of your counsel, if any; and (3) a description of your Dispute. *** ***Engaging in the Informal Dispute Resolution Conference is a condition precedent and requirement that must be fulfilled before commencing arbitration.*** The statute of limitations and any filing fee deadlines shall be tolled while the parties engage in the Informal Dispute Resolution Conference process required by this section.

*See* Attachment 1 (Temu's Terms of Use) at § 19.2 (emphasis added).

No Claimant has satisfied the IDR precondition to arbitration. A mere five of the Claimants agreed to meet with Temu as part of the IDR process, but neither they nor their counsel at Kind Law (who attended these five conferences) was willing to provide any substantive information about the nature of their disputes with Temu, which thwarted any opportunity to informally discuss their claims.[1] Accordingly, even these five Claimants failed to complete the IDR process in good faith as required by the Terms. *Id.* (parties must confer "personally" and in a "good faith effort" in IDR conferences).

More significantly, following these five conferences, counsel for Claimants abruptly refused to make any of his remaining clients available for IDR conferences. These remaining 15,643 Claimants have since had no contact with Temu (through counsel or otherwise) in an effort to satisfy the IDR requirement.

Accordingly, none of the Claimants has satisfied the IDR precondition to bringing their arbitration demands.

**B. Claimants' Demands Do Not Contain Certifications of Compliance with the IDR Process, as the Terms Require**

Relatedly, the Claimants' demands fail to comply with the filing requirements in the Terms related to the IDR process. The Terms require a claimant filing an arbitration demand to "include as part of the demand a personally signed certification of compliance with the informal dispute resolution process." Attachment 1 at § 19.5. Claimants are clearly aware of this requirement, as the five Claimants who purported to participate in the IDR process (*supra* n.1) included the necessary certifications—although, for the reasons described above, Temu disputes the validity of

---

[1] These five Claimants are Aalany McMahan (Demand #1), Ariella Shor (Demand #1186), Avrohom Shor (Demand #1386), Isaac Dwek (Demand #5712), and Luke Seagraves (Demand #9360). *See* Attachments 2-6.

**LATHAM & WATKINS** LLP

these certifications.  As to the remaining 15,643 Claimants, none have complied with the IDR certification requirement, nor could they, as they failed to engage at all in the IDR process.  For example, Attachments 7-11 are a random sample of Claimants' demands (Demand #s 2991, 2992, 2993, 2994, 2995), none of which contain the required IDR certification.  For this additional reason, Claimants have not complied with the preconditions to arbitration contained in the Terms.

### C. Any Dispute Regarding Compliance with Preconditions to Arbitration Must Be Litigated in Court

Given that there is a dispute as to whether Claimants have complied with preconditions to arbitration, these demands cannot proceed; the arbitration provision in the Terms instead requires that any such dispute first be resolved in court.  The Terms specifically provide, as an exception to the delegation clause in the arbitration agreement, that "all Disputes about whether either party has satisfied any condition precedent to arbitration ***shall be decided only by a court*** of competent jurisdiction and not by an arbitrator."  Attachment 1 § 19.7 (emphasis added).  Here, Temu disputes that Claimants have satisfied the conditions precedent to arbitration described above.  AAA lacks authority to resolve this dispute under the Terms.  Accordingly, AAA should close this matter until such dispute is resolved in court.

### D. Payment of Temu's Initiation Fee

On April 11, 2024, Temu received an invoice from AAA for its portion of the applicable initiation fee.  Temu respectfully requests clarification from AAA as to whether Temu's $8,125 initiation fee should be due currently, or deferred pending resolution of the above issues.  The Consumer Mass Arbitration and Mediation Fee Schedule provides that "[t]he business will be responsible for their portion of the [initiation] fee once the individuals have met the AAA's filing requirements."  For the reasons stated above, Temu submits that Claimants have not satisfied the applicable filing requirements, and that AAA should therefore close the case and not require payment of any initiation fees unless and until it is reopened after all filing requirements—including the preconditions to arbitration specified in the Terms—have been met.  However, Temu will make timely payment to AAA of its portion of the initiation fee should AAA deem it appropriate at this time.

Sincerely,

*/s/ Serrin Turner*
of LATHAM & WATKINS LLP

Enclosures

cc: Michael Kind, Esq.

# EXHIBIT 9



8860 South Maryland Parkway, Suite 106
Las Vegas, Nevada 89123
P: (702) 337-2322 | T: (844) 399-KIND (5463)
https://kindlaw.com

April 19, 2024

**Sent by email**
American Arbitration Association
Mass Arbitration Intake
Rachael Jacobsen
Victoria Chandler
massarbintake@adr.org
VictoriaChandler@adr.org
-and-
Serrin Turner, Esq.
LATHAM & WATKINS LLP
Serrin.Turner@lw.com

**RE: Case Number: 01-24-0003-3726**

Dear Ms. Chandler,

We write in response to your request for a comment related to Whaleco Inc.'s ("Temu") letter dated April 12, 2024. Claimants strongly disagree with the position Temu has taken.

I.    **Temu's February 1, 2024, Terms and Conditions are not enforceable since Claimants opted out of the version on February 23, 2024.**

On February 1, 2024, Temu unilaterally changed its Terms and Conditions ("Terms"). Section 19.10 of Temu's February 1, 2024, version provides that consumers have a 30-day right to opt out of the provisions by sending notice to Temu of such opt-out in writing.[1]

On February 23, 2024, 15,648 Claimants opted out of the February 1, 2024, version, and instructed Temu that they instead intend to enforce the agreement that was mutually entered into prior to the unilateral changes. The opt out letter was mailed to Whaleco Inc., Suite 355, 31 St. James Avenue, Boston, Massachusetts 02116, USA in compliance with the Term Notice requirements outlined in section 18.5. [2]

As such, the version of the Terms attached to Temu's letter is not enforceable. The Terms which Claimants intend to enforce are attached hereto as **Exhibit 2.**

---

[1] *See* Section 19.10 of Temu's Terms of Use, attaches as Attachment 1 of Temu's April 12, 2024, letter.
[2] Attached as **Exhibit 1**.

Temu
April 19, 2024
Page 2 of 5

## II.    Informal Dispute Resolution Process

A.    _Claimants challenge the enforceability of the Informal Dispute Process._

Section 2 of the FAA states that arbitration clauses are enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. §2.  Common challenges to the enforceability of a contract include, but are not limited to, (i) unconscionability, (ii) undue influence, (iii) illegality, (iv) waiver, (v) violation of public policy, and (vi) lack of consideration, etc.  Such challenges are especially critical in contracts of adhesion where one party has no or little say in drafting the terms of the contract and no meeting of the minds has occurred between the parties regarding the terms of the contract.

Here, Claimants challenge the enforceability of Temu's Informal Dispute Resolution clause ("IDR"), which has been utilized by Temu to chill consumers from engaging in their right to pursue and resolve disputes through means of alternative dispute resolution.

Specifically, Temu's informal dispute process required claimants to participate in individual conferences prior to submitting their claims with the AAA, wherein Temu treated the informal dispute conferences as an opportunity to depose Claimants, and not as an opportunity to resolve their claims.  For example, Temu was represented by its customer service department, which had no authority to resolve the disputes, and Temu engaged in the informal dispute conferences armed with a script, which Temu treated as an opportunity to depose the claimants.  Moreover, Temu unequivocally stated that their intentions were to conduct ALL informal dispute resolutions conferences in the same manner.

As outlined below, Claimants request that the AAA set a briefing schedule with a merits arbitrator to brief the enforceability of Temu's IDR clause.[3]

B.    _Challenges of the enforceability of the Arbitration Clause are to be resolved by an arbitrator, not a court of competent jurisdiction_.

Section 19.7 of the Terms applicable to Claimants' claims describes the authority of the arbitrator. Such section is commonly referred to as a delegation clause.

Section 19.7 of the Terms applicable to Claimants' claims states that the arbitrator will have exclusive authority to resolve any dispute, such as disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including "**the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the**

---

[3] Claimants reserve all rights and arguments to be raised at a later date.  Nothing in this letter may be construed as a waiver of any right.  For avoidance of doubt, it is Claimants' intent to fully brief their enforceability challenge of Temu's IDR clause at a later date, once a mediator has been appointed.

Temu
April 19, 2024
Page 3 of 5

**Arbitration Agreement**….” (*emphasis added*).[4]  The section continues to list the following exceptions which are to be determined by a court of competent jurisdiction, but which exceptions are not applicable to Claimants' enforceability challenge:[5]

> (1) all Disputes arising out of or relating to Section 19.4 (waiver of class and other non-individualized relief);
> (2) all Disputes about the payment of arbitration fees, except as expressly contemplated in Section 19.9;
> (3) all Disputes about whether either party has satisfied any condition precedent to arbitration; and
> (4) all Disputes about which version of the Arbitration Agreement applies.

As outlined above, Claimants are challenging the enforceability of the IDR clause.[6]  And pursuant to the delegation clause of the Terms, such a challenge must be resolved by an arbitrator and not a court of competent jurisdiction.

In its April 12, 2024, letter, Temu argues that Claimants have not complied with the IDR process and argues that any dispute regarding compliance must be litigated in court, referencing exception number three to Section 19.7.  However, any such determination is premature and must be made after an arbitrator determines whether the IDR clause is enforceable.

As such, Claimants request that the AAA set a briefing schedule with a merits arbitrator to brief the enforceability of Temu's IDR clause.

   C. *Any challenges to the enforceability of the Arbitration provision should be determined by a merits arbitrator, not a process arbitrator.*

As outlined above, the issue of whether or not a clause from the arbitration agreement is enforceable is to be determined by an arbitrator.  There are two types of arbitrators defined within the AAA's rules – a process arbitrator and a merits arbitrator.  Rule MA-6 of the AAA's Mass Arbitration Supplementary rules outlines the authority of the process arbitrator.

MA-6 provides that a process arbitrator has the authority to resolve the following issues:[7]

1. Whether the parties have met the AAA-ICDR's filing requirements, or the filing requirements of the parties' contract;
2. Disputes over any applicable conditions precedent;
3. Disputes regarding payment of administrative fees, arbitrator compensation, and expenses;
4. Disputes over which demands should be included in a mass arbitration filing;

---

[4] *See* Section 19.7 of **Exhibit 2**.
[5] *Id*.
[6] Outlined within Section 19.2 of the applicable Terms.
[7] *See* The AAA's Mass Arbitration Supplementary Rules, MA-6 (c), at p. 6-7, attached hereto as **Exhibit 3**.

Temu
April 19, 2024
Page 4 of 5

5. Selection process for Merits Arbitrator;
6. Determining the applicable AAA rules that will govern the individual disputes;
7. Small claims court jurisdiction;
8. Whether the merits arbitrator will proceed by documents only or hold hearings;
9. Local of merits hearings;
10. Whether subsequently filed cases are part of the same mass arbitration;
11. Whether any previously issued rulings by the process arbitrator are binding on subsequent cases;
12. Non-merits issues affecting case administration; and
13. Any other issue(s) the parties agree in writing to submit to the Process Arbitrator.

As outlined above, MA-6 does not give the process arbitrator the authority to determine the enforceability of an arbitration provision. MA-6 is an all-encompassing rule, meaning, the process arbitrator has authority to resolve only the issues outlined within the rule. Anything not included within the rule is to be determined by a merits arbitrator.

Since Claimants have not agreed in writing to authorize the process arbitrator to determine the enforceability of the arbitration agreement, Claimants' enforceability challenge must be determined by a merits arbitrator.

As such, Claimants request that the AAA set a briefing schedule with a merits arbitrator to brief the enforceability of Temu's IDR clause.

### III.    Aalany McMahan, Ariella Shor, Avrohom Shor, Isaac Dwek, and Luke Seagraves have complied with any Informal Dispute Process requirements (if enforceable), and their Claims must proceed in arbitration.

Section 19.2 of the Terms applicable to Claimants' claims state that prior to commencing arbitration, the parties will meet and confer in a good faith effort to resolve any dispute.[8] Following the participation in an IDR conference, a party who wishes to initiate arbitration must file a demand for arbitration which includes: (1) name, telephone number, mailing address, e-mail address of the party seeking arbitration; (2) account username (if applicable) as well as email address associated with any applicable account; (3) a statement of the legal claims being asserted and factual basis; (4) a description of the remedy sought; (5) a statement clarifying completion of the IDR process; and (6) evidence that requesting party has paid any necessary filing fees.[9]

On February 19, Aalany McMahan, Ariella Shor, Avrohom Shor, Isaac Dwek, and Luke Seagraves participated in IDR conference. Unfortunately, Temu was not prepared nor willing to resolve any of their disputes.

---

[8] *See* Section 19.2 of **Exhibit 2**.
[9] *See* Section 19.5 of **Exhibit 2**

Temu
April 19, 2024
Page 5 of 5

On March 27, 2024, the above listed claimants submitted their demands for arbitration in compliance with the requirements outlined within the applicable Terms. In their letter dated April 12, 2024, Temu even admits that the five claimants referenced above submitted certifications of compliance.

On April 10, 2024, claimants paid their portion of the Initiation Fees.

As such, Aalany McMahan, Ariella Shor, Avrohom Shor, Isaac Dwek, and Luke Seagraves have complied with any Informal Dispute Process requirements, if enforceable at all, and their claims must proceed in arbitration.

In conclusion, claimants disagree with Temu's position. Claimants challenge the enforceability of Temu's IDR clause, which challenge must be resolved by a merits arbitrator. As such, Claimants request that the AAA instruct Temu to pay its portion of the initiation fees and any subsequent fees required. And for the AAA to begin the selection process of a merits arbitrator who will determine the validity of Temu's IDR clause.

Thank you,

*Angel P. Getsov*

Angel P. Getsov, Esq.

# EXHIBIT 9.1



8860 South Maryland Parkway, Suite 106
Las Vegas, Nevada 89123
P: (702) 337-2322 | T: (844) 399-KIND (5463)
www.kindlaw.com

February 23, 2024

**Sent by U.S. Mail**

Whaleco Inc.

Suite 355, 31 St. James Avenue

Boston, Massachusetts 02116

USA

**Re: Opt out of the arbitration agreement provisions**

To Whom It May Concern:

Please note that the 15648 individuals that our firm represents, detailed in the attached list, hereby reject and opt out of the changes to the arbitration agreement that Whaleco Inc. *dba* Temu unilaterally attempted to implement on December 29, 2023 and on February 1, 2024. Our clients intend to instead enforce the agreement that was mutually entered into prior to the attempted changes. Each of our clients have expressly authorized our firm to deliver this message on their behalf.

Thank you,

Michael Kind

# EXHIBIT 9.2

# Temu | Terms of Use

Last updated: December 19, 2023

English|Filipino

Thank you for using Temu! These Terms of Use ("Terms") contain the rules and restrictions that govern your use of our applications, products, services and websites ("Services"). These Terms form a binding agreement between you and us. By completing the registration process and/or browsing the Services, you represent that (1) you have read, understand and agree to be bound by the Terms; (2) you are of legal age to form a binding contract with us; (3) you have the authority to enter into the Terms personally; and (4) if you are using the Services on behalf of a company or other entity, (a) you agree that "you" includes you and that entity, (b) you are an authorized representative of the entity with the authority to bind the entity to these Terms, and (c) you agree to these Terms on the entity's behalf. You should not access or use the Services unless you agree to be bound by all of these Terms.

# 1. Overview

**1.1** Your residence determines the party with which you enter these Terms:

- If you reside in the United States, these Terms are between you and Whaleco Inc., a Delaware company.
- If you reside in the United Kingdom, these terms are between you and Whaleco UK Limited, a UK company.
- If you reside in Canada, you contract with Whaleco Canada Inc. and the applicable terms are here.
- If you reside anywhere other than the United States, Canada, or the United Kingdom, these Terms are between you and Whaleco Technology Limited, an Ireland company.

**1.2** Whaleco Inc., Whaleco UK Limited, and Whaleco Technology Limited, as applicable, are referred to in these Terms and Policies (as defined below) as "we" or "us,". For purposes of these Terms and Policies, we also refer to:

- Our website and mobile apps, which may offer features, products, services or content, including exchanges of information, as "Temu" or "our app";
- End users, including visitors to Temu and those who use Temu to purchase products as "you."

**1.3** We and our affiliates provide technical and operational support for our app. You may pay for multiple orders in one transaction on Temu. Multiple orders may be delivered together in one package.

**1.4** Your use of, and participation in, certain Services may be subject to additional policies we may publish from time to time ("Policies"), including our

Privacy Policy. If the Terms are inconsistent with the Policies, the Policies shall control with respect to the relevant subject matter.

**1.5** PLEASE BE AWARE THAT SECTION 19 BELOW CONTAINS PROVISIONS GOVERNING HOW DISPUTES BETWEEN YOU AND US WILL BE RESOLVED, INCLUDING WITHOUT LIMITATION, ANY DISPUTES THAT AROSE OR WERE ASSERTED PRIOR TO THE EFFECTIVE DATE OF THE TERMS. SECTION 19 CONTAINS, AMONG OTHER THINGS, AN AGREEMENT TO ARBITRATE WHICH REQUIRES, WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU AND US BE RESOLVED BY BINDING AND FINAL ARBITRATION. UNLESS YOU OPT OUT OF THE AGREEMENT TO ARBITRATE WITHIN 30 DAYS OF THE EFFECTIVE DATE OF THE AGREEMENT: (1) YOU AND WE WILL ONLY BE PERMITTED TO PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF AGAINST THE OTHER PARTY ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION OR PROCEEDING AND EACH OF US WAIVES OUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION; AND (2) EACH OF US IS WAIVING OUR RIGHT TO PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF IN A COURT OF LAW AND TO HAVE A JURY TRIAL. IN SOME COUNTRIES YOU MAY HAVE ADDITIONAL RIGHTS AND/OR ELEMENTS OF THE ARBITRATION AGREEMENT MAY NOT APPLY TO YOU AS REQUIRED BY LAW.

**1.6** PLEASE NOTE THAT THESE TERMS ARE SUBJECT TO CHANGE BY US IN OUR SOLE DISCRETION AT ANY TIME. When changes are made, we will make a new copy of the Terms and any updated Policies available on Temu. We will also update the "Last Updated" date at the top of the Terms. Any changes to the Terms will be effective immediately for all users of the Services, provided that any material changes shall be effective for existing users thirty (30) days after posting. We may require you to provide consent to the updated Terms in a specified manner before further use of the Services is permitted. If you do not agree to any change(s) after receiving a notice of such change(s), you shall stop using the Services. Otherwise, your continued use of the Services constitutes your acceptance of such change(s). PLEASE REGULARLY CHECK THE WEBSITE OR APPLICATION TO VIEW THE THEN-CURRENT TERMS.

# 2. User Requirements and Registration

**2.1** To use the Services, you represent that you are at least eighteen (18) years old and of legal age to form a binding contract. Products for children's use may be sold on Temu. However, these products are intended for sale to adults. Certain products may be intended for individuals of certain ages or "mature audiences" only. By ordering such products, you certify that you are old enough to view, use, own, or receive them. We are not responsible for third-party content that you may find offensive, indecent, or objectionable.

**2.2** You may not use the Services if: (a) you cannot enter into a binding contract with us; (b) you are located in a country embargoed by your country of residence or other relevant country; (c) you are on any agency list of prohibited persons or entities, such as the U.S. Treasury Department's list of Specially Designated Nationals; or (d) you are banned from using the Services by us, in our sole discretion.

**2.3** You may be required to create an account, and select a password and user name. When creating your account on Temu ("Account"), you agree to provide true, accurate, complete, and updated information about yourself, including contact details. You are responsible for keeping your registration information with us up to date. You are responsible for all activities that occur under your Account. You agree that you shall monitor your Account to restrict use by minors, and you will accept full responsibility for any unauthorized use of the Services by minors. You may not select as your user name a name that you don't have the right to use, or another person's name with the intent to impersonate that person. You may not transfer your account to anyone else without our prior written permission. You agree not to create an Account or use the Services if you have been permanently banned from any of the Services. You may not share your Account or password with anyone, and you agree to notify us immediately of any unauthorized use of your password or any other breach of security and to exit from your Account at the end of each session.

**2.4** You may also register an Account by connecting through a social network service account and its credentials (an "SNS Account"). If you access the Services through a SNS as part of the functionality of the Services, you may link your Account with SNS Accounts by allowing us to access your SNS Account, as is permitted under the applicable terms and conditions that govern your SNS Account. You represent that you are entitled to grant us access to your SNS Account (including, but not limited to, for use for the purposes described herein) without breach by you of any of the terms and conditions that govern your SNS Account and without obligating us to pay any fees or making us subject to any usage limitations imposed by such SNS. By granting us access to any SNS Accounts, you understand that we may access, make available and store (if applicable) any Content (as defined below) that you have provided to and stored in your SNS Account **("SNS Content")** so that it is available on and through the Services via your Account. Unless otherwise specified in the Agreement, all SNS Content shall be considered to be User Submissions for all purposes of the Terms. Depending on the SNS Accounts you choose and subject to the privacy settings that you have set in such SNS Accounts, personal information that you post to your SNS Accounts may be available on and through your Account on the Services. Please note that if a SNS Account or associated service becomes unavailable, or our access to such SNS Account is terminated by the SNS, then SNS Content will no longer be available on and through the Services. You have the ability to disable the connection between your Account and your SNS Accounts at any time by accessing the "Settings" section of the Services. PLEASE NOTE THAT YOUR RELATIONSHIP WITH THE SNS PROVIDERS ASSOCIATED WITH YOUR SNS ACCOUNTS IS GOVERNED SOLELY BY YOUR AGREEMENT(S) WITH SUCH SNS PROVIDERS, AND WE DISCLAIM ANY LIABILITY FOR PERSONAL INFORMATION THAT MAY BE PROVIDED TO US BY SUCH SNS PROVIDERS IN VIOLATION OF THE PRIVACY SETTINGS THAT YOU HAVE SET IN SUCH SNS ACCOUNTS. We make no effort to review any SNS Content for any purpose, including but not limited to, for accuracy, legality or noninfringement, and we are not responsible for any SNS Content.

# 3. Rules and Restrictions

**3.1** You agree to use the Services for your own use, and not on behalf of or for the benefit of any third party, and only in a manner that complies with these Terms, the Policies, and all laws and regulations applicable to you. If your use of the Services is prohibited by any applicable laws, then you are not authorized to use the Services. We are not responsible if you use the Services in a way that breaks the law.

**3.2** You are responsible for all activity associated with your account. Therefore, you must protect the security of your account and password and not share them with any third party. You must notify us immediately of any unauthorized use or security breach of your account.

**3.3** You must not create multiple accounts.

**3.4** Any sweepstakes, contests, raffles, surveys, games, or similar promotions (collectively, "Promotions") made available through the Services may be governed by separate rules. If the rules for a Promotion conflict with these Terms, the Promotion rules will govern.

**3.5** When using the Services, you agree and undertake not to take any action or make available any User Submissions through the Services that may:

(1) infringe or violate another person's rights, including intellectual property rights;
(2) violate any of these Terms, the Policies, or applicable laws and regulations;
(3) engage in any unlawful, harmful, abusive, misleading, false, fraudulent, deceptive, threatening, harassing, defamatory, libelous, pornographic, obscene, profane or otherwise objectionable or discriminatory conduct;
(4) circumvent or attempt to circumvent any of these Terms, the Policies or other rules relating to the Services including the Promotions;
(5) constitute unauthorized or unsolicited advertising, or junk or bulk e-mail;
(6) collect personal data from other users or use any such information collected from the Services;
(7) engage in any conduct that is likely to cause a security breach of your account;
(8) obtain another user's password, account, or other security information;
(9) use a third party's credentials, conceal your true IP address, or otherwise impersonate or misrepresent your identity or your affiliation with any person or entity;
(10) violate or interfere with the proper functioning or security of any computer network;
(11) run any form of auto-responder or "spam" on the Services, any process that runs or is activated while you are not logged into the Services, or any process that otherwise interferes with the proper functioning of the Services (including by placing an unreasonable load on the Services' infrastructure through overloading, "flooding," "mail bombing" or crashing the Services);
(12) potentially harm the Services, including but not limited to the violation of any security features of the Services, use of manual or automated software or other means to access, "crawl," "scrape," or "spider" any page, data, or portion of or relating to the Services or the introduction of viruses, worms or similar harmful code into the Services;
(13) copy or store any significant portion of the content on the Services without written consent from us;
(14) decompile, reverse engineer, or otherwise obtain the source code or underlying ideas or information of or relating to the Services;
(15) buy any products which you are not legally allowed to purchase or use;
(16) abuse any promotions, discounts, or other benefits offered by us, or manipulate the price of any listed products or interfere with listings; or
(17) attempt to do anything, or permit, encourage, assist, or allow any third party to do anything, prohibited in this list.

In addition to any other remedies available to us, a violation of any of the foregoing is grounds for:

(1) removal or refusal to post any User Submission for any or no reason in our sole discretion;
(2) cancellation of your purchases of products;
(3) cancellation of Rewards or payments due from us; and/or
(4) suspension or termination of your access or use the Services.

If we become aware of any possible violations by you of the Terms, we reserve the right to investigate such violations. If, as a result of the investigation, we believe that criminal activity has occurred, we reserve the right to refer the matter to, and to cooperate with, any and all applicable legal authorities. We are entitled, except to the extent prohibited by applicable law, to disclose any information or materials on or in the Services, including User Submissions, in our possession in connection with your use of the Services, to (i) comply with applicable laws, legal process or governmental request; (ii) enforce the Terms and Policies, (iii) respond to any claims that a User Submission violates the rights of third parties, (iv) respond to your requests for customer service, or (v) protect the rights, property or personal safety of us, our users or the public, and all enforcement or other government officials, as we in our sole discretion believe to be necessary or appropriate.

# 4. Privacy

**4.1** Our Privacy Policy provides information about how we collect, use, and disclose your personal information when you access, visit or use the Services. In connection with your use of the Services, you acknowledge and agree that we may collect, access, use, preserve and disclose your personal information (including your account and user information) as described in our Privacy Policy. The Privacy Policy is part of and is governed by these Terms and by agreeing to these Terms, you agree to be bound by the terms of the Privacy Policy.

# 5. Communications

**5.1** You consent to receive communications from us electronically, such as emails, texts, mobile push notices, and notices and messages on or through the Services ("Push Messages"), and where required by law, we will obtain your opt-in consent to deliver such Push Messages. You acknowledge that, when you use the App, your wireless service provider may charge you fees for data, text messaging and/or other wireless access, including in connection with Push Messages. Please check with your wireless service provider to determine what fees apply to your access to and use of the Services, including your receipt of Push Messages from us. You are solely responsible for any fee, cost or expense that you incur to download, install and/or use the Services on your mobile device, including for your receipt of Push Messages. You also acknowledge and agree that all terms and conditions, agreements, notices, disclosures, and other communications and documents that we provide to you electronically constitute and shall have the same legal effect as "in writing."

**5.2** You agree that we may communicate with you at any email address or telephone number that you provide us, to: (i) notify you regarding your account; (ii) troubleshoot problems with your account; (iii) resolve a dispute; (iv) collect a debt; (v) poll your opinions through surveys or questionnaires; (vi) notify you regarding order, payment and delivery updates; (vii) send you authentication texts; or (viii) as otherwise necessary to service your Account or enforce these Terms, the Policies, applicable laws and regulations, or any other agreement we may have with you. Standard text messaging charges applied by your cell phone carrier will apply to text messages that we send.

**5.3** If you would like to receive our marketing materials via mobile texts and alerts, you may sign up to do so. By signing up, you provide your consent to receive promotional messages or other mobile messages from or on behalf of us, including one-time passcodes, notifications regarding your orders, our promotional messages, and abandoned cart reminders (enabled by using cookies we collect as described in these Terms) at the mobile number you provide us. Opting in for a program does not entail automatic opt-in for another. Message frequency varies and carriers are not liable for any delays or undelivered messages. Message and Data Rates may apply. You acknowledge that you are not required to consent to receive marketing texts as a condition of using the Services. If you wish to opt out of SMS texts from us, you can reply STOP to the corresponding number from your mobile device receiving the messages. However, you acknowledge that opting out of receiving texts may impact your use of the Services. If you would like to resume the subscription, reply UNSTOP to the corresponding number. We will not share your consent, opt-in and opt-out records with any third parties other than text messaging service providers and aggregators. You may also reply "HELP" for assistance. For further assistance, please contact us 1) if you are using a Temu website, at the appropriate email address on the "Contact us" page linked in the website footer, and (2) if you are using a Temu application, through the "Customer support" section in the "You" menu at the bottom of the home page.

**5.4** If you wish to opt out of marketing emails, you can unsubscribe from our marketing email list by following the unsubscribe options in the marketing email itself.

**5.5** Our communications with you may be through a third-party service provider. You acknowledge and consent that, subject to our Privacy Policy, your communications with us, our agents may be recorded, monitored and stored for quality control and training purposes, or to protect your, and our interests.

# 6. User Submissions

**6.1** "User Submission" means anything posted, uploaded, shared, submitted, stored, or otherwise provided by you through the Services, including suggestions, comments, reviews, ratings, photos, videos, or other feedback or materials, and may be viewable by other users. Any User Submission posted by you in your Account may not contain nudity, violence, sexually explicit, or offensive subject matter as determined by us in our sole discretion.

**6.2** For all User Submissions, you grant us a fully-paid, royalty-free, perpetual, irrevocable, non-exclusive, transferable, sublicensable, worldwide right (including any moral rights) and license to use, license, store, display, reproduce, save, modify (e.g. to make sure the User Submission is viewable on different systems and devices), create derivative works, publicly perform, publicly display, distribute, translate, or otherwise act with respect to such User Submissions as we determine is necessary to operate, market, and advertise the Services, including to present, display, or perform such User Submissions in accordance with your preferences.

**6.3** You acknowledge and agree that all User Submissions (including the user name under which you made them) are non-confidential and non-proprietary. We may freely display, disclose, reproduce, modify, license, transfer, distribute and otherwise use the User Submissions in any manner, without any restriction or compensation to you.

**6.4** You warrant that you own or otherwise control all rights to the User Submissions and that our use of any User Submission will not infringe upon or violate the rights of any third party or violate any of the rules and restrictions contained in these Terms (including those included in Section 3 herein).

**6.5** We do not endorse User Submissions and they do not represent our views. We expressly disclaim any liability for User Submissions or damages resulting from them. We expect users to maintain a high level of integrity when submitting User Submissions that are viewable by other users, especially with respect to ratings and reviews of products. You undertake that the User Submissions that are viewable by other users are made truthfully in good faith and based only on your first-hand experience. You further undertake that you will prominently indicate if a User Submission was sponsored or paid for in any way. You acknowledge that we have no obligation to pre-screen User Submissions, although we reserve the right to pre-screen, refuse, exclude or remove any User Submission for any reason or no reason, at our discretion and without notice to you. By entering into these Terms, you hereby provide your irrevocable consent to such monitoring. You acknowledge and agree that you have no expectation of privacy concerning the transmission of your User Submissions. In the event that we pre-screen, refuse, exclude or remove any User Submissions, you acknowledge that we will do so for our benefit, not yours. Without limiting the foregoing, we shall have the right to remove any User Submissions that violate the Terms or are otherwise objectionable.

# 7. Ownership

**7.1** You acknowledge and agree that all materials displayed, performed, or available on or through the Services, including, but not limited to, text, graphics, data, articles, photos, images, illustrations and User Submissions (collectively, "Content") are protected by copyright and/or other intellectual property laws throughout the world. You undertake to comply with all copyright notices, trademark rules, information, and restrictions contained in the Content, and not to copy, reproduce, modify, translate, publish, broadcast, transmit, distribute, perform, upload, display, license, sell, or otherwise use for any purpose any Content not owned by you without the prior consent of the owner of that Content.

**7.2** We respect others' intellectual property rights, and we reserve the right to delete or disable Content alleged to be infringing upon another person's intellectual property rights and to terminate the accounts of the alleged infringers. See our Intellectual Property Policy to learn how to report potentially infringing content.

**7.3** You acknowledge and agree that we own or license the Services. You undertake not to modify, publish, transmit, participate in the transfer or sale of, reproduce, create derivative works based on, or otherwise exploit any of the Services, except as expressly provided in this Section 7.

**7.4** Subject to your compliance with these Terms and all applicable policies, rules, and guidelines, and your payment of any applicable fees, we or our content providers grant you a limited, non-exclusive, non-transferable, non-sublicensable license to access and make personal and non-commercial use of the Services for the sole purpose of using Temu. All rights not expressly granted to you in these Terms or any policies or guidelines are reserved and retained by us or our licensors, suppliers, publishers, rightsholders, or other content providers. The licenses granted by us terminate if you do not comply with these Terms or any applicable policies, rules, or guidelines.

**7.5** You may not make any commercial use of any of the information provided on the Services or make any use of the Services for the benefit of another business unless explicitly permitted by us in advance. You may not solicit, advertise for, or contact in any form users for employment, contracting or any other purpose not related to the Services facilitated through Temu. If you violate this provision, we reserve the right to refuse service, terminate accounts, and/or cancel purchase transactions in our discretion.

# 8. Responsibilities; Third Party Risks

**8.1** You acknowledge and agree that any Content publicly posted or privately transmitted through the Services is the sole responsibility of the person that posted or transmitted such Content. You access and use the Content, and interact with other users, at your own risk. We are not responsible for any errors, mistakes, omissions, inaccuracies in the Content. We do not control the Content and have no duty to take any action regarding how you may interpret, use or react to the Content. We have no obligation to review or monitor, and do not approve, endorse, or make any representations or warranties with respect to, Content. You also understand that we cannot guarantee the identities of the users with whom you interact while using the Services and are not responsible for which users gain access to the Services.

**8.2** You are responsible for all Content you contribute, in any manner, to the Services, and you represent and warrant you have all rights to contribute such Content to the Services in such manner.

**8.3** The Services may contain links or connections to third-party websites or services that are not owned or controlled by us. We have no control over, and assume no responsibility for, the content, accuracy, privacy policies, or practices of or opinions expressed in any third-party websites or services. In addition, we will not and cannot monitor, verify, censor, or edit the content of any third-party website or service. You acknowledge and agree that we are not responsible for any risks resulting from your access or use of any third party websites or services. We encourage you to be aware when you leave the Services and to read the terms of use and privacy policy of each third-party website or service that you visit or use.

**8.4** Your interactions with other users, other entities or individuals as a result of your use of the Services, including communications, payments, performances and deliveries, are solely between you and such third parties; provided, however, that we reserve the right, but has no obligation, to intercede in such interactions. You should make whatever investigation and/or seek whatever professional advice as you feel necessary or appropriate before proceeding with any interaction with any of these third parties. You acknowledge and agree that we are not responsible for any loss or damage incurred as the result of such interactions. You agree that we will not be responsible for any liability incurred as the result of such interactions.

**8.5** It is a material breach of these Terms to arrange for the sale of listed items from, or the payment of fees to, third parties outside the context of the Temu for the purposes of circumventing the obligation to pay the fee for products purchased through the Services.

# 9. Release

**9.1** We expressly disclaim any liability that may arise between users of Temu. If there is a dispute between you and another user, or any third party on Temu, we are under no obligation to become involved. To the fullest extent permitted under applicable law, you release us, our parents, subsidiaries, affiliates, directors, officers, employees, agents and successors from all claims, demands, and damages of every kind or nature, known or unknown, suspected or unsuspected, disclosed or undisclosed, arising out of or in any way related to such disputes.

IN ENTERING INTO THIS RELEASE, YOU EXPRESSLY WAIVE ANY PROTECTIONS (WHETHER STATUTORY OR OTHERWISE) THAT WOULD LIMIT THE COVERAGE OF THIS RELEASE TO INCLUDE ONLY THOSE

CLAIMS WHICH YOU MAY KNOW OR SUSPECT TO EXIST IN YOUR FAVOR AT THE TIME OF AGREEING TO THIS RELEASE.

# 10. Purchases

**10.1** All product prices ("Prices") listed on Temu are exclusive of shipping charges and applicable taxes and fees, including without limitation goods and sales tax, provincial sales tax and harmonized sales tax, which will be charged to you separately at the applicable rate. Prices may change at any time, but any change shall not apply to any order for which we have sent an order confirmation. All amounts are in American dollars unless otherwise noted on Temu. The acceptance of such offers is in our sole discretion and will be communicated to you in our order confirmation. For the avoidance of doubt, we reserve the rights, in our sole discretion, not to accept your offer to purchase any products and to cancel your order or parts of your order in certain events, including, without limitation, supply difficulties or if the products are no longer in stock. Furthermore, you agree that, where applicable, you will act as the importer of the products purchased and you hereby authorize us to appoint a freight forwarding agent to act as your direct representative and pay any sales tax, VAT and customs duties on your behalf. Please note that sales tax, VAT, customs duties, and similar charges collected at the time of purchase are estimated values and may be subject to change depending on applicable laws. If additional amounts are assessed, you are responsible for them.

**10.2** While we strive to provide accurate information on Temu, typographical errors, inaccuracies, or omissions that relate to pricing, product descriptions, availability, and offers may occur. Subject to applicable law, we reserve the right to correct any errors, inaccuracies, or omissions and to change or modify information or cancel orders or parts of orders if any information on Temu is inaccurate at any time without prior notice, including after your order has been submitted or your receipt of an order confirmation or shipping notice. You should not rely on the strike-through price in your purchase decision. If comparing prices is important to your purchase decision, you should do your own comparison before making a purchase.

**10.3** Please check all descriptions and restrictions regarding the product you are interested in thoroughly before you place your order. If you have any special circumstance (e.g., a medical or health condition and/or special need) that may affect or be affected by the product you wish to purchase, it is solely your responsibility to inform us before you place your order.

**10.4** You agree to pay all amounts specified in your order confirmation, including all shipping charges, local sales taxes and other applicable taxes.

**10.5** We make reasonable efforts to ensure the color display of the products on Temu is as accurate as possible. However, we cannot guarantee that your monitor's display of any color will be an accurate depiction of the color of the product you selected to purchase.

**10.6** You acknowledge that the products are in conformity with the transaction or intended purchase if they: (i) comply with the description provided on Temu and possess the qualities presented on Temu; (ii) are fit for the purposes for which goods of such kind are normally used; and (iii) are of the quality and performance which are normal in goods of the same type and which can reasonably be expected.

**10.7** In order to make purchases, you must provide accurate and complete information for a valid payment method, such as a credit card, that you are authorized to use. You must promptly update your account with any changes related to your payment method. BY PROVIDING INFORMATION FOR A PAYMENT METHOD, YOU AUTHORIZE US OR OUR AGENTS OR PAYMENT SERVICE PROCESSORS TO CHARGE THE PAYMENT METHOD FOR: (A) AMOUNTS DUE FOR PURCHASED PRODUCTS; (B) ANY AND ALL APPLICABLE CUSTOMS, TAXES AND SHIPPING COSTS; AND (C) ANY OTHER CHARGES INCURRED IN CONNECTION WITH YOUR USE OF THE SERVICES. YOUR PAYMENTS ARE NON-REFUNDABLE EXCEPT AS EXPRESSLY PROVIDED IN APPLICABLE POLICIES. We may decline, freeze or hold your transaction for any reason, including for suspected fraud, anti-money laundering and sanctions compliance, or if we believe your transaction poses a risk to us or any third party.

**10.8** Payment Processors may charge you fees for your purchases made through Temu. Such processing fees will be disclosed to you via Temu. Your use of the Services and the payment processing provided by the Payment Processor is subject to your agreement with the Payment Processor, as may be modified from time to time. As a condition of using the payment services, you must provide accurate and complete information, and you authorize us to share this information with the Payment Processor.

**10.9** Your payment obligations are fully fulfilled once your payment of the agreed price is received.

# 11. Refunds, Exchanges and Related

**11.1** We assist you with customer services support involving payment, return, refund and other areas in connection with your purchase of products.

**11.2** We want you to be satisfied with your purchases through the Services. For all the products purchased on Temu, you may be entitled to a return and refund. For details of return and refund, please visit our Return and Refund Policy. Please follow the instructions in the policy If you want to request a refund. You acknowledge and agree that we may issue a refund to you in accordance with the Return and Refund Policy.

Unless otherwise described in the Return and Refund Policy, the refund will not cover customs, taxes, or any return shipping costs you may incur in the refund process.

# 12. Rewards

**12.1** You may receive credits, coupons, cash, gifts or other kinds of reward by use of the Services (collectively, "Rewards"). Some rewards may only be used for discounts on or payment for eligible purchases on or through the Services (but note that not all products may be eligible) and cannot be redeemed for cash, except in jurisdictions where required by law. You should read carefully the information and applicable rules regarding different kinds of rewards.

# 13. Ending Our Relationship

**13.1** You are free to stop using the Services at any time. We are also free to terminate or suspend your use of the Services or your account, for any reason in our discretion, including your breach of these Terms. You acknowledge and agree that we have the sole right to decide whether you are in violation of any of the restrictions set forth in these Terms. Even after your use of the Services is terminated or suspended, these Terms will remain enforceable against you and any unpaid amount you owe to us will remain due.

**13.2** If your account is terminated for any reason, all Content and Rewards associated with your account will be destroyed and cancelled. You should try to use any remaining Rewards before the date on which such termination becomes effective.

**13.3** All provisions of the Terms which by their nature should survive, shall survive termination of these Terms, including without limitation, ownership provisions, warranty disclaimers, and limitations of liability.

# 14. WARRANTY DISCLAIMER

**14.1** TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW WE EXPRESSLY DISCLAIM ALL REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, RELATING TO THE SERVICES, ANY CONTENT OR ANY PRODUCT OFFERED OR PURCHASED ON OR THROUGH THE SERVICES, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF PRODUCTS' CONDITION, QUALITY, DURABILITY, PERFORMANCE, ACCURACY, RELIABILITY, MERCHANTABILITY. FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, OR ANY WARRANTIES OF THE CONTENT'S ACCURACY, CORRECTNESS, COMPLETENESS, OR LEGALITY. ALL SUCH WARRANTIES, REPRESENTATIONS, CONDITIONS, AND UNDERTAKINGS ARE HEREBY EXPRESSLY EXCLUDED. NO COMMUNICATION OR INFORMATION, WHETHER ORAL OR WRITTEN, OBTAINED FROM OR THROUGH THE SERVICES SHALL CREATE ANY WARRANTY NOT EXPRESSLY STATED HEREIN. IN ADDITION, WE MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING SUGGESTIONS OR RECOMMENDATIONS OF PRODUCTS OFFERED OR PURCHASED ON OR THROUGH THE SERVICES. THIS SECTION 14 DOES NOT AFFECT IN ANY WAY OUR RETURN AND REFUND POLICY FOR PRODUCTS PURCHASED ON THE SERVICES.

**14.2** YOUR USE OF THE SERVICES AND YOUR USE OF ANY PRODUCT OFFERED AND PURCHASED ON OR THROUGH THE SERVICES ARE AT YOUR OWN RISK. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, UNLESS EXPRESSLY PROVIDED OTHERWISE, THE SERVICES, PRODUCTS OFFERED AND PURCHASED ON OR THROUGH THE SERVICES, AND THE CONTENT ARE MADE AVAILABLE TO YOU ON AN "AS-IS" AND "AS-AVAILABLE" BASIS, WITH ALL FAULTS AND WITHOUT WARRANTIES OF ANY KIND.

**14.3** YOU ACKNOWLEDGE AND AGREE THAT THE TEMU PARTIES (AS DEFINED IN SECTION16.1) ARE NOT LIABLE, AND YOU AGREE NOT TO SEEK TO HOLD THE TEMU PARTIES LIABLE, FOR THE CONDUCT OF THIRD PARTIES, INCLUDING OPERATORS OF EXTERNAL SITES, AND THAT THE RISK OF INJURY FROM SUCH THIRD PARTIES RESTS ENTIRELY WITH YOU. WE MAKE NO PROMISES WITH RESPECT TO, AND EXPRESSLY DISCLAIM ALL LIABILITY FOR: (1) PRODUCTS, SERVICES, INFORMATION, PROGRAMMING, AND/OR ANYTHING ELSE PROVIDED BY A THIRD PARTY THAT IS ACCESSIBLE TO YOU ON OR THROUGH THE SERVICES; OR (2) THE QUALITY OR CONDUCT OF ANY THIRD PARTY YOU ENCOUNTER IN CONNECTION WITH YOUR USE OF THE SERVICES.

**14.4** YOU ACKNOWLEDGE AND AGREE THAT, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, YOU ASSUME FULL RESPONSIBILITY FOR YOUR USE OF THE SERVICES, INCLUDING YOUR INTERACTIONS WITH OTHER USERS OF THE SERVICES, AND THAT ANY INFORMATION YOU SEND OR RECEIVE DURING YOUR USE OF THE SERVICES MAY NOT BE SECURE AND MAY BE INTERCEPTED OR OTHERWISE ACCESSED BY UNAUTHORIZED PARTIES. YOU AGREE THAT, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, WE ARE NOT RESPONSIBLE FOR ANY LOSS OR DAMAGE TO YOUR PROPERTY OR DATA THAT RESULTS FROM ANY MATERIALS YOU ACCESS OR DOWNLOAD FROM THE SERVICES.

**14.5** IF YOU RELY ON ANY DATA OR INFORMATION OBTAINED ON OR THROUGH THE SERVICES, YOU DO SO AT YOUR OWN RISK. YOU ARE SOLELY RESPONSIBLE FOR ANY DAMAGE OR LOSS THAT RESULTS FROM YOUR USE OF SUCH DATA OR INFORMATION.

# 15. LIMITATION OF LIABILITY

**15.1** TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, UNDER NO CIRCUMSTANCES AND UNDER NO LEGAL THEORY (INCLUDING, WITHOUT LIMITATION, TORT, CONTRACT, STRICT LIABILITY, OR OTHERWISE) SHALL TEMU PARTIES BE LIABLE TO YOU OR TO ANY OTHER PERSON FOR (A) ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES OF ANY KIND, INCLUDING DAMAGES FOR LOSS OF DATA, PROFITS, REVENUE OR GOODWILL, REPUTATIONAL HARM, BUSINESS INTERRUPTION, ACCURACY OF RESULTS, OR COMPUTER FAILURE OR MALFUNCTION ARISING OUT OF OR IN CONNECTION WITH THE SERVICES OR (B) YOUR USE OF THE SERVICES, INCLUDING, WITHOUT LIMITATION, ANY INABILITY TO ACCESS OR USE THE SERVICES OR THE PURCHASE AND USE OF PRODUCTS OFFERED ON OR THROUGH THE SERVICES, EVEN IF WE OR ANY OTHER PERSON HAS FORESEEN OR BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE FOREGOING LIMITATION OF LIABILITY SHALL NOT APPLY TO LIABILITY OF A TEMU PARTY FOR (I) DEATH OR PERSONAL INJURY CAUSED BY OUR GROSS NEGLIGENCE; OR FOR (II) ANY INJURY CAUSED BY OUR FRAUD OR FRAUDULENT MISREPRESENTATION.

**15.2** THIS DISCLAIMER APPLIES, WITHOUT LIMITATION, TO THE MAXIMUM EXTENT PERMITTED UNDER LAW, TO ANY DAMAGES OR PERSONAL INJURY ARISING FROM ANY FAILURE OF PERFORMANCE, ERROR, OMISSION, INTERRUPTION, DELETION, DEFECTS, DELAY IN OPERATION OR TRANSMISSION, COMPUTER VIRUS, FILE CORRUPTION, COMMUNICATION-LINE FAILURE, NETWORK OR SYSTEM OUTAGE, ANY THEFT, DESTRUCTION, UNAUTHORIZED ACCESS TO, ALTERATION OF, LOSS OR USE OF, ANY RECORD OR DATA, AND ANY OTHER TANGIBLE OR INTANGIBLE LOSS.

**15.3** YOU SPECIFICALLY ACKNOWLEDGE AND AGREE THAT WE SHALL NOT BE LIABLE FOR ANY DEFAMATORY, OFFENSIVE, OR ILLEGAL CONDUCT BY ANY USER OF THE SERVICES.

**15.4** TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, UNDER NO CIRCUMSTANCES WILL THE TOTAL AGGREGATE AMOUNT FOR WHICH THE TEMU PARTIES ARE LIABLE TO YOU EXCEED THE GREATER OF: (A) THE TOTAL AMOUNT PAID TO US BY YOU DURING THE ONE-MONTH PERIOD PRIOR TO THE ACT, OMISSION OR OCCURRENCE GIVING RISE TO SUCH LIABIITY; (B) $100.00; OR (C) THE REMEDY

OR PENALTY IMPOSED BY THE STATUTE UNDER WHICH SUCH CLAIM ARISES. THE FOREGOING CAP ON LIABILTY SHALL NOT APPLY TO LIABLITY OF A TEMU PARTY FOR (I) DEATH OR PERSONAL INJURY CAUSED BY OUR GROSS NEGLIGENCE; OR FOR (II) ANY INJURY CAUSED BY OUR FRAUD OR FRAUDULENT MISREPRESENTATION. THE PRECEDING SENTENCE SHALL NOT PRECLUDE THE REQUIREMENT FOR YOU TO PROVE ACTUAL DAMAGES.

**15.5** CERTAIN JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF CERTAIN DAMAGES OR IMPLIED WARRANTIES. IF THESE LAWS APPLY TO YOU, SOME OR ALL OF THE ABOVE EXCLUSIONS OR LIMITATIONS MAY NOT APPLY TO YOU, AND YOU MIGHT HAVE ADDITIONAL RIGHTS.

**15.6** THE LIMITATIONS OF DAMAGES SET FORTH ABOVE ARE ESSENTIAL TO THE AGREEMENT BETWEEN YOU AND US.

# 16. Indemnity

**16.1** To the fullest extent permitted by applicable law, you agree to indemnify and hold us, our parents, subsidiaries, affiliates, directors, officers, agents, employees, suppliers, licensors and partners (each, a "Temu Party" and collectively, the "Temu Parties") harmless from and against any and all claims, liabilities, damages, losses, and expenses (including reasonable attorneys' fees ) arising from or in connection with any third-party claims relating to: (a) your use of the Services, including without limitation, User Submissions or any actions taken by a third party using your account; (b) your violation of these Terms; (c) your violation of any rights of another party, including without limitation any copyright, property, or privacy right or any third-party agreement; or (d) your violation of any applicable laws, rules, or regulations. In the event of such a claim, suit, or action ("Claim"), we will attempt to provide notice of the Claim to the contact information we have for your account (provided that failure to deliver such notice shall not eliminate or reduce your indemnification obligations under these Terms).

**16.2** We reserve the right, at our own cost, to assume the exclusive defense and control of any matter otherwise subject to indemnification by you, in which case you will fully cooperate with us in asserting any available defenses.

**16.3** You agree that the provisions in this section will survive any termination of your Account, the Terms and/or your access to the Services.

# 17. App Stores

**17.1 Application License.** Subject to your compliance with the Terms, we grant you a limited non-exclusive, non-transferable, non-sublicensable, revocable license to download, install and use a copy of the Temu mobile application ("Application") on a single mobile device or computer that you own or control and to run such copy of the Application solely for your own personal or internal business purposes. Furthermore, with respect to any Application accessed through or downloaded from the Apple App Store (an "App Store Sourced Application"), you will only use the App Store Sourced Application (a) on an Apple-branded product that runs the iOS (Apple's proprietary operating system) and (b) as permitted by the "Usage Rules" set forth in the Apple App Store Terms of Service. Notwithstanding the first sentence in this section, with respect to any Application accessed through or downloaded from the Google Play store (a "Google Play Sourced Application"), you may have additional license rights with respect to use of the Application on a shared basis within your designated family group.

**17.2 App Stores.** You acknowledge and agree that the availability of the Application and the Services is dependent on the third party from whom you received the Application license, e.g., the Apple App Store or Google Play (each, an "App Store"). You acknowledge that the Terms are between you and us and not with the App Store. We, not the App Store, are solely responsible for The Services, including the Application, the content thereof, maintenance, support services, and warranty therefor, and addressing any claims relating thereto (e.g., product liability, legal compliance or intellectual property infringement). In order to use the Application, you must have access to a wireless network, and you agree to pay all fees associated with such access. You also agree to pay all fees (if any) charged by the App Store in connection with The Services, including the Application. You agree to comply with, and your license to use the Application is conditioned upon your compliance with all terms of agreement imposed by the applicable App Store when using any Service, including the Application. You acknowledge that the App Store (and its subsidiaries) are third-party beneficiaries of the Terms and will have the right to enforce it.

**17.3 Accessing and Downloading the Application from iTunes.** The following applies to any App Store Sourced Application accessed through or downloaded from the Apple App Store:

**17.3.1** You acknowledge and agree that (i) the Terms are concluded between you and us only, and not Apple, and (ii) we, not Apple, are solely responsible for the App Store Sourced Application and content thereof. Your use of the App Store Sourced Application must comply with the App Store Terms of Service.

**17.3.2** You acknowledge that Apple has no obligation whatsoever to furnish any maintenance and support services with respect to the App Store Sourced Application.

**17.3.3** In the event of any failure of the App Store Sourced Application to conform to any applicable warranty, you may notify Apple, and Apple will refund the purchase price for the App Store Sourced Application to you and to the maximum extent permitted by applicable law, Apple will have no other warranty obligation whatsoever with respect to the App Store Sourced Application. As between Apple and us, any other claims, losses, liabilities, damages, costs or expenses attributable to any failure to conform to any warranty will be our sole responsibility.

**17.3.4** You and we acknowledge that, as between Apple and us, Apple is not responsible for addressing any claims you have or any claims of any third party relating to the App Store Sourced Application or your possession and use of the App Store Sourced Application, including, but not limited to: (i) product liability claims; (ii) any claim that the App Store Sourced Application fails to conform to any applicable legal or regulatory requirement; and (iii) claims arising under consumer protection or similar legislation.

**17.3.5** You and we acknowledge that, in the event of any third-party claim that the App Store Sourced Application or your possession and use of that App Store Sourced Application infringes that third party's intellectual property rights, as between Apple and us, we, not Apple, will be solely responsible for the investigation, defense, settlement and discharge of any such intellectual property infringement claim to the extent required by the Terms.

**17.3.6** You and we acknowledge and agree that Apple, and Apple's subsidiaries, are third-party beneficiaries of the Terms as related to your license of the App Store Sourced Application, and that, upon your acceptance of the terms and conditions of the Terms, Apple will have the right (and will be deemed to have accepted the right) to enforce the Terms as related to your license of the App Store Sourced Application against you as a third-party beneficiary thereof.

**17.3.7** Without limiting any other terms of the Terms, you must comply with all applicable third-party terms of agreement when using the App Store Sourced Application.

# 18. General

**18.1 Assignment.** You may not assign, delegate, or transfer these Terms, or your rights and obligations hereunder, to any other person in any way (by operation of law or otherwise) without our prior written consent, and any attempted assignment, subcontract, delegation, or transfer in violation of the foregoing will be null and void. We may transfer, assign, or delegate these Terms and its rights and obligations hereunder to any other person without your consent.

**18.2 Unforeseen Events.** We shall not be liable for any delay or failure to perform resulting from causes outside our reasonable control, including, but not limited to, acts of God, war, terrorism, riots, embargos, acts of civil or military authorities, fire, floods, accidents, pandemics, strikes, or shortages of transportation facilities, fuel, energy, labor, or materials.

**18.3 Choice of Law.** These Terms and any dispute of any sort that might arise between you and us hereunder will be governed by the laws of the State of New York and applicable federal laws of the United States of America, consistent with the Federal Arbitration Act, without regard to any principle of conflict-of-laws. The United Nations Convention on Contracts for the International Sale of Goods does not apply to these Terms. If you live outside of the United States, you may be entitled to the protection of the mandatory consumer protection provisions of your local consumer protection law.

**18.4 Exclusive Venue.** Any dispute of any sort between you and us that arises out of or in connection with the Services and is not subject to arbitration or eligible for small claims action, shall be decided exclusively by (a) if you enter into these Terms with Whaleco Inc., a court of competent jurisdiction located in New York, New York; (b) if you enter into these Terms with Whaleco Technology Limited, a court of competent jurisdiction located in Ireland; and (c) if you enter these Terms with Whaleco UK Limited, a court of competent jurisdiction located in England. You hereby consent to, and waive all defense of lack of personal jurisdiction and forum non conveniens with respect to, venue and jurisdiction in such courts.

**18.5 Statute of Limitations.** You and Temu agree that regardless of any statute or law to the contrary, any claim arising out of or related to the Services must commence within one (1) year after the cause of action accrues. Otherwise, such cause of action is permanently barred.

**18.6 Notice.** You acknowledge and agree that we may give notice to you through email using the latest email address you provided to us, which constitutes effective notice. Therefore, you are responsible for keeping your email address information with us up to date. You may give notice to us at the following addresses:

If to Whaleco Inc.:

Whaleco Inc.

Suite 355, 31 St. James Avenue
Boston, Massachusetts 02116
USA

If to Whaleco Technology Limited or Whaleco UK Limited:

Whaleco Technology Limited

First Floor, 25 St
Stephens Green
Dublin 2, Ireland

Such notice shall be deemed given when received by us by letter delivered by nationally recognized overnight delivery service or first-class postage prepaid mail at the above address.

**18.7 Export Control.** You undertake to use the Services and products purchased on or through the Services in compliance with all applicable US or other export and re-export restrictions of relevant jurisdictions. In particular, you acknowledge and agree that the Services, including any products purchased on or through the Services, may not be exported or re-exported (a) into any embargoed countries by your country of residence or other relevant countries, or (b) to anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Department of Commerce's Denied Person's List or Entity List. You represent and warrant that (i) you are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a "terrorist supporting" country and (ii) you are not listed on any U.S. Government list of prohibited or restricted parties. You also will not use the Services nor the products purchased on the Services for any purpose prohibited by any applicable law.

**18.8 Consumer Complaints.** In accordance with California Civil Code §1789.3, you may report complaints to the Complaint Assistance Unit of the Division of Consumer Services of the California Department of Consumer Affairs by contacting them in writing at 400 R Street, Sacramento, CA 95814, or by telephone at (800) 952-5210.

**18.9 Waiver.** Our failure to respond to a breach by you or others does not waive our right to act with respect to subsequent or similar breaches.

**18.10 Severability.** If any provision of these Terms is found to be unenforceable or invalid, that provision will be limited or eliminated, to the minimum extent necessary, so that these Terms shall otherwise remain in full force and effect and enforceable.

**18.11 Third-Party Beneficiaries.** Except as expressly provided herein, there are no third-party beneficiaries intended under these Terms.

**18.12 Entire Agreement.** These Terms are the final, complete and exclusive agreement of the parties with respect to the subject matter hereof and supersede and merge all prior discussions between the parties with respect to such subject matter.

**18.13 Translation.** The translated versions of these Terms of Use, Privacy & Cookie Policy, Intellectual Property Policy or any other terms or policies, are provided for your reference only. If there are any discrepancies between the English version and versions in other languages, the English version shall always prevail.

# 19. ARBITRATION AGREEMENT

PLEASE READ THIS SECTION 19 ("ARBITRATION AGREEMENT") CAREFULLY. **PLEASE BE AWARE THAT THIS SECTION CONTAINS PROVISIONS GOVERNING HOW DISPUTES BETWEEN YOU AND US WILL BE RESOLVED. AMONG OTHER THINGS, THIS SECTION 19 INCLUDES AN AGREEMENT TO ARBITRATE, WHICH REQUIRES, WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU AND US BE RESOLVED BY BINDING AND FINAL ARBITRATION. THIS SECTION 19 ALSO CONTAINS A CLASS ACTION AND JURY TRIAL WAIVER. IN SOME COUNTRIES YOU MAY HAVE ADDITIONAL RIGHTS AND/OR ELEMENTS OF THIS ARBITRATION AGREEMENT MAY NOT APPLY TO YOU AS REQUIRED BY LAW.**

**19.1. Applicability of Arbitration Agreement.** Subject to the terms of this Arbitration Agreement, you and we agree that any dispute, claim, or disagreement arising out of or relating in any way to your access to or use of the Services, any communications you receive, any products sold or distributed through the Services, or the Terms, including claims and disputes that arose between us before the effective date of the Terms (each, a "Dispute") will be resolved by binding arbitration, using the English language, rather than in court, except that: (1) you and we may assert claims or seek relief in small claims court if such claims qualify and remain in small claims court; and (2) you or we may seek equitable relief in court for infringement or other misuse of intellectual property rights (such as trademarks, trade dress, domain names, trade secrets, copyrights, and patents). For purposes of this Arbitration Agreement, "Dispute" will also include disputes that arose or involve facts occurring before the existence of this or any prior versions of the Terms as well as claims that may arise after the termination of the Terms.

**19.2. Informal Dispute Resolution.** There may be instances when a Dispute arises between you and us. If that occurs, we are committed to working with you to reach a reasonable resolution. You and we agree that good faith informal efforts to resolve Disputes can result in a prompt, low-cost and mutually beneficial outcome. You and we therefore agree that before either party commences arbitration against the other (or initiates an action in small claims court if a party so elects), we will personally meet and confer telephonically or via videoconference, in a good faith effort to resolve informally any Dispute covered by this Arbitration Agreement ("Informal Dispute Resolution Conference"). If you are represented by counsel, your counsel may participate in the conference, but you also agree to participate in the conference. The party initiating a Dispute must give notice to the other party in writing of its intent to initiate an Informal Dispute Resolution Conference ("Notice"), which shall occur within forty-five (45) days after the other party receives such Notice, unless an extension is mutually agreed upon by the parties in writing. Notice to us that you intend to initiate an Informal Dispute Resolution Conference should be sent by email to dispute@temu.com for the U.S., dispute@eur.temu.com for the EU, or dispute@uk.temu.com for the UK, or by regular mail to the applicable address set forth in Section 18.6. The Notice must include: (1) your name, telephone number, mailing address, e-mail address associated with your account (if you have one); (2) the name, telephone number, mailing address and e-mail address of your counsel, if any; and (3) a description of your Dispute.

The Informal Dispute Resolution Conference shall be individualized such that a separate conference must be held each time either party initiates a Dispute, even if the same law firm or group of law firms represents multiple users in similar cases, unless all parties agree; multiple individuals initiating a Dispute cannot participate in the same Informal Dispute Resolution Conference unless all parties agree. In the time between a party receiving the Notice and the Informal Dispute Resolution Conference, nothing in this Arbitration Agreement shall prohibit the parties from engaging in informal communications to resolve the initiating party's Dispute. Engaging in the Informal Dispute Resolution Conference is a condition precedent and requirement that must be fulfilled before commencing arbitration. The statute of limitations and any filing fee deadlines shall be tolled while the parties engage in the Informal Dispute Resolution Conference process required by this section.

**19.3. Waiver of Jury Trial.  YOU AND WE HEREBY WAIVE ANY CONSTITUTIONAL AND STATUTORY RIGHTS TO SUE IN COURT AND HAVE A TRIAL IN FRONT OF A JUDGE OR A JURY.** You and we are instead electing that all Disputes shall be resolved by arbitration under this Arbitration Agreement, except as specified in Section 19.1 above. There is no judge or jury in arbitration, and court review of an arbitration award is subject to very limited review.

**19.4. Waiver of Class and Other Non-Individualized Relief. YOU AND WE AGREE THAT, EXCEPT AS SPECIFIED IN SECTION 19.9, EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS, REPRESENTATIVE, OR COLLECTIVE BASIS, AND THE PARTIES HEREBY WAIVE ALL RIGHTS TO HAVE ANY DISPUTE BE BROUGHT, HEARD, ADMINISTERED, RESOLVED, OR ARBITRATED ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MASS ACTION BASIS. ONLY INDIVIDUAL RELIEF IS AVAILABLE, AND DISPUTES OF MORE THAN ONE CUSTOMER OR USER CANNOT BE ARBITRATED OR CONSOLIDATED WITH THOSE OF ANY OTHER CUSTOMER OR USER.** Subject to this Arbitration Agreement, the arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by the party's individual claim. Nothing in this paragraph is intended to, nor shall it, affect the terms and conditions under Section 19.9. Notwithstanding anything to the contrary in this Arbitration Agreement, if a court decides by means of a final decision, not subject to any further appeal or recourse, that the limitations of this Section are invalid or unenforceable as to a particular claim or request for relief (such as a request for public injunctive relief), you and we agree that that particular claim or request for relief (and only that particular claim or request for relief) shall be severed from the arbitration and may be litigated only in the courts provided for under Section 18.4. All other Disputes shall be arbitrated or litigated in small claims court. This subsection does not prevent you or us from participating in a class-wide settlement of claims.

**19.5. Rules and Forum.**The Terms evidence a transaction involving interstate commerce; and notwithstanding any other provision herein with respect to the applicable substantive law, the Federal Arbitration Act, 9 U.S.C. § 1 et seq., will govern the interpretation and enforcement of this Arbitration Agreement and any arbitration proceedings. If the Informal Dispute Resolution Process described above does not resolve satisfactorily within sixty (60) days after receipt of Notice, you and we agree that either party shall have the right to finally resolve the Dispute through binding arbitration. The arbitration will be conducted by American Arbitration Association (the "AAA"), an established alternative dispute resolution provider, under its rules, including Consumer Arbitration Rules (the "AAA Rules"), then effect, unless otherwise required by law. AAA's rules are also available at https://adr.org/consumer, or by calling 1-800-778-7879. For all actions under the AAA Rules, the proceedings may be filed where your residence is, or in New York, New York, and any in-person hearings will be conducted at a location which is reasonably convenient to both parties taking into account their ability to travel and other pertinent circumstances. If AAA is not available to arbitrate, the parties will select an alternative arbitral forum. Your responsibility to pay any AAA fees and costs will be solely as set forth in the applicable AAA rules.

A party who wishes to initiate arbitration must provide the other party with a request for arbitration (the "Request"). The Request must include: (1) the name, telephone number, mailing address, e-mail address of the party seeking arbitration and the account username (if applicable) as well as the email address associated with any applicable account; (2) a statement of the legal claims being asserted and the factual bases of those claims; (3) a description of the remedy sought and an accurate, good-faith calculation of the amount in controversy in United States Dollars; (4) a statement certifying completion of the Informal Dispute Resolution process as described above; and (5) evidence that the requesting party has paid any necessary filing fees in connection with such arbitration. If the party requesting arbitration is represented by counsel, the Request shall also include counsel's name, telephone number, mailing address, and email address. Such counsel must also sign the Request. By signing the Request, counsel certifies to the best of counsel's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, that: (1) the Request is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of dispute resolution; (2) the claims, defenses and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; and (3) the factual and damages contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. Unless you and we otherwise agree, or the Batch Arbitration process discussed in Section 19.9 is triggered, the arbitration will be conducted in the county where you reside. Subject to the applicable AAA rules, the arbitrator may direct a limited and reasonable exchange of information between the parties, consistent with the expedited nature of the arbitration. You and we agree that all materials and documents exchanged during the arbitration proceedings shall be kept confidential and shall not be shared with anyone except the parties' attorneys, accountants, or business advisors, and then subject to the condition that they agree to keep all materials and documents exchanged during the arbitration proceedings confidential.

**19.6. Arbitrator.** The arbitrator will be either a retired judge or an attorney licensed to practice law in the State of New York, and will be selected by the parties from the AAA roster of consumer dispute arbitrators. If the parties are unable to agree upon an arbitrator within thirty-five (35) days of delivery of the Request, then AAA will appoint the arbitrator in accordance with the applicable AAA rules, provided that if the Batch Arbitration process under Section 19.9 is triggered, AAA will appoint the arbitrator for each batch.

**19.7. Authority of Arbitrator.** The arbitrator shall have exclusive authority to resolve any Dispute, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement, except for the following: (1) all Disputes arising out of or relating to Section 19.4, including any claim that all or part of Section 19.4 is unenforceable, illegal, void or voidable, or that Section 19.4 has been breached, shall be decided by a court of competent jurisdiction and not by an arbitrator; (2) except as expressly contemplated in Section 19.9, all Disputes about the payment of arbitration fees shall be decided only by a court of competent jurisdiction and not by an arbitrator; (3) all Disputes about whether either party has satisfied any condition precedent to arbitration shall be decided only by a court of competent jurisdiction and not by an arbitrator; and (4) all Disputes about which version of the Arbitration Agreement applies shall be decided only by a court of competent jurisdiction and not by an arbitrator. The arbitration proceeding will not be consolidated with any other matters or joined with any other cases or parties, except as expressly provided in Section 19.9. The arbitrator shall have the authority to grant motions dispositive of all or part of any Dispute. The arbitrator shall issue a written award and statement of decision describing the essential findings and conclusions on which the award is based, including the calculation of any damages awarded. The award of the arbitrator is final and binding upon you and us. Judgment on the arbitration award may be entered in any court having jurisdiction.

**19.8. Attorneys' Fees and Costs.** The parties shall bear their own attorneys' fees and costs in arbitration unless the arbitrator finds that either the substance of the Dispute or the relief sought in the Request was frivolous or was brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)). If you or we need to invoke the authority of a court of competent jurisdiction to compel arbitration, then the party that obtains an order compelling arbitration in such action shall have the right to collect from the other party its reasonable costs, necessary disbursements, and reasonable attorneys' fees incurred in securing an order compelling arbitration. The prevailing party in any court action relating to whether either party has satisfied any condition precedent to arbitration, including the Informal Dispute Resolution Process, is entitled to recover their reasonable costs, necessary disbursements, and reasonable attorneys' fees and costs.

**19.9. Batch Arbitration.** To increase the efficiency of administration and resolution of arbitrations, you and we agree that in the event that there are one hundred (100) or more individual Requests of a substantially similar nature filed against us by or with the assistance of the same law firm, group of law firms, or organizations, within a thirty (30) day period, AAA shall (1) administer the arbitration demands in batches of 100 Requests per batch (plus, to the extent there are less than 100 Requests left over after the batching described above, a final batch consisting of the remaining Requests); (2) appoint one arbitrator for each batch; and (3) provide for the resolution of each batch as a single consolidated arbitration with one set of filing and administrative fees due per side per batch, one procedural calendar, one hearing (if any) in a place to be determined by the arbitrator, and one final award ("Batch Arbitration").

All parties agree that Requests are of a "substantially similar nature" if they arise out of or relate to the same event or factual scenario and raise the same or similar legal issues and seek the same or similar relief. To the extent the parties disagree on the application of the Batch Arbitration process, the disagreeing party shall advise AAA, and AAA shall appoint a sole standing arbitrator to determine the applicability of the Batch Arbitration process ("Administrative Arbitrator"). In an effort to expedite resolution of any such dispute by the Administrative Arbitrator, the parties agree the Administrative Arbitrator may set forth such procedures as are necessary to resolve any disputes promptly. The Administrative Arbitrator's fees shall be paid by us.You and we agree to cooperate in good faith with AAA to implement the Batch Arbitration process including the payment of single filing and administrative fees for batches of Requests, as well as any steps to minimize the time and costs of arbitration, which may include: (1) the appointment of a discovery special master to assist the arbitrator in the resolution of discovery disputes; and (2) the adoption of an expedited calendar of the arbitration proceedings. This Batch Arbitration provision shall in no way be interpreted as authorizing a class, collective and/or mass arbitration or action of any kind, or arbitration involving joint or consolidated claims under any circumstances, except as expressly set forth in this provision.

**19.10. 30-Day Right to Opt Out.** You have the right to opt out of the provisions of this Arbitration Agreement by sending written notice of your decision to opt out to the applicable address set forth in Section 18.6, within thirty (30) days after first becoming subject to this Arbitration Agreement. Your notice must include your name and address, the email address you used to set up your Account (if you have one), and an unequivocal statement that you want to opt

out of this Arbitration Agreement. If you opt out of this Arbitration Agreement, all other parts of these Terms will continue to apply to you. Opting out of this Arbitration Agreement has no effect on any other arbitration agreements that you may currently have, or may enter in the future, with us.

**19.11. Invalidity, Expiration.** Except as provided in Section 19.9, if any part or parts of this Arbitration Agreement are found under the law to be invalid or unenforceable, then such specific part or parts shall be of no force and effect and shall be severed and the remainder of the Arbitration Agreement shall continue in full force and effect. You further agree that any Dispute that you have with us as detailed in this Arbitration Agreement must be initiated via arbitration within the applicable statute of limitation for that claim or controversy, or it will be forever time barred. Likewise, you agree that all applicable statutes of limitation will apply to such arbitration in the same manner as those statutes of limitation would apply in the applicable court of competent jurisdiction.

**19.12. Modification.** Notwithstanding any provision in the Terms to the contrary, we agree that if we make any future material change to this Arbitration Agreement, it will notify you. Unless you reject the change within thirty (30) days of such change becoming effective by writing to us at the applicable address set forth in Section 18.6, your continued use of the Services, including the acceptance of products and services offered on or through the Services, following the posting of changes to this Arbitration Agreement constitutes your acceptance of any such changes. Changes to this Arbitration Agreement do not provide you with a new opportunity to opt out of the Arbitration Agreement if you have previously agreed to a version of the Terms and did not validly opt out of arbitration. If you reject any change or update to this Arbitration Agreement, and you were bound by an existing agreement to arbitrate Disputes arising out of or relating in any way to your access to or use of the Services, any communications you receive, any products sold or distributed through the Services or the Terms, the provisions of this Arbitration Agreement as of the date you first accepted the Terms (or accepted any subsequent changes to the Terms) remain in full force and effect. We will continue to honor any valid opt outs of the Arbitration Agreement that you made to a prior version of the Terms.

# Contact Us

1. If you are using a Temu website, at the appropriate email address on the "Contact us" page linked in the website footer2. If you are using a Temu application, through the "Customer support" section in the "You" menu at the bottom of the home page.

# EXHIBIT 9.3

# Mass Arbitration Supplementary Rules



Amended and Effective January 15, 2024

Available online at **adr.org/mass-arbitration**

# Table of Contents

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

MA-1. Applicability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

MA-2. Filing Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

MA-3. Serving of Documents, Notices, and Communications . . . . . . . . . . . . . . . . . . . . .   5

MA-4. Answers, Counterclaims, and Amended Claims . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

MA-5. Fixing of Locale. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

MA-6. Process Arbitrator. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

MA-7. Appointment of Merits Arbitrator(s) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

MA-8. Scheduling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

MA-9. Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

MA-10. Administrative Fees and Compensation and Expenses of the Arbitrator(s). . . .   9



# Mass Arbitration Supplementary Rules

## Introduction

The American Arbitration Association® (AAA®)-International Centre for Dispute Resolution® (ICDR®) developed these Mass Arbitration Supplementary Rules (Supplementary Rules) to streamline the administration of large volume filings involving the same party, parties, and party representative(s), or related party, parties and party representative(s). These Supplementary Rules are intended to provide parties and their representatives with an efficient and economical path toward the resolution of multiple individual disputes.

Parties are encouraged to agree to additional processes that make the resolution of their Mass Arbitration more efficient, such as:

- An agreed-upon Scheduling Order setting forth deadlines across multiple cases, including those for submission of documents and witness lists, completion of discovery, and filing of motions.

    o Where the parties can agree on the Scheduling Order, they should consult with the arbitrator as to whether a Preliminary Management Conference between the parties and the arbitrator is necessary.

    o Eliminating the need for a separate Preliminary Management Conference in each case can significantly impact time to resolution of the case.

- An agreement to appoint a Limited Service Neutral to oversee procedural issues common to the cases, such as discovery, choice of law, and statute of limitations.

- An agreement that cases be heard on the documents, rather than by in-person, telephone, or videoconference hearings.

- An agreement to assign multiple cases to a single arbitrator, making the scheduling of conferences and hearings more efficient. Each case will still be heard and decided individually by the arbitrator.

- An agreement on the form of award.

- An agreement limiting briefs, motions, and discovery requests.

- An agreement allowing testimony via affidavit or recorded deposition, rather than requiring live witness testimony.

### MA-1. Applicability

(a) The AAA may apply these Supplementary Rules to any group of cases defined as a Mass Arbitration in Section MA-1(b) below for disputes where the Employment/ Workplace Fee Schedule or the Consumer Fee Schedule apply. The AAA-ICDR's determination to apply these Supplementary Rules shall be final, unless a party seeks review of that determination by a Process Arbitrator, as provided for in Section MA-6. These Supplementary Rules supplement any other AAA-ICDR rules applicable to the disputes. Where inconsistencies exist among these Supplementary Rules and other AAA-ICDR rules, these Supplementary Rules shall govern.

(b) For the purpose of these Supplementary Rules, Mass Arbitrations are defined as:

   i. twenty-five or more similar Demands for Arbitration (Demand(s)) filed against or on behalf of the same party or related parties,

   ii. where representation of all parties is consistent or coordinated across the cases.

(c) These Supplementary Rules apply whenever 25 or more similar Demands for Arbitration are filed, whether or not such cases are filed simultaneously.

(d) Parties to Mass Arbitrations are encouraged to agree to processes for the efficient resolution of those cases. Any such agreement must be in writing and should address the matters set forth in Sections MA-1 through MA-9 of these Supplementary Rules. In the absence of a post-dispute agreement as to any issue covered by these Supplementary Rules, the Supplementary Rules shall apply.

(e) If, within 30 calendar days after the AAA-ICDR's commencement of administration, a party seeks judicial intervention with respect to cases to which these Supplementary Rules apply and provides the AAA-ICDR with documentation that judicial intervention has been sought, the AAA-ICDR will suspend administration of such cases for 60 calendar days to permit the party to obtain a stay of arbitration from the court.

(f) In its sole discretion, the AAA-ICDR has the authority to interpret and apply these Supplementary Rules. The AAA-ICDR will make initial determinations with respect to administrative issues where necessary in order to apply these Supplementary Rules.

### MA-2. Filing Requirements

A separate Demand for Arbitration must be filed in each individual case. The filing party shall adhere to the filing requirements set forth in the applicable rules. Each Demand must include complete contact information for all parties and representatives. The filings must include an affirmation that the information provided for each individual case is true and correct to the best of the representative's knowledge. When the AAA-ICDR determines that the filing requirements have been met, it shall notify the parties.

As part of the filing requirements, the filing party shall submit a fully completed *Mass Arbitration Intake Data Spreadsheet* (Spreadsheet), which is available at **www.adr.org**, at the time a Mass Arbitration reaches the 25-case threshold, and shall update such Spreadsheet as additional cases are filed. This Spreadsheet must also be provided to opposing parties at the same time it is provided to the AAA-ICDR. The AAA-ICDR may also require the filing party to submit the Demands for Arbitration, and any other documents submitted with the Demands, in an electronic format. The AAA-ICDR will advise the filing party when and in what manner those materials shall be submitted.

### MA-3. Serving of Documents, Notices, and Communications

**(a)** For all purposes in accordance with these Supplementary Rules, the parties shall accept documents, notices, and communications pertaining to each Mass Arbitration via single, combined, electronic communication from the AAA-ICDR. The AAA-ICDR will determine when separate documents, notices, and communications are required.

**(b)** Service of documents, notices, and communications pertaining to Mass Arbitrations will be effected via electronic means, such as a file transfer protocol administered by the AAA-ICDR or AAA WebFile® platform. Parties providing service of documents, notices, and communications must simultaneously notify opposing parties in writing that the documents, notices, or communications have been submitted.

### MA-4. Answers, Counterclaims, and Amended Claims

**(a)** A respondent may file an Answer and/or Counterclaim as set forth in the applicable rules; however, the deadline for filing an Answer shall be 45 calendar days from the date the AAA-ICDR confirms the filing requirements have been met. Answers, Counterclaims, and any amended claims must include an affirmation that the information provided within the submission(s) is true and correct to the best of the representative's knowledge.

**(b)** With the exception of the initial filings required under Section MA-2, where party submissions are substantially similar across a Mass Arbitration, the submission may be filed in a single document and need not be filed separately in each individual case.

    **i.** Any party submission filed in this manner shall also include correspondence advising, by case number, to which cases the submission relates.

    **ii.** Any dispute over whether a party's submission is substantially similar will initially be determined by the AAA-ICDR, subject to a final determination by a Process Arbitrator, as provided for in Section MA-6.

### MA-5. Fixing of Locale

Virtual hearings are the preferred method of evidentiary hearings for cases subject to these Supplementary Rules. However, where in-person hearings are required, and in the absence of party agreement, the AAA-ICDR will identify one or more locales where hearings may take place. In any such determination, the AAA-ICDR will consider the positions of the parties; relative ability of the parties to travel; and factors such as the location of performance of the agreement, the location of witnesses and documents, relative costs, and the location of any prior court proceedings, among other factors presented by the parties.

### MA-6. Process Arbitrator

(a) After all parties have paid the Initiation Fees, and before the appointment of arbitrators pursuant to MA-7, and upon receipt of a party's written notice of a disputed MA-6(c) issue related to the mass arbitration, the AAA-ICDR may, in its sole discretion, appoint a Process Arbitrator.

(b) The AAA-ICDR shall administratively appoint a sole Process Arbitrator unless the AAA-ICDR, in its sole discretion, elects to appoint a Process Arbitrator in accordance with the process described in Section MA-7(a) below.

(c) The Process Arbitrator shall have the authority to determine the following issues:

   i.   Whether the parties have met the AAA-ICDR's filing requirements or the filing requirements in the parties' contract and, if applicable, how the parties can correct any deficiencies in the filing requirements and how to proceed if they do not;

   ii.  Disputes over any applicable conditions precedent and, if applicable, how the parties can meet the conditions precedent and how to proceed if they do not;

   iii. Disputes regarding payment of administrative fees, arbitrator compensation, and expenses;

   iv.  Which Demands for Arbitration should be included as part of the mass arbitration filing;

   v.   The selection process for Merits Arbitrators;

   vi.  Determining the applicable AAA-ICDR Rules that will govern the individual disputes;

   vii. For cases under the Consumer Arbitration Rules:

      a) Whether the cases should be closed and the parties proceed in small claims court;

      b) Whether the Merits Arbitrator(s) shall proceed by documents only or hold hearings;

   viii. The locale of the Merits hearings;

**ix.** Whether subsequently filed cases are part of the same mass arbitration. The Process Arbitrator must allow the parties in these subsequently filed cases the opportunity to address the applicability of any rulings to these cases before making any final determination;

**x.** Whether any previously issued rulings by the Process Arbitrator are binding on the subsequent cases.

**xi.** Any other non-merits issues affecting case administration arising out of the nature of the mass arbitration that the Process Arbitrator determines is appropriate for determination and

**xii.** Any other issue(s) the parties agree in writing to submit to the Process Arbitrator.

**(d)** The Process Arbitrator shall have the power to rule on their own jurisdiction and shall resolve any disputes over the scope and applicability of this Section MA-6, including:

**i.** Whether the dispute(s) before the Process Arbitrator are fact-specific and, therefore, must be made on an individual basis, or;

**ii.** Whether the dispute(s) before the Process Arbitrator are not fact-specific and, therefore, do not need to be made on an individual basis.

**(e)** When a Process Arbitrator issues decisions based on the specific facts of individual arbitrations within the mass arbitration, the Process Arbitrator must document the decisions in separate written rulings setting forth the individual arbitration determinations. The Process Arbitrator shall determine the form of such rulings, including whether to combine the rulings into a single or multiple written communications with the parties.

**(f)** The Process Arbitrator may make rulings based on document submissions only or by telephone or videoconference. The ruling of the Process Arbitrator shall contain the reasons for such ruling.

**(g)** The Process Arbitrator's rulings shall be rendered no later than 30 calendar days from the date the Process Arbitrator set for receipt of the final document submissions. If the Process Arbitrator schedules a hearing, the Process Arbitrator's rulings shall be rendered no later than 30 calendar days from the close of the hearing or 30 calendar days from the date the Process Arbitrator set for receipt of post-hearing document submissions, whichever is later. The AAA-ICDR may extend the time limit for rendering the Process Arbitrator's ruling only in unusual and extreme circumstances. The parties, by agreement, may also extend the time limit for rendering the Process Arbitrator's ruling.

**(h)** The Process Arbitrator is subject to the disclosure and disqualification requirements contained in the applicable AAA-ICDR Rules, which include any grounds for disqualification under applicable law.

**(i)** Unless the parties otherwise agree, the Process Arbitrator's service will conclude as to an individual case upon the appointment of a Merits Arbitrator to that case, the closure of the individual case, or under the terms of the applicable AAA-ICDR Rules regarding the removal of an arbitrator or vacancy, whichever occurs earliest.

**(j)** Rulings by the Process Arbitrator will be final and binding upon the parties and Merits Arbitrator appointed to each individual case, except where a Merits Arbitrator determines that the Process Arbitrator abused their discretion.

**(k)** Absent agreement of all parties to an individual case, the AAA-ICDR shall not appoint the Process Arbitrator as the Merits Arbitrator for any cases in the same mass arbitration.

## MA-7. Appointment of Merits Arbitrator(s)

The parties may mutually agree upon a process for selection of the arbitrator(s) to determine the merits (the Merits Arbitrator(s)), and the AAA-ICDR will facilitate any such selection process. The arbitrator selection process may include the use of the AAA-ICDR arbitrator search platform when the AAA-ICDR deems it practical to provide and permits its use. Parties are encouraged to consider assigning multiple proceedings to a single, mutually agreeable Merits Arbitrator. Absent a contractual process or party agreement, the AAA-ICDR shall have the authority to apply the following process:

**(a)** The AAA-ICDR shall compile a roster of arbitrators for the purpose of identifying arbitrators who may be appointed to cases or groups of cases in a Mass Arbitration. The AAA-ICDR may submit a list of proposed arbitrators to the parties to any Mass Arbitration. The parties are encouraged to agree to arbitrators from this list and to advise the AAA-ICDR of their agreement. If the parties are unable to agree upon arbitrators, each party shall have 14 calendar days from the list transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA-ICDR. To ensure an appropriate number of arbitrators remain available for appointment, the AAA-ICDR may limit the number of strikes.

**(b)** If for any reason appointments cannot be made from the submitted lists or if the AAA-ICDR determines the number of cases is too numerous for use of lists, the AAA-ICDR shall have the authority to administratively appoint Merits Arbitrator(s).

**(c)** To facilitate arbitrator selection, to satisfy the parties' desired arbitrator qualifications, if the number of individual cases exceeds the number of qualified arbitrators in the locale, or in any other circumstance determined by the AAA-ICDR to warrant such action, the AAA-ICDR may assign multiple cases to a single Merits Arbitrator, who will decide each case on its own merits.

**(d)** Arbitrators appointed pursuant to Section MA-7 are subject to the disclosure and disqualification procedures set forth in the applicable AAA-ICDR rules.

## MA-8. Scheduling

Preliminary Management Conferences and hearings will be scheduled in a manner consistent with the expeditious nature of arbitration. The parties are

encouraged to agree on a streamlined procedure for scheduling conferences and hearings. Absent such agreement of the parties, conferences and hearings may be scheduled in any fashion deemed appropriate by the AAA-ICDR or the arbitrator(s). The AAA-ICDR or the arbitrator(s) may schedule the Preliminary Management Conference without first consulting with the parties, although either party may request that it be rescheduled. To avoid delay in the administration of the cases, the AAA-ICDR may require that representatives provide availability via an automated or another electronic scheduling method and that they be available for blocks of hours or days at a time.

### MA-9. Mediation

Within 120 calendar days from the established due date for the Answer, the parties shall initiate a global mediation of the Mass Arbitration pursuant to the applicable AAA-ICDR mediation procedures or as otherwise agreed to by the parties. The mediator shall be administratively appointed by the AAA-ICDR unless the parties agree on a mediator. The mediation shall take place concurrently with the arbitrations and shall not act as a stay of the arbitration proceedings, unless agreed to by the parties. Any party may unilaterally opt out of mediation upon written notification to the AAA-ICDR and the other parties to the arbitration. Notwithstanding the foregoing, the AAA-ICDR may, in its sole discretion, appoint a mediator to facilitate discussions between the parties on processes that may make resolution of the cases more efficient. Unless agreed upon by all parties and the mediator, the mediator shall not be appointed as an arbitrator for any of the cases in the same Mass Arbitration.

### MA-10. Administrative Fees and Compensation and Expenses of the Arbitrator(s)

(a) Administrative fees will be billed according to the applicable Mass Arbitration Administrative Fee Schedule. Administrative fees, as well as arbitrator compensation and expense deposits, are due on or before the deadline established by the AAA-ICDR. Neither settlement nor withdrawal of any individual claim or group of multiple cases shall result in extension of payment due dates or waiver of administrative fees. Administrative fees, as well as arbitrator compensation and expenses, for each Mass Arbitration will be billed and must be paid prior to the AAA-ICDR completing the applicable administrative procedures.

(b) Invoices provided by the AAA-ICDR to the parties for payment of fees and arbitrator compensation and expenses may be in consolidated format for each Mass Arbitration.

(c) Compensation of the Process Arbitrator will be at the rate set forth on the Process Arbitrator's resume. Merits Arbitrator(s) shall be compensated pursuant to the rules and fee schedules applicable to the individual cases.

**(d)** If administrative fees, arbitrator compensation, and/or expenses have not been paid in full, the AAA-ICDR may notify the parties in order that one party may advance the required payment within the time specified by the AAA-ICDR.

**(e)** If payments due are not made by the date specified in such notice to the parties, the arbitrator may order the suspension or termination of the proceedings. If no arbitrator has yet been appointed, the AAA-ICDR may suspend or terminate those proceedings. The AAA-ICDR may also decline to administer future arbitrations with the parties involved.

© 2024 American Arbitration Association, Inc. All rights reserved. These Rules are the copyrighted property of the American Arbitration Association (AAA)-International Centre for Dispute Resolution (ICDR) and are intended to be used in conjunction with the AAA-ICDR's administrative services. Any unauthorized use or modification of these Rules may violate copyright laws and other applicable laws. Please contact 800.778.7879 or websitemail@adr.org for additional information.

# EXHIBIT 10



2355 Highway 36 W.
Suite 400
Roseville, MN 55113
Telephone: (612)332-6545
Fax: (612)342-2334

June 28, 2024

Michael Kind, Esq.
Kind Law
8860 South Maryland Parkway
Suite 106
Las Vegas, NV 89123
Via Email to: mk@kindlaw.com

Matthew Valenti
Latham & Watkins, LLP
1271 Avenue of the Americas
New York, NY 10020
Via Email to: matthew.valenti@lw.com

Case Number: 01-24-0003-3726

Individual Claimants
-vs-
Whaleco, Inc.

Dear Parties:

The American Arbitration Association (AAA) has appointment Dana Welch to serve as Process Arbitrator for these matters.

Please find attached the following items for review:

- Notice of Appointment and Oath
- Notice of Compensation Arrangements
- Arbitrator Resume
- Provider Organization Disclosure dated June 26, 2024, which is required under California Code of Civil Procedure Section 1281.9
- Neutral Database Form dated June 26, 2024, which is provided to you pursuant to California's Ethics Standards for Neutral Arbitrators in Contractual Arbitration Standard 8(b)(1)(B). This search provides whether a party, a lawyer in the arbitration, or an attorney of the law firm with which a lawyer in the arbitration is currently associated is a member of the AAA's Panel of Arbitrators.

Pursuant to California Code of Civil Procedure Section 1281.91, any party may serve a notice of disqualification based on the disclosure statement within **fifteen (15) calendar days** from the date of this letter. Please copy all parties on any objection, but do not copy the Process Arbitrator. Absent receipt of a notice of disqualification within the specified time, we will confirm the appointment of Dana Welch.

As requested by the Process Arbitrator and specified in the Consumer Arbitration Rules, the parties and their representatives must inform the AAA of any circumstances likely to raise justifiable doubt as to whether the Process Arbitrator can remain impartial or independent. Further, such obligation to provide disclosure information remains

in effect throughout the arbitration.

If you need additional information from the proposed Process Arbitrator, please submit your request in writing to the AAA with a copy to all parties.

We will provide a copy of this correspondence to the Process Arbitrator.

Sincerely,
/s/
*Diana Moore on behalf of*
Krista Peach
Assistant Vice President
Direct Dial: (612)278-5114
Email: KristaPeach@adr.org
Fax: (612)342-2334


Enclosures

Cc:    Matthew Tripp-Cox
       Angel Getsov
       Steven M. Janove, Esq.
       Serrin Turner
       Haim Benoliel

# EXHIBIT 11



8860 South Maryland Parkway, Suite 106
Las Vegas, Nevada 89123
P: (702) 337-2322 | T: (844) 399-KIND (5463)
https://kindlaw.com

August 23, 2024

**Sent by email**
Process Arbitrator Dana Welch
American Arbitration Association
dana@welchadr.com

Krista Peach
American Arbitration Association Assistant Vice President
kristapeach@adr.org

>    Re:    **Individual Claimants v. Whaleco, Inc. (Temu)**
>            **Case No. 01-24-0003-3726**

Dear Process Arbitrator Welch:

The individual claimants in the above-referenced matter submit this letter brief per the Process Arbitrator's scheduling orders dated July 26, 2024 and August 9, 2024.

## I.    <u>The questions of unconscionability and waiver must be decided before any determination of whether the Informal Dispute Resolution precondition to arbitration has been satisfied.</u>

### A.  Introduction

Only five of many Individual Claimants assert that they have satisfied the Term's conference requirement by personally participating in a live conference with Temu. The main questions therefore right now are not whether the conference condition has been "satisfied" but (1) whether the language of the Term's conference requirement is unconscionable, (2) whether the court "carve out" in the Terms is unconscionable, and (3) whether Temu waived the conference requirement.

The issues of enforceability and waiver of an alleged condition precedent (an issue for a merits arbitrator) is a procedural matter separate from, and that logically precedes, a determination of whether a party has satisfied a condition to arbitration (an issue for a court under the delegation

clause).[1] Logically, if the condition is not enforceable, or has been waived, the question of whether it has been satisfied need not be reached. Temu can only use the alleged failure of Individual Claimants to satisfy a condition precedent as a defense in the arbitration proceeding if such condition precedent is first found to be enforceable. Similarly, if the court delegation "carve out" is found to be unenforceable, the question of whether the condition has been satisfied would not be delegated to the court.

A primary goal of the Federal Arbitration Act ("FAA") is efficient and speedy dispute resolution. *See Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219-21 (1985). As shown in the case law discussed below, a court will defer to an arbitrator the decision of such procedural arbitrability questions of enforceability and waiver of a condition precedent. Thus, involving a court at this stage would be a premature and unnecessary waste of time and resources for all parties and would undermine the goal of efficient and speedy dispute resolution.

**B. Relevant Sections of Temu's Terms of Use**

Section 19.2 of Temu's Terms describes Informal Dispute Resolution ("IDR") requirement and refers to it as a condition precedent to arbitration. Terms, Ex. A.

Section 19.7 of Temu's Terms (its delegation clause) states that, "the arbitrator shall have exclusive authority to resolve any Dispute, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the

---

[1] Claimants acknowledge that, in connection with Claimants' waiver argument, before the issues were fully briefed, the Process Arbitrator noted that "[t]he issue of whether or not either party engaged in good faith in the IDR process . . . is for a court to determine." Scheduling Order No. 1. However, as discussed herein, the caselaw supports that waiver is a procedural issue for the arbitrator, and not a defense to a condition precedent and Claimants respectfully request that the Process Arbitrator consider their arguments.

In any case, there are two other questions for the merits arbitrator to determine before the question of "satisfaction" of the condition arises: whether the conference condition provisions are unconscionable and whether the delegation clause's "carve out" is unconscionable. Those are questions for the merits arbitrator to decide before a determination can be made on whether the precondition has been met.

2

Arbitration Agreement, except for the following: … (3) all Disputes about whether either party has satisfied any condition precedent to arbitration shall be decided only by a court of competent jurisdiction and not by an arbitrator…." *Id.*

### C.  Any ambiguities should be resolved in Claimants' favor

As argued by Temu in moving to compel arbitration in other cases, generally, as a matter of federal law, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Hu v. Whaleco, Inc*., No. 1:23-cv-06962-MKB-RML (E.D.N.Y. ), ECF No. 37, p. 12, attached hereto as Exhibit B (citing *Calderon v. Breadberry Inc*., 2023 U.S. Dist. LEXIS 22332, 2023 WL 1861639 [E.D.N.Y. 2023]); *see also Morelli v. Alters*, 2020 U.S. Dist. LEXIS 47351, 2020 WL 1285513 (S.D.N.Y. 2020) (holding that "the Arbitration Act establishes, as a matter of federal law, that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.").

Additionally, any ambiguities in a contract should be construed against the drafter. *E.g.*, *Comput. Assocs. Int'l, Inc. v. U.S. Balloon Mfg. Co.*, 10 A.D.3d 699, 700, 782 N.Y.S.2d 117, 119 (App. Div. 2004) ("[A]ny ambiguity in contract language must be construed against the party that drafted the contract.").

### D.  Argument

As an initial matter, only the merits arbitrator has authority to decide issues of enforceability. The incorporation of AAA's rules in Temu's Terms gives the merits arbitrator jurisdiction to decide the enforceability of the precondition to arbitration in section 19.2. Section 19.5 of Temu's Terms of Service specifically incorporates AAA's rules, which includes AAA's rules giving the arbitrator the power to rule on his or her own jurisdiction, as well as the scope and validity of a condition precedent to arbitration. *See* § 19.5 and AAA Commercial Rule R-7; *cf. Garthon Bus. Inv.* at 944; *Matter of 33 Calvert Props. LLC*, 70 Misc. 3d 295; *Footprint Power Salem Harbor Dev., L.P.*, 2018 N.Y. Misc. LEXIS 1583.

The delegation clause in section 19.7 of Temu's Terms further gives AAA's merits

arbitrator jurisdiction to decide the enforceability of the precondition to arbitration in section 19.2. The delegation clause is clear and unmistakable. *Cf. Pearl v. Coinbase Glob., Inc.*, 2023 U.S. Dist. LEXIS 18587, 2023 WL 1769190 (N.D. Cal. 2023) (identical delegation clause). The clause clearly delegates to AAA's arbitrator "exclusive authority" to resolve disputes pertaining to enforceability, revocability, scope, and validity of portions of the arbitration agreement.  § 19.7. In *Pearl*, which involved a delegation clause identical to Temu's, the question of arbitrability, even on the subject of what has been carved out and the unconscionability of what has been carved out, must be decided by the arbitrator. *Pearl*, 2023 U.S. Dist. LEXIS 18587 at *22.

The Process Arbitrator should allow these cases to proceed to the merits arbitrator, and not to court, because the question of (1) whether any condition has been satisfied only arises after the arbitrator decides that those conditions are enforceable, (2) whether the court "carve out" is itself enforceable must first be decided by the arbitrator, and (3) waiver is an issue of procedural arbitrability for the arbitrator and not a defense against the condition's satisfaction.

**1. The question of whether the condition has been satisfied only arises after the arbitrator determines that the condition precedent is enforceable.**

Sending these cases to court to determine *if* a condition has been met before the arbitrator decides *whether* the condition must be met in the first place defies logic and frustrates the very purpose of arbitration: the efficient means to resolving disputes. *E.g.*, *Brandifino v. Cryptometrics, Inc.*, 2010 NY Slip Op 20062, ¶ 10, 27 Misc. 3d 513, 524, 896 N.Y.S.2d 623, 630 (Sup. Ct.) ("[T]he purpose of arbitration [is] to provide a cost-effective and efficient means of resolving a claim."). Logically, and especially since these claims are already here in arbitration, the arbitrator should first determine whether the conference condition is enforceable. If the arbitrator determines that the condition is enforceable, then the arbitrator may remand the question of satisfaction of the condition to the court.

Here, Claimants have numerous arguments that need to be presented to the arbitrator challenging the conference requirement in the Terms as unconscionable—separate from Claimants' "waiver" arguments based on Temu's conduct. Specifically, Claimants' position is that

Temu's pre-arbitration conference provisions are designed to create delays, provide an unfair advantage to Temu, and attempt to chill consumers from bringing their claims in arbitration. For example, the conference provisions are unfairly one-sided and unconscionable because they impose no analogous requirement on Temu to preview defenses it may assert in arbitration. *See Fox v. Vision Serv. Plan*, 2017 WL 735735, at *7 (E.D. Cal. Feb. 24) (Because "nothing in the [Informal Dispute Resolution Process] requires [Defendant] to provide any information to the [claimant]," the asymmetric disclosures required by the process are one-sided and unconscionable.). Temu's conference provisions are also one-sided and unconscionable because the conference does not involve any neutral mediator. *Nyulassy v. Lockheed Martin Corp.*, 120 Cal. App. 4th 1267, 1282-83 (2004) ("requiring plaintiff to submit to an employer-controlled dispute resolution mechanism (i.e., one without a neutral mediator) suggests that defendant would receive a 'free peek' at plaintiff's case, thereby obtaining an advantage if and when plaintiff were later to demand arbitration."). Additionally, Temu's conference provisions are one-sided because, for example, it states that "If you are represented by counsel, your counsel may participate in the conference, but you also agree to participate in the conference," but no such requirement is placed on Temu. *See, e.g.*, *Nyulassy*, 120 Cal. App. 4th at 1282-83 (procedures were substantively unconscionable where they only applied to an employee's employment-related claims but not vice versa); *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 999 (9th Cir. 2010) ("Although the Quixtar ADR agreements require an IBO to submit any claim it has against Quixtar to Informal and Formal Conciliation, they impose no similar obligation on Quixtar when it has a claim against one of its IBOs."); *see also*, *e.g.*, *McKinney v. Bonilla*, 2010 WL 2817179, at *7 (S.D. Cal. July 16) (pre-arbitration internal dispute resolution procedures unconscionable where "it is difficult to see how the internal dispute resolution mechanisms could apply to claims raised by [the company]"). These are just examples of Claimants' arguments that the conference requirement is unconscionable, unrelated to the parties' attempts to satisfy (or, in Temu's case, to frustrate) that condition.

Ironically, Temu *itself* has argued that any questions about the enforceability of the personal conference requirement in Temu's Terms should be resolved by the arbitrator and not by

the courts. In *Hu v. Whaleco Inc.*, the plaintiff argued that Temu's conference requirement was unconscionable. *Hu v. Whaleco Inc.*, Ziboukh Pl.'s Amicus Br., No. 1:23-cv-06962-MKB-RML, ECF No. 45, p. 27 (E.D.N.Y. filed 7/5/24), attached hereto as Exhibit C. In reply, Temu argued that "the Terms provide that disputes about the enforceability of any part of the agreement are delegated exclusively to the arbitrator" and "[a]ccordingly, any challenges to the arbitration agreement's specific provisions as vague, unconscionable, or unenforceable … must instead be made in arbitration." *Id.* at ECF No. 50, pp. 13-14 (filed 8/19/24), attached hereto as Exhibit D (arguing that the plaintiff's arguments regarding the conference requirement "have nothing to do with whether an arbitration agreement was *formed*. Instead, they concern issues that the Terms delegate exclusively to the arbitrator."). Here, just like Temu argued in *Hu*, when convenient for it, questions about enforceability of the personal conference requirement are for the arbitrator to decide. The Process Arbitrator should allow the merits arbitrator to evaluate these questions. *E.g.*, *In re Ring LLC Priv. Litig.*, No. CV 19-10899-MWF (RAOx), 2021 U.S. Dist. LEXIS 195723, at *17 (C.D. Cal. Sep. 3, 2021) (a party "cannot have its cake and eat it, too").

Thus, Claimants' arguments challenging the enforceability of the language of the Term's conference provisions should first be decided by the arbitrator because these issues have no bearing on "whether either party has *satisfied* any condition precedent."

## 2. The question of whether section 19.7's "carve out" is itself enforceable must first be decided by the arbitrator.

Next, the question of whether section 19.7's "carve out" to the delegation clause is itself enforceable must first be decided by the arbitrator. When the parties delegate issues to be resolved by the arbitrator, challenges to any "carve outs" to the delegation clause must be resolved first by the arbitrator. *E.g.*, *Pearl v. Coinbase Glob., Inc.*, No. 22-cv-03561-MMC, 2023 U.S. Dist. LEXIS 18587, at *20 (N.D. Cal. Feb. 3, 2023) (whether a party's challenges are carved out of the delegation clause is a question for the arbitrator); *Kattula v. Coinbase Glob., Inc.*, No. 1:22-CV-3250-TWT, 2023 U.S. Dist. LEXIS 119359, at *13 (N.D. Ga. July 6, 2023); *SteppeChange LLC v. VEON Ltd.*, 354 F. Supp. 3d 1033, 1044 (N.D. Cal. 2018) ("Numerous courts in this circuit have

6

found that despite a carveout, the question of arbitrability, even on the subject of what has been carved out, must be decided by the arbitrator.").

Here, Claimants challenge whether section 19.7's "carve out" (that it is for the court to determine whether the conference condition has been satisfied) is itself enforceable since it is unconscionable. Specifically, Claimants will argue that, as consumers, they should not be required to file every case in court before coming back to arbitration. An arbitration provision that makes arbitration "prohibitively expensive" for a consumer is unconscionable. *See Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 92, 148 L. Ed. 2d 373, 121 S. Ct. 513 (2000). Here, Temu cannot force these claimants to file their case in court—and pay the court filing fees—for each case that they seek to file in arbitration. Temu's attempt to move these matters into court, only to return back here to arbitration once again, is unconscionable.

Claimants' position is that the carve out itself is not enforceable. Therefore, the arbitrator must first determine the applicability and enforceability of section 19.7's exception before the exception itself can be invoked.

### 3. The question of waiver is an arbitrability issue to be decided by the arbitrator, not a defense against the conference condition's satisfaction.

Even if the court were to first address whether the conference condition has been satisfied, the court would not consider the Claimants' waiver arguments, as waiver is not a defense to satisfaction but an arbitrability issue for the arbitrator to decide.

Questions of waiver is an issue of procedural arbitrability that, under both federal and New York State law, is for an arbitrator, not a court, to decide. It is well established by the United States Supreme Court that questions of procedural arbitrability are generally for arbitrators, not courts to decide. *BG Group PLC v. Republic of Arg.*, 572 U.S. 25 (2014); *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 83 (2002). Courts presume that the parties intend arbitrators "to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration." *BG Group plc*, 572 U.S. at 34. Such procedural matters for an arbitrator include claims of waiver, delay, satisfaction of time limits, notice, laches, estoppel, and other conditions precedent to

arbitration. *Id.* at 35. Because conditions precedent "determine **when** the contractual duty to arbitrate arises, whether a condition precedent has been satisfied is a question of procedural arbitrability." *King v. Stage 29 Prods., LLC*, 2020 U.S. Dist. LEXIS 116073 (S.D.N.Y. 2020) (citing *BG Group PLC*, 572 U.S. at 35).

The Court held in *Howsam* that waiver (of a condition precedent) should be decided by an arbitrator. 537 U.S. at 84-85. The issue of whether the parties' failure to engage in informal dispute resolution frustrated a condition precedent is a question of procedural arbitrability that must be determined by an arbitrator. *Morelli v. Alters*, 2020 U.S. Dist. LEXIS 47351, 2020 WL 1285513 (S.D.N.Y. 2020) (relying on *Howsam*); *see also United States ex rel. Alamo Envtl., Inc. v. Cape Envtl Mgmt.*, 2012 U.S. Dist. LEXIS 182198 (W.D. Okla. 2012).

In *Morelli*, the court justified an arbitrator deciding the issues relating to informal dispute resolution as a condition precedent for two reasons. First, the question of whether the parties are obligated to engage in informal dispute resolution before they proceed to arbitration is a procedural question for an arbitrator to decide. *Id*. Second, there was a substantial question regarding whether a party had waived the right to informal dispute resolution by not cooperating in the process, thereby improperly frustrating or preventing the occurrence of the condition. Relying on *Howsam*, the Court found that the parties' failure to complete the informal dispute resolution process (in that case mediation), did not prevent the Court from sending the case to arbitration.

Under New York State law, a condition precedent to arbitration "is often a circumstance inextricably bound up in the substantive contractual relations between the parties, in which case it would properly fall within the jurisdiction of the arbitrator." *Calvin Klein, Inc. v. G.P. Winter Assoc.*, 204 A.D.2d 149, 149-50 (1st Dep't 1994) (finding that the contract drafter's action of making a partial payment were an implicit acknowledgment of a controversy having moved beyond the preliminary phase of receiving a ruling from a project architect, and that the failure to file a formal notice within 21 days, and the reason for such alleged lapse, were failures of conditions inextricably bound up with questions of contract performance and thus were issues for arbitration).

Here, Claimants argue that Temu's failure to engage in the conferences in good faith and with the intended purpose stated in section 19.2 constitutes a waiver of the condition precedent to arbitration. *See*, *e.g.*, *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 83 (2002); *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 23 (2d Cir. 2018) ("a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition.") (quoting Restatement Second of Contracts § 225 cmt. b ["[A condition] may be excused by prevention or hindrance of its occurrence through a breach of the duty of good faith and fair dealing."]); *Young v. Hunter*, 6 N.Y. 203, 207 (1852) (A "party cannot insist upon a condition precedent, when its non-performance has been caused by [the party]."); *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 212 (2d Cir. 2002) (A party may not take advantage of a condition precedent by rendering it impossible to perform.) (citing *Stern v. Gepo Realty Corp.*, 289 N.Y.274, 277 [1942]).

The third carved-out exception in the delegation clause does not overcome state and federal precedent and bar the arbitrator from deciding the enforceability of section 19.2 (granting a court, not an arbitrator, the authority to decide "all [d]isputes about whether either party has satisfied any condition precedent to arbitration"). Temu's actions in relation to the conference process fall outside the scope of issues for a court to decide. The issue is not about Temu's satisfaction of a condition precedent, but rather whether Temu's actions constitute a waiver of the condition precedent and have frustrated the ability of Individual Claimants to satisfy a condition precedent. Such waiver and frustration are gateway procedural matters for an arbitrator to decide.

Furthermore, if the conference provisions relied upon by Temu is a condition precedent to arbitration, Temu can frustrate arbitration of disputes by simply refusing to participate in any informal attempts at resolution. That is indeed what it has done here. Temu, the drafter of the Terms, including the provisions for arbitration and IDR, has frustrated the occurrence of the IDR by not engaging in the process in good faith and with the intended purpose stated in section 19.2. It now improperly seeks to avoid arbitration by relying on alleged non-occurrences of the informal dispute resolution that Temu itself frustrated. *See*, *e.g.*, *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*,

906 F.3d 12, 23 (2d Cir. 2018); *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 212 (2d Cir. 2002); *Morelli v. Alters*, 2020 U.S. Dist. LEXIS 47351 (S.D.N.Y. 2020); *Siemens Information Systems, Inc. v. TPI Enterprises, Inc.*, 1987 U.S. Dist. LEXIS 12011 (S.D.N.Y. 1987). Such gamesmanship must not be endorsed. The issue of waiver should first be decided by the arbitrator.

Notably, only five Claimants engaged in conferences with Temu. For the remainder of the claimants the *only* questions at this stage are enforceability and waiver. The Process Arbitrator should not send these cases to the court to determine if those claimants met the conference requirement—which is not the subject of the current dispute—only for the court to return the cases to arbitration to determine whether the conference requirement is enforceable or has been waived.

Therefore, under the parties' agreement, the FAA, federal law, and New York State law, a merits arbitrator must determine the waiver issue.

## II.    Individual Claimants have met AAA's filing requirements.

Individual Claimants have met AAA's filing requirements. As discussed, the claims are properly pending before AAA, and under Temu's Terms, AAA's Rules, the FAA, federal court decisions interpreting and applying the FAA, and New York State law, a merits arbitrator has jurisdiction to decide the matter of procedural arbitrability regarding the enforceability of section 19.2. Claimants have paid their initiation fees and have otherwise met their filing requirements.


Respectfully submitted,

/s/ Michael Kind
Michael Kind, Esq.


**Exhibits:**
A. Applicable Terms
B, C & D. Relevant filings from *Hu v. Whaleco, Inc*., No. 1:23-cv-06962-MKB-RML

# EXHIBIT A

# Temu | Terms of Use

Last updated: December 29, 2023

Thank you for using Temu! These Terms of Use ("Terms") contain the rules and restrictions that govern your use of our applications, products, services and websites ("Services"). These Terms form a binding agreement between you and us. By completing the registration process and/or browsing the Services, you represent that (1) you have read, understand and agree to be bound by the Terms; (2) you are of legal age to form a binding contract with us; (3) you have the authority to enter into the Terms personally; and (4) if you are using the Services on behalf of a company or other entity, (a) you agree that "you" includes you and that entity, (b) you are an authorized representative of the entity with the authority to bind the entity to these Terms, and (c) you agree to these Terms on the entity's behalf. You should not access or use the Services unless you agree to be bound by all of these Terms.

## 1. Overview

**1.1**  Your residence determines the party with which you enter these Terms:

- If you reside in the United States, these Terms are between you and Whaleco Inc., a Delaware company.
- If you reside in the United Kingdom, these terms are between you and Whaleco UK Limited, a UK company.
- If you reside in Canada, you contract with Whaleco Canada Inc. and the applicable terms are here.
- If you reside anywhere other than the United States, Canada, or the United Kingdom, these terms are between you and Whaleco Technology Limited, an Ireland company.

**1.2**  Whaleco Inc., Whaleco UK Limited, and Whaleco Technology Limited, as applicable, are referred to in these Terms and Policies (as defined below) as "we" or "us,". For purposes of these Terms and Policies, we also refer to:

- Our website and mobile apps, which may offer features, products, services or content, including exchanges of information, as "Temu" or "our app";
- End users, including visitors to Temu and those who use Temu to purchase products as "you."

**1.3**  We and our affiliates provide technical and operational support for our app. You may pay for multiple orders in one transaction on Temu. Multiple orders may be delivered together in one package.

**1.4**  Your use of, and participation in, certain Services are also subject to additional policies we may publish from time to time ("Policies"), including our Privacy Policy and our Cookie and Similar Technologies Policy. If the Terms are inconsistent with the Policies, the Policies shall control with respect to the relevant subject matter.

**1.5**  PLEASE BE AWARE THAT SECTION 19 BELOW CONTAINS PROVISIONS GOVERNING HOW DISPUTES BETWEEN YOU AND US WILL BE RESOLVED, INCLUDING WITHOUT LIMITATION, ANY DISPUTES THAT AROSE OR WERE ASSERTED PRIOR TO THE EFFECTIVE DATE OF THE TERMS. **SECTION 19 CONTAINS, AMONG OTHER THINGS, AN AGREEMENT TO ARBITRATE WHICH REQUIRES, WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU AND US BE RESOLVED BY BINDING AND FINAL ARBITRATION.** UNLESS YOU OPT OUT OF THE AGREEMENT TO ARBITRATE WITHIN 30 DAYS OF THE EFFECTIVE DATE OF THE AGREEMENT: (1) YOU AND WE WILL ONLY BE PERMITTED TO PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF AGAINST THE OTHER PARTY ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION OR PROCEEDING AND EACH OF US WAIVES OUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION; AND (2) EACH OF US IS WAIVING OUR RIGHT TO PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF IN A COURT OF LAW AND TO HAVE A JURY TRIAL. IN SOME COUNTRIES YOU MAY HAVE ADDITIONAL RIGHTS AND/OR ELEMENTS OF THE ARBITRATION AGREEMENT MAY NOT APPLY TO YOU AS REQUIRED BY LAW.

**1.6**  PLEASE NOTE THAT THESE TERMS ARE SUBJECT TO CHANGE BY US IN OUR SOLE DISCRETION AT ANY TIME. When changes are made, we will publish a copy of the current Terms and any updated Policies available on Temu, and we will also update the "Last Updated" date at the top of the Terms. We encourage you to periodically review Terms and Policies for the latest version. Unless otherwise stated in such update, any changes to the Terms will be effective immediately for users of the Services without an Account and thirty (30) days after posting for users with Accounts. We may require you to provide consent to the updated Terms in a specified manner before further use of the Services is permitted. If you do not agree to any change(s) after receiving notice of such change(s), you shall stop using the Services. Otherwise, your continued use of the Services constitutes your acceptance of such change(s). PLEASE REGULARLY CHECK THE WEBSITE OR APPLICATION TO VIEW THE THEN-CURRENT TERMS.

## 2. User Requirements and Registration




that you may find offensive, indecent, or objectionable.

**2.2**  You may not use the Services if: (a) you cannot enter into a binding contract with us; (b) you are located in a country embargoed by your country of residence or other relevant country; (c) you are on any agency list of prohibited persons or entities, such as the U.S. Treasury Department's list of Specially Designated Nationals; or (d) you are banned from using the Services by us, in our sole discretion.

**2.3**  To access or use some of our Services, you may be required to create an account with us. When creating your account on Temu ("Account"), you agree to provide true, accurate, complete, and updated information about yourself, including contact details. You are responsible for keeping your registration information with us up to date. You are responsible for all activities that occur under your Account. You agree that you shall monitor your Account to restrict use by minors, and you will accept full responsibility for any unauthorized use of the Services by minors. You may not select as your user name a name that you don't have the right to use, or another person's name with the intent to impersonate that person. You may not transfer your Account to anyone else without our prior written permission. You agree not to create an Account or use the Services if you have been permanently banned from any of the Services. You may not share your Account or password with anyone, and you agree to notify us immediately of any unauthorized use of your password or any other breach of security and to exit from your Account at the end of each session.

**2.4**  You may also register an Account by connecting through a social networking service ("SNS") account and its credentials (an "SNS Account"). If you access the Services through a SNS as part of the functionality of the Services, you may link your Account with SNS Accounts by allowing us to access your SNS Account, as is permitted under the applicable terms and conditions that govern your SNS Account. You represent that you are entitled to grant us access to your SNS Account (including, but not limited to, for use for the purposes described herein) without breach by you of any of the terms and conditions that govern your SNS Account and without obligating us to pay any fees or making us subject to any usage limitations imposed by such SNS. By granting us access to any SNS Accounts, you understand that we may access, make available and store (if applicable) any Content (as defined below) that you have provided to and stored in your SNS Account ("SNS Content") so that it is available on and through the Services via your Account. Unless otherwise specified in the Agreement, all SNS Content shall be considered to be User Submissions for all purposes of the Terms. Depending on the SNS Accounts you choose and subject to the privacy settings that you have set in such SNS Accounts, personal information that you post to your SNS Accounts may be available on and through your Account on the Services. Please note that if a SNS Account or associated service becomes unavailable, or our access to such SNS Account is terminated by the SNS, then SNS Content will no longer be available on and through the Services. You have the ability to disable the connection between your Account and your SNS Accounts at any time by accessing the "Settings" section of the Services. PLEASE NOTE THAT YOUR RELATIONSHIP WITH THE SNS PROVIDERS ASSOCIATED WITH YOUR SNS ACCOUNTS IS GOVERNED SOLELY BY YOUR AGREEMENT(S) WITH SUCH SNS PROVIDERS, AND WE DISCLAIM ANY LIABILITY FOR PERSONAL INFORMATION THAT MAY BE PROVIDED TO US BY SUCH SNS PROVIDERS IN VIOLATION OF THE PRIVACY SETTINGS THAT YOU HAVE SET IN SUCH SNS ACCOUNTS. We make no effort to review any SNS Content for any purpose, including but not limited to, for accuracy, legality or noninfringement, and we are not responsible for any SNS Content.

## 3. Rules and Restrictions

**3.1**  You agree to use the Services for your own use, and not on behalf of or for the benefit of any third party, and only in a manner that complies with these Terms, the Policies, and all laws and regulations applicable to you. If your use of the Services is prohibited by any applicable laws, then you are not authorized to use the Services. We are not responsible if you use the Services in a way that breaks the law.

**3.2**  You are responsible for all activity associated with your Account. Therefore, you must protect the security of your Account and password and not share them with any third party. You must notify us immediately of any unauthorized use or security breach of your Account.

**3.3**  You must not create multiple accounts.

**3.4**  Any sweepstakes, contests, raffles, surveys, games, or similar promotions (collectively, "Promotions") made available through the Services may be governed by separate rules. If the rules for a Promotion conflict with these Terms, the Promotion rules will govern.

**3.5**  When using the Services, you agree and undertake not to take any action or make available any User Submissions through the Services that may:

(1) infringe or violate another person's rights, including intellectual property rights;

(2) violate any of these Terms, the Policies, or applicable laws and regulations;

(3) engage in any unlawful, harmful, abusive, misleading, false, fraudulent, deceptive, threatening, harassing, defamatory, libelous, pornographic, obscene, profane or otherwise objectionable or discriminatory conduct;

(4) circumvent or attempt to circumvent any of these Terms, the Policies or other rules relating to the Services including the Promotions;

(5) constitute unauthorized or unsolicited advertising, or junk or bulk email;

(6) collect personal data from other users or use any such information collected from the Services;

(7) engage in any conduct that is likely to cause a security breach of your Account;

(8) obtain another user's password, account, or other security information;




through overloading, "flooding," "mail bombing" or crashing the Services);

(12) potentially harm the Services, including but not limited to the violation of any security features of the Services, use of manual or automated software or other means to access, "crawl", "scrape", or "spider" any page, data, or portion of or relating to the Services or the introduction of viruses, worms or similar harmful code into the Services;

(13) copy or store any significant portion of the content on the Services without written consent from us;

(14) decompile, reverse engineer, or otherwise obtain the source code or underlying ideas or information of or relating to the Services;

(15) buy any products which you are not legally allowed to purchase or use;

(16) abuse any promotions, discounts, or other benefits offered by us, or manipulate the price of any listed products or interfere with listings; or

(17) attempt to do anything, or permit, encourage, assist, or allow any third party to do anything, prohibited in this list.

In addition to any other remedies available to us, a violation of any of the foregoing is grounds for:

(1) removal or refusal to post any User Submission for any or no reason in our sole discretion;

(2) cancellation of your purchases of products;

(3) cancellation of Rewards or payments due from us; and/or

(4) suspension or termination of your access or use the Services.

If we become aware of any possible violations by you of the Terms, we reserve the right to investigate such violations. If, as a result of the investigation, we believe that criminal activity has occurred, we reserve the right to refer the matter to, and to cooperate with, any and all applicable legal authorities. We are entitled, except to the extent prohibited by applicable law, to disclose any information or materials on or in the Services, including User Submissions, in our possession in connection with your use of the Services, to (i) comply with applicable laws, legal process or governmental request; (ii) enforce the Terms and Policies, (iii) respond to any claims that a User Submission violates the rights of third parties, (iv) respond to your requests for customer service, or (v) protect the rights, property or personal safety of us, our users or the public, and all enforcement or other government officials, as we in our sole discretion believe to be necessary or appropriate.

## 4. Privacy

**4.1** Our Privacy Policy provides information about how we collect, use, and disclose your personal information when you access, visit or use the Services. In connection with your use of the Services, you acknowledge and agree that we may collect, access, use, preserve and disclose your personal information (including your Account and user information) as described in our Privacy Policy and our Cookie and Similar Technologies Policy. The Privacy Policy is part of and is governed by these Terms and by agreeing to these Terms, you agree to be bound by the terms of the Privacy Policy and Cookie and Similar Technologies Policy.

## 5. Communications

**5.1** You consent to receive communications from us electronically, such as emails, texts, mobile push notices, and notices and messages on or through the Services ("Push Messages"), and where required by law, we will obtain your opt-in consent to deliver such Push Messages. You acknowledge that, when you use the App, your wireless service provider may charge you fees for data, text messaging and/or other wireless access, including in connection with Push Messages. Please check with your wireless service provider to determine what fees apply to your access to and use of the Services, including your receipt of Push Messages from us. You are solely responsible for any fee, cost or expense that you incur to download, install and/or use the Services on your mobile device, including for your receipt of Push Messages. You also acknowledge and agree that all terms and conditions, agreements, notices, disclosures, and other communications and documents that we provide to you electronically constitute and shall have the same legal effect as "in writing." The foregoing does not affect your statutory rights, including but not limited to the Electronic Signatures in Global and National Commerce Act at 15 U.S.C. §7001 et seq. ("E-Sign").

**5.2** You agree that we may communicate with you at any email address or telephone number that you provide us, to: (i) notify you regarding your Account; (ii) troubleshoot problems with your Account; (iii) resolve a dispute; (iv) collect a debt; (v) poll your opinions through surveys or questionnaires; (vi) notify you regarding order, payment and delivery updates; (vii) send you authentication texts; or (viii) as otherwise necessary to service your Account or enforce these Terms, the Policies, applicable laws and regulations, or any other agreement we may have with you. Standard text messaging charges applied by your cell phone carrier will apply to text messages that we send.

**5.3** If you would like to receive our marketing materials via mobile texts and alerts, you may sign up to do so. By signing up, you acknowledge that we may send you promotional messages or other mobile messages from or on behalf of us, including one-time passcodes, notifications regarding your orders, our promotional messages, and abandoned cart reminders (enabled by using cookies we collect as described in these Terms) at the mobile number you provide us. Opting in for a program does not entail automatic opt-in for another. Message frequency varies and carriers are not liable for any delays or undelivered messages. Message and Data Rates may apply. You acknowledge that you are not required to consent to receive marketing texts as





through the "Customer support" section in the "You" menu at the bottom of the home page.

**5.4**  If you wish to opt out of marketing emails, you can unsubscribe from our marketing email list by following the unsubscribe options in the marketing email itself.

**5.5**  Our communications with you may be through a third-party service provider. You acknowledge and consent that, subject to our Privacy Policy, your communications with us, our agents may be recorded, monitored and stored for quality control and training purposes, or to protect your and our interests.

## 6. User Submissions

**6.1**  "User Submission" means anything posted, uploaded, shared, submitted, stored, or otherwise provided by you through the Services, including suggestions, comments, reviews, ratings, photos, videos, or other feedback or materials, and may be viewable by other users. Any User Submission posted by you in your Account may not contain nudity, violence, sexually explicit, or offensive subject matter as determined by us in our sole discretion.

**6.2**  For all User Submissions, you grant us a fully-paid, royalty-free, perpetual, irrevocable, non-exclusive, transferable, sublicensable, worldwide right (including any moral rights) and license to use, license, store, display, reproduce, save, modify (e.g. to make sure the User Submission is viewable on different systems and devices), create derivative works, publicly perform, publicly display, distribute, translate, or otherwise act with respect to such User Submissions as we determine is necessary to operate, market, and advertise the Services, including to present, display, or perform such User Submissions in accordance with your preferences.

**6.3**  You acknowledge and agree that all User Submissions (including the user name under which you made them) are non-confidential and non-proprietary. We may freely display, disclose, reproduce, modify, license, transfer, distribute and otherwise use the User Submissions in any manner, without any restriction or compensation to you.

**6.4**  You warrant that you own or otherwise control all rights to the User Submissions and that our use of any User Submission will not infringe upon or violate the rights of any third party or violate any of the rules and restrictions contained in these Terms (including those included in Section 3 herein).

**6.5**  We do not endorse User Submissions, and they do not represent our views. We expressly disclaim any liability for User Submissions or damages resulting from them. We expect users to maintain a high level of integrity when submitting User Submissions that are viewable by other users, especially with respect to ratings and reviews of products. You undertake that the User Submissions that are viewable by other users are made truthfully in good faith and based only on your first-hand experience. You further undertake that you will prominently indicate if a User Submission was sponsored or paid for in any way. You acknowledge that we have no obligation to pre-screen User Submissions, although we reserve the right to pre-screen, refuse, exclude or remove any User Submission for any reason or no reason, at our discretion and without notice to you. By entering into these Terms, you hereby provide your irrevocable consent to such monitoring.  You acknowledge and agree that you have no expectation of privacy concerning the transmission of your User Submissions.  In the event that we pre-screen, refuse, exclude or remove any User Submissions, you acknowledge that we will do so for our benefit, not yours.  Without limiting the foregoing, we shall have the right to remove any User Submissions that violate the Terms or are otherwise objectionable.

## 7. Ownership

**7.1**  You acknowledge and agree that all materials displayed, performed, or available on or through the Services, including, but not limited to, text, graphics, data, articles, photos, images, illustrations and User Submissions (collectively, "Content") are protected by copyright and/or other intellectual property laws throughout the world. You undertake to comply with all copyright notices, trademark rules, information, and restrictions contained in the Content, and not to copy, reproduce, modify, translate, publish, broadcast, transmit, distribute, perform, upload, display, license, sell, or otherwise use for any purpose any Content not owned by you without the prior consent of the owner of that Content.

**7.2**  We respect others' intellectual property rights, and we reserve the right to delete or disable Content alleged to be infringing upon another person's intellectual property rights and to terminate the accounts of the alleged infringers. See our Intellectual Property Policy to learn how to report potentially infringing content.

**7.3**  You acknowledge and agree that we own or license the Services. You undertake not to modify, publish, transmit, participate in the transfer or sale of, reproduce, create derivative works based on, or otherwise exploit any of the Services, except as expressly provided in this Section 7.

**7.4**  Subject to your compliance with these Terms and all applicable policies, rules, and guidelines, and your payment of any applicable fees, we or our content providers grant you a limited, non-exclusive, non-transferable, non-sublicensable license to access and make personal and non-commercial use of the Services for the sole purpose of using Temu. All rights not expressly granted to you in these Terms or any policies or guidelines are reserved and retained by us or our licensors, suppliers, publishers, rightsholders, or other content providers. The licenses granted by us terminate if you do not comply with these Terms or any applicable policies, rules, or guidelines.




**8. Responsibilities; Third Party Risks**

8.1  You acknowledge and agree that any Content publicly posted or privately transmitted through the Services is the sole responsibility of the person that posted or transmitted such Content. You access and use the Content, and interact with other users, at your own risk. We are not responsible for any errors, mistakes, omissions, inaccuracies in the Content. We do not control the Content and have no duty to take any action regarding how you may interpret, use or react to the Content. We have no obligation to review or monitor, and do not approve, endorse, or make any representations or warranties with respect to, Content. You also understand that we cannot guarantee the identities of the users with whom you interact while using the Services and are not responsible for which users gain access to the Services.

8.2  You are responsible for all Content you contribute, in any manner, to the Services, and you represent and warrant you have all rights to contribute such Content to the Services in such manner.

8.3  The Services may contain links or connections to third-party websites or services that are not owned or controlled by us. We have no control over, and assume no responsibility for, the content, accuracy, privacy policies, or practices of or opinions expressed in any third-party websites or services. In addition, we will not and cannot monitor, verify, censor, or edit the content of any third-party website or service. You acknowledge and agree that we are not responsible for any risks resulting from your access or use of any third party websites or services. We encourage you to be aware when you leave the Services and to read the terms of use and privacy policy of each third-party website or service that you visit or use.

8.4  Your interactions with other users, other entities or individuals as a result of your use of the Services, including communications, payments, performances and deliveries, are solely between you and such third parties; provided, however, that we reserve the right, but has no obligation, to intercede in such interactions. You should make whatever investigation and/or seek whatever professional advice as you feel necessary or appropriate before proceeding with any interaction with any of these third parties. You acknowledge and agree that we are not responsible for any loss or damage incurred as the result of such interactions. You agree that we will not be responsible for any liability incurred as the result of such interactions.

8.5  It is a material breach of these Terms to arrange for the sale of listed items from, or the payment of fees to third parties outside the context of Temu for the purposes of circumventing the obligation to pay the fee for products purchased through the Services.

**9. Release**

9.1  We expressly disclaim any liability that may arise between users of Temu. If there is a dispute between you and another user or any third party on Temu, we are under no obligation to become involved. To the fullest extent permitted under applicable law, you release us, our parents, subsidiaries, affiliates, directors, officers, employees, agents and successors from all claims, demands, and damages of every kind or nature, known or unknown, suspected or unsuspected, disclosed or undisclosed, arising out of or in any way related to such disputes.

IN ENTERING INTO THIS RELEASE, YOU EXPRESSLY WAIVE ANY PROTECTIONS (WHETHER STATUTORY OR OTHERWISE) THAT WOULD LIMIT THE COVERAGE OF THIS RELEASE TO INCLUDE ONLY THOSE CLAIMS WHICH YOU MAY KNOW OR SUSPECT TO EXIST IN YOUR FAVOR AT THE TIME OF AGREEING TO THIS RELEASE.

**10. Purchases**

10.1  You are responsible for reading the full product listing before purchasing a product. By confirming your purchase, you agree to pay all applicable fees, taxes, shipping costs and other amounts associated with your purchase. Further, to the extent applicable, you acknowledge your responsibility for sales tax, VAT and customs duties. When you place an order and the order is being shipped to you, the title for product pass to you upon delivery of the product to the carrier. You agree that, where applicable, you will act as the importer of the products purchased and you hereby authorize us to appoint a freight forwarding agent to act as your direct representative and pay any sales tax, VAT and customs duties on your behalf. Please note that sales tax, VAT, customs duties, and similar charges collected at the time of purchase are estimated values and may be subject to change depending on applicable laws. If additional amounts are assessed, you are responsible for them. We will not be liable if a product is delayed or denied customs clearance as a result of your failure to pay such amounts.

10.2  While we strive to provide accurate information on Temu, typographical errors, inaccuracies, or omissions that relate to pricing, product descriptions, availability, and offers may occur. Subject to applicable law, we reserve the right to correct any errors, inaccuracies, or omissions and to change or modify information or cancel orders or parts of orders if any information on Temu is inaccurate at any time without prior notice, including after your order has been submitted or your receipt of an order confirmation or shipping notice. You should not rely on the strike-through price in your purchase decision. If comparing prices is important to your purchase decision, you should do your own comparison before making a purchase.




monitor's display of any color will be an accurate depiction of the color of the product you selected to purchase.

10.5   You acknowledge that the products are in conformity with the transaction or intended purchase if they: (i) comply with the description provided on Temu and possess the qualities presented on Temu; (ii) are fit for the purposes for which goods of such kind are normally used; and (iii) are of the quality and performance which are normal in goods of the same type and which can reasonably be expected.

10.6   In order to make purchases, you must provide accurate and complete information for a valid payment method, such as a credit card, that you are authorized to use. You must promptly update your account with any changes related to your payment method. BY PROVIDING INFORMATION FOR A PAYMENT METHOD, YOU AUTHORIZE US OR OUR AGENTS OR PAYMENT SERVICE PROCESSORS TO CHARGE THE PAYMENT METHOD FOR: (A) AMOUNTS DUE FOR PURCHASED PRODUCTS; (B) ANY AND ALL APPLICABLE CUSTOMS, TAXES AND SHIPPING COSTS; AND (C) ANY OTHER CHARGES INCURRED IN CONNECTION WITH YOUR USE OF THE SERVICES. YOUR PAYMENTS ARE NON-REFUNDABLE EXCEPT AS EXPRESSLY PROVIDED IN APPLICABLE POLICIES. We may decline, freeze or hold your transaction for any reason, including for suspected fraud, anti-money laundering and sanctions compliance, or if we believe your transaction poses a risk to us or any third party.

10.7   Payment Processors may charge you fees for your purchases made through Temu. Such processing fees will be disclosed to you via Temu. Your use of the Services and the payment processing provided by the Payment Processor is subject to your agreement with the Payment Processor, as may be modified from time to time. As a condition of using the payment services, you must provide accurate and complete information, and you authorize us to share this information with the Payment Processor.

10.8   Your payment obligations are fully fulfilled once your payment of the agreed price is received.

## 11. Refunds, Exchanges and Related

11.1   We assist you with customer services support involving payment, return, refund and other areas in connection with your purchase of products.

11.2   We want you to be satisfied with your purchases through the Services. For all the products purchased on Temu, you may be entitled to a return and refund. For details of return and refund, please visit our <u>Return and Refund Policy</u>. Please follow the instructions in the policy If you want to request a refund. You acknowledge and agree that we may issue a refund to you in accordance with the Return and Refund Policy.

Unless otherwise described in the <u>Return and Refund Policy</u>, the refund will not cover customs, taxes, or any return shipping costs you may incur in the refund process.

## 12. Rewards

12.1   You may receive credits, coupons, cash, gifts or other kinds of reward by use of the Services (collectively, "Rewards"). Some rewards may only be used for discounts on or payment for eligible purchases on or through the Services (but note that not all products may be eligible) and cannot be redeemed for cash, except in jurisdictions where required by law. You should read carefully the information and applicable rules regarding different kinds of rewards.

## 13. Ending Our Relationship

13.1   You are free to stop using the Services at any time. We are also free to terminate or suspend your use of the Services or your Account, for any reason in our discretion, including your breach of these Terms. You acknowledge and agree that we have the sole right to decide whether you are in violation of any of the restrictions set forth in these Terms. Even after your use of the Services is terminated or suspended, these Terms will remain enforceable against you and any unpaid amount you owe to us will remain due.

13.2   If your Account is terminated for any reason, all Content and Rewards associated with your Account will be destroyed and cancelled. You should try to use any remaining Rewards before the date on which such termination becomes effective.

13.3   All provisions of the Terms which by their nature should survive, shall survive termination of these Terms, including without limitation, ownership provisions, warranty disclaimers, and limitations of liability.

## 14. WARRANTY DISCLAIMER

14.1   TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW WE EXPRESSLY DISCLAIM ALL REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, RELATING TO THE SERVICES, ANY CONTENT OR ANY PRODUCT OFFERED OR PURCHASED ON OR THROUGH THE SERVICES, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF PRODUCTS' CONDITION, QUALITY, DURABILITY, PERFORMANCE, ACCURACY, RELIABILITY, MERCHANTABILITY. FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, OR ANY WARRANTIES OF THE CONTENT'S ACCURACY,





14.2  YOUR USE OF THE SERVICES AND YOUR USE OF ANY PRODUCT OFFERED AND PURCHASED ON OR THROUGH THE SERVICES ARE AT YOUR OWN RISK. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, UNLESS EXPRESSLY PROVIDED OTHERWISE, THE SERVICES, PRODUCTS OFFERED AND PURCHASED ON OR THROUGH THE SERVICES, AND THE CONTENT ARE MADE AVAILABLE TO YOU ON AN "AS-IS" AND "AS-AVAILABLE" BASIS, WITH ALL FAULTS AND WITHOUT WARRANTIES OF ANY KIND.

14.3  YOU ACKNOWLEDGE AND AGREE THAT THE TEMU PARTIES (AS DEFINED IN SECTION 16.1) ARE NOT LIABLE, AND YOU AGREE NOT TO SEEK TO HOLD THE TEMU PARTIES LIABLE, FOR THE CONDUCT OF THIRD PARTIES, INCLUDING OPERATORS OF EXTERNAL SITES, AND THAT THE RISK OF INJURY FROM SUCH THIRD PARTIES RESTS ENTIRELY WITH YOU. WE MAKE NO PROMISES WITH RESPECT TO, AND EXPRESSLY DISCLAIM ALL LIABILITY FOR: (1) PRODUCTS, SERVICES, INFORMATION, PROGRAMMING, AND/OR ANYTHING ELSE PROVIDED BY A THIRD PARTY THAT IS ACCESSIBLE TO YOU ON OR THROUGH THE SERVICES; OR (2) THE QUALITY OR CONDUCT OF ANY THIRD PARTY YOU ENCOUNTER IN CONNECTION WITH YOUR USE OF THE SERVICES.

14.4  YOU ACKNOWLEDGE AND AGREE THAT, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, YOU ASSUME FULL RESPONSIBILITY FOR YOUR USE OF THE SERVICES, INCLUDING YOUR INTERACTIONS WITH OTHER USERS OF THE SERVICES, AND THAT ANY INFORMATION YOU SEND OR RECEIVE DURING YOUR USE OF THE SERVICES MAY NOT BE SECURE AND MAY BE INTERCEPTED OR OTHERWISE ACCESSED BY UNAUTHORIZED PARTIES. YOU AGREE THAT, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, WE ARE NOT RESPONSIBLE FOR ANY LOSS OR DAMAGE TO YOUR PROPERTY OR DATA THAT RESULTS FROM ANY MATERIALS YOU ACCESS OR DOWNLOAD FROM THE SERVICES.

14.5  IF YOU RELY ON ANY DATA OR INFORMATION OBTAINED ON OR THROUGH THE SERVICES, YOU DO SO AT YOUR OWN RISK. YOU ARE SOLELY RESPONSIBLE FOR ANY DAMAGE OR LOSS THAT RESULTS FROM YOUR USE OF SUCH DATA OR INFORMATION.

## 15. LIMITATION OF LIABILITY

15.1  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, UNDER NO CIRCUMSTANCES AND UNDER NO LEGAL THEORY (INCLUDING, WITHOUT LIMITATION, TORT, CONTRACT, STRICT LIABILITY, OR OTHERWISE) SHALL TEMU PARTIES BE LIABLE TO YOU OR TO ANY OTHER PERSON FOR (A) ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES OF ANY KIND, INCLUDING DAMAGES FOR LOSS OF DATA, PROFITS, REVENUE OR GOODWILL, REPUTATIONAL HARM, BUSINESS INTERRUPTION, ACCURACY OF RESULTS, OR COMPUTER FAILURE OR MALFUNCTION ARISING OUT OF OR IN CONNECTION WITH THE SERVICES OR (B) YOUR USE OF THE SERVICES, INCLUDING, WITHOUT LIMITATION, ANY INABILITY TO ACCESS OR USE THE SERVICES OR THE PURCHASE AND USE OF PRODUCTS OFFERED ON OR THROUGH THE SERVICES, EVEN IF WE OR ANY OTHER PERSON HAS FORESEEN OR BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE FOREGOING LIMITATION OF LIABILITY SHALL NOT APPLY TO LIABILITY OF A TEMU PARTY FOR (I) DEATH OR PERSONAL INJURY CAUSED BY OUR GROSS NEGLIGENCE; OR FOR (II) ANY INJURY CAUSED BY OUR FRAUD OR FRAUDULENT MISREPRESENTATION.

15.2  THIS DISCLAIMER APPLIES, WITHOUT LIMITATION, TO THE MAXIMUM EXTENT PERMITTED UNDER LAW, TO ANY DAMAGES OR PERSONAL INJURY ARISING FROM ANY FAILURE OF PERFORMANCE, ERROR, OMISSION, INTERRUPTION, DELETION, DEFECTS, DELAY IN OPERATION OR TRANSMISSION, COMPUTER VIRUS, FILE CORRUPTION, COMMUNICATION-LINE FAILURE, NETWORK OR SYSTEM OUTAGE, ANY THEFT, DESTRUCTION, UNAUTHORIZED ACCESS TO, ALTERATION OF, LOSS OR USE OF, ANY RECORD OR DATA, AND ANY OTHER TANGIBLE OR INTANGIBLE LOSS.

15.3  YOU SPECIFICALLY ACKNOWLEDGE AND AGREE THAT WE SHALL NOT BE LIABLE FOR ANY DEFAMATORY, OFFENSIVE, OR ILLEGAL CONDUCT BY ANY USER OF THE SERVICES.

15.4  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, UNDER NO CIRCUMSTANCES WILL THE TOTAL AGGREGATE AMOUNT FOR WHICH THE TEMU PARTIES ARE LIABLE TO YOU EXCEED THE GREATER OF: (A) THE TOTAL AMOUNT PAID TO US BY YOU DURING THE ONE-MONTH PERIOD PRIOR TO THE ACT, OMISSION OR OCCURRENCE GIVING RISE TO SUCH LIABIITY; (B) $100.00; OR (C) THE REMEDY OR PENALTY IMPOSED BY THE STATUTE UNDER WHICH SUCH CLAIM ARISES. THE FOREGOING CAP ON LIABILTY SHALL NOT APPLY TO LIABLITY OF A TEMU PARTY FOR (I) DEATH OR PERSONAL INJURY CAUSED BY OUR GROSS NEGLIGENCE; OR FOR (II) ANY INJURY CAUSED BY OUR FRAUD OR FRAUDULENT MISREPRESENTATION. THE PRECEDING SENTENCE SHALL NOT PRECLUDE THE REQUIREMENT FOR YOU TO PROVE ACTUAL DAMAGES.

15.5  CERTAIN JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF CERTAIN DAMAGES OR IMPLIED WARRANTIES. IF THESE LAWS APPLY TO YOU, SOME OR ALL OF THE ABOVE EXCLUSIONS OR LIMITATIONS MAY NOT APPLY TO YOU, AND YOU MIGHT HAVE ADDITIONAL RIGHTS.

15.6  THE LIMITATIONS OF DAMAGES SET FORTH ABOVE ARE ESSENTIAL TO THE AGREEMENT BETWEEN YOU AND US.

## 16. Indemnity




agreement; or (d) your violation of any applicable laws, rules, or regulations. In the event of such a claim, suit, or action ("Claim"), we will attempt to provide notice of the Claim to the contact information we have for your Account (provided that failure to deliver such notice shall not eliminate or reduce your indemnification obligations under these Terms).

16.2   We reserve the right, at our own cost, to assume the exclusive defense and control of any matter otherwise subject to indemnification by you, in which case you will fully cooperate with us in asserting any available defenses.

16.3   You agree that the provisions in this section will survive any termination of your Account, the Terms and/or your access to the Services.

## 17. App Stores

**17.1 Application License.**  Subject to your compliance with the Terms, we grant you a limited non-exclusive, non-transferable, non-sublicensable, revocable license to download, install and use a copy of the Temu mobile application ("Application") on a single mobile device or computer that you own or control and to run such copy of the Application solely for your own personal or internal business purposes. Furthermore, with respect to any Application accessed through or downloaded from the Apple App Store (an "App Store Sourced Application"), you will only use the App Store Sourced Application (a) on an Apple-branded product that runs the iOS (Apple's proprietary operating system) and (b) as permitted by the "Usage Rules" set forth in the Apple App Store Terms of Service. Notwithstanding the first sentence in this section, with respect to any Application accessed through or downloaded from the Google Play store (a "Google Play Sourced Application"), you may have additional license rights with respect to use of the Application on a shared basis within your designated family group.

**17.2 App Stores.**  You acknowledge and agree that the availability of the Application and the Services is dependent on the third party from whom you received the Application license, e.g., the Apple App Store or Google Play (each, an "App Store"). You acknowledge that the Terms are between you and us and not with the App Store. We, not the App Store, are solely responsible for The Services, including the Application, the content thereof, maintenance, support services, and warranty therefor, and addressing any claims relating thereto (e.g., product liability, legal compliance or intellectual property infringement). In order to use the Application, you must have access to a wireless network, and you agree to pay all fees associated with such access. You also agree to pay all fees (if any) charged by the App Store in connection with The Services, including the Application. You agree to comply with, and your license to use the Application is conditioned upon your compliance with all terms of agreement imposed by the applicable App Store when using any Service, including the Application. You acknowledge that the App Store (and its subsidiaries) are third-party beneficiaries of the Terms and will have the right to enforce it.

**17.3 Accessing and Downloading the Application from iTunes.**  The following applies to any App Store Sourced Application accessed through or downloaded from the Apple App Store:

17.3.1   You acknowledge and agree that (i) the Terms are concluded between you and us only, and not Apple, and (ii) we, not Apple, are solely responsible for the App Store Sourced Application and content thereof. Your use of the App Store Sourced Application must comply with the App Store Terms of Service.

17.3.2   You acknowledge that Apple has no obligation whatsoever to furnish any maintenance and support services with respect to the App Store Sourced Application.

17.3.3   In the event of any failure of the App Store Sourced Application to conform to any applicable warranty, you may notify Apple, and Apple will refund the purchase price for the App Store Sourced Application to you and to the maximum extent permitted by applicable law, Apple will have no other warranty obligation whatsoever with respect to the App Store Sourced Application. As between Apple and us, any other claims, losses, liabilities, damages, costs or expenses attributable to any failure to conform to any warranty will be our sole responsibility.

17.3.4   You and we acknowledge that, as between Apple and us, Apple is not responsible for addressing any claims you have or any claims of any third party relating to the App Store Sourced Application or your possession and use of the App Store Sourced Application, including, but not limited to: (i) product liability claims; (ii) any claim that the App Store Sourced Application fails to conform to any applicable legal or regulatory requirement; and (iii) claims arising under consumer protection or similar legislation.

17.3.5   You and we acknowledge that, in the event of any third-party claim that the App Store Sourced Application or your possession and use of that App Store Sourced Application infringes that third party's intellectual property rights, as between Apple and us, we, not Apple, will be solely responsible for the investigation, defense, settlement and discharge of any such intellectual property infringement claim to the extent required by the Terms.

17.3.6   You and we acknowledge and agree that Apple, and Apple's subsidiaries, are third-party beneficiaries of the Terms as related to your license of the App Store Sourced Application, and that, upon your acceptance of the terms and conditions of the Terms, Apple will have the right (and will be





## 18. General

**18.1 Assignment.**  You may not assign, delegate, or transfer these Terms, or your rights and obligations hereunder, to any other person in any way (by operation of law or otherwise) without our prior written consent, and any attempted assignment, subcontract, delegation, or transfer in violation of the foregoing will be null and void. We may transfer, assign, or delegate these Terms and its rights and obligations hereunder to any other person without your consent.

**18.2 Force Majeure.**  We shall not be liable for any delay or failure to perform resulting from causes outside our reasonable control, including, but not limited to, acts of God, war, terrorism, riots, embargos, acts of civil or military authorities, fire, floods, accidents, pandemics, strikes, or shortages of transportation facilities, fuel, energy, labor, or materials.

**18.3 Choice of Law.**  These Terms and any dispute of any sort that might arise between you and us hereunder will be governed by the laws of the State of New York and applicable federal laws of the United States of America, consistent with the Federal Arbitration Act, without regard to any principle of conflict-of-laws. The United Nations Convention on Contracts for the International Sale of Goods does not apply to these Terms.

**18.4 Exclusive Venue.**  Any dispute of any sort between you and us that arises out of or in connection with the Services and is not subject to arbitration or eligible for small claims action, shall be decided exclusively by (a) if you enter into these Terms with Whaleco Inc., a court of competent jurisdiction located in New York, New York; (b) if you enter into these Terms with Whaleco Technology Limited, a court of competent jurisdiction located in Ireland; and (c) if you enter these Terms with Whaleco UK Limited, a court of competent jurisdiction located in England. You hereby consent to, and waive all defense of lack of personal jurisdiction and forum non conveniens with respect to, venue and jurisdiction in such courts.

**18.5 Notice.**  You acknowledge and agree that we may give notice to you through email using the latest email address you provided to us, which constitutes effective notice. Therefore, you are responsible for keeping your email address information with us up to date. You may give notice to us at the following addresses:

If to Whaleco Inc.:

Whaleco Inc.

Suite 355, 31 St. James Avenue
Boston, Massachusetts 02116
USA

If to Whaleco Technology Limited or Whaleco UK Limited:

Whaleco Technology Limited

First Floor, 25 St
Stephens Green
Dublin 2, Ireland

Such notice shall be deemed given when received by us by letter delivered by nationally recognized overnight delivery service or first-class postage prepaid mail at the above address.

**18.6 Export Control.**  You undertake to use the Services and products purchased on or through the Services in compliance with all applicable US or other export and re-export restrictions of relevant jurisdictions. In particular, you acknowledge and agree that the Services, including any products purchased on or through the Services, may not be exported or re-exported (a) into any embargoed countries by your country of residence or other relevant countries, or (b) to anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Department of Commerce's Denied Person's List or Entity List. You represent and warrant that (i) you are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a "terrorist supporting" country and (ii) you are not listed on any U.S. Government list of prohibited or restricted parties. You also will not use the Services nor the products purchased on the Services for any purpose prohibited by any applicable law.

**18.7 Consumer Complaints.**  In accordance with California Civil Code §1789.3, you may report complaints to the Complaint Assistance Unit of the Division of Consumer Services of the California Department of Consumer Affairs by contacting them in writing at 400 R Street, Sacramento, CA 95814, or by telephone at (800) 952-5210.

**18.8 Waiver.**  Our failure to respond to a breach by you or others does not waive our right to act with respect to subsequent or similar breaches.

**18.9 Severability.**  Except as provided in Section 19.11, if any provision of these Terms is found to be unenforceable or invalid, that provision will be limited or eliminated, to the minimum extent necessary, so that these Terms shall otherwise remain in full force and effect and enforceable.

**18.10 Third-Party Beneficiaries.**  There are no third-party beneficiaries intended under these Terms.




languages, the English version shall always prevail.

**18.13 International Provision – United Kingdom.** The following provision applies only if you are located in the United Kingdom: A third party who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any provision of this Agreement, but this does not affect any right or remedy of such third party which exists or is available apart from that Act.

## 19. ARBITRATION AGREEMENT

**PLEASE READ THIS SECTION 19 ("ARBITRATION AGREEMENT") CAREFULLY. PLEASE BE AWARE THAT THIS SECTION CONTAINS PROVISIONS GOVERNING HOW DISPUTES BETWEEN YOU AND US WILL BE RESOLVED. AMONG OTHER THINGS, THIS SECTION 19 INCLUDES AN AGREEMENT TO ARBITRATE, WHICH REQUIRES, WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU AND US BE RESOLVED BY BINDING AND FINAL ARBITRATION. THIS SECTION 19 ALSO CONTAINS A CLASS ACTION AND JURY TRIAL WAIVER. IN SOME COUNTRIES YOU MAY HAVE ADDITIONAL RIGHTS AND/OR ELEMENTS OF THIS ARBITRATION AGREEMENT MAY NOT APPLY TO YOU AS REQUIRED BY LAW.**

**19.1 Applicability of Arbitration Agreement.** Subject to the terms of this Arbitration Agreement, you and we agree that any dispute, claim, or disagreement arising out of or relating in any way to your access to or use of the Services, any communications you receive, any products sold or distributed through the Services, or the Terms, including claims and disputes that arose between us before the effective date of the Terms (each, a "Dispute") will be resolved by binding arbitration, using the English language, rather than in court, except that: (1) you and we may assert claims or seek relief in small claims court if such claims qualify and remain in small claims court; and (2) you or we may seek equitable relief in court for infringement or other misuse of intellectual property rights (such as trademarks, trade dress, domain names, trade secrets, copyrights, and patents). For purposes of this Arbitration Agreement, "Dispute" will also include disputes that arose or involve facts occurring before the existence of this or any prior versions of the Terms as well as claims that may arise after the termination of the Terms.

**19.2 Informal Dispute Resolution.** There may be instances when a Dispute arises between you and us. If that occurs, we are committed to working with you to reach a reasonable resolution. You and we agree that good faith informal efforts to resolve Disputes can result in a prompt, low-cost and mutually beneficial outcome. You and we therefore agree that before either party commences arbitration against the other (or initiates an action in small claims court if a party so elects), we will personally meet and confer telephonically or via videoconference, in a good faith effort to resolve informally any Dispute covered by this Arbitration Agreement ("Informal Dispute Resolution Conference"). If you are represented by counsel, your counsel may participate in the conference, but you also agree to participate in the conference. The party initiating a Dispute must give notice to the other party in writing of its intent to initiate an Informal Dispute Resolution Conference ("Notice"), which shall occur within forty-five (45) days after the other party receives such Notice, unless an extension is mutually agreed upon by the parties in writing. Notice to us that you intend to initiate an Informal Dispute Resolution Conference should be sent by email to dispute@temu.com for the U.S., dispute@eur.temu.com for the EU, or dispute@uk.temu.com for the UK, or by regular mail to the applicable address set forth in Section 18.5. The Notice must include: (1) your name, telephone number, mailing address, email address associated with your Account (if you have one); (2) the name, telephone number, mailing address and e-mail address of your counsel, if any; and (3) a description of your Dispute.

The Informal Dispute Resolution Conference shall be individualized such that a separate conference must be held each time either party initiates a Dispute, even if the same law firm or group of law firms represents multiple users in similar cases, unless all parties agree; multiple individuals initiating a Dispute cannot participate in the same Informal Dispute Resolution Conference unless all parties agree. In the time between a party receiving the Notice and the Informal Dispute Resolution Conference, nothing in this Arbitration Agreement shall prohibit the parties from engaging in informal communications to resolve the initiating party's Dispute. Engaging in the Informal Dispute Resolution Conference is a condition precedent and requirement that must be fulfilled before commencing arbitration. The statute of limitations and any filing fee deadlines shall be tolled while the parties engage in the Informal Dispute Resolution Conference process required by this section.

**19.3 Waiver of Jury Trial. YOU AND WE HEREBY WAIVE ANY CONSTITUTIONAL AND STATUTORY RIGHTS TO SUE IN COURT AND HAVE A TRIAL IN FRONT OF A JUDGE OR A JURY.** You and we are instead electing that all Disputes shall be resolved by arbitration under this Arbitration Agreement, except as specified in Section 19.1 above. There is no judge or jury in arbitration, and court review of an arbitration award is subject to very limited review.

**19.4 Waiver of Class and Other Non-Individualized Relief. YOU AND WE AGREE THAT, EXCEPT AS SPECIFIED IN SECTION 19.9, EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS, REPRESENTATIVE, OR COLLECTIVE BASIS, AND THE PARTIES HEREBY WAIVE ALL RIGHTS TO HAVE ANY DISPUTE BE BROUGHT, HEARD, ADMINISTERED, RESOLVED, OR ARBITRATED ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MASS ACTION BASIS. ONLY INDIVIDUAL RELIEF IS AVAILABLE, AND DISPUTES OF MORE THAN ONE CUSTOMER OR USER CANNOT BE ARBITRATED OR CONSOLIDATED WITH THOSE OF ANY OTHER CUSTOMER OR USER.** Subject to this Arbitration Agreement, the arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by the party's individual claim. Nothing in this paragraph is intended to, nor shall it, affect the terms and conditions under Section 19.9. Notwithstanding anything to the contrary in this Arbitration Agreement, if a final decision, not subject to any further appeal or recourse, determines that the limitations of this Section are invalid or unenforceable as to a particular claim or request for relief (such as a request for public injunctive relief),




the applicable substantive law, the Federal Arbitration Act, 9 U.S.C. § 1 et seq., will govern the interpretation and enforcement of this Arbitration Agreement and any arbitration proceedings. If the Informal Dispute Resolution Process described above does not resolve satisfactorily within sixty (60) days after receipt of Notice, you and we agree that either party shall have the right to finally resolve the Dispute through binding arbitration. The arbitration will be conducted by American Arbitration Association (the "AAA"), an established alternative dispute resolution provider, under its rules, including Consumer Arbitration Rules (the "AAA Rules"), then effect, unless otherwise required by law. AAA's rules are also available at https://adr.org/consumer, or by calling 1-800-778-7879. For all actions under the AAA Rules, the proceedings may be filed where your residence is, or in New York, New York, and any in-person hearings will be conducted at a location which is reasonably convenient to both parties taking into account their ability to travel and other pertinent circumstances. If AAA is not available to arbitrate, the parties will select an alternative arbitral forum. Your responsibility to pay any AAA fees and costs will be solely as set forth in the applicable AAA rules.

If the Parties are not able to resolve the Dispute through the mandatory informal dispute resolution process referenced above, either party may initiate an arbitration proceeding by sending a demand to the other party that describes the nature and basis for the claim and includes all of the information required in the arbitration notice ("Arbitration Notice"). The Party initiating arbitration must include as part of the demand a personally signed certification of compliance with the informal dispute resolution process. The Arbitration Notice must include: (1) the name, telephone number, mailing address, e-mail address of the party seeking arbitration and the account username (if applicable) as well as the email address associated with any applicable account; (2) a statement of the legal claims being asserted and the factual bases of those claims; (3) a description of the remedy sought and an accurate, good-faith calculation of the amount in controversy in United States Dollars; (4) a statement certifying completion of the Informal Dispute Resolution process as described above; and (5) evidence that the requesting party has paid any necessary filing fees in connection with such arbitration. If the party requesting arbitration is represented by counsel, the Arbitration Notice shall also include counsel's name, telephone number, mailing address, and email address. Such counsel must also sign the Arbitration Notice. By signing the Arbitration Notice, counsel certifies to the best of counsel's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, that: (1) the Arbitration Notice is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of dispute resolution; (2) the claims, defenses and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; and (3) the factual and damages contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. Unless you and we otherwise agree, or the Batch Arbitration process discussed in Section 19.9 is triggered, the arbitration will be conducted in the county where you reside. Subject to the applicable AAA rules, the arbitrator may direct a limited and reasonable exchange of information between the parties, consistent with the expedited nature of the arbitration. If the AAA is not available to arbitrate, the parties will select an alternative arbitral forum. Your responsibility to pay any AAA fees and costs will be solely as set forth in the applicable AAA Rules. You and we agree that all materials and documents exchanged during the arbitration proceedings shall be kept confidential and shall not be shared with anyone except the parties' attorneys, accountants, or business advisors, and then subject to the condition that they agree to keep all materials and documents exchanged during the arbitration proceedings confidential. During the arbitration, the amount of any settlement offer made by you or us must not be disclosed to the arbitrator until after the arbitrator makes a final decision and award, if any.

**19.6 Arbitrator.**  The arbitrator will be either a retired judge or an attorney licensed to practice law in the State of New York, and will be selected by the parties from the AAA roster of consumer dispute arbitrators. If the parties are unable to agree upon an arbitrator within thirty-five (35) days of delivery of the Arbitration Notice, then AAA will appoint the arbitrator in accordance with the applicable AAA rules, provided that if the Batch Arbitration process under Section 19.9 is triggered, AAA will appoint the arbitrator for each batch.

**19.7 Authority of Arbitrator.**  The arbitrator shall have exclusive authority to resolve any Dispute, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement, except for the following: (1) all Disputes arising out of or relating to Section 19.4, including any claim that all or part of Section 19.4 is unenforceable, illegal, void or voidable, or that Section 19.4 has been breached, shall be decided by a court of competent jurisdiction and not by an arbitrator; (2) except as expressly contemplated in Section 19.9, all Disputes about the payment of arbitration fees shall be decided only by a court of competent jurisdiction and not by an arbitrator; (3) all Disputes about whether either party has satisfied any condition precedent to arbitration shall be decided only by a court of competent jurisdiction and not by an arbitrator; and (4) all Disputes about which version of the Arbitration Agreement applies shall be decided only by a court of competent jurisdiction and not by an arbitrator. The arbitration proceeding will not be consolidated with any other matters or joined with any other cases or parties, except as expressly provided in Section 19.9. The arbitrator shall have the authority to grant motions dispositive of all or part of any Dispute. The arbitrator shall issue a written award and statement of decision describing the essential findings and conclusions on which the award is based, including the calculation of any damages awarded. The award of the arbitrator is final and binding upon you and us. Judgment on the arbitration award may be entered in any court having jurisdiction.

**19.8 Attorneys' Fees and Costs.**  The parties shall bear their own attorneys' fees and costs in arbitration unless the arbitrator finds that either the substance of the Dispute or the relief sought in the Arbitration Notice was frivolous or was brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)). If you or we need to invoke the authority of a court of competent jurisdiction to compel arbitration, then the party that obtains an order compelling arbitration in such action shall have the right to collect from the other party its reasonable costs, necessary disbursements, and reasonable attorneys' fees incurred in securing an order compelling arbitration. The prevailing party in any court




group of law firms, or organizations, within a thirty (30) day period, AAA shall (1) administer the arbitration demands in batches of 100 Arbitration Notices per batch (plus, to the extent there are less than 100 Arbitration Notices left over after the batching described above, a final batch consisting of the remaining Arbitration Notices), or in a single batch if there are fewer than 100 Arbitration Notices in total; (2) appoint one arbitrator for each batch; (3) administer the batches concurrently; (4) provide for the resolution of each batch as a single consolidated arbitration with one set of filing and administrative fees due per side per batch, one procedural calendar, one hearing (if any) in a place to be determined by the arbitrator, and one final award ("Batch Arbitration"). Arbitration awards in one batch of arbitration demands shall have no precedential effect on subsequently administered batches.

All parties agree that Arbitration Notices are of a "substantially similar nature" if they arise out of or relate to the same event or factual scenario and raise the same or similar legal issues and seek the same or similar relief. To the extent the parties disagree on the application of the Batch Arbitration process, the disagreeing party shall advise AAA, and AAA shall appoint a sole standing arbitrator to determine the applicability of the Batch Arbitration process ("Administrative Arbitrator"). In an effort to expedite resolution of any such dispute by the Administrative Arbitrator, the parties agree the Administrative Arbitrator may set forth such procedures as are necessary to resolve any disputes promptly. The Administrative Arbitrator's fees shall be paid by us. You and we agree to cooperate in good faith with AAA to implement the Batch Arbitration process including the payment of single filing and administrative fees for batches of Arbitration Notices, as well as any steps to minimize the time and costs of arbitration, which may include: (1) the appointment of a discovery special master to assist the arbitrator in the resolution of discovery disputes; and (2) the adoption of an expedited calendar of the arbitration proceedings. This Batch Arbitration provision shall in no way be interpreted as authorizing a class, collective and/or mass arbitration or action of any kind, or arbitration involving joint or consolidated claims under any circumstances, except as expressly set forth in this provision.

**19.10 30-Day Right to Opt Out.**  You have the right to opt out of the provisions of this Arbitration Agreement by sending written notice of your decision to opt out to the applicable address set forth in Section 18.5, within thirty (30) days after first becoming subject to this Arbitration Agreement. Your notice must include your name and address, the email address you used to set up your Account (if you have one), and an unequivocal statement that you want to opt out of this Arbitration Agreement. If you opt out of this Arbitration Agreement, all other parts of these Terms will continue to apply to you. Opting out of this Arbitration Agreement has no effect on any other arbitration agreements that you may currently have, or may enter in the future, with us.

**19.11 Invalidity, Expiration.**  Except as provided in Section 19.9, if any part or parts of this Arbitration Agreement are found under the law to be invalid or unenforceable, then such specific part or parts shall be of no force and effect and shall be severed and the remainder of the Arbitration Agreement shall continue in full force and effect. For the avoidance of doubt, this means that, if Section 19.9 is found under the law to be invalid or unenforceable to any extent, then you agree that the entire Arbitration Agreement shall be of no force and effect. You further agree that any Dispute that you have with us as detailed in this Arbitration Agreement must be initiated via arbitration within the applicable statute of limitation for that claim or controversy, or it will be forever time barred. Likewise, you agree that all applicable statutes of limitation will apply to such arbitration in the same manner as those statutes of limitation would apply in the applicable court of competent jurisdiction.

**19.12 Modification.**  Notwithstanding any provision in the Terms to the contrary, we agree that if we make any future material change to this Arbitration Agreement, it will notify you. Unless you reject the change within thirty (30) days of such change becoming effective by writing to us at the applicable address set forth in Section 18.5, your continued use of the Services, including the acceptance of products and services offered on or through the Services, following the posting of changes to this Arbitration Agreement constitutes your acceptance of any such changes. Changes to this Arbitration Agreement do not provide you with a new opportunity to opt out of the Arbitration Agreement if you have previously agreed to a version of the Terms and did not validly opt out of arbitration. If you reject any change or update to this Arbitration Agreement, and you were bound by an existing agreement to arbitrate Disputes arising out of or relating in any way to your access to or use of the Services, any communications you receive, any products sold or distributed through the Services or the Terms, the provisions of this Arbitration Agreement as of the date you first accepted the Terms (or accepted any subsequent changes to the Terms) remain in full force and effect. We will continue to honor any valid opt outs of the Arbitration Agreement that you made to a prior version of the Terms.

## Contact us

1. If you are using a Temu website, at the appropriate email address on the "Contact us" page linked in the website footer

2. If you are using a Temu application, through the "Customer support" section in the "You" menu at the bottom of the home page.



About Temu

Temu - Team Up, Price Down!

Return and refund policy

Intellectual property policy

Shipping info

Support center & FAQ

Temu purchase protection

Careers

Press

© 2023 WhaleCo Inc.    Terms of use    Privacy policy    Your privacy choices    Ad Choices





# EXHIBIT B

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

ERIC HU, EDWIN ANTONIO SURIS, TIMOTHY SMITH, ROY NORMAN MORROW, MING HUI LIN, NANCY BATALAS, JAMES LAFATA, DANIEL DAVID KATTAN, TRACY EVETTE STARLING, CHRISTOPH B. OH, HECTOR ANDREW CORDERO, YO-YO CHEN, and MANISHA REDDY NARAYAN, on behalf of themselves and all others similarly situated,

                  Plaintiffs,

v.

WHALECO INC. d/b/a TEMU,

                  Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:23-cv-06962-MKB-RML

District Judge Margo K. Brodie

Magistrate Judge Robert M. Levy

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION

Date:  April 19, 2024

Serrin Turner
Matthew Valenti
Hadrian Luo
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
Email: serrin.turner@lw.com
      matthew.valenti@lw.com
      hadrian.luo@lw.com

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................1

FACTUAL BACKGROUND ................................................................................................2

    A.    Defendant Temu........................................................................................2

    B.    A User Must Consent to Temu's Terms to Make Purchases on the Temu
        App.............................................................................................................2

    C.    The Terms Broadly Require That Disputes Be Arbitrated .......................3

    D.    Plaintiffs Ignored Their Agreements and Filed a Class Action in Court.................4

LEGAL STANDARD...........................................................................................................5

ARGUMENT .......................................................................................................................6

    A.    Each Plaintiff Validly Agreed to the Terms ............................................6

    B.    The Arbitration Agreement and Class Action Waiver Are Enforceable ...............10

CONCLUSION....................................................................................................................13

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**CASES**

*Acaley v. Vimeo, Inc.*,
    464 F. Supp. 3d 959 (N.D. Ill. 2020) ...................................................................................8, 9

*Alvarez v. Experian Info. Sols., Inc.*,
    661 F. Supp. 3d 18 (E.D.N.Y. 2023) ......................................................................................12

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011).............................................................................................................5, 12

*Bahoor v. Varonis Sys.*,
    152 F. Supp. 3d 1091 (N.D. Ill. 2015) ...................................................................................11

*Berkson v. Gogo*,
    97 F. Supp. 3d 359 (E.D.N.Y. 2015) .......................................................................................6

*Bynum v. Maplebear Inc.*,
    160 F. Supp. 3d 527 (E.D.N.Y. 2016) .....................................................................................5

*Calderon v. Breadberry Inc.*,
    2023 WL 1861639 (E.D.N.Y. Feb. 9, 2023)....................................................................11, 12

*Cupples v. Valic Fin. Advisors, Inc.*,
    2014 WL 4662272 (E.D.N.Y. Sept. 18, 2014) ........................................................................6

*Edmundson v. Klarna, Inc.*,
    85 F.4th 695 (2d Cir. 2023) ........................................................................................5, 6, 10

*Feld v. Postmates*,
    442 F. Supp. 3d 825 (S.D.N.Y. 2020)............................................................................6, 7, 8

*Fteja v. Facebook*,
    841 F. Supp. 2d 829 (S.D.N.Y. 2012)......................................................................................7

*Henry Schein v. Archer & White*,
    586 U.S. 63 (2019)..................................................................................................................12

*In re Am. Exp. Fin. Advisors Sec. Litig.*,
    672 F.3d 113 (2d Cir. 2011)..............................................................................................5, 11

*Johnson v. Uber*,
    2018 WL 4503938 (N.D. Ill. 2018) .........................................................................................7

*Lee v. Ticketmaster*,
    817 F. App'x 393 (9th Cir. 2020) ........................................................................9

*Meyer v. Uber*,
    868 F.3d 66 (2d Cir. 2017)........................................................................6, 7, 9, 10

*Morgikian v. Fid. Invs.*,
    2022 WL 836950 (E.D.N.Y. Mar. 21, 2022) .........................................................11

*Moses H. Cone Mem'l Hosp. v. Mercury Constr.*,
    460 U.S. 1 (1983)...............................................................................................5, 11

*Mumin v. Uber Techs., Inc.*,
    239 F. Supp. 3d 507 (E.D.N.Y. 2017) ..................................................................12

*Nayal v. HIP Network*,
    620 F. Supp. 2d 566 (S.D.N.Y. 2009) ..................................................................12

*New Prime v. Oliveira*,
    586 U.S. 105 (2019) .............................................................................................12

*Paramedics Electromedicina v. GE Med. Sys.*,
    369 F.3d 645 (2d Cir. 2004)..................................................................................11

*Plazza v. Airbnb, Inc.*,
    289 F. Supp. 3d 537 (S.D.N.Y. 2018)....................................................................7

*Saizhang Guan v. Uber Techs., Inc.*,
    236 F. Supp. 3d 711 (E.D.N.Y. 2017) ....................................................................7

*Selden v. Airbnb*,
    4 F.4th 148 (D.C. Cir. 2021) ......................................................................6, 7, 10

*Selden v. Airbnb, Inc.*,
    2016 WL 6476934 (D.D.C. Nov. 1, 2016), *aff'd*, 4 F.4th 148 (D.C. Cir. 2021) .......................8

*Shalomayev v. Altice USA, Inc.*,
    2022 WL 2359406 (E.D.N.Y. June 30, 2022) ........................................................8

*Shearson/Am. Exp., Inc. v. McMahon*,
    482 U.S. 220 (1987).................................................................................................5

*Sinavsky v. NBC*,
    2021 WL 4151013 (S.D.N.Y. 2021)......................................................................12

*Starke v. Gilt Groupe*,
    2014 WL 1652225 (S.D.N.Y. 2014).........................................................................9

*Thorne v. Square*,
   2022 WL 542383 (E.D.N.Y. 2022).....................................................................................6, 9

*Zachman v. Hudson Valley Fed. Credit Union*,
   49 F.4th 95 (2d Cir. 2022) .........................................................................................5

*Zaltz v. JDATE*,
   952 F. Supp. 2d 439 (E.D.N.Y. 2013) ........................................................................7

## STATUTES

9 U.S.C. § 1 *et seq*...........................................................................................................5

Defendant Whaleco Inc. d/b/a Temu ("Temu") respectfully submits this memorandum in support of its motion to compel arbitration.[1]

## PRELIMINARY STATEMENT

Plaintiffs' claims belong in arbitration, not in court. Each Plaintiff registered a Temu account. In doing so, they were presented with a prompt informing them that, by continuing, they would be agreeing to Temu's Terms of Use ("Terms")—which were hyperlinked in the prompt, allowing Plaintiffs to review the Terms if they wished. The prompt was in a format that the Second Circuit has held sufficient to form a valid agreement. Plaintiffs cannot dispute that they were presented with the prompt and chose to continue past it, and thus that they are bound by the Terms.

The Terms mandate that Plaintiffs' claims proceed on an individual basis in arbitration. First, the Terms include a broad arbitration provision requiring arbitration of any dispute arising out of or relating in any way to their use of Temu—which easily encompasses Plaintiffs' claims, all of which relate to Temu's alleged collection of their personal data through their use of Temu. Even if there were any doubt about the arbitration provision's scope, the Terms delegate resolution of arbitrability issues to the arbitrator. Courts routinely compel arbitration in these circumstances.

Second, the Terms include a class action waiver barring the Plaintiffs from pursuing classwide claims. Each Plaintiff agreed that any dispute they bring against Temu must be resolved on an individual basis. Plaintiffs ignored this requirement when they filed their amended complaint on behalf of a putative class of all Temu account-holders. Class waivers like the one here are regularly enforced and require that arbitration be compelled on an individual basis.

Accordingly, the Court should compel individual arbitration of Plaintiffs' claims.

---

[1] Unless otherwise indicated, all internal citations and quotations are omitted, and all emphasis is added. Citations to "Ex. _" refer to the exhibits attached to the Declaration of Michael Trinh ("Trinh Decl."), and citations to "App." refer to the appendix at the end of this brief.

# FACTUAL BACKGROUND

## A.    Defendant Temu

Temu is an e-commerce company that connects consumers with sellers, manufacturers, and brands around the world. ECF No. 19 ("Amended Complaint" or "AC") ¶¶ 38, 40; Trinh Decl. ¶ 3. Temu makes its services available to consumers through its mobile app on Android and Apple iOS devices. Trinh Decl. ¶ 3. The Temu app is extremely popular and has become one of the most downloaded apps in the U.S. AC ¶ 39.

## B.    A User Must Consent to Temu's Terms to Make Purchases on the Temu App

In order to make purchases on the Temu app, users must first register a Temu account and accept Temu's Terms. *See* Trinh Decl. ¶¶ 5–7. Specifically, as part of the registration process, each user is shown a prompt (the "Registration Prompt") with: (i) a field to enter the email or phone number they will use to register, and a corresponding "Continue" button; and (ii) buttons allowing the user to "Continue" by instead registering via their existing Google, Facebook, Apple, or Twitter/X account. *Id.* Immediately below these options is a notice stating: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." *Id.* ¶ 7. The bolded words "Terms of Use" and "Privacy & Cookie Policy" hyperlink to the respective agreements. *Id.* As shown below, the entire Registration Prompt is displayed clearly on one screen—so the user need not scroll down to see any part of it, including the link to the Terms. *Id.*; Ex. A.



After a user registers a Temu account, if they ever log out of the Temu app, they must agree to the Terms again each time they input their credentials to log back in—at which point they again are shown the Registration Prompt. Trinh Decl. ¶ 8.

### C.    The Terms Broadly Require That Disputes Be Arbitrated

The Terms make clear that disputes arising from the user's use of Temu's services are broadly subject to arbitration. The Terms conspicuously call attention to the arbitration agreement, noting at the beginning of the document, in all caps and bold font, that "**SECTION 19 CONTAINS, AMONG OTHER THINGS, AN AGREEMENT TO ARBITRATE WHICH REQUIRES, WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU**

AND [TEMU] BE RESOLVED BY BINDING AND FINAL ARBITRATION." Ex. B § 1.5 (emphasis in original). Section 19, titled "Arbitration Agreement," in turn provides that "any dispute, claim, or disagreement arising out of or relating in any way to your access to or use of the Services … will be resolved by binding arbitration … rather than in court." *Id.* § 19.1. The limited exceptions to this provision—for claims brought in small claims court and claims for intellectual property infringement—do not apply here. *Id.* Section 19 also contains a class action waiver, generally providing, again in all caps and bold, that claims may be brought "**ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS, REPRESENTATIVE, OR COLLECTIVE BASIS**." *Id.* § 19.4 (emphasis in original).

The Arbitration Agreement contains a delegation clause broadly requiring that disputes regarding the arbitration provision be decided by an arbitrator in the first instance. Again with limited exceptions not applicable here, the delegation clause provides: "The arbitrator shall have exclusive authority to resolve any Dispute, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement … ." *Id.* § 19.7.

### D.    Plaintiffs Ignored Their Agreements and Filed a Class Action in Court

Plaintiff Eric Hu filed this putative class action complaint against Temu on September 20, 2023, asserting various data privacy causes of action on behalf of a putative nationwide class of Temu account-holders. ECF No. 1 ¶¶ 1, 78 ("Original Complaint"). These claims were premised on baseless conjecture—lifted extensively from a report published by a known short-seller with an interest in driving down stock prices—that Temu's app improperly collects personal data from users' mobile devices. *Id.* ¶¶ 36-44. The Original Complaint named only Hu as Plaintiff.

4

On February 19, 2024, Plaintiff amended his Complaint. ECF No. 19. The Amended Complaint added twelve new Plaintiffs, all of whom allegedly "downloaded the Temu App and purchased products on the platform." AC ¶¶ 23-35. Plaintiffs bring the Amended Complaint on behalf of a putative class of all individuals in the United States who "registered an account with Temu" at any time from July 2022 to the present. *Id.* ¶ 74.

## LEGAL STANDARD

The Arbitration Agreement provides that the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, will govern the interpretation and enforcement of the Arbitration Agreement. Ex. B § 19.5. "[T]he FAA was designed to promote arbitration," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345 (2011), and requires that "the courts rigorously enforce arbitration agreements." *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 220 (1987). In the Second Circuit, courts ask "(1) whether the parties entered into a valid agreement to arbitrate, and if so, (2) whether the dispute comes within the scope of the arbitration agreement." *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). "When enforcing an arbitration agreement, as with any other contract, the parties' intentions control." *Bynum v. Maplebear Inc.*, 160 F. Supp. 3d 527, 533–34 (E.D.N.Y. 2016). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*, 460 U.S. 1, 24–25 (1983).

"In deciding motions to compel, courts apply a standard similar to that applicable for a motion for summary judgment." *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 702 (2d Cir. 2023). Once the moving party shows the existence of an agreement to arbitrate, "the burden shifts to the party seeking to avoid arbitration to 'show the agreement to be inapplicable or invalid.'" *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 102 (2d Cir. 2022). The nonmoving party must

come forward with "specific facts showing that there is a genuine issue for trial." *Cupples v. Valic Fin. Advisors, Inc.*, 2014 WL 4662272, at *3 (E.D.N.Y. Sept. 18, 2014).

## ARGUMENT

### A.    Each Plaintiff Validly Agreed to the Terms

Plaintiffs had sufficient notice of the Terms, and manifested their assent to be bound by them, when they created their Temu accounts. Courts have repeatedly addressed and upheld terms-of-use agreements in comparable cases.[2]

Determining whether an online terms-of-use agreement was formed turns on whether a user "had reasonable notice of the terms of use" and "manifested assent" thereto. *Thorne v. Square*, 2022 WL 542383, *7 (E.D.N.Y. 2022). This objective standard is applied through the lens of a "reasonably prudent smartphone user." *Meyer*, 868 F.3d at 77. That is, the standard presumes the plaintiff has some reasonable level of familiarity with using and navigating a smartphone app and signing up for services through it. *See Feld v. Postmates*, 442 F. Supp. 3d 825, 830 (S.D.N.Y. 2020) ("The Court … does not presume that the user has never before encountered an app or entered into a contract using a smartphone.").

Temu's Terms are presented in a common format, known as a "sign-in wrap" agreement, in which the user is given a hyperlink to the Terms at the time of account registration and is expressly informed that, by creating an account, they are agreeing to the Terms. *See Selden v.*

---

[2] To determine whether a contract's arbitration clause applies to a given dispute, federal courts apply "state-law principles of contract formation." *Meyer v. Uber*, 868 F.3d 66, 74 (2d Cir. 2017). Although the Terms are governed by New York law (Ex. B § 18.3), the Court may consult cases applying the law of other jurisdictions, such as Illinois and California, as "the substantive contractual laws of New York, California, and Illinois … are substantively similar with respect to the issue of contract formation." *Berkson v. Gogo*, 97 F. Supp. 3d 359, 388 (E.D.N.Y. 2015); *see also Edmundson,* 85 F.4th at 702–03 ("[T]raditional contract formation law does not vary meaningfully from state to state, … and therefore, our precedents determining the enforceability of arbitration provisions according to the contract-law principles of other states may also be relevant to this dispute.").

*Airbnb*, 4 F.4th 148, 156 (D.C. Cir. 2021) (explaining that "sign-in wrap" consists of a user interface "designed so that a user is notified of the existence and applicability of the site's 'terms of use' when proceeding through the website's sign-in or login process"). Courts consistently uphold sign-in wrap agreements. *See Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 723–24 (E.D.N.Y. 2017) ("[C]ourts in this Circuit have upheld 'Sign–In Wrap' agreements where plaintiffs did not even click an 'I Accept' button, but instead clicked a 'Sign Up' or 'Sign In' button where nearby language informed them that clicking the buttons would constitute accepting the terms of service."); *Fteja v. Facebook*, 841 F. Supp. 2d 829, 839-41 (S.D.N.Y. 2012) (collecting cases).

Applying the objective standard, courts determine the validity of sign-in wrap agreements by "look[ing] to the layout and language of the site to decide whether it would provide a reasonably prudent smartphone user with reasonable notice that a click—i.e., signing up—will manifest assent to an agreement." *Airbnb*, 4 F.4th at 156; *see also Meyer*, 868 F.3d at 75 (same); *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 548 (S.D.N.Y. 2018) (applying objective test to evaluate whether a user has adequate notice). A user has sufficient notice of the terms when a link to them is presented conspicuously and placed near the "register" or "continue" button—for example, where the link appears on the same screen, so that the user need not scroll down to find it. *See, e.g.*, *Zaltz v. JDATE,* 952 F. Supp. 2d 439, 453 (E.D.N.Y. 2013) (enforcing agreement where "Terms and Conditions of Service appear on the same screen as the button a prospective user must click in order to move forward in the registration process"); *Johnson v. Uber*, 2018 WL 4503938, *4 (N.D. Ill. 2018) (enforcing agreement where "the app that Johnson used to create his Uber account [stated]: 'By creating an Uber account, you agree to the Terms of Service & Privacy Policy,'" which "appeared in an easy-to-read font on an uncluttered screen, and no scrolling was required to view it"); *Postmates*, 442 F. Supp. 3d at 831 (same).

As these cases make clear, there are no rigid requirements as to exactly how a link to terms of service must be presented in order to be conspicuous. While some courts focus on whether the hyperlink is underlined, in a specific color, or of a certain font size, the weight of authority holds that no single factor is required or determinative. *See, e.g.*, *Postmates*, 442 F. Supp. 3d at 831 ("That the notice and hyperlinks are in a smaller font size does not render the disclaimer inconspicuous; the grey and black color contrast against the white background and are clear to the reasonably prudent user creating an account. The hyperlinks to the TOS and Privacy Policy are in a darker, bolder font than the rest of the text, signifying to a reasonably prudent user that these would be clickable terms."); *Acaley v. Vimeo, Inc.*, 464 F. Supp. 3d 959, 963 (N.D. Ill. 2020) (finding valid agreement notwithstanding "smaller-font text," where the link "appeared in bold type"). Because "any reasonably-active adult consumer will almost certainly appreciate that by signing up for a particular service, he or she is accepting the terms and conditions of the provider," there are no particular stylings or formats that must be used as long as the agreement is presented to users reasonably and made easily accessible to them. *Selden v. Airbnb, Inc.*, 2016 WL 6476934, at *5 (D.D.C. Nov. 1, 2016), *aff'd*, 4 F.4th 148 (D.C. Cir. 2021).[3]

The Registration Prompt shown during Temu's registration process satisfies the reasonable notice standard. It presented the Terms to Plaintiffs through a hyperlink appearing in bold font, in an uncluttered format, which was immediately visible on a single screen. Trinh Decl. ¶¶ 5–7; Ex. A. Courts regularly hold that this format provides reasonable notice of the linked terms, and therefore users manifest their assent when they choose to continue. *See, e.g.*, *Shalomayev v. Altice*

---

[3] Judge Cooper in *Selden* aptly described how familiar modern smartphone users are with these exact sort of registration screens and their implications, even eight years ago: "All of us who have signed up for an online service recently will recall the experience. After entering the service provider's website, we were presented with a 'sign up' or 'create account' button prominently displayed on the screen. Next to the button—less prominent, no doubt—was the ubiquitous advisory that, by signing up, we would be accepting the provider's 'terms of service.'" *Id.* at *1.

*USA, Inc.*, 2022 WL 2359406, at *6 (E.D.N.Y. June 30, 2022) (Brodie, J.) (granting motion to compel arbitration where user was "provided a link to the Defendant-affiliated website where Plaintiff could view all of the General Terms of Service"); *Starke v. Gilt Groupe*, 2014 WL 1652225, *3 (S.D.N.Y. 2014) (finding valid agreement because, "[w]hen [the plaintiff] clicked 'Shop Now,' he was informed that by doing so, and giving his email address, 'you agree to the Terms of Membership for all Gilt Groupe sites'"); *Square*, 2022 WL 542383, *8 (finding valid agreement where "a reasonably prudent smartphone user would understand that the terms were connected to the creation of a user account"); *Vimeo*, 464 F. Supp. 3d at 966 (finding valid agreement where screen indicated that plaintiff could "'Create account' and, directly below that, in smaller but still conspicuous font, displayed a statement that read: 'By starting you agree to our terms and privacy policy,' with hyperlinks to the respective documents"); *Lee v. Ticketmaster*, 817 F. App'x 393, 394 (9th Cir. 2020) ("Lee validly assented to Ticketmaster's Terms of Use, including the arbitration provision, [because] each time he clicked the 'Sign In' button … three lines below the button, the website displayed the phrase, 'By continuing past this page, you agree to our Terms of Use'…").

The Second Circuit's decision in *Meyer v. Uber Technologies*, *supra*, is instructive. *Meyer* held that a registration screen substantially similar to Temu's provided reasonable notice of Uber's terms of use. *Compare* Ex. A, *with* App. at 1 (applicable registration screen reproduced from the *Meyer* court's opinion). The court explained that the Uber registration screen—just like Temu's— was "uncluttered, with only fields for the user to enter his or her [registration] details, buttons to register for a user account or to connect the user's pre-existing PayPal account or Google Wallet," and a notice stating that "[b]y creating an Uber account, you agree to [Uber's terms of use]," which "appears directly below the buttons for registration." *Meyer*, 868 F.3d 66 at 78; *compare* Ex. A. Further, like Temu's Registration Prompt, "[t]he entire screen [in the Uber application] is visible

at once, and the user does not need to scroll beyond what is immediately visible to find notice of the Terms of Service." *Meyer*, 868 F.3d 66 at 78. Accordingly, "a reasonably prudent smartphone user would understand that the terms were connected to the creation of a user account." *Id.* Temu's Registration Prompt is substantially the same—if anything, it is less cluttered—so the reasoning in *Meyer* fully applies here.

The Second Circuit recently reached a similar holding in *Edmundson v. Klarna*, 85 F.4th at 705–07, again finding that a registration screen substantially similar to Temu's provided reasonable notice to users. *See* App. at 2 (applicable screen reproduced from the *Klarna* court's opinion). The court rejected the plaintiff's arguments about the font size and color of the hyperlinks to the terms, explaining that "[a]lthough [they] are in a smaller font relative to other text … , they are set apart from surrounding information by being underlined and in a color that stands in sharp contrast to the color of the interfaces[] [*i.e.*, dark text on white background]." *Id.* at 706 ("[B]ecause the interface does not include a plethora of clutter or extraneous information, the notice to Klarna's terms—even if in a smaller font—appears sufficiently conspicuous.").[4]

There is no material basis on which Temu's registration screen could be distinguished from those upheld in *Meyer*, *Klarna*, and the other cases cited above. Consistent with those authorities, Temu's sign-in wrap agreement is valid, and all users who chose to register a Temu account—including Plaintiffs—manifested their assent to be bound by the Terms.

## B.    The Arbitration Agreement and Class Action Waiver Are Enforceable

Having formed a valid agreement with Temu, Plaintiffs are bound by its provisions. Settled

---

[4] Similarly, in *Selden v. Airbnb*, the D.C. Circuit held Airbnb's registration screen sufficient where: (i) "[t]he three buttons [for Facebook, Google, and email registration] plainly provided options for how a user could sign up for Airbnb"; (ii) "[d]irectly below these three options, Airbnb informed the user that 'By signing up, I agree to Airbnb's Terms of Service'"; and (iii) "[t]he buttons appeared in close proximity to the notice and on a single screen." 4 F.4th at 157; *see* App. at 3 (applicable Airbnb registration screen reproduced from the *Airbnb* court's opinion).

law makes clear that the arbitration provision and class action waiver in the Terms apply here and require arbitration of the Plaintiffs' claims on an individual basis.

Courts enforce valid arbitration agreements so long as the dispute at issue comes within their scope. *See In re Am. Exp.*, 672 F.3d at 128. The arbitration provision in the Terms is broad, covering "any dispute … arising out of or relating to" Plaintiffs' use of Temu. Ex. B § 19.1. "Broad clauses, such as those that apply to substantially all disputes arising under the relevant contract, afford a strong presumption of arbitrability for claims arising in connection with their respective contractual arrangements." *Morgikian v. Fid. Invs.*, 2022 WL 836950, at *3 (E.D.N.Y. Mar. 21, 2022); *see also Bahoor v. Varonis Sys.*, 152 F. Supp. 3d 1091, 1099 (N.D. Ill. 2015) ("New York courts have explained that when an arbitration clause covers 'any dispute' and does not exclude any claims from arbitration, it is an 'all-inclusive provision' that presumptively covers the parties' disputes.").

Plaintiffs' proposed nationwide class definition consists of "[a]ll persons residing in the United States who registered an account with Temu," AC ¶ 174, and Plaintiffs allege they were harmed because Temu "intentionally design[ed] the Temu App, including all associated code, to surreptitiously obtain, improperly gain knowledge of, review, and retain Plaintiffs' and the Class's private and personally identifiable data and content." *Id*. ¶ 320; *see also id.* ¶ 171. Thus, Plaintiffs' claims plainly "arise from" or "relate to" their use of Temu—particularly given that those provisions that are interpreted broadly, consistent with the FAA's mandate that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Calderon v. Breadberry Inc.*, 2023 WL 1861639, at *3 (E.D.N.Y. Feb. 9, 2023) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25); *see, e.g.*, *Paramedics Electromedicina v. GE Med. Sys.*, 369 F.3d 645, 654 (2d Cir. 2004) (holding that "arising out of" means that if the "allegations underlying the claims 'touch matters' covered by the parties' … agreements, then those claims must be

arbitrated").

Even if there were any doubt that Plaintiffs' claims fall within the arbitration provision's scope, those questions must be resolved in arbitration, given that the Terms provide that the arbitrator shall have "exclusive authority" to determine the arbitration provision's enforceability and scope. Ex. B § 19.7. In these circumstances, disputes about the scope or application of the agreement must be delegated to the arbitrator. *See New Prime v. Oliveira*, 586 U.S. 105, 111-12 (2019) ("A delegation clause gives an arbitrator authority to decide even the initial question whether the parties' dispute is subject to arbitration."); *Henry Schein v. Archer & White*, 586 U.S. 63, 69 (2019) ("[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."); *Alvarez v. Experian Info. Sols., Inc.*, 661 F. Supp. 3d 18, 28 (E.D.N.Y. 2023) ("The Delegation Clause evinces a clear and unmistakable intention to delegate the question of arbitrability to the arbitrator. Numerous courts have come to the same conclusion when dealing with identical language and have declined to reach the question of arbitrability."); *Sinavsky v. NBC*, 2021 WL 4151013, *5 (S.D.N.Y. 2021) (same). As this Court has recognized, consistent with the FAA, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Calderon*, 2023 WL 1861639, at *3.

Finally, Plaintiffs waived their rights to bring claims against Temu on a classwide basis. Class action waivers like the one in the Terms are enforceable under the FAA and New York law. *See, e.g.*, *Concepcion*, 563 U.S. at 352 (holding such waivers enforceable under the FAA); *Nayal v. HIP Network*, 620 F. Supp. 2d 566, 573 (S.D.N.Y. 2009) ("Courts applying New York law … have uniformly held that class action waivers are not unconscionable."). Plaintiffs thus cannot bring any classwide claims in this Court—or in arbitration. *See Mumin v. Uber Techs., Inc.*, 239 F. Supp. 3d 507, 521 (E.D.N.Y. 2017) (enforcing class action waiver in arbitration clause).

## **CONCLUSION**

For the foregoing reasons, the Court should compel Plaintiffs to arbitrate on an individual

basis and stay the case pending the resolution of Plaintiffs' claims in arbitration.


Dated:  April 19, 2024                                Respectfully submitted,


                                                      */s/ Serrin Turner*
                                                      Serrin Turner
                                                      Matthew Valenti
                                                      Hadrian Luo
                                                      LATHAM & WATKINS LLP
                                                      1271 Avenue of the Americas
                                                      New York, New York 10020
                                                      Telephone:  (212) 906-1200
                                                      Facsimile:  (212) 751-4864
                                                      Email:  serrin.turner@lw.com
                                                               matthew.valenti@lw.com
                                                               hadrian.luo@lw.com


                                                      *Attorneys for Defendant Whaleco Inc. d/b/a Temu*

## APPENDIX A

### Exemplar Sign-in Wrap Registration Screens Upheld by Courts

(Page 1 of 3)

| |
|---|
| **Uber Registration Screen** |
| *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 81 (2d Cir. 2017) |



**APPENDIX A**
(Page 2 of 3)

| Klarna Confirmation Screen |
| :---: |
| *See Edmundson v. Klarna, Inc.*, 85 F.4th 695, 711 (2d Cir. 2023) |



**APPENDIX A**
(Page 3 of 3)

| Airbnb Registration Screen<br>*See Selden v. Airbnb, Inc.*, 4 F.4th 148, 152 (D.C. Cir. 2021) |
| --- |
|  |

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

ERIC HU,
EDWIN ANTONIO SURIS,
TIMOTHY SMITH,
ROY NORMAN MORROW,
MING HUI LIN,
NANCY BATALAS,
JAMES LAFATA,
DANIEL DAVID KATTAN,
TRACY EVETTE STARLING,
CHRISTOPH B. OH,
HECTOR ANDREW CORDERO,
YO-YO CHEN,
MANISHA REDDY NARAYAN,
on behalf of themselves and all others
similarly situated,

                      Plaintiffs,

    v.

WHALECO, INC., d/b/a Temu,

                    Defendant.

Case No. 23-cv-06962-MKB-RML

***ZIBOUKH* PLAINTIFFS' *AMICUS CURIAE* BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND INTEREST OF *AMICI CURIAE* ........................................................1

LEGAL STANDARD...................................................................................................................4

I.  THE TERMS OF USE, INCLUDING THE ARBITRATION CLAUSE, ARE UNENFORCEABLE BECAUSE DEFENDANTS FAILED TO PROVIDE PLAINTIFFS ADEQUATE NOTICE OF THE TERMS. ...........................4

    A.  Two Federal Courts Have Already Held That Temu's Terms Are Unenforceable. ......................................................................................................5

    B.  The Decisions Holding The Terms Unenforceable Were Correctly Decided. ...................................................................................................................7

II.  THE ARBITRATION CLAUSE IS UNENFORCEABLE UNDER THE TERMS' PLAIN LANGUAGE.................................................................................15

III.  THE LACK OF CLARITY, AND INTERNAL INCONSISTENCY, OF THE TERMS PRECLUDED THE MUTUAL ASSENT NECESSARY FOR CONTRACT FORMATION. ...................................................................................16

IV.  DEFENDANTS' NOVEL BATCH ARBITRATION CLAUSE IS BOTH PROCEDURALLY AND SUBSTANTIVELY UNCONSCIONABLE. .....................18

    A.  The Arbitration Clause Is Procedurally Unconscionable...................................19

    B.  The Arbitration Clause Is Substantively Unconscionable. ................................21

V.  DISCOVERY WOULD FURTHER DEMONSTRATE THE ARBITRATION CLAUSE'S UNENFORCEABILITY. ...............................................25

CONCLUSION............................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Achey v. Cellco P'ship,*
    293 A.3d 551 (2023) ............................................................................................19

*Applebaum v. Lyft, Inc.,*
    263 F. Supp. 3d 454 (S.D.N.Y. 2017) .................................................5, 6, 7, 9

*Arnaud v. Doctor's Assocs. Inc.,*
    2019 WL 4279268 (E.D.N.Y. Sept. 10, 2019) ...................................................5, 9

*Berkson v. Gogo LLC,*
    97 F. Supp. 3d 359 (E.D.N.Y. 2015) .......................................................... *passim*

*Berman v. Freedom Fin. Network, LLC,*
    30 F.4th 849 (9th Cir. 2022) .............................................................................9

*Cap Gemini Ernst & Young, U.S., LLC v. Nackel,*
    346 F.3d 360 (2d Cir. 2003)...........................................................................18

*China Shipping Container Lines Co. Ltd. v. Big Port Serv. DMCC,*
    803 Fed. Appx. 481 (2d Cir. 2020)...............................................................15

*Cullinane v. Uber Techs., Inc.,*
    893 F.3d 53 (1st Cir. 2018)....................................................................9, 12, 14

*De Jesus v. Gregorys Coffee Mgmt., LLC,*
    2021 WL 5391026 (E.D.N.Y. Nov. 29, 2021)..................................................3, 18

*Dedon GmbH v. Janus et Cie,*
    411 Fed. Appx. 361 (2d Cir. 2011)..................................................................5

*Doe v. Roblox Corp.,*
    602 F. Supp. 3d 1243 (N.D. Cal. 2022) ...........................................................2

*Doffing v. Meta Platforms,*
    2022 WL 3357698 (D. Or. July 20, 2022) ........................................................2

*Eakins v. Whaleco Inc.,*
    2024 WL 1190766 (W.D. Okla. Mar. 5, 2024)............................................ *passim*

*F.T. Maritime Services Ltd. v. Lambda Shipholding Ltd.,*
    533 F. Supp. 3d 149 (S.D.N.Y. 2021)...........................................................15

*Feld v. Postmates, Inc.*,
    442 F. Supp. 3d 825 (S.D.N.Y. 2020)...................................................................12

*Fontanez v. Whaleco, Inc.*,
    No. 53-2023CA000374 (Fla. Cir. Cit. Aug. 29, 2023) .................................12, 13, 14

*Fteja v. Facebook, Inc.*,
    841 F. Supp. 2d 829 (S.D.N.Y. 2012)...................................................................12

*Heckman v. Live Nation Entertainment, Inc.*,
    686 F. Supp. 3d 939 (N.D. Cal. 2023) ......................................................... *passim*

*Hines v. Overstock.com, Inc.*,
    668 F. Supp. 2d 362 (E.D.N.Y. 2009) ...................................................................5

*Jackson v. Amazon, Inc.*,
    65 F.4th 1093 (9th Cir. 2023) ...............................................................................25

*Johnson v. Whaleco Inc.*,
    2023 U.S. Dist. LEXIS 184104 (M.D. Fla. Oct. 13, 2023) ........................... *passim*

*MacClelland v. Cellco P'ship*,
    609 F. Supp. 3d 1024 (N.D. Cal. 2022) ............................................19, 22, 24, 25

*Meeg v. Heights Casino*,
    2020 WL 1493658 (E.D.N.Y. Mar. 27, 2020) .......................................................16

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017*)*...............................................................11, 12, 13, 25

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014) .............................................................................10

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016)........................................................................ *passim*

*Pepper v. Fluent Inc.*,
    2023 WL 4561798 (S.D.N.Y. July 17, 2023) .........................................................4

*Plazza v. Airbnb, Inc.*,
    289 F. Supp. 3d 537 (S.D.N.Y. 2018)...................................................................12

*Sablosky v. Edward S. Gordon Co.*,
    535 N.E.2d 643 (N.Y. 1989).................................................................................18

*Sellers v. JustAnswer LLC*,
    73 Cal. App. 5th 444 (2021) ................................................................................10

*Specht v. Netscape Comm'cns Corp.*,
    306 F.3d 17 (2d Cir. 2002)........................................................................4, 5, 16

*Starke v. SquareTrade, Inc.*,
    913 F.3d 279 (2d Cir. 2019).................................................... *passim*

*Wilson v. Redbox Automated Retail, Inc.*,
    448 F. Supp. 3d 873 (N.D. Ill. 2020) ..................................................10

*Zachman v. Hudson Valley Fed. Credit Union*,
    49 F.4th 95 (2d Cir. 2022) ....................................................................25

## OTHER AUTHORITIES

Fed. R. Civ. P. 23(b)(3)...........................................................................24

Federal Rule of Civil Procedure 11 (b).......................................................24

Rule 11 ...................................................................................................24

## INTRODUCTION AND INTEREST OF *AMICI CURIAE*

Amici are plaintiffs who had their private information misappropriated by the Temu app and brought suit in the related *Ziboukh* litigation (the "*Ziboukh* Plaintiffs").[1] Temu is an online shopping app that offers low-cost goods made in China and is one of the most popular apps in the United States. Experts who have examined Temu have concluded that it is a "dangerous" app that "'bypasses' phone security systems to read a user's private messages, make changes to the phone's settings and track notifications,"[2] and gains access to "literally everything on your phone."[3] Experts have also found that "Temu misled people about how it uses their data."[4]

Government experts agree. For example, in April 2023, a U.S.-China Economic and Security Review Commission report found that Temu posed significant data risks;[5] in May 2023, the State of Montana banned Temu from government devices because of the "risk of foreign adversaries obtaining Montanans' personal, private, sensitive information and data";[6] in December 2023, Congress demanded that Defendants produce information regarding Temu's data collection practices, noting "Security officials have cited concerns about Temu and the amount of data collected" and that Congress was "concerned that China may be able to exploit lax data security practices or backdoors to access user information, much like the concerns we

---

[1] See Ziboukh et al v. Whaleco Inc. et al, No. 24-cv-3733-MKB-RML.

[2] After TikTok, Montana Bans WeChat, Temu And Telegram From Government Devices, Int'l Bus. Times (May 18, 2023), https://www.ibtimes.com/after-tiktok-montana-bans-wechat-temu-telegram-government-devices-3694060.

[3] Get Temu, the Popular Shopping App, Off Your Phone Now, KimKomando (Apr. 15, 2023), https://www.komando.com/tips/software-and-apps/temu-security-concerns/.

[4] Apple, for example, reportedly found recently that Temu "violated the company's mandatory privacy rules." Booming Chinese Shopping App Faces Western Scrutiny Over Data Security, Politico (July 24, 2023), https://www.politico.eu/article/booming-chinese-shopping-app-temu-faces-western-scrutiny-over-data-security-2/.

[5] U.S.-China Econ. Sec. Rev. Comm'n, Shein, Temu, and Chinese e-Commerce: Data Risks, Sourcing Violations, and Trade Loopholes (Apr. 14, 2023), https://www.uscc.gov/research/shein-temu-and-chinese-e-commerce-data-risks-sourcing-violations-and-trade-loopholes.

[6] After TikTok, *supra* note 1.

have raised regarding TikTok"[7]; and on June 25, 2024 the State of Arkansas filed an enforcement action alleging that Temu is a "data-theft business that sells goods online as a means to an end."[8]

The *Ziboukh* Plaintiffs are victims of Temu's data practices. The *Ziboukh* complaint includes a class of Temu users, a class of minor Temu users, and a class of non-users who had their electronic communications with Temu users collected by the app. While there are issues that are unique to these classes that independently bar arbitration, and Defendants apparently concede that the claims brought by non-users are not arbitrable,[9] there are several common reasons that the motions to compel arbitration in this case and *Ziboukh* should be denied.

*First,* as two other federal courts have already held, Defendants failed to give consumers adequate notice of Temu's Terms of Use, including the arbitration clause, and they are therefore unenforceable. *Eakins v. Whaleco Inc.*, 2024 WL 1190766 (W.D. Okla. Mar. 5, 2024); *Johnson v. Whaleco Inc.*, 2023 U.S. Dist. LEXIS 184104 (M.D. Fla. Oct. 13, 2023). Those well-reasoned decisions are correct.

*Second*, the fact that these decisions have been issued makes Temu's arbitration clause unenforceable on its face. The Terms provide that, in the event Temu's "batch arbitration" provision is determined to be invalid or unenforceable, the entire arbitration clause shall be void

---

[7] Committee on Energy and Commerce, letter (Dec. 20, 2023), https://d1dth6e84htgma.cloudfront.net/CCP_Marketplace_Letter_to_Whaleco_Inc_Temu_7f921e1a67.pdf.

[8] Attorney General Griffin Press Release (June 25, 2024), https://arkansasag.gov/news_releases/attorney-general-griffin-sues-chinese-e-commerce-company-temu-for-deceiving-arkansans-illegally-accessing-their-personal-information/. As these materials demonstrate, Defendants' suggestion that the allegations are "premised on baseless conjecture" or "lifted extensively from a report by a known short-seller" are inaccurate.

[9] There are multiple additional reasons *Ziboukh* Plaintiffs' claims are not arbitrable. For example: First, unlike the *Hu* Plaintiffs, *Ziboukh* Plaintiffs name PDD Holdings, Inc. as a Defendant; PDD Holdings, Inc. is not a party to the Terms and thus Plaintiffs never agreed to arbitrate any claims against it. Second, the non-user Plaintiffs never agreed to the Terms and so cannot be compelled to arbitrate. Third, any arbitration agreement with minor users is void or voidable. *See, e.g., Doe v. Roblox Corp*., 602 F. Supp. 3d 1243, 1256 (N.D. Cal. 2022) (child "would not be on inquiry notice that she was assenting to" online terms); *Doffing v. Meta Platforms*, 2022 WL 3357698, at *6 (D. Or. July 20, 2022) (online terms "procedurally unconscionable, substantively unconscionable, and unenforceable against a minor").

and unenforceable. (7/8/23 Terms § 20.11, Ex. A.)[10] That is the case here, given the rulings holding the Terms as a whole, including the batch arbitration provision, are unenforceable. Nonetheless, even in the absence of such language, Defendants would be prohibited from enforcing the Terms under the doctrine of collateral estoppel.

*Third*, the Terms are so internally inconsistent and unworkable that there could be no "meeting of the minds" necessary for contract formation. The lengthy arbitration provisions purport to require arbitration in "batches" while simultaneously requiring "individual" arbitration and prohibiting "mass arbitration." In doing so, the arbitration clause purports to incorporate the AAA rules, which in turn do not provide for "batch" arbitration at all. These and many other inconsistencies are apparent on the face of the Terms, which are so complex and unworkable that they precluded consumers from understanding what precisely they were agreeing to.

*Fourth*, no enforceable agreement was formed because the arbitration clause is procedurally and substantively unconscionable. The clause seeks to substitute Plaintiffs' right to pursue litigation with a novel "batch arbitration" procedure that deprives consumers of their ability to obtain relief. Multiple courts have ruled such provisions unenforceable. Indeed, the clause here implicitly acknowledges the potential invalidity of these procedures, stating that the entire agreement is void if the "batch arbitration" procedure is held unenforceable. (*Id.* § 20.11.)

*Finally,* while the arbitration clause is unenforceable on its face, discovery would undoubtedly further demonstrate that Defendants' motion should be denied.

---

[10] Defendants rely on a version of the Terms created after *Hu* and *Ziboukh* were filed. Ex. B. to Def. Mot. However, "'Arbitration agreements signed after litigation is commenced are deemed unconscionable and thus unenforceable.'" *De Jesus v. Gregorys Coffee Mgmt., LLC*, 2021 WL 5391026, at *5 (E.D.N.Y. Nov. 29, 2021). Nonetheless, the motion should be denied regardless of which version of the Terms is applied.

## LEGAL STANDARD

"The threshold question of whether the parties … agreed to arbitration is determined by state contract law principles." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016). "'Under New York law, the party seeking arbitration bears the burden of proving that a valid arbitration agreement exists … by a preponderance of the evidence.'" *Pepper v. Fluent Inc.*, 2023 WL 4561798, at \*7 (S.D.N.Y. July 17, 2023), quoting *Kutluca v. PQ New York Inc.*, 266 F. Supp. 3d 691, 700-01 (S.D.N.Y. 2017). Thus, the moving party "'must prove by a preponderance of the evidence that all the elements necessary to form a valid contract are met, *namely offer, acceptance, consideration, mutual assent, and intent to be bound.'" Id.*

"Courts deciding motions to compel [arbitration] apply a standard similar to the one applicable to a motion for summary judgment." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 281 n.1 (2d Cir. 2019); Def. Mot. at 5. Under this standard, courts "draw[] all reasonable inferences in favor of the non-moving party." *Id.* "[D]espite the strong federal policy favoring arbitration, arbitration remains a creature of contract," and courts must "decide whether the parties to a contract have agreed to arbitrate disputes." *Id.* at 288. "[A] party cannot be required to submit to arbitration any dispute which the party has not agreed so to submit." *Specht v. Netscape Comm'cns Corp.*, 306 F.3d 17, 26-27 (2d Cir. 2002).

## I.     The Terms Of Use, Including The Arbitration Clause, Are Unenforceable Because Defendants Failed To Provide Plaintiffs Adequate Notice Of The Terms.

The Second Circuit has held that in order for online terms of use to be enforceable, there must be "clear and conspicuous" notice of the terms. *Starke*, 913 F.3d at 293. "[A] contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" *Id.* at 288-89. In the web-based context, inquiry notice requires that "the design and content of the relevant interface" present the arbitration provision "in a clear and conspicuous way." *Id.* at 289. "Clarity and

conspicuousness of arbitration terms are important in securing informed assent." *Specht*, 306

F.3d at 30. "[W]here a party challenges the very existence of the contract containing an

arbitration clause, a court cannot compel arbitration without first resolving the issue of the

contract's existence." *Dedon GmbH v. Janus et Cie*, 411 Fed. Appx. 361, 363 (2d Cir. 2011).

Accordingly, courts within this circuit have repeatedly held that no contract is formed,

and arbitration must be denied, where (as here) the presentation of online terms through

hyperlinks or otherwise is not sufficiently conspicuous to put consumers on inquiry notice of the

terms. *See, e.g., Starke*, 913 F.3d at 294 (terms unenforceable where hyperlink was "spacially

decoupled" from portion of website requiring users' assent); *Specht*, 306 F.3d at 31-32 (no

inquiry notice of terms provided via hyperlink at bottom of webpage); *Nicosia v. Amazon.com,

Inc.*, 834 F.3d 220, 236 (2d Cir. 2016) (hyperlink not sufficiently conspicuous where it was not

"directly adjacent" to button manifesting assent); *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454,

466–67 (S.D.N.Y. 2017) (terms unenforceable where the hyperlink was "in the smallest font on

the screen"); *Arnaud v. Doctor's Assocs. Inc.*, 2019 WL 4279268, at *6 (E.D.N.Y. Sept. 10,

2019) (hyperlink not "clear and conspicuous"); *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 404

(E.D.N.Y. 2015) (same); *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y.

2009) (terms unenforceable where hyperlink not prominently displayed).

### A. Two Federal Courts Have Already Held That Temu's Terms Are Unenforceable.

Applying these principles, two federal district courts have already held that Temu's

Terms of Use are unenforceable and denied Defendants' motions to compel arbitration. In

*Johnson*, the court concluded that the hyperlink to the Terms was not "sufficiently conspicuous"

and consumers were not "put on notice to the Agreement with Defendant and cannot be

compelled to arbitrate this dispute." 2023 U.S. Dist. LEXIS 184104, at *7, **9-10. Specifically,

the court found that the presentation of the hyperlink appeared to be purposefully designed to evade consumers' notice: "Most damning to Defendants' attempt to enforce the Agreement is its use of a very light grey font against a white background, devoid of underlined text or any conspicuous cues." *Id.* at \*\*7-8. "This camouflaged font contradicts Defendant's assertion that its registration page displays a 'conspicuous hyperlink to [it]s Terms of Use…. And crucially—it evinces an intent to **conceal** those hyperlinks from conspicuous view, which militates strongly against finding the existence of an agreement to arbitrate." *Id.* at \*8.

In addition, the court found that "[t]he inconspicuous nature of the hyperlinks is further compounded by its poor placement on the website." *Id.* As the court explained, "Here, the faint text linking to Defendant's browsewrap agreement is located at the bottom of the webpage beneath four other buttons and far below the bright-orange 'Continue' button… . This placement does not put a reasonably prudent user on inquiry notice." *Id.* at \*9. Accordingly, the court concluded that "'the hyperlink to the Terms is not prominent or particularly remarkable at the bottom of the page[] where it is featured,'" *id.* at \*7, and "does not put a reasonably prudent user on inquiry notice," *id.* at \*9. "'It is not reasonable to expect a user to continue reading below the highly conspicuous purchase button.'" *Id.* at \*8.

In *Eakins*, the court likewise denied Defendants' motion to compel arbitration, holding that plaintiff did not receive "reasonably conspicuous notice that she was agreeing to Defendant's terms." 2024 WL 1190766, at \*2. As the court noted, "parties must manifest their mutual assent to the essential terms of an agreement." *Id.*, citing *Starke*, 913 F.3d at 288-89. The court concluded that no such assent could occur given the presentation of Temu's Terms.

"For starters, the terms of use agreement appears in relatively small font at the bottom of the screen—spacially decoupled from the attention-grabbing orange 'Continue' button that users

click to create their account." *Id.*, citing *Starke*, 913 F.3d at 294; *Applebaum*, 263 F. Supp. 3d at 466-67. The court concluded that the presentation was thus similar to those found inadequate in *Starke* where there was similar "decoupling" of the hyperlink and button manifesting consent, and in *Applebaum* where the hyperlink was similarly presented in small font.

As the court further observed, "Most glaring, however, is the App's failure to distinguish the 'Terms of Use' hyperlink from the surrounding text." *Id.* at *4. Citing numerous decisions finding similar presentations of hyperlinked terms unenforceable, the court observed that "[t]he notice here appears in grey font against a white backdrop, and while 'Terms of Use' is a darker shade of grey, the contrast is neither remarkable nor presents with the traditional hallmarks of a hyperlinked text." *Id.* As the court noted, "Courts have generally 'required more than mere coloring to indicate the existence of a hyperlink to a contract'" and "the App's failure to adequately distinguish the hyperlinked text coupled with its obscure placement of the terms of use agreement, fails the conspicuous test." *Id.,* quoting *Applebaum*, 263 F. Supp. 3d at 467.

### B.    The Decisions Holding The Terms Unenforceable Were Correctly Decided.

The rulings in *Johnson* and *Eakins* are broadly consistent with, and indeed relied on, settled law recognized by courts in the Second Circuit—such as *Starke*, *Applebaum* and *Berkson*—and other jurisdictions. These decisions hold that online terms are unenforceable where, as here, the hyperlink to the terms (1) is not sufficiently conspicuous or (2) is "spacially decoupled" from the button manifesting consent to the terms.[11] For example:

In *Starke*, the Second Circuit held terms unenforceable where "[t]he 'Terms & Conditions' hyperlink was spacially decoupled from the transaction because it was not provided near the portion of the Amazon purchase page actually requiring [plaintiff's] attention (that is, the

---

[11] Examples of the prompts at issue in these cases are provided in Exhibit B. (Ex. B).

'Add to Cart' button)." 913 F.3d at 294. The same is true here where the hyperlink for the Terms is at the bottom of the page, far from the "continue" button and separated by multiple other buttons and statements.

However, the presentation of the Terms here is even more problematic than in *Starke* because the "continue" button is adjacent to a prompt requesting that users enter their email or phone number, which in turn is below promotions for "free shipping" and "free returns." Ex. A to Def. Mot.[12] As a result, a reasonably prudent user would likely conclude that by pressing "continue" all they are doing is providing the email or phone number requested in the immediately adjacent text box, or that they are simply acknowledging they will receive "free shipping" or "free returns". Indeed, the Temu prompt appears intentionally designed to avoid alerting the user to any supposed contract formation or contract terms. *Id.*

In *Nicosia*, the Second Circuit similarly ruled that defendant "failed to show that [the plaintiff] was on notice and agreed to mandatory arbitration" because the notice of terms was "not directly adjacent" to the button intended to manifest assent. 834 F.3d at 236. Moreover, the court noted that "[t]he message itself—'By placing your order, you agree to Amazon.com's … conditions of use'—is not bold, capitalized, or conspicuous in light of the whole webpage.…" *Id.* at 236-37. As the Second Circuit subsequently reiterated in *Soliman v. Subway Franchising Advertising Fund Trust, Ltd.*, "'even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice.'" 999 F.3d 828, 836 (2d Cir. 2021). Rather, in order to provide consumers with adequate notice, the hyperlink itself must be sufficiently conspicuous. The presentation of Terms here, as in *Nicosia*, fails this

---

[12] As described in the declaration Defendants submitted, "the Registration Prompt contains … a field where the user can enter an email address or phone number to use in registering an account and a **corresponding** 'Continue' button." (Trinh Decl. ¶ 7 (emphasis added).)

test because the hyperlink is in small font at the bottom of a page containing a series of buttons and other statements that are in much larger font. In addition, the color of the hyperlinks is similar to the surrounding text, further obscuring the link to the Terms.

The court's ruling in *Applebaum* is consistent with these decisions. There, the court concluded that the terms were unenforceable where language indicating that consumers were "'agree[ing] to Lyft's Terms of Service'" was "in the smallest font on the screen." *Applebaum*, 263 F. Supp. 3d at 466-67. Again, that is also the case here where the statement regarding agreement to the Terms is in the smallest font on the screen.

In *Berkson*, the court similarly found terms unenforceable because the hyperlink to the terms was not sufficiently conspicuous. 97 F. Supp. 3d at 404. Moreover, the court found that "[t]he importance of the 'terms of use' was obscured by the physical manifestation of assent … clicking the "SIGN IN' button." *Id.* Here the Terms were even more obscure because the button manifesting consent merely stated "continue" rather than "create account," "sign in," "register" or "I agree".

Finally, in *Arnaud*, the court likewise denied a motion to compel arbitration because the link to the terms was not "clear and conspicuous." 2019 WL 4279268, at *6. As the court there observed, "merely placing the links on the same page as the action button is insufficient to provide inquiry notice." *Id.* Rather, the links must be sufficiently conspicuous in the context of the entire page, and as the courts in *Eakins* and *Johnson* correctly found, that is not the case here.

These rulings are consistent with those from other jurisdictions, which have repeatedly held that presentations similar to Temu's are unenforceable. *See, e.g., Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (terms unenforceable even though underlined: "A web designer must do more than simply underscore the hyperlinked text in order to ensure

that it is sufficiently set apart from the surrounding text."); *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 64 (1st Cir. 2018) (terms unenforceable where "the presence of other terms on the same screen with a similar or larger size, typeface, and with more noticeable attributes diminished the hyperlink's capability to grab the user's attention"); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the [] agreement."); *Wilson v. Redbox Automated Retail, Inc.*, 448 F. Supp. 3d 873, 883 (N.D. Ill. 2020) (terms unenforceable where "the button for the Terms of Use and accompanying disclosure [was] not adjacent to the 'Pay Now' button"); *Sellers v. JustAnswer LLC,* 73 Cal. App. 5th 444, 479 (2021) (terms unenforceable where hyperlink was "at the very bottom of the screen, in smaller text than anything else on the page, and in a grey hue that contrasts less with the dark background than any other text on the page").

In sum, there are many features of the Temu website that courts have ruled defeat the constructive notice necessary to render terms enforceable, including: (1) the hyperlink to the Terms (and statement regarding assent to the Terms) are not adjacent to the button manifesting assent, but rather at the bottom of the page, (2) the hyperlink to the Terms (and statement regarding assent) are in the smallest font on the page, (3) the hyperlink to the Terms is not distinguishable from the surrounding text (through bright blue coloring or underlining for example), and indeed appears to be purposefully designed to blend in with the surrounding text, (4) there are multiple buttons and statements in larger font appearing between the button manifesting assent and the hyperlink to the Terms (and statement regarding assent), (5) the button manifesting assent does not say "I agree," "Sign up," "Create Account," or "Register," but rather merely states "continue", and (6) in addition to the other buttons and statements on the page,

there are unrelated statements promoting Temu as providing "free shipping" and "free returns".

Defendants' arguments to the contrary all fail. *First,* Defendants' contention that Plaintiffs have "no Second Circuit precedent on their side" (Def. Reply at 8) is inaccurate: decisions like *Nicosia* and *Starke* and many district court decisions within the Second Circuit all support Plaintiffs' position. The cases Defendants cite are easily distinguishable. For example, in *Meyer* the terms were presented in a payment screen where, as Defendants acknowledge, the hyperlink "appears directly below the buttons for registration'"—buttons that (unlike Temu) expressly indicate they "Register" an account. (Def. Mot. at 9, quoting *Meyer v. Uber Techs., Inc.,* 868 F.3d 66, 82 (2d Cir. 2017).)  Moreover, as is illustrated in the registration screen Defendants attach to their motion (Ex. A to Def. Mot.), the hyperlink to the terms in *Meyer* was in bright blue text and was underlined and capitalized, in contrast to the surrounding text, which was grey. In contrast, the Temu hyperlink was not underlined or capitalized and was similar in color to the surrounding text, which—as the courts in *Eakins* and *Johnson* correctly found— purposefully obscures the hyperlink to the Terms. Likewise, in *Edmundson v. Klarna, Inc.*, the hyperlink to the terms was "set apart from surrounding information by being underlined and in a color that stands in sharp contrast to the color of the interfaces' backgrounds" and was "spacially and temporally coupled with the user's transaction," appearing "directly adjacent to the 'button intended to manifest assent to the terms.'" 85 F.4th 695, 706 (2d Cir. 2023). Moreover, as illustrated in the screen attached to Defendants' motion (Ex. A to Def. Mot.), the button manifesting assent did not state merely "continue" but rather "Confirm and continue," further drawing attention to the statement "I agree to the **payment terms**" appearing directly above the button. Moreover, neither presentation contained "extraneous information," such as the

promotions on the Temu prompt. *See id.*[13] In any event, as Defendants and the Second Circuit recognize, "'traditional contract formation law does not vary meaningfully from state to state'" and thus "the Court may consult cases applying the law of other jurisdictions." (Def. Mot. at 6 n.2, quoting *Klarna*, 85 F.4th at 702-03.)

*Second*, Defendants' assertion that the Terms are enforceable because they are allegedly presented as a "sign in", rather than a "browsewrap", agreement is likewise inaccurate. As Defendants' cases recognize, "[t]he categorization of types of web-based contracts ... is not dispositive," *Feld*, 422 F. Supp. 3d at 829, citing *Meyer*, 868 F.3d at 76, and indeed, "not all interfaces fit neatly into" these categories, 868 F.3d at 76. In fact, while the *Johnson* court concluded that the agreement was "browsewrap," 2023 U.S. Dist. LEXIS 184104, at *7, and the *Eakins* court found that it was "best characterized as a sign-in wrap," 2024 WL 1190766, at *3 n.4, *both* courts found the Terms unenforceable. Indeed, while Defendants assert that "the Prompt here is a sign-in wrap agreement" (Def. Reply at 2), they previously described it as

---

[13] The other cases Defendants cite are equally distinguishable. In *Selden v. Airbnb, Inc.*, the court held terms enforceable because the screen "used red to indicate a hyperlink," in contrast to cases like *Cullinane* where the hyperlinks were not set off from surrounding text using a different color and thus were "not conspicuous." 4 F.4th 148, 157 (D.C. Cir. 2021). Indeed, the bright red hyperlinks appeared directly below the "sign in" button. Ex. A to Def. Mot. *Saizhang Guan v. Uber Technologies, Inc.*, held terms enforceable and distinguished cases like *Berkson* on the ground that "Uber drew the drivers' attention to the terms of the Service Agreement with bold, capitalized statements, and twice required the drivers to click 'YES, I AGREE,' a much more explicit form of assent than the single clicking of a 'SIGN IN' button." 236 F. Supp. 711, 724 (E.D.N.Y. 2017). In *Lee v. Ticketmaster, LLC*, the hyperlinks were "displayed in blue font" in both a "sign in" screen and "place order" screen. 817 Fed. App'x 393, 395 (9th Cir. 2020). *Thorne v. Square, Inc.*, involved a cash app where a user "'could not avoid noticing the hyperlink when she registered for an account'" because the notice was provided "in a text containing information integral to a successful Cash App registration," namely "a six-digit sign-in code" that was necessary "to successfully register." 2022 WL 542383, at *8 (E.D.N.Y. Feb. 23, 2022). In *Shalomayev v. Altice USA, Inc.*, a sales representative provided consumers a mobile device that displayed "a series of Terms & Conditions," which were also emailed to consumers. 2022 WL 2359406, at *1 (E.D.N.Y. June 30, 2022); *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 552 (S.D.N.Y. 2018) (hyperlinks "highlighted with blue font and an underline"); *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 831 (S.D.N.Y. 2020) (hyperlinks set off from text and "'spacially coupled' with the sign-up button," appearing "directly above"); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835 (S.D.N.Y. 2012) (hyperlink underlined and "immediately below" button).

"browsewrap",[14] and the prompt nowhere states that users are "signing in" or "registering" an account much less pushing a "sign in" or "sign up" button as in Defendants' examples (*id.*).

Moreover, contrary to Defendants' suggestion (Def. Mot. at 7), courts have indicated that "sign-in" wraps can be even more problematic because they can affirmatively mislead consumers. In *Berkson*, for example, the court described such agreements as a "questionable form of internet contracting": "A questionable form of internet contracting has been used in recent years—sign-in-wraps. These internet consumer contracts do not require the user to click on a box showing user is notified of the existence and applicability of the site's 'terms of use' when proceeding through the website's sign-in or login process." 97 F. Supp. 3d at 399. In any event, as the Second Circuit has observed, what matters is the design and presentation of the Terms—not the characterization of the agreement, *Meyer*, 868 F.3d at 76—and here courts have concluded that the design and presentation of the Terms does not provide users adequate notice.

*Third*, Defendants' assertion that the Temu website is not "cluttered" (Def. Mot. at 10; Def. Reply at 1) is inaccurate. As noted, the link to Temu's Terms appears in small grey font that is separated from the giant, bright orange "Continue" button by four other buttons (also brightly colored, featuring the logos of Google, Facebook, Twitter, and Apple). Moreover, the "continue" button is immediately below a text box requiring entry of users' email or phone number in order to continue to the next page, and in turn that text box is below unrelated promotions of "free shipping" and "free returns" that further obscure the hyperlinked Terms.[15]

In fact, the Temu website is highly cluttered: "Temu has gamified its site. Pop-ups with

---

[14] In *Fontanez,* Defendant Whaleco characterized the agreement as "browsewrap", stating: "A 'browsewrap' agreement occurs when a website or mobile app provides a link to the terms and conditions and allows the purchaser to complete the transaction without visiting the page containing the term and conditions." Def. Mot. at 7-8, *Fontanez v. Whaleco*, Ex. C.

[15] Nor is the issue simply that the link is at the "bottom" of the page (Def. Reply at 5-6)—it is that it is separated from the "continue" button by a series of intervening buttons and text.

wheels to spin for discounts, tokens to collect, and countdown clocks make it seem like time on offers is running out, but they're designed to push customers toward purchases."[16] In addition to the promotions on the Temu prompt, the general gamified nature of the website only adds to the clutter, which in turn further undermines any claim consumers were provided adequate notice. *Nicosia* 834 F.3d at 236; *Cullinane*, 893 F.3d at 63-64.

*Fourth*, for the reasons discussed above, the courts in *Eakin* and *Johnson* properly rejected the Florida state court's decision in *Fontanez*. (Def. Reply at 8, citing *Fontanez v. Whaleco, Inc.*, No. 53-2023CA000374 (Fla. Cir. Cit. Aug. 29, 2023).) Moreover, as the court in *Eakins* observed, *Fontanez* is further distinguishable because the plaintiff "had already filed 'eleven class action lawsuits,' and the 'reasonable inference [was] that … [she] should have been aware that online retailers have 'Terms of Use' or 'Terms and Conditions' agreements.'" *Eakins*, 2024 WL 1190766, at *4; *Johnson*, 2023 U.S. Dist. LEXIS 184104, at *9 n.8.

*Finally*, the cases cited above refute Defendants' contention that the *Hu* Plaintiffs are merely "nitpick[ing]" the Temu prompt. (Def. Reply at 1.) The features Plaintiffs identify are the same features courts have repeatedly held render notice inadequate. Moreover, it appears that Defendants have made at least some effort to correct some (but not all) of the deficiencies in the registration prompt for future users. As Defendants note in a footnote in the declaration they submitted, in October 2023 after this lawsuit was filed (and the same month *Johnson* held that Temu's Terms were unenforceable), Defendants made what they characterize as "cosmetic" changes to the Temu prompt. (Trinh Decl. at 2 n.1.) As a result, users who sign up for Temu in the future will be presented with hyperlinks to the Terms that are a bright blue color,

---

[16] What is Temu? Read Before You "Shop Like a Billionaire," PC Magazine, Nov. 22, 2023, https://www.pcmag.com/how-to/what-is-temu-read-before-you-shop-like-a-billionaire.

distinguishing them from the surrounding text.[17]

## II.    The Arbitration Clause Is Unenforceable Under the Terms' Plain Language.

The recent decisions holding the Terms unenforceable are not merely persuasive authority. They are dispositive given the Terms' plain language stating that the arbitration clause is unenforceable where such rulings have been issued. Specifically, Section 20.11 provides that the entire arbitration clause is unenforceable if the batch arbitration provisions in Section 20.9 are invalidated. (7/8/23 Terms § 20.11, Ex. A.) As Defendants underscored in a subsequent revision of the Terms, if the "batch arbitration" provision "is found under the law to be invalid or unenforceable **to any extent**, then you agree that the entire Arbitration Agreement shall be of no force and effect." (2/1/24 Terms § 19.11, Ex. B to Def. Mot. (emphasis added).) Here, two courts have ruled the batch arbitration provision (and the rest of the Terms)—are unenforceable. Thus, under the Terms' plain language, the arbitration agreement has "no force and effect."

Even absent this dispositive language, however, the recent decisions would have preclusive effect under the doctrine of collateral estoppel. The presentation of the Terms here and in *Johnson* and *Eakins* are identical.  (*See* Comparison, Ex. D.) Moreover, as Defendants acknowledge and the Second Circuit has ruled, "'traditional contract formation law does not vary meaningfully from state to state.'" (Def. Mot. at 6 n.2, quoting *Klarna*, 85 F.4th at 702-03.) Accordingly, the law and facts are essentially the same, and the *Johnson* decision has been reduced to a final judgment, as the parties settled that case after the court denied Defendants' motion to compel arbitration. *See China Shipping Container Lines Co. Ltd. v. Big Port Serv. DMCC*, 803 Fed. Appx. 481, 484 (2d Cir. 2020) (collateral estoppel "preclude[d] [party] from

---

[17] Defendants' claim that *Eakins* and *Johnson* relied on "low-resolution copies of Temu's registration screen" (Def. Reply at 9 n.4) is wrong. Moreover, Defendants had full opportunity to submit whatever they wanted to those courts and litigate the issues before those them.

relitigating the existence of an arbitration agreement" where prior ruling held no agreement to

arbitrate existed); *F.T. Maritime Services Ltd. v. Lambda Shipholding Ltd.*, 533 F. Supp. 3d 149,

156 (S.D.N.Y. 2021) (collateral estoppel barred petition to compel arbitration; prior ruling

precluded re-litigating "whether an arbitration agreement exists").

## III.   The Lack of Clarity, and Internal Inconsistency, of The Terms Precluded The Mutual Assent Necessary For Contract Formation.

Defendants' motion fails for an additional, independent reason. Had consumers been

given adequate notice of the Terms, Defendants' attempt to enforce them would still fail because

they are so convoluted and internally inconsistent that there could be no "'meeting of the minds'

and 'a manifestation of mutual assent,'" as required under New York law. *Starke*, 913 F.3d at

293, citing *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 93 N.Y.2d 584, 589 (N.Y.

1999). In particular, "[c]larity and conspicuousness of arbitration terms are important in securing

informed assent." *Specht*, 306 F.3d at 30. "Under New York law, a court may only compel

arbitration when 'the evidence establishes … [a] clear, explicit and unequivocal agreement to

arbitrate.'" *Meeg v. Heights Casino*, 2020 WL 1493658, at *3 (E.D.N.Y. Mar. 27, 2020), quoting

*Fiveco, Inc. v. Haber*, 11 N.Y.3d 140, 144 (2008).

Here, however, the Terms are far from clear. The arbitration clause specifies that

arbitration proceed through a novel "batch" arbitration procedure, yet at the same time

specifically states that claims shall proceed on an "individual" basis and prohibits "mass

arbitration." Specifically, the clause states that "you and Temu will only be permitted to pursue

disputes or claims and seek relief against the other party on an ***individual basis***" (7/8/23 Terms §

1.6, Ex. A), emphasizes that claims may be brought "***ONLY ON AN INDIVIDUAL BASIS***,"

states that claims "**CANNOT BE ARBITRATED OR CONSOLIDATED** WITH THOSE OF

ANY OTHER CUSTOMER OR USER" (*id.* § 20.4), and states "[t]his Batch Arbitration

provision **shall in no way** be interpreted as authorizing a class, **collective and/or mass arbitration** or action of **any kind**" (*id.* § 20.9) (emphasis added).

    However, the AAA rules that the clause incorporates do not mention "batch arbitration" at all. Instead, they provide procedures for "consumer arbitration" and supplementary rules for "mass arbitration" of consumer claims. *See* https://adr.org/consumer, Ex. E; Consumer Arb. Rules, Ex. F; Mass Arb. Rules, Ex. G. While "mass arbitration" is prohibited by the Terms, the AAA applies its "mass arbitration" rules whenever there are "twenty-five or more Consumer or Employment/Workplace similar Demand for Arbitration (Demand(s)) filed against or on behalf of the same party or related parties." Ex. G, at 4. Thus, the AAA rules are in direct conflict with the Terms, which point consumers to the AAA's website and ask them to parse through the irreconcilable inconsistencies themselves. (7/8/23 Terms § 20.5, Ex. A.)

    Similarly, while the arbitration clause states that arbitrations will proceed in "batches" that include 100 claimants each and for which AAA will charge "one set of filing and administrative fees" (*id.* § 20.9), again, the AAA rules contain no such procedures. While the AAA provides a discounted rate for the fees it charges plaintiffs and defendants for "mass arbitrations," the fee is a per claimant fee that varies depending on the total number of claimants—and, again, the Terms expressly prohibit "mass arbitration." *See* Exs. E, H & I

    Finally, while the arbitration clause suggests that the parties will somehow agree to send each "batch" arbitration to a forum that is convenient for all 100 claimants in the batch, the AAA rules again appear to provide differently. Specifically, the arbitration clause states that "For all actions under the Rules, the proceedings may be filed where your residence is, or in New York, New York, and any in-person hearings will be conducted at a location which is reasonably convenient to both parties taking into account their ability to travel and other pertinent

circumstances." (7/8/23 Terms § 20.5, Ex. A.) However, the AAA rules provide that the location

of the arbitration will be selected by the arbitrator. *See* Ex. F, p. 15. Accordingly, there are

multiple areas in which the arbitration clause is at odds with the AAA rules that govern the

arbitration.

## IV. Defendants' Novel Batch Arbitration Clause Is Both Procedurally And Substantively Unconscionable.

Defendants' motion further fails because the arbitration clause is both substantively and

procedurally unconscionable. Indeed, the Terms implicitly acknowledge that the novel

procedures they adopt may be unenforceable, providing that if the batch arbitration provision is

ruled invalid, the entire arbitration clause will be void.[18] (7/8/23 Terms § 20.11, Ex. A.)

"The doctrine of unconscionability 'seeks to prevent sophisticated parties with grossly

unequal bargaining power from taking advantage of less sophisticated parties.'" *De Jesus*, 2021

WL 5391026, at *7. "The question of unconscionability of an arbitration agreement must be

resolved first, 'as a matter of state law, before compelling arbitration pursuant to the FAA.'" *Id.*

at *4; *Cap Gemini Ernst & Young, U.S., LLC v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003).

"Courts do not enforce terms of agreements that are unconscionable…. Whether

procedural unconscionability exists is determined by what led to the formation of the contract….

Substantive unconscionability is essentially an issue of the reasonableness of a term." *Berkson*,

97 F. Supp. 3d at 391; *Sablosky v. Edward S. Gordon Co.*, 535 N.E.2d 643, 647 (N.Y. 1989).

The novel and one-sided arbitration clause here increases the burdens on consumers,

---

[18] When *Hu* and *Ziboukh* were filed, the Terms provided: "Except as provided in Section 20.9 [batch arbitration], if any part or parts of this Arbitration Agreement are found under the law to be invalid or unenforceable, then such specific part or parts shall be of no force and effect and shall be severed and the remainder of the Arbitration Agreement shall continue in full force and effect." 7/8/23 Terms § 20.11, Ex. A. After the lawsuits, the following was added: "For the avoidance of doubt, this means that, if Section 19.9 is found under the law to be invalid or unenforceable to any extent, then you agree that the entire Arbitration Agreement shall be of no force and effect." 2/1/24 Terms § 19.11, Ex. B to Def. Mot.

effectively frustrating their ability to bring claims. It is part of a trend among companies seeking to employ "strategies for deterring and defending against mass arbitrations, primarily through the careful drafting of their arbitration agreements."[19] The clause supplants the time-tested procedural mechanism of class litigation with complicated and unclear arbitration procedures that deter Plaintiffs from pursuing their rights by requiring them to jump through multiple hoops and navigate costly and one-sided procedures. Indeed, the one-sided nature of the clause is powerfully evidenced by the fact that Defendants are unwilling to arbitrate at all if the batch arbitration procedures are ruled unenforceable to any extent. (7/8/23 Terms § 20.11, Ex. A.)

Courts have rejected such novel "batch arbitration" procedures as substantively and procedurally unconscionable in a series of recent cases. *See, e.g., Heckman v. Live Nation Entertainment, Inc.*, 686 F. Supp. 3d 939 (N.D. Cal. 2023); *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1040-41 (N.D. Cal. 2022); *Achey v. Cellco P'ship*, 293 A.3d 551, 558 (2023)(clause has "a systematic effect to impose arbitration on a customer as an inferior forum").

### A.     The Arbitration Clause Is Procedurally Unconscionable.

The procedural component of unconscionability "focuses on the factors of oppression and surprise." *Heckman*, 686 F. Supp. 3d at 952. "'Oppression results where there is no real negotiation of contract terms because of unequal bargaining power.'" *Id.* "'Surprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms.'" *Id.* Multiple courts have found batch arbitration procedures like those here procedurally unconscionable.

In *Heckman*, for example, the court found a batch arbitration clause "procedurally

---

[19] As Mass Arbitrations Proliferate, Companies Have Deployed Strategies for Deterring and Defending Against Them (May 24, 2021), https://www.gibsondunn.com/as-mass-arbitrations-proliferate-companies-have-deployed-strategies-for-deterring-and-defending-against-them/.

unconscionable to an extreme degree" where the clause "was presented on a take-it-or-leave-it basis" and was "oppressive due to 'an inequality of bargaining power that result[ed] in no real negotiation and an absence of meaningful choice.'" *Id.* Among other things, the court observed that the clause represented "a significant change in the parties' agreement (from individual, bilateral arbitration to mass arbitration)" and that the "true nature of this change" was "bur[ried]" in the arbitration provider's "difficult-to-parse Rules". *Id.* The court found that even if consumers "were to review the revised TOU, it is doubtful that they would understand that they were agreeing to resolve their claims in a novel mass arbitration procedure." *Id.* at 956. The terms stated "quite confusingly, that all claims will be resolved by 'individual arbitration,' and not 'in any purported class or representative proceeding.'" *Id.* Moreover, "to discover what they were actually agreeing to, users would need to parse through … separately posted Rules and comprehend their implications (no small task …)." *Id.*

The same problems exist here. Consumers must not only follow a hyperlink to the Terms containing the arbitration clause, but they then must follow yet another link to the AAA's website and ascertain which rules on that site govern their arbitration and find another link to the 38 pages of consumer arbitration rules that the clause specifies will govern the arbitration.[20] Once they perform this task, as noted above, consumers will find that the arbitration clause is inconsistent with these rules and riddled with internal inconsistencies that make it impossible for an ordinary consumer to understand its terms and provide any valid consent to arbitration.

The lack of clarity is compounded by the fact that Defendants have made multiple amendments to the arbitration clause. As in *Heckman*, Defendants gave themselves the right to

---

[20] "The arbitration will be conducted by American Arbitration Association (the 'AAA'), an established alternative dispute resolution provider, under its rules, including Consumer Arbitration Rules (the 'AAA Rules'), then in effect, unless otherwise required by law. AAA's rules are also available at https://adr.org/consumer, or by calling 1-800-778-7879." Ex. A, § 20.5.

unilaterally amend the arbitration clause, and the clause assumes that consumers consent to such unilateral changes by merely continuing to use the site. (7/8/23 Terms § 1.7, Ex. A.) These unilateral amendments have included switching the company that provides arbitration services, which resulted in a wholesale change in the rules that would govern the arbitration. Specifically, Defendants switched from JAMS (9/1/22 Terms § 20.5, Ex. J), which as *Heckman* observed, historically "did not provide for a grouping of individual consumer claims," 686 F. Supp. 3d at 951, to the AAA rules which likewise do not provide for "batch" arbitration, but do provide for "mass arbitration," which is prohibited by the arbitration clause here.

### B.      The Arbitration Clause Is Substantively Unconscionable.

The arbitration clause further fails because it is substantively unconscionable. "'Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided.'" *Heckman*, 686 F. Supp. 3d at 957. "'As with any contract, the unconscionability inquiry requires a court to examine the totality of the agreement's substantive terms as well as the circumstances of its formation to determine whether the overall bargain was unreasonably one-sided.'" *Id.* Where the terms "exhibit[] an extremely high degree of procedural unconscionability, 'even a relatively low degree of substantive unconscionability may suffice to render the agreement unenforceable.'" *Id.*

The clause here is purposefully designed to make resolution of large numbers of relatively low-dollar consumer claims impractical. Defendants would require millions of individual consumers to jump through a series of costly, time-consuming, and one-sided procedures designed to frustrate consumers' ability to recover.

Indeed, so intent are Defendants on imposing these hurdles on consumers, that they also included a provision that voids the arbitration clause in its entirety when it is invalidated to any extent. (7/8/23 Terms § 20.11, Ex. A.) This provision only underscores that the arbitration clause

is designed not to facilitate efficient claims resolution, but rather the opposite: to impose one-sided burdens and costs that make resolution of such claims nearly impossible.

**Informal Dispute Resolution.** Defendants first require that Plaintiffs engage in an "informal dispute resolution" process that "is a condition precedent and requirement that must be fulfilled before commencing arbitration." (*Id.* § 20.2.) The clause requires consumers to personally participate in the dispute resolution conference, but contains no such requirement that an officer or employee from the Defendants participate in such conferences. (*Id.*) Accordingly, "[t]he provision … lacks mutuality, which is a 'paramount' consideration in assessing substantive unconscionability." *MacClelland*, 609 F. Supp. 3d at 1042.

The arbitration clause also contains measures designed to ensure that this dispute resolution process functions as a bottleneck to resolution of the claims. For example, the clause provides that "[t]he Informal Dispute Resolution Conference shall be individualized such that a separate conference must be held each time either party initiates a Dispute, even if the same law firm or group of law firms represents multiple users in similar cases …." (7/8/23 Terms § 20.2, Ex. A.) As a result, Defendants seek to compel thousands of individual conferences before arbitration can proceed. Such provisions "can operate to effectively thwart arbitration and vindication of rights altogether." *MacClelland*, 609 F. Supp. 3d at 1046.

**Arbitration Demand.** Plaintiffs next seek to impose several requirements for the arbitration demand, which apply only to consumers. These include requiring a statement of the legal claims being asserted and the factual bases for them, a description of the remedy sought and an accurate, good-faith calculation of the amount in controversy, a statement certifying completion of the Informal Dispute Resolution process, and evidence that the claimant paid any necessary filing fees in connection with such arbitration. (7/8/23 Terms § 20.5, Ex. A.)

**"Batch" Arbitration.** Most significantly, the clause requires a procedure it labels "batch arbitration" that is not mentioned in the AAA rules, but which requires that claims be arbitrated "in batches of 100" "as a single consolidated arbitration with one set of filing and administrative fees due per side per batch, one procedural calendar, one hearing (if any) in a place to be determined by the arbitrator, and one final award." (*Id.* § 20.9.)[21] While the procedures governing "batch arbitration" are far from clear, it clearly disadvantages consumers.

*First*, batch arbitration deprives consumers of the right to have arbitration occur in the county where they reside. While "arbitration will be conducted in the county where you [the claimant] reside" when there are less than 100 claims, when "batch" arbitration is triggered, the arbitration occurs in another location determined by procedures that are not clear. (*Id.* § 20.5.)

*Second*, lumping each consumer's claim with 99 other claims deprives consumers of the "individual" adjudication that the arbitration clause purports to guarantee.

*Third*, grouping claims in batches is likely to be arbitrary and lead to further unfairness. For example, the court in *Heckman* found it troubling that a neutral would have "'sole discretion' in determining … whether to group together similar cases in a mass arbitration." "Such unfettered discretion invites the potential for unfairness … ." 686 F. Supp. 3d at 961.

*Fourth*, the clause requires that arbitrators "be selected by the parties from the AAA roster of consumer dispute arbitrators." (7/8/23 Terms § 20.6, Ex. A.) However, here, where there are millions of potential claims this limitation presents another barrier to resolution.[22]

*Finally*, the court in *Heckman* noted that such arbitration procedures raise significant due

---

[21] The post-litigation Terms trigger batch arbitration when there are only 25 demands and state: "Arbitration awards in one batch of arbitration demands shall have no precedential effect on subsequently administered batches." 2/1/24 Terms § 19.9, Ex. B to Def. Mot.

[22] Defendants appear to recognize this problem because later versions of the Terms state: "If the AAA is not available to arbitrate, the parties will select an alternative arbitral forum," which raises new problems and renders the clause vague and uncertain. Ex. B to Def. Mot. § 20.5.

process concerns "given the lack of other critical procedural safeguards present in MDLs and class actions." 686 F. Supp. 3d at 962. Claimants do not have the opportunity to participate in "batch" arbitrations other than their own arbitrarily-assigned batch. Moreover, "[t]here is no process for appointing leadership or impartial[ly] making determinations as to adequacy of counsel." *Id.* "And critically, there is no opportunity for claimants to opt out, as is required for class actions maintained under Fed. R. Civ. P. 23(b)(3)." *Id.* Accordingly, the court found that the "protocol creates a process that poses a serious risk of being fundamentally unfair to claimants, and therefore evinces elements of substantive unconscionability." *Id.*

**Sanctions.** The arbitration clause also rewrites Rule 11 in a way that is non-mutual, stating: "[t]he parties shall bear their own attorneys' fees and costs in arbitration unless the arbitrator finds that either the substance of the Dispute or the relief sought in the Request was frivolous or was brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11 (b))." (7/8/23 Terms § 20.8, Ex. A.) The clause does not impose costs or fees for frivolous ***defenses***. Likewise, the clause purports to require that "the party that obtains an order compelling arbitration" shall "have the right to collect from the other party its reasonable costs, necessary disbursements, and reasonable attorneys fees incurred in securing an order compelling arbitration," but does not authorize such recovery if arbitration is denied—even where (as here) multiple courts have already held that the arbitration clause is unenforceable. (*Id.*)

**Public Injunctive Relief.** Finally, the arbitration clause is unconscionable because it does not allow for an award of public injunctive relief. *MacClelland*, 609 F. Supp. 3d at 1037. The Terms implicitly acknowledge this flaw, noting the possibility that a court may rule that the "limitations of this Section are invalid or unenforceable as to a particular claim or request for

relief (such as a request for public injunctive relief)." (7/8/23 Terms § 20.4, Ex. A.)

In sum, the arbitration clause contains "multiple substantively unconscionable provisions such that it indicates a systematic effort to impose arbitration not simply as an alternative to litigation, but as an inferior forum." *See MacClelland*, 609 F. Supp. 3d at 1044.

## V.    Discovery Would Further Demonstrate the Arbitration Clause's Unenforceability.

Finally, while the arbitration clause (and Terms) are unenforceable on their face, discovery would undoubtedly produce further confirmation given that enforceability "is clearly a fact-intensive inquiry." *Meyer*, 868 F.3d at 76. That is particularly true here, where Defendants adopted a novel "batch" arbitration provision and submitted factual material in support of their motion. *See Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 103 (2d Cir. 2022) (remanding for "evidence of how the [electronic] Agreement was presented"); *Heckman*, 2023 WL 5505999, at *2 (discovery ordered on "the validity, unconscionability, and severability" of arbitration clause).[23]

**CONCLUSION**

For the foregoing reasons, Defendants' motion to compel arbitration should be denied.


Dated: July 5, 2024                          Respectfully submitted by,

                                             **HAGENS BERMAN SOBOL SHAPIRO LLP**

                                             */s/ Jeannie Evans*

---

[23] This dispute is not within the clause's scope (Def. Mot. at 11) because the claims do not relate to "access to or use of the Services"—they relate to data theft. 7/8/23 Terms §20.12, Ex. A; *Jackson v. Amazon, Inc.*, 65 F.4th 1093, 1103 (9th Cir. 2023) ("wiretapping and invasion of privacy … does not touch on any matters related to the contract that would fall within the arbitration clause"). Indeed, *Ziboukh* includes Plaintiffs who never accessed or used Temu.

Jeannie Evans (Bar No. 6296339)
Hagens Berman Sobol Shapiro LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4962
Facsimile: (708) 628-4952
jeannie@hbsslaw.com

Steve W. Berman (Bar No. 3126833)
Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Nathaniel A. Tarnor, #4742797
68 3rd Street, Suite 249
Brooklyn, NY 11231
Telephone: (212) 752-5455
Facsimile: (917) 210-3980
nathant@hbsslaw.com

**ALPHEUS LLC**

Douglas G. Smith
77 West Wacker Drive, Suite 4500
Chicago, IL 60601
Telephone: (312) 451-6708
dsmith@alpheusllc.com

*Attorneys for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 5, 2024, a true and correct copy of the foregoing was filed

electronically by CM/ECF, which caused notice to be sent to all counsel of record.

*/s/ Jeannie Y. Evans* _____

# EXHIBIT D

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

ERIC HU, EDWIN ANTONIO SURIS, ) 
TIMOTHY SMITH, ROY NORMAN )
MORROW, MING HUI LIN, NANCY )
BATALAS, JAMES LAFATA, DANIEL )
DAVID KATTAN, TRACY EVETTE )
STARLING, CHRISTOPH B. OH, HECTOR )    Case No. 1:23-cv-06962-MKB-RML
ANDREW CORDERO, YO-YO CHEN, and )
MANISHA REDDY NARAYAN, on behalf )     District Judge Margo K. Brodie
of themselves and all others similarly situated, )
  )    Magistrate Judge Robert M. Levy
                Plaintiffs, )
  )
    v. )
  )
WHALECO INC. d/b/a TEMU, )
  )
              Defendant. )

## DEFENDANT'S RESPONSE TO
## ZIBOUKH PLAINTIFFS' AMICUS BRIEF

Date: August 19, 2024

Serrin Turner
Matthew Valenti
Hadrian Luo
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: serrin.turner@lw.com
     matthew.valenti@lw.com
     hadrian.luo@lw.com

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT ....................................................................................................................2

I.     TEMU'S PROMPT PROVIDES REASONABLE NOTICE THAT USERS ARE
      AGREEING TO THE TERMS OF USE .......................................................................2

     A.    The Prompt Satisfies the Second Circuit Standard ....................................2
     B.    The *Ziboukh* Plaintiffs' Arguments Are Identical to Ones the Second
         Circuit Has Repeatedly Rejected ..............................................................4
     C.    The Cases the *Ziboukh* Plaintiffs Cite Do Not Reflect Current Law and
         Are Easily Distinguishable in Any Event ..................................................5
     D.    The Prompt Is Not "Cluttered" .................................................................6
     E.    The Three Out-of-Circuit Decisions Holding the Terms Unenforceable
         Are Inconsistent with Second Circuit Law and Should Be Disregarded ...............7

II.    ALL OTHER ISSUES HAVE BEEN DELEGATED TO THE ARBITRATOR .............8

     A.    The *Ziboukh* Plaintiffs' Argument That the Batching Provision Is
         Ambiguous Is Delegated to the Arbitrator (and Baseless in Any Event) ...............9
     B.    The *Ziboukh* Plaintiffs' Arguments That Certain Provisions Are
         Unconscionable Are Delegated to the Arbitrator (and Baseless in Any
         Event) ......................................................................................................12

         1.    The Batch Arbitration Clause Is Not Procedurally Unconscionable ........13
         2.    The Arbitration Agreement Is Not Substantively Unconscionable ..........15

III.   DISCOVERY IS NEITHER REQUIRED NOR WARRANTED ....................................20

CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arnaud v. Doctor's Assocs. Inc.*,
2019 WL 4279268 (E.D.N.Y. Sept. 10, 2019), *aff'd*, 821 F. App'x 54 (2d Cir. 2020) .......................................................................................................................6

*Bank v. WorldCom, Inc.*,
2002 WL 171629 (N.Y. Sup. Ct. Jan. 24, 2002)....................................................14

*Bielski v. Coinbase, Inc.*,
87 F.4th 1003 (9th Cir. 2023) ................................................................................16

*Billboard Media, LLC v. Wray*,
2024 WL 2941270 (S.D.N.Y. Apr. 25, 2024)...........................................................9

*Davenport v. Nvidia Corp.*,
2024 WL 832387 (N.D. Cal. Feb. 28, 2024) ..........................................................16

*Dish Network Corp. v. Ace Am. Ins. Co.*,
431 F. Supp. 3d 415 (S.D.N.Y. 2019), *aff'd*, 21 F.4th 207 (2d Cir. 2021)..............8

*Doctor's Assocs., LLC v. Tripathi*,
794 F. App'x 91 (2d Cir. 2019) ...............................................................................9

*Eakins v. Whaleco Inc.*,
2024 WL 1190766 (W.D. Okla. Mar. 5, 2024).........................................................8

*Edmundson v. Klarna*,
85 F.4th 695 (2d Cir. 2023) .......................................................................3, 5, 7, 14

*Edmundson v. Klarna, Inc.*,
642 F. Supp. 3d 256 (D. Conn. 2022), *rev'd and remanded*, 85 F.4th 695 (2d Cir. 2023) ................................................................................................................4

*Feld v. Postmates*,
442 F. Supp. 3d 825 (S.D.N.Y. 2020).....................................................................2

*Fontanez v. Whaleco, Inc.*,
No. 53-3032CA-00374 (Fla. Polk County Ct. Nov. 15, 2023)................................8

*Gillman v. Chase Manhattan Bank, N.A.*,
73 N.Y.2d 1 (1988) ................................................................................................16

*Heckman v. Live Nation Entertainment, Inc.*,
686 F. Supp. 3d 939 (N.D. Cal. 2023) ...................................................................15

*Hodges v. Comcast Cable Commc'ns, LLC*,
   21 F.4th 535 (9th Cir. 2021) ...................................................................19, 20

*Johnson v. Whaleco Inc.*,
   2023 U.S. Dist. LEXIS 184104 (M.D. Fla. Oct. 13, 2023) ......................................8

*La Barbera v. Elite Ready Mix Corp.*,
   2009 WL 2707358 (E.D.N.Y. Aug. 27, 2009) ......................................................11

*Lee v. Am. Exp. Travel Related Servs., Inc.*,
   348 F. App'x 205 (9th Cir. 2009) .........................................................................13

*MacClelland v. Cellco P'ship*,
   609 F. Supp. 3d 1024 (N.D. Cal. 2022) ......................................................14, 15, 18

*McGrath v. DoorDash*,
   2020 WL 6526129 (N.D. Cal. Nov. 5, 2020) .......................................................18

*Meeg v. Heights Casino*,
   2020 WL 1493658 (E.D.N.Y. Mar. 27, 2020) ......................................................11

*Meyer v. Kalanick*,
   200 F. Supp. 3d 408 (S.D.N.Y. 2016), *vacated sub nom. Meyer v. Uber*
   *Techs., Inc.*, 868 F.3d 66 (2d Cir. 2017) ...............................................................5

*Meyer v. T-Mobile USA Inc.*,
   836 F. Supp. 2d 994 (N.D. Cal. 2011) .................................................................13

*Meyer v. Uber*,
   868 F.3d 66 (2d Cir. 2017).........................................................................2, 3, 7

*Ng v. HSBC Mortg. Corp.*,
   2011 WL 3511296 (E.D.N.Y. Aug. 10, 2011) .....................................................12

*Nicosia v. Amazon.com, Inc.*,
   834 F.3d 220 (2d Cir. 2016)..................................................................................6

*Parklane Hosiery Co. v. Shore*,
   439 U.S. 322 (1979)...............................................................................................8

*Rent-A-Ctr., W., Inc. v. Jackson*,
   561 U.S. 63 (2010).................................................................................................9

*Ruckelshaus v. Monsanto Co.*,
   467 U.S. 986 (1984).............................................................................................13

*Selden v. Airbnb, Inc.*,
   2016 WL 6476934 (D.D.C. Nov. 1, 2016), *aff'd*, 4 F.4th 148 (D.C. Cir. 2021) .......................3

*Smith v. Whaleco Inc.*,
   2024 WL 3513800 (W.D. Okla. July 23, 2024)..............................................................8

*SOL Grp. Mktg. Co. v. Lines*,
   2016 WL 205444 (S.D.N.Y. Jan. 15, 2016) ..................................................................14

*Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*,
   999 F.3d 828 (2d Cir. 2021)..........................................................................................2

*Specht v. Netscape Commc'ns Corp.*,
   306 F.3d 17 (2d Cir. 2002)............................................................................................11

*Starke v. SquareTrade, Inc.*,
   913 F.3d 279 (2d Cir. 2019).........................................................................5, 6, 11, 22

*State v. Wolowitz*,
   468 N.Y.S.2d 131 (App. Div. 1983) ..............................................................................16

*Tsiampalis v. Monarch Life Ins. Co.*,
   2007 WL 188673 (E.D.N.Y. Jan. 23, 2007) ..................................................................10

## OTHER AUTHORITIES

AAA Consumer Clause Registry,
   https://apps.adr.org/ClauseRegistryUI/faces/org/adr/extapps/
   clauseregistry/view/pages/clauseRegistry.jsf...........................................................12

National Consumer Disputes Advisory Committee, "Consumer Due Process
   Protocol Statement of Principles,"
   https://www.adr.org/sites/default/files/document_repository/
   Consumer%20Due%20Process%20Protocol%20(1).pdf ........................................12

Pursuant to the Court's July 18, 2024 order (granting ECF No. 48), Defendant Whaleco Inc. d/b/a Temu ("Temu") hereby responds to the amicus brief (ECF No. 45) filed by the plaintiffs in *Ziboukh et al. v. Whaleco Inc. et al.* (No. 24-cv-03733) (the "*Ziboukh* Plaintiffs") opposing Temu's motion to compel arbitration in the above-captioned case (the *Hu* litigation).

## PRELIMINARY STATEMENT[1]

The Court should grant Temu's motion to compel arbitration for the reasons stated in Temu's briefs (ECF Nos. 37, 40).  The *Ziboukh* Plaintiffs' amicus brief offers no relevant arguments—let alone persuasive ones—beyond what the parties to this litigation have already briefed.

The amicus brief first challenges Temu's account registration prompt ("Prompt"), claiming it provides inadequate notice that users are assenting to the Terms when they create an account. But the Prompt is uncluttered and the reasonably prudent Internet user can easily see and understand the hyperlink to the Terms it contains, without having to scroll down.  That suffices to form an agreement under Second Circuit authority.  In arguing otherwise, the *Ziboukh* Plaintiffs recycle the same arguments raised by the *Hu* Plaintiffs—*e.g.*, quibbling over the placement of the hyperlink, or its font color or size, etc.  Not only were these arguments thoroughly addressed in the *Hu* briefing, but the Second Circuit squarely rejected similar arguments in both the *Meyer* and *Klarna* cases (*see infra*)—which represent binding authority that the *Ziboukh* Plaintiffs cannot cogently distinguish from the facts here.

---

[1] Unless otherwise indicated, all internal citations and quotations are omitted, and all emphasis is added.  Citations to "Def. Br." and "Def. Reply" refer to Temu's opening and reply briefs, respectively, in support of its motion to compel arbitration (ECF Nos. 37, 40), and citations to the "Terms" refer to Temu's Terms of Use attached to Defendant's opening brief (ECF No. 38-2).

The remainder of the amicus brief is not even relevant to deciding Temu's motion to compel arbitration. The *Ziboukh* Plaintiffs spend many pages challenging the *enforceability* of discrete provisions within the arbitration agreement. But none of those arguments bears on whether an agreement to arbitrate was *formed* in the first place (it was), and the Terms provide that disputes about the enforceability of any part of the agreement are delegated exclusively to the arbitrator. In any event, the *Ziboukh* Plaintiffs' enforceability arguments are meritless, resting on repeated mischaracterizations and misinterpretations of the arbitration agreement.

Accordingly, the Court should reject the arguments in the amicus brief and grant Temu's motion to compel arbitration.

## **ARGUMENT**

## I. TEMU'S PROMPT PROVIDES REASONABLE NOTICE THAT USERS ARE AGREEING TO THE TERMS OF USE

In determining whether a registration screen is sufficient to allow for the creation of a valid agreement, Second Circuit courts ask whether the overall design of the prompt puts a "reasonably prudent smartphone user" on notice that they would be agreeing to the applicable terms of use. Def. Br. at 6-10; *Meyer v. Uber*, 868 F.3d 66, 77 (2d Cir. 2017); *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 836 (2d Cir. 2021) (courts must analyze "the website or advertisement design as a whole"); *Feld v. Postmate*s, 442 F. Supp. 3d 825, 830 (S.D.N.Y. 2020) ("The Court … does not presume that the user never before encountered an app or entered into a contract using a smartphone."). As Temu has amply explained, this standard is satisfied here.

### A. The Prompt Satisfies the Second Circuit Standard

The *Ziboukh* Plaintiffs devote much of their argument to nitpicking the details of the Prompt, but tellingly they avoid reproducing an image of it. That is because its overall design easily satisfies the Second Circuit standard. *See* ECF No. 38-1. The Prompt is uncluttered and

appears on a single screen, and the hyperlink to the Terms appears in bold font, adjacent to the buttons for creating an account—clearly visible to a reasonably prudent user. *E.g.*, *Meyer*, 868 F.3d 66 at 78 ("The entire screen [in the Uber application] is visible at once, and the user does not need to scroll beyond what is immediately visible to find notice of the Terms of Service."); *Edmundson v. Klarna*, 85 F.4th 695, 705-07 (2d Cir. 2023) (similar). The Prompt is all the more conspicuous given that it is shown as the user is creating an account—when they *expect* to be prompted to agree to the company's terms of service as part of the registration process. *Meyer*, 868 F.3d 66 at 78 ("[A] reasonably prudent smartphone user would understand that the terms were connected to the creation of a user account."); *see also Selden v. Airbnb, Inc.*, 2016 WL 6476934, at *5 (D.D.C. Nov. 1, 2016) ("Any reasonably-active adult consumer will almost certainly appreciate that by signing up for a particular service, he or she is accepting the terms and conditions of the provider."), *aff'd*, 4 F.4th 148 (D.C. Cir. 2021).

Nonetheless, the *Ziboukh* Plaintiffs—just like the *Hu* Plaintiffs—resort to quibbling with various aesthetic aspects of the Prompt, such as the particular styling and placement of the hyperlink on the screen. *See* Amicus Br. at 10-11 (claiming, for example, that "the Temu hyperlink was not underlined or capitalized" and was therefore inconspicuous). These arguments were thoroughly addressed in Temu's prior briefing with the *Hu* Plaintiffs, *see* Def. Br. at 8-10; Def. Reply at 5-7, and fare no better when advanced by the *Ziboukh* Plaintiffs. Again, as the Second Circuit has explained, "there are 'no particular features that must be present to satisfy the reasonably conspicuous standard.'" *Klarna*, 85 F.4th at 707. Thus, the *Ziboukh* Plaintiffs have no basis to argue that any particular styling or placement was required.

## B.   The *Ziboukh* Plaintiffs' Arguments Are Identical to Ones the Second Circuit Has Repeatedly Rejected

Not only do the *Ziboukh* Plaintiffs fail to account for the Second Circuit's decisions in *Meyer* and *Klarna*, they make the exact same arguments the Second Circuit rejected in those cases. For example, the chart below compares the *Ziboukh* Plaintiffs' arguments with those credited by the district court opinion in *Klarna*, which the Second Circuit reversed:

| *Ziboukh* Plaintiffs' Argument | District Court Opinion in *Klarna*, Reversed by Second Circuit |
|---|---|
| • The Prompt is "separated by multiple other buttons and statements." *See* Amicus Br. at 8.<br>• "[T]here are multiple buttons and statements in larger font." *Id.* at 10.<br>• The Prompt is "separated from the giant, bright orange 'Continue' button by four other buttons … ." *Id.* at 13.<br>• "[I]t is separated from the 'continue' button by a series of intervening buttons and text" *Id.* at 13 n.15. | "First, there are multiple different items attracting the user's attention on this screen. Initially, the user must select how they intend to pay for their purchase, deciding between no fewer than six different options." *Edmundson v. Klarna, Inc.*, 642 F. Supp. 3d 256, 268 (D. Conn. 2022), *rev'd and remanded*, 85 F.4th 695 (2d Cir. 2023). |
| • The Prompt "appears in grey font against a white backdrop." *Id.* at 7.<br>• It is "not distinguishable from the surrounding text (through bright blue coloring or underlining for example)." *Id.* at 10.<br>• "[T]he Temu hyperlink was not underlined or capitalized and was in similar color to the surrounding text." *Id.* at 11.<br>• "[T]he link to Temu's Terms appears in small grey font." *Id.* at. 13. | "Second, … the text surrounding the hyperlinked terms and conditions is gray on a white background. Such color selection certainly does not stand out" because "they are not the characteristic blue that a user would associate with hyperlinks." *Id.* |
| • The Prompt "is located at the bottom of the webpage." *Id.* at 6.<br>• It is "spacially [sic] decoupled." *Id.* at 6, 7.<br>• It is "not adjacent to the button manifesting assent, but rather at the bottom of the page." *Id.* at 10. | "Third, the hyperlinks are only minimally spatially related to the place where the user would manifest assent to the terms contained in the hyperlinked agreements." *Id.* |
| • The Prompt "appears in relatively small font." *Id.* at 6.<br>• "[T]he statement regarding agreement to | "The text containing the hyperlinks is also the smallest text on the screen, even smaller than other disclaimers." *Id.* |

| the Terms is in the smallest font on the screen." *Id.* at 9.<br>• It is "in the smallest font on the page." *Id.* at 10. | |

The Second Circuit found the district court's acceptance of these arguments to be reversible error. *See Klarna*, 85 F.4th at 705-706 (finding it inconsequential that "the hyperlinks to Klarna's terms [we]re in a smaller font" and were not blue, because the notice to the user was "sufficiently conspicuous in light of the whole interface" (cleaned up)).

Similarly, prior to *Klarna*, the district court in *Meyer* relied on some of the same arguments now advanced by the *Ziboukh* Plaintiffs—arguments that the Second Circuit rejected on appeal. *See Meyer v. Kalanick*, 200 F. Supp. 3d 408, 420 (S.D.N.Y. 2016) ("Uber's statement about 'Terms of Service' appears far below and in much smaller font. … [T]he hyperlink stating 'Terms of Service & Privacy Policy' is located far beneath the 'Register' button and takes on the appearance of an afterthought."), *vacated sub nom. Meyer v. Uber Techs., Inc.*, 868 F.3d 66 (2d Cir. 2017). The Second Circuit has thus specifically rejected the sort of fussy criticisms asserted here by the *Ziboukh* Plaintiffs, making clear that it is instead the overall design of a registration screen that matters. There is no basis for any different result here.

## C. The Cases the *Ziboukh* Plaintiffs Cite Do Not Reflect Current Law and Are Easily Distinguishable in Any Event

Having no cogent basis to distinguish Temu's Prompt from those upheld in *Meyer* and *Klarna*, the *Ziboukh* Plaintiffs cite cases that do not reflect the current state of law in the Second Circuit—because they all predate *Klarna* or are not even from within this Circuit—and are each distinguishable in any event. To take one example, the *Ziboukh* Plaintiffs rely heavily on *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 294 (2d Cir. 2019), *see, e.g.*, Amicus Br. at 7-8, even though the case bears no resemblance to this one. *Starke* did not even involve an account registration

screen. It involved a user who purchased a product on Amazon, where the "purchase page[] did not provide [him] with notice that terms governing the sale would be provided via hyperlink." *Id.* at 292. Instead, the user eventually received a series of emails, one of which contained "a hyperlink in the bottom left corner, labeled 'Terms & Conditions.'" *Id.* at 285. The email "d[id] not advise him that he would be deemed to agree to the contract terms in the document to be found by clicking that link." *Id.* at 293.

It is unclear how the *Ziboukh* Plaintiffs could conclude from these facts that "the presentation of the Terms here is even more problematic than in *Starke*." Amicus Br. at 8; *compare* Appendix 1 hereto (reproduction of email in *Starke* containing terms of use hyperlink). To the contrary, if anything, *Starke* supports the proposition that Temu's Prompt is sufficient, because the Second Circuit explained there that "[t]o provide conspicuous notice of the [terms and conditions], SquareTrade could have simply included a noticeable hyperlink on the Amazon purchase page directing users to review the terms and conditions." *Starke*, 913 F.3d at 294. That is exactly what the Prompt does here at the point of registration.[2]

### D.     The Prompt Is Not "Cluttered"

The *Ziboukh* Plaintiffs also contend that the Prompt is "highly cluttered," Amicus Br. at 13, but it is obviously not, as one can easily see from looking at the Prompt. *See* ECF No. 38-1. The inclusion of multiple buttons reflects multiple options for creating an account, which does not

---

[2] The remaining cases cited by the *Ziboukh* Plaintiffs, Amicus Br. at 8-10, are similarly off-point. *See, e.g.*, *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 237 (2d Cir. 2016) (emphasizing cluttered page where "there appear to be between fifteen and twenty-five links on the Order Page, and various text is displayed in at least four font sizes and six colors (blue, yellow, green, red, orange, and black), alongside multiple buttons and promotional advertisements"); *Arnaud v. Doctor's Assocs. Inc.*, 2019 WL 4279268, at *6 (E.D.N.Y. Sept. 10, 2019) (emphasizing that "no text anywhere on the webpage indicated that the user was agreeing to any additional terms, and the fact that the link was labeled 'T&Cs' provides little or no notice to the user that he might be bound by additional information contained at that link"), *aff'd*, 821 F. App'x 54 (2d Cir. 2020).

make the screen "cluttered"—as *Meyer*, *Klarna*, and other cases recognize, but that the *Ziboukh* Plaintiffs continue to ignore.  Def. Br. at 8-10; Def. Reply at 8-10; *Klarna*, 85 F.4th at 705 (finding screen uncluttered where there were "three buttons to select either to register for a new account or to connect to two types of pre-existing accounts"); *Meyer*, 868 F.3d at 78 (finding screen "uncluttered, with only fields for the user to enter his or her credit card details, buttons to register for a user account or to connect the user's pre-existing PayPal account or Google Wallet to the Uber account").  Nor do the "Free shipping" and "Free returns" labels at the top of the Prompt render it cluttered—a contention that the *Ziboukh* Plaintiffs do not explain.  Amicus Br. at 13.

The *Ziboukh* Plaintiffs try to switch the subject to supposed "clutter" on the Temu *website*, stating that "the gamified nature of the website only adds to the clutter, which in turn further undermines any claim users were provided adequate notice."  Amicus Br. at 14.  This argument makes no sense.  Whether or not Temu's *website* is "gamified" has nothing to do with the Prompt on the app being "cluttered," and certainly would not affect whether a user registering an account would receive sufficient notice of the Terms.

E.     **The Three Out-of-Circuit Decisions Holding the Prompt Is Inconspicuous Are Inconsistent with Second Circuit Law and Should Be Disregarded**

Finally, for all of the reasons set forth above, the three district court decisions from the Western District of Oklahoma and Middle District of Florida on which the *Ziboukh* Plaintiffs heavily rely[3] should be disregarded, as they rest on the same sorts of arguments the Second Circuit specifically rejected in *Meyer* and *Klarna*.  Nor do any of those decisions have preclusive effect on this Court, as the *Ziboukh* Plaintiffs claim.  Amicus Br. at 15-16.  The decisions are inconsistent

---

[3] *See* Amicus Br. at 2 (citing *Eakins v. Whaleco Inc.*, 2024 WL 1190766 (W.D. Okla. Mar. 5, 2024) and *Johnson v. Whaleco Inc.*, 2023 U.S. Dist. LEXIS 184104 (M.D. Fla. Oct. 13, 2023)); Notice of Supplemental Authority from *Ziboukh* Plaintiffs dated July 26, 2024 (citing *Smith v. Whaleco Inc.*, 2024 WL 3513800 (W.D. Okla. July 23, 2024)).

with Second Circuit law, and they are also inconsistent with the opinion of another court in Florida that held that Temu's Prompt was sufficiently conspicuous. *See* ECF No. 40-1 (decision from *Fontanez v. Whaleco, Inc.*, No. 53-3032CA-00374 (Fla. Polk County Ct. Nov. 15, 2023) (granting Temu's motion to compel arbitration)). These factors prevent the application of non-mutual offensive collateral estoppel. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330 (1979) ("Allowing offensive collateral estoppel may … be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant."); *Dish Network Corp. v. Ace Am. Ins. Co*., 431 F. Supp. 3d 415, 427 (S.D.N.Y. 2019) (rejecting offensive collateral estoppel where there was already one case decision inconsistent with three others, and the prior decisions were in different circuits where courts were bound by different precedent), *aff'd*, 21 F.4th 207 (2d Cir. 2021).[4]

## II.     ALL OTHER ISSUES HAVE BEEN DELEGATED TO THE ARBITRATOR

The rest of the Amicus Brief presents a motley mix of arguments regarding the interpretation and enforceability of certain provisions of the arbitration agreement. *See* Amicus Br. at 16-25. These arguments are meritless; but more importantly, they are irrelevant to Temu's

---

[4] The *Ziboukh* Plaintiffs' argument that the Florida and Oklahoma decisions make the entire arbitration agreement unenforceable by contract, Amicus Br. at 15, is borderline frivolous. Plaintiffs rely on language in the Terms' severability provision, which provides that if the *batching provision* of the arbitration agreement is found *invalid or unenforceable*, both parties agree that the entire arbitration agreement is null and void. *See* Terms § 19.11. But the Florida and Oklahoma decisions did not address the Terms' batching provision at all, let alone find it invalid or unenforceable. Indeed, the decisions did not address *any* issue of validity or enforceability whatsoever; instead, the issue was whether an agreement to arbitrate had been *formed*, not whether any aspect of it was valid or enforceable. *See Smith*, 2024 WL 3513800 at *4; *Eakins*, 2024 WL 1190766 at *4; *Johnson*, 2023 U.S. Dist. LEXIS 184104, *10. Nor could a court rule that the batching provision is unenforceable, as that issue is delegated exclusively to the arbitrator under Section 19.7 of the Terms (*infra* at 11).

Motion to Compel, because they have nothing to do with whether an arbitration agreement was *formed*. Instead, they concern issues that the Terms delegate exclusively to the arbitrator.

The delegation clause in Temu's arbitration agreement provides that "[t]he arbitrator shall have exclusive authority to resolve any Dispute, including, without limitation, disputes arising out of or related to the *interpretation* or application of the Arbitration Agreement, including the *enforceability*, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement … ." Terms § 19.7. This broad delegation provision is subject only to limited exceptions not applicable here. Accordingly, any challenges to the arbitration agreement's specific provisions as vague, unconscionable, or unenforceable—like those the *Ziboukh* Plaintiffs attempt to raise—must instead be made in arbitration. *See, e.g.*, *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71-72 (2010) (finding that a clause granting the arbitrator "exclusive authority to resolve any dispute related to the … enforceability … of this Agreement" delegated the question of whether the agreement was unconscionable to the arbitrator); *Doctor's Assocs., LLC v. Tripathi*, 794 F. App'x 91, 94 (2d Cir. 2019) (summary order) ("With respect to the enforceability of the arbitration agreement, we agree with the district court that the arbitration agreement clearly and unmistakably delegated this issue for the arbitrator's determination in the first instance."); *Billboard Media, LLC v. Wray*, 2024 WL 2941270, at *7 (S.D.N.Y. Apr. 25, 2024) (finding language similar to Temu's delegation clause "clearly and unmistakably delegates to the arbitrator issues of arbitrability, including gateway questions" of interpretation, enforceability and unconscionability).

### A. The *Ziboukh* Plaintiffs' Argument That the Batching Provision Is Ambiguous Is Delegated to the Arbitrator (and Baseless in Any Event)

The *Ziboukh* Plaintiffs first argue that there was no mutual assent for the parties to arbitrate their claims because a particular subsection of the agreement—requiring the batching of related

arbitration claims—is supposedly "inconsistent," "convoluted," and "at odds with the AAA rules." Amicus Br. at 16-18. That argument is wrong on several fronts.

As an initial matter, whatever bone the *Ziboukh* Plaintiffs have to pick with a discrete *subsection* of the arbitration agreement, they cannot deny that the parties mutually assented to arbitration in general because there is nothing unclear about that in the Terms. The Terms say in plain language—printed in bold and all-caps at the top of the document—that "**SECTION 19 CONTAINS, AMONG OTHER THINGS, AN AGREEMENT TO ARBITRATE WHICH REQUIRES, WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU AND US BE RESOLVED BY BINDING AND FINAL ARBITRATION.**" Terms § 1.4. The language could not be any clearer that, by agreeing to the Terms, a user is agreeing to submit to arbitration.

Any argument that the batching provision is vague would instead be an issue of contract *interpretation*—not *formation*—and as such would be delegated exclusively to the arbitrator. Again, the Terms delegate to the arbitrator any disputes about the interpretation of any portion of the arbitration agreement. Terms § 19.7. Accordingly, if the *Ziboukh* or *Hu* Plaintiffs want to raise a dispute as to how the batching provision should be interpreted or applied to them, they may do so in arbitration; but any ambiguity (if there was one) would not negate their assent to the overall agreement. *See, e.g.*, *Tsiampalis v. Monarch Life Ins. Co.*, 2007 WL 188673, at *4 (E.D.N.Y. Jan. 23, 2007) ("A mere ambiguity in a contract does not justify a finding that the ambiguous terms are void. Nothing prohibits parties from entering into contracts with terms that are ambiguous."); *see also La Barbera v. Elite Ready Mix Corp.*, 2009 WL 2707358, at *4 (E.D.N.Y. Aug. 27, 2009) (finding that the court must evaluate the entire contract to avoid adopting

an interpretation that would result in inconsistency between provisions or render a particular provision superfluous).[5]

In any event, the supposed ambiguities the *Ziboukh* Plaintiffs claim to find in the batch arbitration provision do not exist. *See* Amicus Br. at 16-17. They argue that requiring batch arbitrations in certain circumstances (Terms § 19.9), while otherwise prohibiting consolidated or collective arbitration (*id.* § 19.4), is somehow impermissibly inconsistent. It is not. The Terms simply contain a general prohibition on parties seeking relief "on a class, collective, representative, or mass action basis," while also providing, as an *exception* to that general rule, that if one law firm seeks to file similar arbitration demands on behalf of 25 or more individuals, then for the sake of efficiency, the parties agree that the arbitrator will group the demands into batches decided by the same arbitrator. Terms § 19.9. An exception to a general rule does not create an "ambiguity"— let alone one that affects contract formation.

The *Ziboukh* Plaintiffs are also wrong that the Terms' batching provision is unenforceable because it is not reflected in—and therefore supposedly "irreconcilable" with—the AAA rules. *See* Amicus Br. at 17 (arguing that "the AAA rules that the clause incorporates do not mention 'batch arbitration' at all"). To the contrary, the AAA rules *encourage* the parties to arrive at their

---

[5] None of the cases the *Ziboukh* Plaintiffs cite (*Meeg*, *Starke*, and *Specht*), Am. Br. at 16, held that an alleged ambiguity in a batching (or any other) provision within an arbitration agreement negates the entire arbitration agreement. In each of these cases, the court denied a motion to compel arbitration because it was insufficiently clear that the plaintiff agreed to arbitrate *at all*—a concern, as explained above, that is not present here. *See e.g.*, *Meeg v. Heights Casino*, 2020 WL 1493658, at *4 (E.D.N.Y. Mar. 27, 2020) (denying motion to compel arbitration where a handbook containing the arbitration requirement contained the disclaimer "informational only" and specified that it did not create "contractual rights or obligations with respect to any matters contained"); *Starke*, 913 F.3d at 289 (denying motion to compel arbitration because parties did not have sufficient notice of the arbitration provision); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 30 (2d Cir. 2002) (denying motion to compel arbitration because parties could not "clearly comprehend that the agreement to arbitrate exists").

own agreements to make the arbitration process more efficient: "Parties are encouraged to agree to additional processes that make the resolution of their Mass Arbitration more efficient, such as … *An agreement to assign multiple cases to a single arbitrator*, making the scheduling of conferences and hearings more efficient." ECF No. 46-7 at 3. There is thus no inconsistency here, as the AAA rules plainly allow what the Terms require.[6]

### B. The *Ziboukh* Plaintiffs' Arguments That Certain Provisions Are Unconscionable Are Delegated to the Arbitrator (and Baseless in Any Event)

The *Ziboukh* Plaintiffs' remaining arguments expressly challenge the arbitration agreement's enforceability. Specifically, they challenge various provisions—relating to informal dispute resolution, arbitration demand requirements, batching of related demands (again), attorneys' fees for frivolous demands, and public injunctive relief—as "unconscionable." *See* Amicus Br. at 18-25. Given that these arguments on their face concern the arbitration agreement's enforceability, they are plainly delegated to the arbitrator. Terms § 19.7 (providing that the "arbitrator shall have exclusive authority to resolve any Dispute … related to … the *enforceability*" of the agreement); *see Ng v. HSBC Mortg. Corp.*, 2011 WL 3511296, at *8 (E.D.N.Y. Aug. 10, 2011) ("Under New York law, unconscionability is an affirmative defense to the *enforcement* of a contract.").

---

[6] The *Ziboukh* Plaintiffs' concerns about the batching provision being inconsistent with AAA rules also make little sense given that the AAA already reviewed Temu's arbitration agreement—including its batch arbitration clause—and added it to their Consumer Clause Registry. *See* AAA Consumer Clause Registry, https://apps.adr.org/ClauseRegistryUI/faces/org/adr/extapps/clauseregistry/view/pages/clauseRegistry.jsf (search for "Temu" reflects that the Terms were accepted on April 1, 2024). That means the AAA has determined that the arbitration clause "substantially and materially compl[ies] with the due process standards of the AAA Consumer Due Process Protocol." ECF No. 46-5 at 5. This protocol requires giving users "clear and adequate notice of the arbitration provision and its consequences" and "fair hearings" at a "reasonable cost." *See* National Consumer Disputes Advisory Committee, "Consumer Due Process Protocol Statement of Principles," https://www.adr.org/sites/default/files/document_repository/Consumer%20Due%20Process%20Protocol%20(1).pdf.

For the sake of completeness, however, even if these arguments could be adjudicated in court, they are baseless.

### 1. The Batch Arbitration Clause Is Not Procedurally Unconscionable

The *Ziboukh* Plaintiffs argue that the batching provision is procedurally unconscionable because there was no real negotiation of the contract and consumers would be surprised by the agreed-upon terms of the bargain. *See* Amicus Br. at 19.

As an initial matter, neither the *Ziboukh* nor the *Hu* Plaintiffs have standing to challenge the enforceability of the arbitration batching provision—whether viewed as an issue of procedural or substantive unconscionability—because it does not currently apply to them. The batching provision applies only "in the event that there are twenty-five (25) or more individual Arbitration Notices of a substantially similar nature filed against us *by or with the assistance of the same law firm, group of law firms, or organizations*." Terms § 19.9 (emphasis added). Here, there are only seventeen named Plaintiffs represented by counsel in the *Ziboukh* case (only twelve of which claim to be Temu users), and only thirteen named Plaintiffs represented by counsel in the *Hu* case; and of course none of the Plaintiffs represented by either counsel have submitted any arbitration notices. Accordingly, Plaintiffs in either case are not currently subject to batch arbitration and have no standing to challenge the batch arbitration provision. *See Meyer v. T-Mobile USA Inc.*, 836 F. Supp. 2d 994, 1003 (N.D. Cal. 2011) (finding that plaintiff lacked standing to challenge provision in arbitration agreement because it had not been applied to her); *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1019–20 (1984) (challenge to constitutionality of arbitration scheme was not ripe for resolution because the plaintiff had not been injured by the provision); *Lee v. Am. Exp. Travel Related Servs., Inc.*, 348 F. App'x 205, 207 (9th Cir. 2009) ("Plaintiffs cannot satisfy the requirements of Article III because they have not yet been injured by the mere inclusion of

13

these provisions in their agreements, nor is the threat of future harm from such provisions sufficiently imminent to confer standing.").

Regardless, the batch arbitration provision is not procedurally unconscionable. The *Ziboukh* Plaintiffs first complain that the provision is offered on a "take-it-or-leave-it" basis. *See* Amicus Br. at 20. But the fact that there was no arms' length negotiation over this provision is hardly unusual in the online consumer context, as "terms are usually unnegotiated and consumers often proceed without reading the fine print." *Klarna*, 85 F.4th at 703. New York courts generally decline to find online agreements procedurally unconscionable on this basis because consumers are always free to take their business elsewhere. *See, e.g.*, *Bank v. WorldCom, Inc.*, 2002 WL 171629, at *6 (N.Y. Sup. Ct. Jan. 24, 2002) (finding that the consumer was not in a "take it or leave it" position because they could buy a competitor's product instead); *SOL Grp. Mktg. Co. v. Lines*, 2016 WL 205444, at *7 (S.D.N.Y. Jan. 15, 2016) ("[T]here is no contract of adhesion where the complaining party had the option of engaging in business with another company or individual besides the defendant before signing the contract.").[7]

The *Ziboukh* Plaintiffs also argue that courts have found "novel and one-sided" batch arbitration clauses to be procedurally unconscionable. *See* Amicus Br. at 18-21.[8] But the decision on which they primarily rely, *Heckman v. Live Nation Entertainment, Inc.*, 686 F. Supp. 3d 939

---

[7] Even the court in *MacClelland*—a case on which the *Ziboukh* Plaintiffs rely—acknowledged that while online consumer contracts are not individually negotiated, this at most gives rise to a "minimal" level of procedural unconscionability. *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1034 (N.D. Cal. 2022) ("[T]he agreement here is a contract of adhesion, but the adhesive nature of the agreement presents only a minimal finding of procedural unconscionability.").

[8] It bears mention that batch arbitration clauses are no longer "novel." Leading arbitration providers like AAA have incorporated mass arbitration procedures into their consumer rules and encourage parties to reach an agreement to resolve disputes efficiently. For example, as noted above, the AAA's mass arbitration rules encourage parties to agree to processes for the efficient resolution of those cases, including "an agreement to assign multiple cases to a single arbitrator, making the scheduling of conferences and hearings more efficient." ECF No. 46-7 at 3.

(N.D. Cal. 2023), is not at all analogous to the facts here.  In *Heckman,* the defendant changed arbitration providers in the middle of litigation, *id.* at 946, leading the court to find high levels of procedural unconscionability because the defendant had allegedly made this change to its terms without notice and was seeking to apply the revised terms retroactively with respect to the claim in that case.  *Id.* at 953.  The court also held that nothing in the revised terms indicated that consumers were agreeing to mass arbitration procedures, which were instead contained solely in the new provider's rules (which were allegedly difficult to parse), and that the language in the terms instead left consumers with the impression that they had agreed to "individual arbitration." *Id.* at 956.

The concerns raised in *Heckman*—even assuming it was correctly decided—are not remotely present here.  The batch arbitration provision was in effect at all times that Plaintiffs used the Temu app, and Temu's Terms were not modified in the middle of litigation to change arbitration providers or add a batch arbitration provision.  *See* ECF No. 38 at ¶¶ 9-10.  Users are also permitted to opt out of any updated agreement within 30 days, a critical factor not present in *Heckman*.  *See* Terms § 19.10; *cf. Heckman*, 686 F. Supp. 3d at 962 ("[C]ritically, there is no opportunity for claimants to opt out.");  *MacClelland*, 609 F. Supp. 3d at 1043 (finding ability to opt out to be key factor in unconscionability analysis).  Finally, the batch arbitration provision here is clearly spelled out in the Terms themselves (*see supra* at 12-13; Terms § 19.9), rather than being located on solely on the arbitration provider's website as in *Heckman*.  686 F. Supp. 3d at 956.

### 2.    The Arbitration Agreement Is Not Substantively Unconscionable

The *Ziboukh* Plaintiffs argue that various provisions in the arbitration agreement are substantively unconscionable.  *See* Amicus Br. at 21-25.  None of them are.  Substantive unconscionability turns on whether a contract unreasonably favors one party over the other.  *See Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 12 (1988).  Unconscionability operates on

a sliding scale, such that where, as here, there is little to no procedural unconscionability, substantive unconscionability must be substantial. *See State v. Wolowitz*, 468 N.Y.S.2d 131, 145 (App. Div. 1983) (explaining that "procedural and substantive unconscionability operate on a 'sliding scale'; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa"). The *Ziboukh* Plaintiffs fail to meet the requisite standard as to any component of the arbitration agreement.[9]

**Informal Dispute Resolution Requirement.** The *Ziboukh* Plaintiffs first challenge the informal dispute resolution process contained in the Terms, which simply requires the complaining party to have a single phone call or videoconference with the other party before filing an arbitration demand. The provision is mutually applicable, easy to comply with, permits consumers to have their attorney present, and tolls any relevant statutes of limitations while discussions take place. *See* Terms § 19.2. Procedures such as these are routinely found enforceable because they do not place an undue burden on consumers and provide sufficient procedural protections for all parties. *See Bielski v. Coinbase, Inc*., 87 F.4th 1003 (9th Cir. 2023) (enforcing Coinbase's informal dispute resolution process because it did not place a time restriction on a party to bring the claim); *Davenport v. Nvidia Corp*., 2024 WL 832387, at *6 (N.D. Cal. Feb. 28, 2024) (finding that an agreement requiring users to contact the company to give it a chance to resolve any complaints informally was not the "kind of onerous hoop jumping that would render the pre-arbitration procedures a substantively unconscionable roadblock to relief"). Contrary to what the *Ziboukh* Plaintiffs contend, *see* Amicus Br. at 22, Temu is required to participate in the conference (which is inherent in the fact that it is a "conference") and is required to do so in good faith. Terms § 19.2

---

[9] Moreover, even if any part of the agreement were to be found invalid, with the exception of Section 19.9, that part of the agreement may be severed and the rest of the agreement can remain in full force and effect. *See* Terms § 19.11.

("[W]e will personally meet and confer telephonically or via videoconference, in a good faith effort to resolve informally…").  The *Ziboukh* Plaintiffs do not and cannot explain why requiring the parties to engage in a brief, informal discussion prior to any arbitration demand being filed unconscionably favors Temu.  Nor do the *Ziboukh* Plaintiffs cite a single case finding a similar requirement unconscionable; instead, they cite *MacClelland*, Amicus Br. at 22, but that case did not even address an informal dispute resolution provision, let alone find such a provision to be unconscionable.

**Arbitration Demand.**  The *Ziboukh* Plaintiffs next attempt to challenge the Terms' filing requirements for arbitration demands, which require a statement of the legal claims being asserted and their factual bases, a description of the remedy sought and an accurate, good-faith calculation of the amount in controversy, a statement certifying completion of the Informal Dispute Resolution process, and evidence that the requesting party has paid any filing required fees.  The *Ziboukh* Plaintiffs inexplicably assert that these requirements "apply only to consumers."  Amicus Br. at 22.  They cite nothing for that assertion, and it is directly contradicted by the Terms, which make clear that the requirements are mutual.  *See* Terms § 19.5 ("If the Parties are not able to resolve the Dispute through the mandatory informal dispute resolution process referenced above, *either party may initiate an arbitration proceeding by sending a demand* to the other party that describes the nature and basis for the claim *and includes all of the information required* in the arbitration notice.").  Further, the effort needed to comply with the filing requirements is no greater than the effort involved in filing a complaint in court, which both the *Hu* Plaintiffs and the *Ziboukh* Plaintiffs can clearly muster (as evidenced by the 525-paragraph Amended Complaint in *Hu* and the 396-paragraph Amended Complaint in *Ziboukh*).

**Batching Clause.** The *Ziboukh* Plaintiffs next challenge the batching clause in the Terms as substantively unconscionable, but, again, it is not. First, the batching provision is fair to both sides, because any ambiguities concerning how it will be administered are decided by either the AAA or a neutral arbitrator, not by any individual party. Terms § 19.9; *cf. McGrath v. DoorDash*, 2020 WL 6526129, at *10 (N.D. Cal. Nov. 5, 2020) (finding that mass arbitration protocol appeared fair because the "test cases are chosen randomly").[10]

Second, the *Ziboukh* Plaintiffs are wrong that the batching process "deprives consumers of [] 'individual' adjudication." Amicus Br. at 23. The AAA's rules make clear that, while the parties may agree to "assign multiple cases to a single arbitrator, making the scheduling of conferences and hearings more efficient," "[e]ach case will still be heard and decided individually by the arbitrator." ECF No. 46-7 at 3. Further, no batch has a precedential effect on any subsequent batch. Terms § 19.9.

Finally, the *Ziboukh* Plaintiffs vaguely allege that the arbitration provision "lack[s] other procedural safeguards," but they are wrong here as well. Amicus Br. at 23-24. The provision has several safeguards, including (i) the right to bring claims in small-claims court for any claims that qualify, *see* Terms § 19.1, (ii) the right to opt out of the agreement altogether within 30 days, *see id.* § 19.10, and (iii) the ability for AAA to adjudicate batches of arbitrations concurrently, rather than serially, so as to avoid unnecessary delays, *see id.* § 19.9; *cf. MacClelland*, 609 F. Supp. 3d at 1042 (finding that provision requiring serial adjudication of batches of arbitrations risked

---

[10] The *Ziboukh* Plaintiffs' claim that it is unconscionable for a claimant to potentially be required to litigate a claim outside the county they reside (Amicus Br. at 23) is bizarre—given that counsel for the *Ziboukh* Plaintiffs chose to bring a litigation on their clients' behalf in states (first in Illinois and then in New York) where most of their clients do not reside. The *Ziboukh* Plaintiffs do not and cannot explain why litigating outside their home states is unobjectionable in litigation but unconscionable in arbitration.

prejudicial delays, where "[i]n addition to the length of delay, the provision is pregnant with the risk that claims will be effectively barred when coupled with the statute of limitations.").

**Sanctions.** The *Ziboukh* Plaintiffs also complain that the provision in the Terms allowing arbitrators to impose attorneys' fees against a party bringing frivolous claims is non-mutual. Amicus Br. at 24. Here again, they mischaracterize the agreement. The provision on its face applies to *any* party that brings a frivolous claim against the other, and thus applies equally to Temu and consumers alike. Terms § 19.8 ("The *parties* shall bear their own attorneys' fees and costs in arbitration unless the arbitrator finds that either the substance of the Dispute or the relief sought in the Arbitration Notice was frivolous or was brought for an improper purpose. If *you or we* need to invoke the authority of a court of competent jurisdiction to compel arbitration, then the party that obtains an order compelling arbitration in such action shall have the right to collect from the other party its reasonable costs, necessary disbursements, and reasonable attorneys' fees incurred in securing an order compelling arbitration.").

**Public Injunctive Relief.** Finally, the *Ziboukh* Plaintiffs argue that the arbitration agreement "is unconscionable because it does not allow for an award of public injunctive relief." Amicus Br. at 24. The *Hu* Plaintiffs are not even seeking "public injunctive relief" and therefore cannot challenge this provision, nor can the *Ziboukh* Plaintiffs on their behalf. *See Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 542 (9th Cir. 2021) (holding that "public injunctive relief … is limited to forward-looking injunctions that seek to prevent future violations of law *for the benefit of the general public as a whole*, as opposed to a particular class of persons"—even including a large class of users of a consumer service). In any event, the agreement allows arbitrators to award individual injunctive relief, and makes clear that claims for public injunctive

relief may be severed and litigated in court.  *See* Terms § 19.4.  Accordingly, parties are not prevented from obtaining public injunctive relief.  *See id.*

## III.    DISCOVERY IS NEITHER REQUIRED NOR WARRANTED

There are no factual disputes requiring discovery because the motion to compel arbitration simply requires a review of the Prompt.  *See supra* at § I.  There is no dispute that the Prompt would have been viewed by the *Hu* Plaintiffs in registering for a Temu account, so therefore no additional factual information is needed to determine whether the parties formed an agreement to arbitrate.  Your Honor previously stayed discovery in this litigation pending resolution of the motion to compel—consistent with the Supreme Court's holding in *Coinbase v. Bielski* that "the asserted benefits of arbitration (efficiency, less expense, less intrusive discovery and the like) would be irretrievably lost" if discovery were not stayed pending ultimate resolution of a motion to compel arbitration.  599 U.S. 736, 743 (2023); *see* March 18, 2024 Order, ECF No. 20.  The Northern District of Illinois stayed discovery in the *Ziboukh* case for the same reason, before the case was transferred.  *See Ziboukh*, ECF No. 27.  There is no reason for any change of course in this regard—particularly when the *Hu* Plaintiffs themselves are not seeking discovery.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to compel should be granted.

Dated August 19, 2024                    Respectfully submitted,

                                        */s/ Serrin Turner*
                                        Serrin Turner
                                        Matthew Valenti
                                        Hadrian Luo
                                        LATHAM & WATKINS LLP
                                        1271 Avenue of the Americas
                                        New York, New York 10020
                                        Telephone:  (212) 906-1200
                                        Facsimile:  (212) 751-4864
                                        Email:  serrin.turner@lw.com
                                                matthew.valenti@lw.com
                                                hadrian.luo@lw.com


                                        *Attorneys for Defendant Whaleco Inc. d/b/a
                                        Temu*

# APPENDIX 1

| SquareTrade Email |
| :---: |
| *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 285 (2d Cir. 2019) |



# EXHIBIT 12

**Serrin Turner**
Direct Dial: (212) 906-1330
Serrin.Turner@lw.com

## LATHAM & WATKINS LLP

1271 Avenue of the Americas
New York, New York 10020-1401
Tel: +1.212.906.1200 Fax: +1.212.751.4864
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Silicon Valley |
| Hong Kong | Singapore |
| Houston | Tel Aviv |
| London | Tokyo |
| Los Angeles | Washington, D.C. |
| Madrid | |

August 23, 2024

**VIA EMAIL**
Dana Welch
Process Arbitrator
American Arbitration Association
dana@welchadr.com

Re:   *Individual Claimants v. Whaleco Inc.* – Case 01-24-0003-3726

Ms. Welch:

We represent the Respondent, Whaleco Inc. d/b/a Temu ("Temu"), and hereby submit Temu's letter brief pursuant to the Process Arbitrator's Scheduling Order Nos. 1 and 2.

As explained in more detail below, Claimants have not satisfied an express condition precedent to commencing arbitration. They are prohibited from commencing arbitration of *any dispute* until they do so. To the extent Claimants believe they are not required to comply with the condition precedent because it is unenforceable, any such argument is being raised as a defense to the dispute over whether they have complied—and that dispute, defenses and all, can only be resolved in court. Until that dispute is resolved in Claimants' favor, the AAA has no jurisdiction to entertain any dispute among the parties.

A.    **The AAA Has No Jurisdiction over This Dispute Because Claimants Have Failed to Satisfy a Condition Precedent to Commencing Arbitration**

A party "cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 314 (2010) (citation

LATHAM&WATKINS LLP

omitted).  Here, the Terms of Use ("Terms") to which the parties agreed state that the IDR[1]

requirement must be satisfied before any party submits an arbitration demand.  As the Terms state:

"Engaging in the Informal Dispute Resolution Conference *is a condition precedent* and

requirement that *must be fulfilled before commencing* arbitration."  Terms § 19.2 (emphasis

added).  The parties therefore agreed that no arbitration may be filed, and nothing is arbitrable,

unless and until the IDR precondition is satisfied.  Here, the vast majority of Claimants

undisputedly have not satisfied the IDR precondition, and Temu disputes whether the remaining

five Claimants in fact complied.  There is therefore nothing the Claimants can currently arbitrate

under the Terms.

New York courts[2] routinely recognize that non-compliance with a condition precedent bars

a party from commencing arbitration, and that in the face of such non-compliance, arbitration

cannot proceed unless and until that issue is first resolved in court.  *See, e.g.*, *Ambassador Const.*

*Co. v. 40 Wall St. Dev. Assoc., LLC*, 264 A.D.2d 317, 318 (1st Dep't 1999) ("[D]efendants' right

to arbitrate is barred by the failure to comply with a clearly applicable contractual condition

precedent.  The question of whether a condition precedent has been complied with is generally an

issue for the courts, particularly where the question of whether the condition precedent has been

satisfied can be determined prior to resolution of the substantive claims." (citation omitted));

*Lakeland Fire Dist. v. E. Area Gen. Contractors, Inc.*, 16 A.D.3d 417, 418 (2d Dep't 2005) ("There

is no proof that East Area … properly referred its claim to the architect [or] sought mediation at

any time; both of these steps were expressly defined as conditions precedent to arbitration. … The

---

[1] Capitalized terms not defined herein have the same meaning as in Scheduling Order No. 1.

[2] The Terms have a New York forum selection clause and choice of law provision.  *See* Terms §§ 18.3, 18.4.

LATHAM&WATKINS LLP

Supreme Court therefore was correct in concluding that the appellant failed to satisfy a condition precedent to arbitration, and in granting the petitioner's request for a permanent stay of the arbitration."); *Brenda DeLuca Tr. v. Elhannon*, 108 A.D.3d 902, 903–04 (3d Dep't 2013) ("Whether a condition precedent to arbitration has been satisfied is a determination to be made by the courts in the first instance. … Inasmuch as the parties' contract explicitly established that submission of a claim for decision by the architect was a condition precedent to arbitration and respondent failed to satisfy such condition, Supreme Court properly granted petitioner's application to stay arbitration.").[3]

In certain circumstances, disputes about procedural conditions in an arbitration agreement may be for the arbitrator to decide—but not in the circumstances here. New York courts distinguish conditions precedent to arbitration, which must be satisfied or resolved in court prior to arbitrating, and procedural conditions that may be resolved by the arbitrator, as follows:

> In distinguishing between conditions precedent to be passed upon by the court and procedural stipulations to be resolved by the arbitrators the guiding principle is:
>
> 'Whether the particular requirement falls within the jurisdiction of the courts or of the arbitrators, depends on * * * whether it is in

---

[3] *See also* Formal Dispute Resolution—Conditions Precedent to Arbitration, 33 N.Y.Prac., New York Construction Law Manual § 16:18 (2d ed.) ("Compliance with conditions precedent to arbitration is generally a question of law for the court to determine," and "failure to comply with an express condition precedent will bar the right to compel arbitration. … Conditions precedent are those requirements that are intended to be complied with before a party has a right to seek redress in arbitration … ."); *Niagara Frontier Transp. Auth. v. Computer Scis. Corp.*, 179 A.D.2d 1037, 1037 (4th Dep't 1992) ("[W]here the agreement expressly states that compliance with the contractual notice provision is a condition precedent to arbitration, the question of compliance is for the court to decide."); *Allied Constr. Corp. v. Parsons Transportation Grp. of New York, Inc.*, 160 N.Y.S.3d 856 (N.Y. Sup. Ct. 2022) ("Having engaged in (unsuccessful) mediation is thus a precondition to commencing an arbitral proceeding. Plaintiff does not, however, represent (either in the complaint or the papers supporting the motion to compel) that the parties previously engaged in mediation. Failure to establish that this precondition has been satisfied forecloses plaintiff's request on this motion to compel arbitration.").

LATHAM&WATKINS LLP

> essence [a] prerequisite to enter into the arbitration process [disputes over which must be resolved in court] or a procedural prescription for the management of that process [which may be resolved in arbitration].'

*New York Plaza Bldg. Co. v. Oppenheim, Appel, Dixon & Co.*, 103 A.D.2d 203, 207 (1st Dep't 1984) (citing *Rockland Cnty. v. Primiano Const. Co.*, 51 N.Y.2d 1, 9 (1980)); *see also Matter of Spencer-Van Etten Cent. Sch. Dist. (A. Roy Auchinachie & Sons, Inc.)*, 578 N.Y.S.2d 278, 279 (3d Dep't 1992) ("Whether a particular requirement in a valid contract providing arbitration is a condition precedent to arbitration or a condition in arbitration 'depends on its substance and the function it is properly perceived as playing—whether it is in essence a prerequisite to entry into the arbitration process or a procedural prescription for the management of that process.'") (citation omitted).

      Here, it is clear that the IDR requirement is "in essence a prerequisite to enter into the arbitration process." *New York Plaza*, 103 A.D.2d at 207. The Terms expressly say it is a "condition precedent" that "must be fulfilled *before commencing* arbitration," *see* Terms § 19.2—language that flatly precludes Claimants from arbitrating with Temu until they comply or successfully litigate that issue in court. Indeed, that legal principle—already found in the applicable case law—is incorporated directly into the Terms, which specifically state that "all Disputes about whether either party has satisfied any condition precedent to arbitration shall be decided only by a court of competent jurisdiction and not by an arbitrator." *Id.* § 19.7.[4]

---

[4] That compliance with the IDR process is a prerequisite to enter arbitration is further underscored by Section 19.5 of the Terms, which requires that any arbitration demand against Temu include "a statement certifying completion of the informal dispute resolution process as described above." With the exception of the five individuals, Claimants have failed to provide any such certification, making it even clearer that they have no right to proceed in arbitration. *See* AAA Mass Arbitration Supplementary Rules, MA-6 ("The Process Arbitrator shall have the authority to determine … [w]hether the parties have met … the filing requirements in the parties' contract.").

LATHAM&WATKINS LLP

Accordingly, under the plain language of the Terms and New York case law, Claimants are barred from litigating any dispute with Temu through the AAA, because they have not satisfied the IDR requirement or, at the least, Temu disputes their compliance with it. Any distinction between enforceability versus compliance with the IDR requirement (addressed below) need not even be reached by the Process Arbitrator—because either way, the AAA cannot resolve that dispute, or any other, at present.

**B.     Claimants Cannot Manufacture AAA Jurisdiction by Casting This as a Dispute About the Enforceability of the Arbitration Agreement**

Claimants respond that they are excused from complying with the IDR requirement because it is unenforceable, and that AAA Merits Arbitrators should resolve this question. Claimants' sole support for this argument is that the Terms contain a standard delegation clause providing that the arbitrator has "authority to resolve any Dispute [regarding] enforceability … of the Arbitration Agreement or any portion of [it]." Terms § 19.7. Claimants' position should be rejected for several reasons.

First and foremost, Claimants' argument rests on the invalid premise that this matter is properly before the AAA in the first place. It is not, for the reasons described above. The AAA has no authority to resolve a dispute about enforceability—or anything else—when a condition precedent to commencing arbitration remains unfulfilled.

Even putting aside that basic jurisdictional barrier, Claimants ignore the carveout to the delegation clause requiring any dispute about the satisfaction of a condition precedent to arbitration to be resolved in court. Claimants cannot circumvent this carveout by portraying this dispute as being about the enforceability, rather than satisfaction, of the IDR condition precedent. For one thing, whether each party has participated in the IDR process in good faith is a core part of the

parties' present dispute.  As detailed in Temu's prior submissions to the AAA, Claimants scheduled more than 9,600 IDR conferences without raising any specific objection that the requirement was unenforceable.  *See* Temu's April 26, 2024 Letter to the AAA at 2.  And all the arguments Claimants previously raised relating to this dispute have been about whether Temu has participated or will participate in the IDR process in good faith, as opposed to whether the IDR provision is enforceable on its face.  *See* Claimants' March 26, 2024 Letter to Temu at 3 (provided as Attachment C to Temu's April 26, 2024 Letter to the AAA) ("In conclusion, the claimants complied in good faith with the informal dispute resolution process as outlined within Temu's Terms and Conditions," but "Temu failed to act in good faith under the very Terms that Temu itself drafted.").

In any event, the dichotomy Claimants seek to draw—between a dispute over whether the IDR provision has been satisfied versus a dispute over whether it is enforceable—is a false one. To whatever extent Claimants now seek to challenge the enforceability of the IDR provision, they are doing so *as a defense* to the broader dispute over whether they satisfied their IDR obligations: specifically, they are claiming that they are excused from satisfying the IDR provision because it is unenforceable.  This broader dispute is encompassed *as a whole* by the carveout in the delegation clause, which covers "*all* Disputes about whether either party has satisfied any condition precedent to arbitration."  Terms § 19.7 (emphasis added).  The parties' Joint Statement filed with the Process Arbitrator itself acknowledges that any dispute about enforceability is bound up with the parties' underlying dispute about compliance.  *See* Joint Statement at 1 ("The parties dispute whether Claimants *need to satisfy, or have already satisfied*, the informal dispute resolution conference [] provision in Temu's Terms of Use, as a precondition to filing their arbitration demands with the AAA.") (emphasis added).

**LATHAM & WATKINS LLP**

Courts regularly entertain challenges to the enforceability of a contractual provision as a defense to alleged non-compliance with the provision. *See, e.g.*, *Ng v. HSBC Mortg. Corp.*, 2011 WL 3511296, at *8 (E.D.N.Y. Aug. 10, 2011) ("Under New York law, unconscionability is an affirmative defense to the enforcement of a contract."); *Wells Fargo Bank, N.A. v. Bivona & Cohen, P.C.*, 2015 WL 5752595, at *7 (S.D.N.Y. Sept. 30, 2015) (evaluating unconscionability as an affirmative defense to enforcement). Here, given that the carveout to the delegation clause specifically provides that disputes over non-compliance with a condition precedent (such as the IDR requirement) must be heard in court, any defenses that are part of such a dispute—including any challenges to the enforceability of the condition precedent that Claimants seek to raise here—can and should be heard in court as well. There is no basis in law or logic to somehow bifurcate the parties' dispute such that the main dispute over compliance is heard in court while the Claimants' defense to the dispute is resolved in arbitration.

Especially in the circumstances here—where Claimants seek for the issue of enforceability to be resolved by various Merits Arbitrators in hundreds of batch arbitrations—such bifurcation would fundamentally deprive Temu of the benefit that the IDR prerequisite was meant to provide. The clear intent of Sections 19.2 and 19.7 of the Terms is that parties should not be required to bear the costs and burdens of arbitration until they have first tried to resolve their disagreement through the IDR process. Yet Claimants are essentially seeking to force Temu to submit to a mass arbitration over the enforceability of the IDR provision with respect to more than 20,000 Claimants, requiring approximately 200 batch arbitrations—and to bear all the attendant costs and burdens that these proceedings entail—while conceding they have not satisfied (or at least conceding there is a dispute regarding their satisfaction of) an express condition to commencing arbitration in the first place. That would negate the entire purpose of the condition precedent.

**LATHAM&WATKINS**LLP

Interpreting the Terms to allow for such an outcome would be incompatible with the parties' intent, as well as common sense. *See Harmony Rockaway, LLC v. Gelwan*, 200 A.D.3d 863 (2d Dep't 2021) ("A court's fundamental objective in interpreting a contract is to determine the parties' intent from the language employed and to fulfill their reasonable expectations.").

### C.    Kind Law Imposes IDR Requirements on Its Own Clients, to Which Claimants Agreed—Making This Entire Dispute a Farce

Finally, it bears mention that this whole attempt by Kind Law to gin up a dispute over the enforceability of the IDR requirement is disingenuous—and transparently so. As it happens, Kind Law includes an arbitration agreement in its client agreements—including its agreements with Claimants here—that contains IDR requirements similar to (or, if anything, more onerous than) Temu's IDR requirement. Attached as Appendix A to this letter is a publicly available copy of the engagement letter that Kind Law entered into with one of the Claimants, Sandra Lucas (Claimant 12,645), in connection with representing her against Temu.[5] The engagement letter provides the following in connection with the resolution of any disputes that arise between the Claimant and Kind Law:

> 11. Dispute Resolution; Confidentiality *** If you and the attorneys have any other dispute about this contract or our services, or if you determine not to utilize the Fee Dispute Resolution described above, ***we will first try to settle it through direct discussions***. You agree to give us 30 days' notice of any dispute by sending a letter or email to mk@kindlaw.com. ***If you and the attorneys cannot resolve the dispute through direct discussions, both parties agree to first try to settle the dispute by mediation*** administered by the American Arbitration Association under its Consumer Mediation Procedures. ***If the parties cannot resolve the dispute then, any disagreements***

---

[5] The engagement letter was located at https://www.scribd.com/document/714663668/2-Temu-Retainer-Agreement (last visited August 16, 2024). It appears to be a form letter that Kind Law presumably used for all the Claimants it solicited to file demands against Temu.

LATHAM & WATKINS LLP

> ***will be settled by arbitration*** administered by the American
> Arbitration Association … .

*See* Appendix A at § 11 (emphasis added).  Not only does this provision require—like Temu's arbitration agreement—that the parties seek to resolve any dispute through informal, direct discussions before resorting to arbitration, it goes beyond that: If such discussions fail, the parties are further required to engage in mediation with the AAA before arbitration can commenced.  In other words, Kind Law's clients agree to engage in *two layers* of informal dispute resolution before filing an arbitration demand against Kind Law.

Kind Law thus purports to challenge, on behalf of Claimants, Temu's IDR provision as unconscionable on its face, when Kind Law itself has imposed on Claimants an IDR provision that includes requirements that are more extensive than Temu's.  Kind Law's position is thus hard to take seriously.  It cannot in good faith challenge a provision as unconscionable when it has endorsed (and gone beyond) that provision in its own client agreements.  To the extent Kind Law is challenging the *manner* in which Temu has carried out or allegedly will carry out IDR conferences, then, even under the false dichotomy Kind Law has sought to draw between compliance and enforceability, that dispute falls squarely within the carveout to the delegation provision and must be resolved in court.

Sincerely,

of LATHAM & WATKINS LLP

cc:    Krista Peach
       Michael Kind

# EXHIBIT 13

## LATHAM & WATKINS LLP

1271 Avenue of the Americas
New York, New York  10020-1401
Tel: +1.212.906.1200  Fax: +1.212.751.4864
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Silicon Valley |
| Hong Kong | Singapore |
| Houston | Tel Aviv |
| London | Tokyo |
| Los Angeles | Washington, D.C. |
| Madrid | |

September 5, 2024

**VIA EMAIL**
Dana Welch
Process Arbitrator
American Arbitration Association
dana@welchadr.com

> Re:   *Individual Claimants v. Whaleco Inc.* **– Case 01-24-0003-3726**

Ms. Welch:

We write on behalf of Temu pursuant to your August 26, 2024 request for supplemental briefing on the following question:

> *In Hu v. Whaleco, Temu argued that issues of enforceability of the arbitration agreement or any part thereof are delegated by the arbitration agreement to the arbitrator, and can only be decided by the arbitrator.  In this matter, Temu argues that the issue of enforceability of a part of the arbitration agreement - i.e. - the condition precedent clause - must be decided by the court as a defense to the issue of whether the condition precedent has been met. How do you distinguish these two cases?*

As detailed below, Temu's position in the *Hu* case and its position here are fully consistent: Issues of enforceability of the arbitration agreement are generally delegated to the AAA, *except* to the extent they are part of disputes relating to satisfaction of a condition precedent, in which case they must be resolved in court.  The *Hu* case does not involve any dispute relating to satisfaction of a condition precedent; so it belongs in arbitration.  The instant dispute does relate to satisfaction of a condition precedent; so it belongs in court.  The fact that Claimants are seeking to *defend* their non-compliance with the IDR requirement by challenging its enforceability does not make this any

September 5, 2024
Page 2

LATHAM&WATKINS LLP

less of a dispute about their failure to comply.  Indeed, any reading of the delegation clause that would allow a dispute concerning the enforceability of the IDR requirement to be arbitrated even though the IDR requirement itself has not been satisfied would conflict with the filing requirements in the arbitration agreement, which require a party to certify compliance with the IDR requirement in order to initiate arbitration in the first place.  *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.'") (citation omitted).

For these reasons, as well as those stated in Temu's initial brief, the AAA lacks jurisdiction over the instant dispute.  However, if for any reason it is found that the AAA does have jurisdiction over Claimants' attempt to challenge the enforceability of the IDR requirement, then that issue should be decided by the Process Arbitrator rather than Merits Arbitrators.  The AAA Mass Arbitration Supplementary Rules specifically provide that it is the Process Arbitrator who has the authority to resolve "[d]isputes over any applicable conditions precedent"—which this indisputably is.  Therefore, if the instant dispute belongs before the AAA at all, it belongs before the Process Arbitrator.  The only reason Claimants seek for the issue to be referred to hundreds of Merits Arbitrators is to drive up arbitration fees in order to generate artificial settlement leverage— whereas the very reason for the appointment of a Process Arbitrator is to avoid such inefficiencies.

A.    **Disputes over Compliance with the IDR Condition Precedent Are Excepted from the Delegation Provision, as Temu Has Consistently Stated**

Claimants suggest that Temu has contradicted itself by arguing in litigation that disputes over the enforceability of the arbitration agreement are for the AAA to decide, while claiming that the dispute here is for the court to decide.  Claimants' Brief at 6.  There is no contradiction.  Temu's

**LATHAM&WATKINS**LLP

position regarding the delegation provision is the same here as in the *Hu* case—and, in both matters, simply tracks the language in the arbitration agreement.

By way of background, there are two related putative class actions against Temu pending in the Eastern District of New York—*Ziboukh v. Whaleco et al.* (No. 24-cv-03733) and *Hu v. Whaleco* (23-cv-06962). The plaintiffs in both cases purport to be Temu customers but deny they formed a valid arbitration agreement with Temu. They are not trying to avail themselves of arbitration without going through the IDR process first—they are seeking to avoid arbitration altogether. Thus, in the *Hu* case, the application of Section 19.7's carveout was not triggered. The named plaintiffs in the *Ziboukh* case filed an amicus brief opposing Temu's motion to compel arbitration in the *Hu* case, in which they argued, among other things, that the arbitration agreement cannot be enforced at all because various provisions of Temu's arbitration agreement are supposedly unenforceable on their face  *See* 23-cv-06962, ECF No. 45.

The document attached as Exhibit D to Claimants' Brief is Temu's response to the *Ziboukh* plaintiffs' amicus brief. In explaining the arbitration agreement's delegation clause in the brief, Temu wrote the following, which was selectively quoted by Claimants:

> The delegation clause in Temu's arbitration agreement provides that '[t]he arbitrator shall have exclusive authority to resolve any Dispute, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement … .' Terms § 19.7. This broad delegation provision ***is subject only to limited exceptions not applicable here***. Accordingly, any challenges to the arbitration agreement's specific provisions as vague, unconscionable, or unenforceable—like those the Ziboukh Plaintiffs attempt to raise—must instead be made in arbitration.

LATHAM&WATKINS LLP

Claimants' Brief, Ex. D at 9 (emphasis added).  Thus, while Claimants fail to mention it, Temu made clear in the *Hu* case that the delegation provision *is subject to exceptions*.  Those exceptions include "all Disputes about whether either party has satisfied any condition precedent to arbitration."  Terms § 19.7.  This is one of the limited circumstances in which that exception applies.

The *Hu* case does not concern any dispute over whether the plaintiffs there have satisfied a condition precedent to arbitration—but that is the nub of the dispute here.  Claimants seek to proceed with arbitration, but Temu disputes their right to do so because they have not complied with the IDR process, which is an express precondition to arbitration under the agreement.  Claimants' argument that they are excused from complying with the IDR precondition because it is supposedly unconscionable is a *defense* they seek to raise *in that dispute*.  Indeed, there is no standalone claim that Claimants could bring based on "unconscionability"; it is *only* a defense that can be raised to dispute non-compliance with a contract.  *See, e.g.*, *Costoso v. Bank of Am.*, 74 F. Supp. 3d 558, 573 (E.D.N.Y. 2015) (rejecting "Plaintiff's attempt to convert the doctrine of unconscionability into an affirmative claim for relief"); *Ng v. HSBC Mortg. Corp.*, 2011 WL 3511296, at *8 (E.D.N.Y. Aug. 10, 2011) ("Under New York law, unconscionability is an affirmative defense to the enforcement of a contract. ... A cause of action for unconscionability may not be used to seek affirmative relief."); *see also Zam & Zam Super Mkt., LLC v. Ignite Payments, LLC*, 2017 WL 6729854, at *21 (E.D.N.Y. Oct. 31, 2017), *aff'd*, 736 F. App'x 274 (2d Cir. 2018) ("[U]nder New York law, unconscionability is an affirmative defense to the enforcement of a contract.") (cleaned up).

Because the underlying dispute between the parties here concerns the Claimants' non-compliance with the IDR requirement, it belongs in court, not before the AAA.  For that reason, if

LATHAM&WATKINS LLP

the dispute is brought to a court and Claimants make their unconscionability arguments there, Temu will litigate that issue in court and *will not* argue that it must be decided by an arbitrator—precisely because the issue is being raised as a defense to non-compliance, and the arbitration agreement carves out disputes about non-compliance from the delegation clause. Had that been what was in dispute in *Hu*—*i.e.*, had the plaintiffs there been seeking to *compel* arbitration (rather than avoid it), without going through the IDR process first—Temu would have taken the same position in that matter; but that was not what was in dispute. Accordingly, there is no difference in Temu's legal position across the two matters, but rather a difference in the nature of the disputes they involved.

Claimants not only ignore the significance of the exceptions to the delegation clause in quoting from Temu's brief in the *Hu* case, they do the same in their citations to case law. Claimants cite several cases for the proposition that "[c]ourts presume that the parties intend arbitrators 'to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration.'" Claimants' Brief at 7-8 (citation omitted). However, Claimants fail to mention that these cases state that the parties' agreement trumps any such rule. For example, Claimants cite *BG Group., PLC v. Republic of Argentina*, but the Supreme Court held there only that arbitrators may decide "procedural preconditions" where the "*contract is silent on the matter* of who is to decide a 'threshold' question about arbitration." 572 U.S. 25, 34 (2014) (emphasis added). Claimants' other cases contain similar language and make clear that the parties' agreement controls.[1] Here, of course, the Terms are not silent, as they provide that all disputes about

---

[1] *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 85 (2002) (stating that "in the absence of an agreement to the contrary … issues of procedural arbitrability … are for the arbitrators to decide"); *King v. Stage 29 Prods., LLC*, 2020 WL 3577925, at *4 (S.D.N.Y. July 1, 2020)

LATHAM&WATKINS LLP

compliance with conditions precedent must be resolved in court.  *See* Terms § 19.7; *see also Leed Architectural Prod., Inc. v. United Steelworkers of Am., Loc*., 6674, 916 F.2d 63, 65 (2d Cir. 1990) ("An arbitrator's authority to settle disputes … is contractual in nature, and is limited to the powers that the agreement confers.").

    **B.**    **Interpreting the Carveout as Claimants Suggest Would Conflict with the Arbitration Agreement's Filing Requirements**

    The IDR-related filing requirement in the Terms would be meaningless if Claimants could arbitrate the enforceability of the IDR precondition.  The Terms specifically provide that, in order to initiate an arbitration, a claimant must submit an arbitration demand to Temu that includes, among other things, "a statement certifying completion of the informal dispute resolution process."  Terms § 19.5.  Claimants do not dispute that, with the exception of five Claimants, no other Claimant has satisfied this filing requirement.  Claimants' Brief at 10; *see also* Temu's April 12, 2024 Letter to the AAA at 2.

    This underscores that Claimants' dispute about the IDR process belongs in court.  Allowing Claimants to arbitrate *anything* without first complying with the IDR process would conflict with the requirement that they must certify compliance with the IDR process before initiating arbitration.  Claimants' position on the delegation provision would render that filing requirement a nullity.  Temu's position, by contrast, reads the two provisions in harmony: a Claimant cannot file an arbitration demand unless they first certify they have complied with the IDR requirement; and if there are any disputes over compliance with the requirement (including whether they are excused from complying for some reason), they can and must litigate that issue in court instead.

---

("[T]hreshold questions of arbitrability are a matter of contract."); *Morelli v. Alters*, 2020 WL 1285513, at *10 (S.D.N.Y. Mar. 18, 2020) (stating that "in the absence of an agreement to the contrary … issues of procedural arbitrability … are for the arbitrators to decide").

**LATHAM&WATKINS** LLP

*See La Barbera v. Elite Ready Mix Corp.*, 2009 WL 2707358, at \*4 (E.D.N.Y. Aug. 27, 2009) (explaining that a contract must be evaluated in its entirety to avoid adopting an interpretation that would result in inconsistency between provisions or making a provision superfluous).

Indeed, the IDR-related filing requirement is an independent basis on which the Process Arbitrator can resolve this matter. Under the AAA rules, the Process Arbitrator has the authority to decide "[w]hether the parties have met … the filing requirements in the parties' contract." *See* AAA Mass Arbitration Supplementary Rules, MA-6(c)(i). Here, Claimants undisputedly have not done so. Accordingly, as Temu has previously noted, regardless of whether disputes over the enforceability of the IDR precondition are delegated to an arbitrator under the arbitration agreement, the Process Arbitrator should find that the filing requirements have not been met any event and therefore the matter cannot proceed further. *See* Temu Letter Brief at 4 n.4.

> **C.** **If the Process Arbitrator Nonetheless Finds That the AAA Has Jurisdiction to Resolve the Enforceability of the IDR Precondition, That Issue Can and Should Be Resolved by the Process Arbitrator Rather Than Hundreds of Merits Arbitrators**

For all the reasons stated, the Claimants' attempt to manufacture AAA jurisdiction here, by characterizing the dispute as being merely about the enforceability of the IDR requirement as opposed to compliance with it, should be rejected. However, even if Claimants' argument is accepted, that does not mean that the issue of the enforceability of the IDR requirement should be referred to hundreds of Merits Arbitrators to decide. Under the AAA's rules, the issue is for the Process Arbitrator to decide.

Claimants are simply wrong to assert that the AAA's rules require Merits Arbitrators to resolve any challenge to the enforceability of the IDR requirement. Claimants' Brief at 3 ("As an initial matter, only the merits arbitrator has authority to decide issues of enforceability."). None

LATHAM&WATKINS<sup>LLP</sup>

of the authority Claimants cite supports this point. *Id.* at 3-4. Claimants cite Commercial Rule R-7, but the Commercial Rules do not even generally apply to this consumer dispute, let alone specifically address the respective roles of process and merits arbitrators in a consumer mass arbitration. To the contrary, the AAA Mass Arbitration Supplementary Rules are the relevant AAA rules here, and they specifically assign the Process Arbitrator the authority to resolve "[d]isputes over any applicable conditions precedent." MA-6(c)(ii).[2] This provision is not limited to any particular *types* of disputes concerning conditions precedent—and it certainly does not draw any purported distinction between disputes about compliance versus disputes about enforceability. Rather, the provision encompasses *any* dispute "over" an applicable condition precedent, which readily describes the parties' dispute here. *See, e.g.*, Joint Statement at 1 ("The parties dispute whether Claimants need to satisfy, or have already satisfied, the informal dispute resolution conference [] provision in Temu's Terms of Use, as a precondition to filing their arbitration demands with the AAA.").

Accordingly, as Temu has previously noted, *see* Temu Ltr. To AAA dated Apr. 26, 2024, at 3 n.5, even if it were determined that the AAA has jurisdiction to resolve the enforceability of the IDR requirement, that issue can and should be decided by the Process Arbitrator. Requiring separate Merits Arbitrators for more than 200 batches of Claimants to resolve the issue would be profoundly inefficient and contrary to the intent of the IDR requirement itself, which serves to protect parties from the burdens of arbitration unless they first attempt a more informal resolution. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) ("The point of affording parties

---

[2] The same rules also give the Process Authority to resolve "[a]ny [] non-merits issues affecting case administration arising out of the nature of the mass arbitration that the Process Arbitrator determines is appropriate for determination." MA-6(c)(xi).

discretion in designing arbitration processes is to allow for efficient, streamlined procedures tailored to the type of dispute.").  Likewise, referring the issue to hundreds of Merits Arbitrators would undercut the purpose of the Mass Arbitration Supplementary Rules—"which are intended to provide parties and their representatives with an efficient and economical path toward the resolution of multiple individual disputes."  MA-Introduction.

* * *

In conclusion, Temu requests that the Process Arbitrator enforce the Terms as they are written and as the parties intended, and find that this dispute—which is fundamentally about Claimants' failure to comply with a condition precedent to the arbitration process—must be resolved in court.  Alternatively, if the Process Arbitrator concludes that the dispute belongs before the AAA on the basis that it concerns the enforceability of the IDR requirement, Temu requests that the Process Arbitrator decide the issue (after further briefing), rather than needlessly referring the issue to be decided by hundreds of Merits Arbitrators.

Sincerely,

_____

of LATHAM & WATKINS LLP

cc:    Krista Peach
       Michael Kind

# EXHIBIT 14



8860 South Maryland Parkway, Suite 106
Las Vegas, Nevada 89123
P: (702) 337-2322 | T: (844) 399-KIND (5463)
https://kindlaw.com

September 12, 2024

**Sent by email**
Process Arbitrator Dana Welch
American Arbitration Association
dana@welchadr.com

Krista Peach
American Arbitration Association Assistant Vice President
kristapeach@adr.org

Re:    **Individual Claimants v. Whaleco, Inc. (Temu)**
         **Case No. 01-24-0003-3726**

Dear Process Arbitrator Welch:

The individual claimants in the above-referenced matter submit this letter brief in response to Temu's supplemental brief dated September 4, 2024.

I.    <u>**Introduction.**</u>

The current question in this case is whether the conference requirement is enforceable or not. The language of the Terms and the applicable caselaw overwhelmingly supports that this is a gateway question for the arbitrator.

Temu argues that it is a question for the court. But when the same question was presented *in court* by other consumers in the *Hu* case, Temu argued that it is a question for the arbitrator. Shockingly, in its supplemental brief, Temu admits that it will adopt a stance opposing whatever position the consumer takes. Temu's Suppl. Br., p. 5 ("[H]ad the plaintiffs there been seeking to *compel* arbitration (rather than avoid it), without going through the IDR process first—Temu would have taken the same position in that matter."). Temu cannot have its cake and eat it too.

Temu is playing games, and it is time for that to end. Despite Temu's aggressive efforts to block Claimants from presenting their valid claims, Claimants have successfully advanced their claims up to this point. The Process Arbitrator should now allow these claims to proceed to the

merits arbitrators and not send these claims back to court (only to later be returned back to the AAA once again).

Importantly, issues of arbitrability and unconscionability are core merits issues that must be determined by a merits arbitrator and go beyond the scope of a process arbitrator's jurisdiction. *E.g.*, *Pandolfi v. Aviagames, Inc.*, 2024 U.S. Dist. Lexis 159007, 2024 WL 4051754 (N.D. Cal., Sep. 4, 2024) ("The issue of arbitrability is a core merits determination and is hardly a ministerial decision that one would expect the Process Arbitrator to decide"). The Process Arbitrator should allow these matters to proceed to merits arbitrators to resolve the parties' disputes.

**I.    The underlying dispute here—the unenforceability of the conference requirement— is, like Temu admits in *Hu*, a gateway question for the arbitrator, and not the court**

*Hu* and this case are identical in every relevant aspect. Except that here Temu argues that the court should decide whether the conferences are enforceable. But in *Hu*, Temu argued that the arbitrator should decide that issue.

In both *Hu* and this case, the claimants argue that Temu's conference requirements are unconscionable. In *Hu*, the claimant argued that the conference requirement was unconscionable because it was not mutual and because it was designed to function as a bottleneck for consumers to resolve their claims. *Hu v. Whaleco Inc*., Ziboukh Pl.'s Amicus Br., No. 1:23-cv-06962-MKB-RML, ECF No. 45, p. 27 (E.D.N.Y. filed 7/5/24), Ex. C ("As a result, Defendants seek to compel thousands of individual conferences before arbitration can proceed. Such provisions "can operate to effectively thwart arbitration and vindication of rights altogether."). In reply, Temu argued that "disputes about the enforceability of any part of the agreement are delegated exclusively to the arbitrator" and "[a]ccordingly, any challenges to the arbitration agreement's specific provisions as vague, unconscionable, or unenforceable … must instead be made in arbitration." *Id.* at ECF No. 50, pp. 13-14 (filed 8/19/24), Ex. D.

Here too, as discussed in Claimants' brief, the present question is whether the conference requirement is enforceable. The question should be presented to the arbitrator, just like Temu argued in *Hu*.

Temu is wrong to rely on *Costoso v. Bank of Am.*, 74 F. Supp. 3d 558, 573 (E.D.N.Y. 2015), and similar cases, to support the argument that Claimants cannot raise an affirmative claim of unconscionability. Claimants are not seeking to bring a new claim of unconscionability. Instead, Claimants have identified a "Dispute" regarding the "interpretation," "application," "enforceability," and "validity" of the Arbitration Agreement, that is plainly delegated to the arbitrator under Section 19.7. Terms, § 19.7; *see*, *e.g.*, *Brkic v. Dumbo Moving & Storage, Inc.*, 2023 U.S. Dist. LEXIS 3810, 2023 WL 128801, at *12-13 (S.D.N.Y. Jan. 9, 2023) (involving a similar delegation provision; "gateway" issues, including disputes over the validity or enforceability of an arbitration agreement are for the arbitrator).

The underlying dispute here, like in *Hu*, is the unenforceability of the conference requirement. That issue—the current question in this case—is for the arbitrator and not the court.

## II.    The merits arbitrator, and not the Process Arbitrator, should determine questions of arbitrability

Issues of arbitrability and unconscionability are core merits issues that must be determined by a merits arbitrator; they are not administrative or ministerial in nature and go beyond the scope of a process arbitrator's jurisdiction. "The issue of arbitrability is a core merits determination and is hardly a ministerial decision that one would expect the Process Arbitrator to decide." *See generally Pandolfi v. Aviagames, Inc.*, 2024 U.S. Dist. Lexis 159007, 2024 WL 4051754 (N.D. Cal., Sep. 4, 2024) (discussing the AAA's Mass Arbitration Rule MA-6 and discussed the scope of the process arbitrator's jurisdiction); MA-6(d) ("Only administrative issues may be submitted to the Process Arbitrator for determination. Administrative issues include. . . ."). Here, the parties' dispute involves questions of arbitrability and unconscionability, which require core merits determinations. Temu fails to cite any support showing otherwise. There can be no dispute that these issues are for a merits arbitrator.

Moreover, many claimants' due process rights may be violated if the Process Arbitrator had the power to adjudicate gateway issues of arbitrability. *Pandolfi v. Aviagames, Inc.*, 2024 U.S. Dist. Lexis 159007, 2024 WL 4051754 (N.D. Cal., Sep. 4, 2024) (if "the Process Arbitrator has

the power to adjudicate gateway issues of arbitrability, then there would be serious due process concerns. . . . That would mean consumers in later-filed arbitrations would be bound by the first decision on arbitrability—a key and highly consequential decision—without ever being given notice or an opportunity to be heard on the matter"); MA-6(k) ("Rulings by the Process Arbitrator will be final and binding upon the parties and Merits Arbitrator(s) with respect to *subsequently filed cases* that the AAA determines to be part of the same Multiple Case Filing.") (emphasis added). Here, the parties' dispute over arbitrability and enforceability issues must be determined by merits arbitrators, with claimants each being afforded due process and the opportunity to be heard.

Therefore, the underlying dispute—whether the conference requirement is enforceable—is not for the Process Arbitrator. It is a question for the merits arbitrator.

## III.   <u>Conclusion.</u>

Claimants' claims are properly pending before the AAA. Under Temu's Terms, AAA's Rules, the FAA, federal court decisions interpreting and applying the FAA, and New York State law, only a merits arbitrator has jurisdiction to decide the matter of procedural arbitrability regarding the enforceability of section 19.2. The Process Arbitrator should allow these matters to proceed to merits arbitrators to resolve the parties' disputes.


Respectfully submitted,

<u>/s/ Michael Kind</u>
Michael Kind, Esq.

# EXHIBIT 15

AMERICAN ARBITRATION ASSOCIATION
CONSUMER ARBITRATION TRIBUNAL

**Individual Claimants v. Whaleco, Inc.**
**Case No. 01-24-0003-3726**

PROCESS ARBITRATOR'S ORDER

## I.        INTRODUCTION

Pursuant to Scheduling Order # 1, the parties submitted briefs addressing the following issues:

1. Whether the issue of enforceability of § 19.2 of Temu's Terms of Use (TOU)  is a defense to the question of whether the Individual Claimants have satisfied the Informal Dispute Resolution ("IDR") precondition to arbitration, in which case a Court shall consider the issue; or whether the issue of enforceability of § 19.2 of Temu's TOU must be decided prior to any determination of whether the IDR precondition has been met, in which case, a merits arbitrator must decide the issue of enforceability.

2. Whether the Individual Claimants have met American Arbitration Association's ("AAA") filing requirements so that Respondent must pay its portion of the applicable initiation fee.

## II.        THE ARBITRATION AGREEMENT

The parties' arbitration agreement is included in the Temu | Terms of Use, last updated December 19, 2023.  It provides, in pertinent part:

> **18.3  Choice of Law.**  These Terms and any dispute of any sort that might arise between you and us hereunder will be governed by the laws of the state of New York  . . . without regard to any principle of conflict-of-laws.

19.2  **Informal Dispute Resolution.** . . . You and we agree that good faith informal efforts to resolve Disputes can result in a prompt, low cost and mutually beneficial outcome.  You and we therefore agree that before either party commences arbitration against the other (or initiates an action in small claims court if a party so elects), we will personally meet and confer telephonically or via teleconference, in a good faith effort to resolve any Dispute covered by this Arbitration Agreement ("Informal Dispute Resolution Conference"). . . . Engaging in the Informal Dispute Resolution Conference is a condition precedent and requirement that must be fulfilled before commencing arbitration.

19.4  **Waiver of Class and Other Non-Individualized Relief.** . . . .the Federal Arbitration Act, 9 U.S.C. § 1 et seq., will govern the interpretation and enforcement of this Arbitration Agreement and any arbitration proceedings.

19.7.  **Authority of Arbitrator.**  The arbitrator shall have exclusive authority to resolve any Dispute, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement, except for the following: . . . . (3) all Disputes about whether either party has satisfied any condition precedent to arbitration shall be decided only by a court of competent jurisdiction and not by an arbitrator . . . .

## III.    STATEMENT OF PERTINENT FACTS

Five Individual Claimants engaged in the Individual Dispute Resolution ("IDR") process. Temu alleges that these five Individual Claimants did not satisfy the IDR precondition because they were unwilling to provide any substantive information about their dispute with Temu.  The Individual Claimants allege that "Temu treated the informal dispute conferences as an opportunity to depose Claimants, and not as an opportunity to resolve the claims."  *Letter from Kind Law to the AAA,* dated April 19, 2024 at 2.  Each party alleges that the other party failed to engage in the IDR process in good faith.

The remaining 20,484 Individual Claimants did not engage in any IDR conference.

## IV.     THE PARTIES' CONTENTIONS

Claimants contend that only a merits arbitrator can decide whether § 19.2 of the arbitration agreement is enforceable or not unenforceable because it is unconscionable, and that this determination must be made prior to any submission to a court for an assessment of whether either party has met the condition precedent of engaging in the IDR process in good faith. Claimants further argue that Temu's failure to engage in the IDR process in good faith constituted a waiver of the condition precedent, and therefore must be ruled on by a merits arbitrator. Claimants contend that they have met the filing requirements for the American Arbitration Association.

Temu argues that only a court can determine whether either party has met the condition precedent of the IDR conferences, and that the argument that § 19.2 is not enforceable because it is unconscionable is a defense to that issue and therefore must be heard by a court, not an arbitrator.

These issues are analyzed below.

## V.     ANALYSIS

A.     <u>The Parties' Arbitration Agreement Requires that the Condition Precedent Must be Met Before Arbitration Can Be Commenced; as a Result, the AAA has no Jurisdiction</u>.

It is axiomatic that the FAA requires that "'private agreements to arbitrate are enforced according to their terms.'" *Stolt-Nielsen SA v. AnimalFeeds International*, 130 S.Ct. 1758, 1763 (2010), citing *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Univ.,* 109 S.Ct. 1248 (1989).

Section 19.2 *requires* the parties to engage in the IDR conference in good faith "before commencing arbitration."  This is a jurisdictional requirement; *i.e.*, the AAA has no jurisdiction over the dispute unless and until this condition precedent is met.  *See, e.g., Ambassador Const. Co. v. 40 Wall St. Dev. Assoc., LLC*, 264 A.D.2d 317, 318 (1st Dep't 1999) ("[D]efendants' right to arbitrate is barred by the failure to comply with a clearly applicable contractual condition precedent.").  *See also, In re Brenda DeLuca Trust*, 108 A.D.3d 902, 903-04 (3d Dep't 2013) (because condition precedent to arbitration had not been met, arbitration properly stayed).

While issues of unconscionability and enforcement of the arbitration agreement or any of its provisions are typically delegated to the arbitrator, that is not the case when the arbitration agreement specifically provides to the contrary.  *See BG Group, PLC v. Republic of Argentina,* 572 U.S. 25, 34 (2014) (the arbitrator may decide procedural preconditions where "the contract is silent on the matter of who is to decide a 'threshold' question about arbitration.").  Temu's arbitration agreement is not silent on the issue of who decides the threshold issue of whether the condition precedent of IDR conferences has been met.  It is unequivocal in delegating that authority to a court.

Section 19.7's delegation clause carves out disputes over whether either party has met any condition precedent, conferring on a court, not an arbitrator, the authority to decide that issue.  Thus, it is up to a court – not merits arbitrators – to determine whether either party complied with § 19.2, including whether either party complied with that section in good faith.  That is because § 19.2 itself requires both parties to engage in the IDR conferences in good faith.  As such, the issue of good faith must be considered by a court when it considers compliance with § 19.2.

Claimants assert that Temu's failure to engage in the IDR conferences in good faith constitutes a waiver of the condition precedent, and that only a merits arbitrator can determine whether such a waiver has taken place.  However, waiver is "the intentional relinquishment of a known right."  *Hadden v. Consolidated Edison Co.,* 45 N.Y.2d 466, 469 (N.Y. 1978).  It cannot be said, based on this record, that Temu intentionally relinquished its right to IDR conferences.  In fact, its very insistence on IDR conferences in this proceeding demonstrates its intention to assert that right.  Instead, the issue is whether Temu – or the Individual Claimants – engaged in the IDR conferences in good faith, which, as explained *supra,* is up to a court to decide.

    B.    <u>The Court May Consider Enforceability of Section 19.2 When it Considers Whether the Condition Precedent has been Met</u>.

Because the AAA does not have jurisdiction at this time over the dispute, no merits arbitrator has jurisdiction to consider the question of whether § 19.2 is unenforceable because it is unconscionable, notwithstanding the arbitration agreement's grant of exclusive authority to the arbitrator to consider the issue of enforceability (*see* § 19.7).

Instead, a court, which does have jurisdiction over the issue of whether the condition precedent has been met, may consider Claimants' argument that they did not comply with the provision because it is unconscionable.   Unconscionability of a contractual provision is a defense to a claim of non-compliance with that provision.  *See Ng v. HSBC Mortg. Corp.,* 2011 WL 3511296, at *8 (E.D.N.Y. 2011) ("Under New York law, unconscionability is an affirmative defense to the enforcement of a contract").

Temu has stated in its supplemental briefing that it "Temu will litigate that issue [unconscionability] in court and *will not* argue that must be decided by an arbitrator . . . ." *Temu's Supplemental Brief* at p. 5 (emphasis in the original).  Thus, a court will have in front of it

the entirety of the parties' arguments, including the Individual Claimants' contention that they should not have to comply with the condition precedent of the IDR conferences because that requirement is unconscionable.

      C.      <u>The Issue in Front of the Court in *Hu* is Distinguishable from this Matter</u>.

In *Hu v. Whaleco* (23-cv-06962), a putative class action, the plaintiffs are resisting arbitration on Temu's motion to compel. Here, the Individual Claimants want to proceed with arbitration, but argue that they should not have to comply with the precondition of the IDR conferences. Although enforceability may be in contention in both cases, the issues are distinguishable.

### VI.    CONCLUSION

For the foregoing reasons, the AAA currently does not have jurisdiction over this dispute. Because it lacks jurisdiction, Respondents are not required to pay any future fees to the AAA. Only a court can consider the issue of whether the condition precedent of the IDR conferences have met, including the issues of whether § 19.2 is enforceable and whether the parties engaged in the IDR process in good faith.

IT IS SO ORDERED.                September 19, 2024

Dana Welch
Process Arbitrator

# EXHIBIT 16



**Michael Kind <mk@kindlaw.com>**

---

## Re: Re:[## 82114 ##] Temu
1 message

---

**Haim Benoliel** <hb@kindlaw.com>                                                          Fri, Jan 5, 2024 at 1:02 PM
To: "McTigue Jr., Michael W" <Michael.McTigue@skadden.com>
Cc: Michael Kind <mk@kindlaw.com>, "Slawe, Meredith C" <Meredith.Slawe@skadden.com>

Mike,

As a follow up to our conversation, we are amenable to mediation with Bob Meyer. The alternative we mentioned is Marty Scheinnman - https://scheinmanneutrals.com/martin-scheinman-2/.

Thanks,
Haim



8860 S. Maryland Parkway, Suite 106, Las Vegas, Nevada 89123
Direct: (212) 470-2103
Toll Free: (844) 399-KIND (5463)
Fax: (702) 329-5881
https://kindlaw.com

**CONFIDENTIALITY NOTICE AND WARNING**:

This email (including all attachments) is privileged and may contain confidential information that is only intended to be viewed by intended recipients. If you received this email in error, please notify me immediately and delete the message. I do not waive any rights, privileges, or the confidentiality of the email's content. Any dissemination of this communication is strictly prohibited, without my written consent. Thank you for your cooperation.

# EXHIBIT 17

AMERICAN ARBITRATION ASSOCIATION
CONSUMER ARBITRATION TRIBUNAL

**Individual Claimants v. Whaleco, Inc.**
**Case No. 01-24-0003-3726**

Scheduling Order No. 1

On July 26, 2024, counsel for the parties appeared in front of the undersigned Process Arbitrator.  Michael Kind of Kind Law appeared for the Individual Claimants.  Serrin Turner and Matthew P. Valenti of Latham & Watkins LLP appeared for Respondent Whaleco, Inc.  Krista Peach, Assistant Vice President, American Arbitration Association ("AAA"), also attended.  The following is the Order of the Process Arbitrator.

1. The following issues are before the Process Arbitrator:

   a. Whether the issue of enforceability of § 19.2 of Temu's Terms of Use is a defense to the question of whether the Individual Claimants have satisfied the Informal Dispute Resolution ("IDR") precondition to arbitration.  In that event, pursuant to § 19.7 of Temu's Terms of Use, a court must decide whether the precondition has been met.  Alternatively, whether the issue of enforceability of § 19.2 of Temu's Terms of Use must be decided prior to any determination of whether the IDR precondition has been met, in which case, merits arbitrators must decide the issue of enforceability.

      i. The issue of whether or not either party engaged in good faith in the IDR process is part of determination of whether the Individual Claimants have met the IDR precondition, and is therefore not before the Process Arbitrator.  It is for a court to determine.

     b.   Whether the Individual Claimants have met AAA's filing requirements so that

Respondent must pay its portion of the applicable initiation fee.

2.   The parties shall file simultaneous briefs addressing the above issues.  The briefs shall be

no more than 10 pages, double-spaced, and shall be filed by 5 p.m. PT on August 9, 2024.

IT IS SO ORDERED.                              July 26, 2024

Dana Welch
Process Arbitrator